IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 07-166C (Judge C.O.C. Miller)

PAUL E. DOLAN

Plaintiff,

v.

THE UNITED STATES

Defendant,

# PLAINTIFF'S APPENDIX
VOLUME 3

August 3, 2007

John A. Wickham, Esq.
32975 Saint Moritz Drive
Evergreen CO 80439-6720
(303) 670-3825
Counsel for plaintiff

APPENDIX TABLE OF CONTENTS

Army Regulation
AR 635-100, *Personnel Separations: Officer Personnel* (1989), with Interim Change IO5 (1993)....................36-42

Army Regulation
AR 135-175, *Army National Guard and Army Reserve: Separation of Officers* (1987)....................43-45

Army Regulation
AR 635-40, *Personnel Separations: Physical Evaluation for Retention, Retirement or Separation* (1990)....................46-76

Army Regulation
AR 40-501, *Medical Services: Standards of Medical Fitness* (2004) [prior issue unavailable, revisions not relevant]....................77-91

Department of Defense Instruction
DODI 1332.18, *Separation or Retirement for Physical Disability* (1996)....................92-98

Department of Defense Instruction
DODD 1332.38, *Physical Disability Evaluation* (1996)....................99-102

Army Regulation
AR 40-400, *Medical Services: Patient Administration* (2006) [prior issue unavailable, revisions not relevant]....................103-106

Federal Statutes, Title 10

§ 1074. Medical and dental Care for members....................107-109

§ 1201. Regulars and members on active duty for more than 30 days; [disability] retirement....................110-111

§ 1202. Regulars and members on active duty for more than 30 days; temporary disability retired list....................112

§ 1203. Regulars and members on active duty for more than 30 days; separation....................113-114

§ 1214. Right to full and fair hearing....................114

APPENDIX TABLE OF CONTENTS (continued)

Federal Statutes, Title 10

§ 10209. Regular and reserve components: discrimination prohibited.........................................115

Headquarters,
Department of the Army
Washington, DC
23 July 1993

**Immediate Action**
**INTERIM CHANGE**

AR 635-100
Interim Change
No. I05
Expires 23 July 1995

Personnel Separations

Officer Personnel

---

JUSTIFICATION. This interim change is necessary to implement the Warrant Officer Management Act (WOMA) as contained in the FY92, National Defense Authorization Act. Implements policy concerning release from active duty/discharge of warrant officers, W1 who fail to complete the Warrant Officer Basic Course.

EXPIRATION. This interim change expires two years from the date of publication and will be destroyed at that time unless sooner superseded or rescinded.

1. AR 635-100, 1 May 1989; Interim Change I01, 25 July 1991; and Interim Change I02, 26 June 1992 are changed as follows:

Page 2. Interim Change I02, paragraph 1-9, last sentence is amended to read "See DODPM, Part 4, Chapter 4, Section B, Paragraphs 40411 through 40416, 1 January 1993, for entitlements to non-disability separation pay."

Page 6. Paragraph 3-2c is deleted.

Page 9. Section II, title is amended to read "Release from Active Duty and Termination of Reserve Appointments of Student Officers and Warrant Officers Attending Branch Orientation, Familiarization Courses, or Warrant Officer Basic Course."

Page 9. Paragraph 3-19, line 1 is amended to add subparagraph "a." in front of the word "Officers" and to add subparagraph b as follows:

b. Effective 1 October 1992, WO, W1 appointed contingent upon successful completion of the Warrant Officer Basic Course (WOBC) will be REFRAD or process for discharge as appropriate if--

(1) Eliminated from the WOBC for failure to meet conduct, moral, professional, academic, or leadership standards.

(2) They are Reserve component WO, W1 who are serving on active duty or fail to successfully complete the WOBC within 2 years of appointment (3 years with HQDA (DAAR-PE or NGB-ARP-PO) waiver).

Page 11. Interim Change I01, paragraph 3-30b, lines 4 and 5 are amended to delete "AUS" and to add "Active Duty List", line 6 amended to delete "and CW4" and to add, "CW4, and CW5" after "CW3."

Page 11. Interim Change I01, paragraph 3-30b(1)(b), line 1 is amended to delete "or CW4" and to add "CW4 or CW5."

Page 11. Interim Change I01, paragraph 3-30b(1)(c), line 5 is amended to delete "AUS" and to add "active duty list." Line 5 is further amended to delete "or CW4" after "CW3", and to add "CW4, or CW5" after "CW3."

Page 14. Paragraph 3-53a, line 2 is amended to add "and warrant officers" after the word "officers."

Page 14. Paragraph 3-53c, lines 2 and 3 are amended to delete "11th through 28th words."

Page 14. Paragraph 3-55, line 1 is amended to change "PERSCOM" to read "Cdr, ARPERCEN."

Page 14. Section XIV, paragraphs 3-56 through 3-58 , entire section is rescinded.

Page 20. Paragraph 3-98 is superseded as follows:

a. Except as indicated in b through g below, Active Duty List (ADL) reserve component commissioned officers and warrant officers will be released from active duty as indicated in (1) and (2) below when not selected for promotion on the ADL.

(1) Reserve commissioned officers twice failed of selection for ADL promotion to captain, major, or lieutenant colonel will be released from active duty on the first day of the seventh month after approval of the report of the second board which did not recommend these officers for promotion, unless earlier release is voluntarily requested, or retention on active duty in a Reserve status is approved by the Secretary of the Army or his or her designee.

(2) Reserve warrant officers twice failed of selection for ADL promotion to grade of chief warrant officer CW3, CW4, or CW5 will be released from active duty on the first day of the seventh month after approval of the report of the second board which did

**Headquarters**
**Department of the Army**
**Washington, DC**
**1 May 1989**

***Army Regulation 635–100**

**Effective 1 June 1989**

**Personnel Separations**

# Officer Personnel

This UPDATE printing publishes a revision of this publication. Because the publication has been revised the changed portions have not been highlighted.

By Order of the Secretary of the Army:

CARL E. VUONO
*General, United States Army*
*Chief of Staff*

Official:

MILTON H. HAMILTON
*Administrative Assistant to the Secretary of the Army*

**Summary.** This regulation provides policies and procedures for separating officers (to include non-disability retirement) from active duty. It also implements DOD Directive 1332.20 and DOD Directive 1332.30.

**Applicability.** This regulation is applicable to all Regular Army officer personnel and Reserve Component officer personnel on active duty, or, if specified by particular provisions of this regulation, active duty for training, United States Army Reserve (USAR), or the Army National Guard (ARNG). Unless otherwise specifically provided, the provisions of this regulation are binding on field commanders but not on Headquarters, Department of the Army (HQDA). Nonstatutory exceptions to the provisions of this regulation will be approved by the Assistant Secretary of the Army for Manpower and Reserve Affairs or his or her designated representative.

**Impact on New Manning.** This regulation does not contain information that affects the new manning system.

**Internal control systems.** This regulation is subject to the requirements of AR 11–2. It contains internal control provisions but does not contain checklists for conducting internal control reviews. These checklists are being developed and will be published at a later date.

**Supplementation.** Supplementation of this regulation and establishment of command and local forms are prohibited without prior approval from the U.S. Total Army Personnel Command (TAPC–OPP–M), Alexandria, VA 22332–0418.

**Interim changes.** Interim changes to this regulation are not official unless they are authenticated by the Administrative Assistant to the Secretary of the Army. Users will destroy interim changes on their expiration date unless sooner superseded or rescinded.

**Suggested Improvements.** The proponent agency of this regulation is the Office of the Deputy Chief of Staff for Personnel. Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to Cdr, PERSCOM (TAPC–OPP–M), Alexandria, VA 22332–0418.

**Distribution.** Distribution of this publication is made in accordance with the requirements on DA 12–09–E, Block number 3569, intended for command level A for Active Army, B for ARNG, and A for USAR.

**Contents** (Listed by paragraph number)

**Chapter 1**
**General**
Purpose • 1–1
References • 1–2
Explanation of abbreviations and terms • 1–3
Responsibilities • 1–4
Discharge certificates • 1–5
Character of service • 1–6
Report of Separation from Active Duty (DD Form 214) • 1–7
Action required before the involuntary separation of officers with access to special intelligence, other compartmented information, or sensitive programs • 1–8

**Chapter 2**
**Separation of Officers in Foreign Countries**
Scope • 2–1
Officers confined pursuant to the sentence of a foreign court • 2–2
Separation while under investigation or sentenced but not confined by foreign courts • 2–3
Personnel eligible for return from overseas for discharge or release from active duty • 2–4

**Chapter 3**
**Release from Active Duty of Non-Regular Commissioned and Warrant Officers**

*Section I*
*General*
Scope • 3–1
Statutory authority • 3–2
Separation approval authority • 3–3
Years of service • 3–4
Adverse matters • 3–5
Officers under investigation • 3–6
Travel • 3–7
Medical/dental care required, or sick in hospital when period of service expires • 3–8
Officers on active duty for training (ADT) • 3–9
Investigation of court-martial charges or trail by court-martial pending • 3–10
Indebtedness • 3–11
Dual status officers • 3–12
Medical examination • 3–13
Leave • 3–14
Status on and after separation • 3–15
Processing applications • 3–16
Assignment of personnel to transfer activities • 3–17

*This regulation supersedes AR 635–100, 19 February 1969.

**3–46. Procedures**

*a.* Provisions of paragraph 3–16 apply as appropriate.

*b.* Applications from officers otherwise eligible to receive readjustment pay will include the following statement: "I understand that this request for early release from active duty, if approved will constitute release under voluntary conditions and will preclude my entitlement to readjustment pay."

## Section XI
## *Expiration of Active Duty Commitment*

**3–47. General**

Officers who decline to request extension of service under AR 135–215 and officers whose requests for extension of service have been disapproved by HQDA, will be released from active duty in sufficient time to arrive at their home not later than 2400 hours on the day of completion of their tours of service. This section is also applicable to six months active duty for training personnel.

**3–48. Authority**

*a.* Separation approval authorities will ensure that officers under their jurisdiction are released as scheduled except officers serving in dual status who will be reported to Cdr, PERSCOM (TAPC–PDT–RS) according to paragraph 3–14.

*b.* Officers not under the jurisdiction of a commander having separation approval authority will be reported to Cdr, PERSCOM (TAPC–PDT–RS) not later than 60 days prior to scheduled date of release from active duty for issuance of orders for assignment to a transfer activity according to paragraph 3–17.

*c.* The authority for separation will be cited as follows:

(1) Officers serving with their consent, who decline further service: AR 635–100, para 3–48*c*(1) and SPD in AR 635–5–1.

(2) Officers serving without their consent, who decline further service: AR 635–100, para 3–48*c*(2) and SPD in AR 635–5–1.

(3) Expiration of active duty commitment due to disapproval of voluntary indefinite service: AR 635–100, para 3–48*c*(3) and SPD in AR 635–5–1.

## Section XII
## *Involuntary Release from Active Duty*

**3–49. General**

Officers will be involuntarily released from active duty on the recommendation of the DA Active Duty Board (DAADB) for misconduct, moral or professional dereliction and/or when their degree of efficiency and manner of performance or the needs of the service require such action. The CG, PERSCOM will operate the DAADB.

*a.* Whenever evidence reveals that—

(1) An officer has committed a significant act of misconduct or moral or professional dereliction.

(2) The officer's degree of efficiency and manner of performance require release from active duty or elimination from the service, action will be taken as stated in *b* and *c* below.

*b.* The records of the officers together with all available evidence, will be obtained by the CG, PERSCOM, The Judge Advocate General, or the Chief of Chaplains, as appropriate, and forwarded without recommendation to Cdr, PERSCOM (TAPC–OPP–M).

*c.* The CG, PERSCOM (TAPC–OPP–M) will forward these records and evidence, without recommendation, to the DAADB for consideration for release from active duty and elimination from the service, in the prescribed guidance and criteria.

*d.* Officer records will be screened annually by the CG, PERSCOM, The Judge Advocate, or the Chief of Chaplains, as appropriate, to determine whether any officers other than those referred to in *b* and *c* above should be considered for release from active duty, or elimination from the service for the reasons stated in *a* above.

(1) If it is determined that any officers should be considered by a DAADB, the records and evidence will be forwarded, without recommendation, by the CG, PERSCOM, The Judge Advocate or the Chief of Chaplains, as appropriate, to the CG, PERSCOM (TAPC–OPP–M).

(2) The CG, PERSCOM (TAPC–OPP–M) will forward these records and evidence, without recommendation, to the DAADB for consideration for release from active duty or elimination from the service, in the prescribed guidance and criteria.

*e.* On initiation of an action by an agency (*b, c* or *d* above) a DA Form 268 (Report to Suspend Favorable Personnel Actions) will be prepared and distributed according to AR 600–8–2.

*f.* Actions on officers in *a* through *c* above which are recommended by the DAADB for release from active duty and elimination from the service will be released from active duty by HQDA, and will be processed for consideration for elimination under the provisions of AR 135–175 or NGR 635–101, as appropriate.

*g.* When budgetary or authorization limitations require a reduction of officer strength, a DAADB will be convened to determine which officers will be released from active duty. The CG, PERSCOM, The Judge Advocate General, Chief of Chaplains, or any of these offices, using prescribed criteria may be required to forward officer records, without recommendation, for consideration by the Board. Officers designated for release under this paragraph are not considered ineffective or substandard in duty performance. Their release is dictated by the needs of the Service.

*h.* Each officer considered under *a* through *c* above will be notified in writing that his or her records and any other available evidence are being transmitted to the DAADB for consideration and will be informed of the criteria which his or her records were submitted. The letter of notification will outline the criteria furnished the Board for guidance in selecting officers for separation. Each officer will have the right to submit appropriate written material for the DAADB's consideration regarding his or her case, and the officer concerned or a designee will be afforded the opportunity to review all of the officer's personnel records and any other written material which will be submitted to the DAADB for evaluation.

*i.* The decisions of these boards are final.

*j.* Officers designated for release under this section may be released from active duty on any date between the date of notification and the 90th day after receipt of notification by the officer concerned. The officer will not be released prior to the 90th day without his or her consent. Notwithstanding the foregoing, any officer designated for release by reason of a finding which includes misconduct, moral or professional dereliction will be released not earlier than five days nor later than 14 days after receipt by the command of the notification that the officer is to be released. The statement in figure 3–2 will be completed and signed by the officer concerned and placed in his or her DA Form 201 (US Army Military Personnel Records Jacket) as a permanent document.

*k.* Officers who will complete 18 of more years of active Federal service on their scheduled release date will not be processed under this section, unless such action is approved by the Secretary of the Army, but will be retained on active duty until the last day of the month following the month they complete 20 years of active Federal service.

*l.* Release from active duty under this section is involuntary; therefore, release prior to the 90th day after notification will have no effect on entitlement to separation pay.

*m.* Notwithstanding the above provisions, an officer who is found guilty, or action is taken which is tantamount to a finding of guilty, by any Federal or State court may be released by the Secretary of the Army from active duty immediately when the offense—

(1) Is punishable under the Uniform Code of Military Justice by a maximum penalty of death or confinement for one year or more. If the offense is not listed in the Manual for Courts-Martial, 1984, Table of Maximum Punishments, or is not closely related to an offense listed therein, the maximum punishment authorized by The United States Code or the District of Columbia Code, whichever is lesser, applies; or

(2) Involves moral turpitude, regardless of the sentence received or maximum punishment permissible under any code. The release of officers under this provision who have completed 18 or more years of active Federal service on the date the officer is

found guilty, must be approved by the Secretary of the Army. If the finding of guilty is subsequently set aside, the officer may, with his or her consent and the approval of the Secretary of the Army, be returned to active duty.

### 3–50. Action by commanding officers

*a.* Commanders at all echelons will submit actions on officers, whose manner of performance of duty when compared with their contemporaries, indicates a lack of justification for retention on active duty, through channels to Cdr, PERSCOM (TAPC–OPP–M), The Judge Advocate General, the Chief of Chaplains, as appropriate. An action may be submitted at any time and will be accompanied with details of the reasons for recommendation of the officer for release from active duty.

*b.* On initiation of an action, the commander will prepare and distribute DA Form 268 according to AR 600–8–2.

*c.* On receipt in PERSCOM, actions will be processed according to paragraph 3–49*d*(2) or (3), as appropriate.

*d.* Prior to forwarding a recommendation, the initiating commander will refer the action for comment or rebuttal to the officer being recommended for release from active duty. (See AR 600–37.) Specific reasons for the recommendation will be presented in writing to the officer concerned. No reasons will be added after the officer's review, without further referral to the officer.

*e.* Heads of staff agencies may when appropriate, initiate a recommendation for an officer's release from active duty under this section. On initiation of an action, a DA Form 268 will be prepared according to AR 600–8–2. This provision also applies to officers who are pregnant and whose substandard performance of duty is not solely attributable to the condition of pregnancy; for example:

(1) Failure to perform prescribed duties due to defective attitude rather than physical limitation.

(2) Failure to report to duty without medical or military authorization.

(3) Refusal of CONUS reassignment during the first six months of pregnancy.

### 3–51. Authority

*a.* Commanders specified in paragraph 3–3 are responsible to effect the timely separation of officer notified of involuntary release from active duty under this section.

*b.* Separation approval authorities are authorized to effect earlier release, with the consent of the officer concerned. This authority may not be further delegated.

*c.* The authority for separation is AR 635–100, paragraph 3–49*a*, *b*, and *g*, as applicable and SPD shown in AR 635–5–1 will be cited.

### 3–52. Procedures

Officers to be released from active duty under this section will be notified through appropriate commander by PERSCOM (TAPC–PDT–RS).

## Section XIII
## Failure of Selection for Permanent Reserve Promotion

### 3–53. General

*a.* The provisions of this section do not apply to commissioned officers on the active duty list (AR 624–100 and 10 USC 620). Except as indicated in *b* through *e* below, the following officers will be released from active duty and discharged on the 120th day after receipt of involuntary release notification, unless earlier release is voluntarily requested, or transferred to the Retired Reserve, if requested and eligible under AR 140–10. Officers with a remaining service obligation will be transferred to the Ready Reserve.

(1) Reserve commissioned officers serving on active duty as commissioned officers, who fail a second time to be selected for promotion to permanent Reserve grade of captain, major, or lieutenant colonel.

(2) Reserve warrant officers serving on active duty as warrant officers who fail a second time to be selected for promotion to permanent grade of W3 or W4.

*b.* Reserve commissioned officers holding the permanent Reserve grade of second lieutenant and serving on active duty as commissioned officers who are not promoted to the permanent Reserve grade of first lieutenant on or before date of completion of three years promotion service will be released from active duty and discharged on date of completion of such service unless they have a service obligation. Those serving an obligated period of active duty will be retained on active duty until completion of this obligation.

*c.* Reserve warrant officers holding the permanent Reserve grade of W1 and serving on active duty as warrant officers who are not promoted to the permanent grade of W1 and serving on active duty as warrant officers who are not promoted to the permanent Reserve grade of W2 on or before date of completion of three years promotion service, will be released from active duty and discharged on date of completion of such service unless they have a service obligation. Those serving an obligated period of active duty will be retained on active duty until completion of obligation.

*d.* Officers who are within two years of qualifying for retirement under chapter 4 (20 years active Federal commissioned service) on their scheduled release date, and who can so qualify prior to attaining maximum ages specified in this chapter, section VI, will be retained on active duty until the last day of the month following the month they qualify for such retirement.

*e.* An officer eligible for retirement under chapter 4 may apply for retirement to be effective not later than the first day of the month following the month which release is directed.

### 3–54. Authority

*a.* Commanders specified in paragraph 3–3 will ensure necessary action is taken to effect release from active duty and discharge or transfer to the Ready or Retired Reserve, on scheduled date of release, of officers notified of mandatory release under this section. Dual status officers will be reported to Cdr, PERSCOM (TAPC–PDT–RS) according to paragraph 3–12.

*b.* Separation approval authorities are authorized to take final action on requests for earlier release, except on requests from officers serving in dual status will be forwarded to Cdr, PERSCOM (TAPC–PDT–RS) as required by paragraph 3–12. This authority may not be further delegated.

*c.* The authority for separation will be cited as follows:

(1) Officers released and transferred to Ready or Retired Reserve; AR 635–100, chapter 3, section XIII and SPD shown in AR 635–5–1.

(2) Officers released and discharged: AR 635–100, chapter 3, section XIII and SPD shown in AR 635–5–1.

### 3–55. Procedures

Letters of notification will be dispatched by PERSCOM, to appropriate commanders. The statement will be completed by the officer concerned and dispatched immediately to the addresses indicated. One copy of the statement will be filed in the officer's DA Form 201 until his or her release from active duty or retirement, as applicable, has been effected.

## Section XIV
## Failure of Selection for Promotion of Warrant Officers on the Active List

### 3–56. General

*a.* Except as indicated in *b* through *g* below, the following warrant officers will be released from active duty on the 90th day after receipt of involuntary release notification unless earlier release is requested:

(1) Reserve warrant officers serving on active duty as warrant officers who are twice reported by a DA Promotion Selection Board as not recommended for promotion to temporary AUS

grade of chief warrant officer W3 or W4 provided there are at least nine months between the adjournment dates.

(2) AUS warrant officers who are twice reported by a DA Promotion Selection Board as not recommended for promotion to temporary AUS grade of chief warrant officer W3 or W4 provided there are at lease nine months between the adjournment dates.

(3) Reserve warrant officer W1, who are considered by promotion authorities (AR 624–100, para 3–2) for temporary promotion to chief warrant officer, CW2, and are nonselected (AR 624–100, para 3–7).

*b.* Officers having 90 days or less remaining to serve on active duty as reflected by a current service agreement due to denial or declination of further active duty, and officers who have been notified of their impending involuntary release from active duty under any other provisions of laws or regulations, are not subject to this section.

*c.* An officer eligible for retirement under chapter 4 may apply for retirement, to be effective not later than the first day of the month following the month which release is directed.

*d.* Officers who will complete 18 or more years of active Federal service on their scheduled release date will not be processed under this section, unless such action is approved by the Secretary of the Army. They will be retained on active duty until the last day of the month following the month which they complete 20 years Active Federal service.

*e.* An officer whose case is referred by a DA Special Selection Board for reconsideration for promotion under AR 624–100, paragraph 2–8c will continue to be processed for separation as scheduled. If the reconsideration by the board has not been completed by the scheduled separation date, PERSCOM (TAPC–PDT–RS) will direct the temporary suspension of the officer's separation pending receipt of the results of the reconsideration. If after the originally scheduled release date the board's decision is unfavorable, the officer will be designated for release no later than 30 days from receipt of notification by the officer concerned.

*f.* Warrant officers in the grade of CW2 or CW3 who are selected for continuation on active duty by a DA Selective Continuation Board are not subject to release from active duty under this section.

### 3–57. Authority

*a.* Separation approval authorities (para 3–3 or AR 624–100) (para 3–2 (for nonselect Reserve warrant officers W1 to temporary CW2)) will ensure that necessary action is taken to effect the separation on the scheduled date of release from active duty of officers notified of promotion failure under this section or AR 624–100, paragraph 3–7.

*b.* Separation approval authorities (para 3–3, or AR 624–100, para 3–2 (for nonselect Reserve warrant officers W1 to temporary CW2)) are authorized to take final action on requests for earlier release, except for dual status officers. Requests from dual status officers will be forwarded to Cdr, PERSCOM (TAPC–PDT–RS) as required by paragraph 3–12. These authorities may not be further delegated.

*c.* The authority for separation is this chapter, section XIV and SPD shown in AR 635–5–1 will be used.

### 3–58. Procedures

Letters of notification, (except for nonselected Reserve warrant officers W1), and if applicable, "Acknowledgement of Notification of Second Nonselection for Temporary Promotion" statement will be dispatched by Cdr, PERSCOM (TAPC–PDT–RS) to commanders specified in paragraph 3–3. The statement will be completed by the officer concerned and dispatched immediately to the address indicated. One copy of the statement will be filed in the officer's OMPF until the officer's release from active duty or retirement, as appropriate, has been effected. For Reserve warrant officers W1 who are nonselected for promotion to temporary CW2, letters of notification will be dispatched by authorities stated in AR 624–100, paragraph 3–2.

## Section XV
## Release from Active Duty Pending Appellate Review

### 3–59. General

*a.* An officer holding a current appointment in the ARNG or the USAR which will not expire on release from active duty who is sentenced to dismissal (commissioned officer) or dishonorable discharge (warrant officer) without confinement may be released from active duty on approval of the sentence by the reviewing authority and prior to completion of appellate review. Officers may be placed on excess leave in lieu of release from active duty according to AR 630–5.

*b.* An officer holding a current appointment in the ARNG or USAR which will not expire on release from active duty who is sentenced to dismissal (commissioned officer) or dishonorable discharge (warrant officer) and confinement has been served prior to completion of appellate review will be released from active duty on completion of confinement.

*c.* Any officer or warrant officer released from active duty under provisions of paragraph 3–59*a* or *b* above, in whose case final action does not include execution of the dismissal or dishonorable discharge, will be returned to active duty with his or her consent in the grade held at the time of release and with the same service commitment the officer had at the time of release.

### 3–60. Authority

*a.* Release from active duty will be effected according to instructions issued by Cdr, PERSCOM (TAPC–PDT–RS).

*b.* The authority for separation is AR 635–100, chapter 3, section XV and SPD shown in AR 635–5–1 will be used.

### 3–61. Procedures

*a.* Immediately on approval of a sentence to dismissal or dishonorable discharge and no confinement in the case of an ARNG or USAR commissioned or warrant officer, the general court-martial reviewing authority will notify CDR, PERSCOM, ALEX VA//TAPC–PDT–RS// by electrical means. When the officer is to be returned to continental United States under *d* below, the appropriate CONUS transfer activity will be included as information addressee.

*b.* Not later than two weeks prior to completion of confinement in the case of an ARNG or USAR commissioned or warrant officer sentenced to dismissal or dishonorable discharge and confinement, but whose sentence has not been finally approved, commanders of confinement facilities will notify CDR PERSCOM by electrical means.

*c.* The above notifications are exempt from reports control under AR 335–15, chapter 7 and will include the following:

(1) Name, grade, SSN, branch and assignment.

(2) Date and source of general court-martial order, and sentence as approved.

(3) Date of release from confinement.

(4) Date of departure, mode of travel, transportation terminal and estimated time of arrival, if being returned from oversea command under *d* below.

*d.* Following transmission of required reports, affected officers stationed oversea may be returned to the appropriate CONUS transfer activity to await receipt of instruction from CG PERSCOM.

*e.* A letter of instructions directing the release from active duty in each case will be dispatched by PERSCOM to the appropriate commander. The following statement will be included in reassignment orders directing an individual to report to a transfer activity for separation: "Pursuant to the provision of the Uniform Code of Military Justice, Manual for Court-Martial, 1984", officer could be retained in the service pending final action on the court-martial charges under which he or she stands convicted. The fact that he or she is being released from active duty shall not effect or be construed to effect, constructively or impliedly, any condonation or pardon of the offense or offenses under which he or she stands convicted, or remission, in whole or in part, of the sentence adjudged against him or her. The period of service from which he or

his or her own defense. If it is determined that the officer is suffering from an incapacitating mental illness, the examiner should indicate whether that illness was probably the cause of the conduct under investigation.

### 5–8. Medical evaluation when homosexuality is involved

*a.* Medical evaluation of officers considered for separation under paragraph 5–11*a* (6) will include a mental status evaluation, to be accomplished by the examining physician. DA Form 3822–R (Report of Mental Status Evaluation) will be used for this purpose. A psychiatric study of the officer is not required unless:

(1) Specifically requested by the officer.

(2) Deemed appropriate by the examining physician.

(3) Specifically requested by the commander who recommended separation or by the selection board or board of inquiry, as applicable.

(4) Psychiatric diagnosis, including an opinion whether the officer was able to distinguish right from wrong and adhere to the right at the time of the conduct under investigation, and whether he or she currently has the mental capacity to understand board and judicial proceedings and participate in his or her own defense. If it is determined that the officer is suffering from an incapacitating mental illness, the examiner should indicate whether the illness was probably the cause of the homosexual conduct under investigation.

*b.* A copy of the medical evaluation, to include the psychiatric study (if any), will be filed with the individual's health record. The medical treatment facility commander will forward the original of this evaluation report to the unit commander.

## Section IV
## Reasons which Authorize Elimination

### 5–9. General

Retention of officers who are substandard in performance of duty or conduct, deficient in character, wanting in professional qualifications or status, or otherwise unsuited for military service cannot be justified in peace or war. The same standards of efficiency and conduct are applicable to officers regardless of component.

### 5–10. Substandard performance of duty

While not all-inclusive, existence of one of the following or similar conditions, unless successfully rebutted, authorizes elimination of an officer due to substandard performance of duty.

*a.* Downward trend in overall performance resulting in an unacceptable record of efficiency or a consistent record of mediocre service.

*b.* Failure to keep pace or to progress with contemporaries as demonstrated by a low record of efficiency when compared with other officers of the same grade, and competitive category (AR 624–100). An officer who is identified by an active duty list promotion board (convened according to 10 USC 611a) as "not fully qualified" for promotion will be recommended for elimination under this paragraph, as provided for by the Secretary of the Army in the memorandum of instructions to the promotion board.

*c.* Failure to exercise necessary leadership or command expected of an officer of his or her grade.

*d.* Failure to assimilate technical proficiency required of his or her grade and competitive category (AR 624–100).

*e.* Failure to discharge properly assignments commensurate with his or her grade and experience.

*f.* Apathy, defective attitudes, or other character disorders to include inability or unwillingness to expend effort.

*g.* Failure to respond to rehabilitation efforts regarding an alcohol or other drug problem in a reasonable length of time.

*h.* Failure to conform to prescribed standard of dress, personal appearance, and military deportment.

(I) Failure to achieve security [illegible]
(J) when nonmedical [illegible]
[illegible] 28 June 82

### 5–11. Misconduct, moral or professional dereliction or in interests of national security

*a.* While not all inclusive, existence of one of the following or similar conditions, unless successfully rebutted, authorizes elimination of an officer due to misconduct, moral or professional dereliction or in the interest of national security:

(1) Discreditable or intentional failure to meet personal financial obligation.

(2) Mismanagement of personal affairs detrimentally affecting the performance of duty of the officer concerned.

(3) Mismanagement of personal affairs to the discredit of the service.

(4) Intentional omission or misstatement of fact in official statements or records, for the purpose of misrepresentation.

(5) Acts of personal misconduct (including, but not limited to, acts committed while in a drunken or drug intoxicated state).

(6) Homosexuality (see sec XIV).

(7) Intentional neglect of or failure to perform duties.

(8) Conduct unbecoming an officer.

(9) Conduct or actions resulting in the loss of a professional status, such as withdrawal, suspension of abandonment of professional license, endorsement, or certification which is directly or indirectly connected with the performance of one's military duties and necessary for the performance, including withdrawal of clinical privileges for Army Medical Department (AMEDD) officers.

(10) Acts or behavior not clearly consistent with the interest of national security (see AR 604–10 for substantive criteria).

(11) Conduct or actions by a warrant officer resulting in the loss of special qualifications (such as withdrawal/revocation of CID accreditation, revocation of marine qualification license, removal from the Personnel Reliability Program (PRP), withdrawal of clinical privileges or loss of flying status) which directly or indirectly precludes a warrant officer from performing in his or her MOS and is necessary for the performance. Elimination based on the reasons may not be utilized if reclassification action is feasible and in the best interest of the service or if loss of special qualifications was due to medical reasons beyond the control of the warrant officer.

(12) Failure to respond to rehabilitation efforts regarding repeated acts of child/spouse maltreatment or abuse and/or other acts of family violence in a reasonable length of time.

*b.* When one or more of the reasons enumerated in a (1) through (7) above is alleged, if the circumstances which form the basis indicate that the reason in item (8) also is involved, it will constitute additional reason for requiring elimination.

### 5–12. Derogatory information

*a.* Any one of the following or similar reasons gives rise to serious doubt as to the advisability of permitting the officer concerned to retain a commission or warrant and requires a review of his or her overall record. This is to determine if such derogatory information, when viewed in conjunction with other aspects of his or her record, warrants recommendation for elimination.

(1) Punishment under Uniform Code of Military Justice, Article 15.

(2) Conviction by court-martial.

(3) Denial of security clearance (see para 5–33*b*).

(4) An officer evaluation report (OER) under AR 623–105, paragraph 5–18 or 5–25.

(5) Adverse information filed in the OMPF according to AR 600–37.

(6) Failure by a RA officer of a course at a service school. For failure by a Reserve Component officer, see chapter 3, section II.

*b.* Standing alone, one of these conditions may not support elimination. On the other hand, it may combine with other known deficiencies to form a pattern which, when viewed in relation to an individual's overall record, requires elimination.

## Section V
## Initiation of Elimination Action for Nonprobationary Officers

### 5-13. Initiation of elimination

*a.* Elimination action may be initiated by—

(1) CG, PERSCOM.

(2) A GOSCA for an officer assigned or attached to his or her command (para 1-3) (Unless specifically withheld by HQDA).

(3) The Deputy Chief of Staff for Personnel, U.S. Army (DCSPER), when recommendations are made by HQDA promotion, school, or command selection boards that an officer should be required to show cause for retention on active duty. The DA, DCSPER, or his or her designated representative in the grade of MG or above, will review such names and decide if referral to a board of inquiry is appropriate. If referral is appropriate, the action will be processed under paragraph 5-14.

(4) Secretary of the Army, Chief of Staff, U.S. Army and officials in their offices as are designated by them. Actions will be processed under paragraph 5-14.

*b.* Unless precluded by paragraph 5-13*d*(4), elimination action will be initiated against an officer who is—

(1) Medically diagnosed as drug dependent.

(2) Identified as having committed an act of personal misconduct involving drugs (see para 5-10 and 5-11).

*c.* Any subordinate commander may recommend the initiation of elimination proceedings under this chapter for an officer in his or her command to the GOSCA for that officer.

*d.* Commanders have the discretion to initiate disciplinary action under the Uniform Code of Military Justice (UCMJ) or to recommend or initiate elimination proceedings under the provisions of this regulation.

(1) The fact that elimination proceedings were initiated when disciplinary action could have been taken will not affect the validity of the elimination proceedings.

(2) Elimination action will not be used in lieu of disciplinary action solely to spare an officer, who may have committed serious misconduct, the harsher penalties which may be imposed under the UCMJ.

(3) Conduct which was the subject of judicial or nonjudicial punishment may be the basis for elimination proceedings under this regulation (but see para 5-3*a*).

(4) Elimination proceedings, however, will not be initiated with respect to conduct which is the subject of UCMJ charges unless the charges are dismissed or appellate review has been completed.

*e.* Regardless of who initiates a recommendation for elimination, the GOSCA will ascertain the identity and whereabouts of Government witnesses and make reasonable efforts to ensure their availability to appear before a board of inquiry.

### 5-14. Initial administrative processing

CG, PERSCOM (for cases initiated under para 5-13*a* (1), (3) or (4)) and GOSCA (for cases initiated under para 5-13*a* (2)) will take the following actions prior to the elimination of an officer under this chapter:

*a.* Notify the officer in writing that elimination has been initiated and that the officer is required to show cause for retention on active duty.

*b.* Advise the officer of the reasons supporting the elimination and the factual allegations supporting the reasons (fig 5-1). Only applicable reasons as outlined in paragraph 5-10 and/or 5-11 which can be supported by specific factual allegations and evidence may be the basis for elimination. Evidence to support the elimination must be able to stand on its own merits. Prior coordination with the servicing judge advocate or legal adviser is required for actions initiated by the GOSCA.

*c.* Advise the officer that he or she may—

(1) Tender resignation in lieu of elimination (AR 635-120, chap 4).

(2) Request discharge in lieu of elimination (RA commissioned officers only) (AR 635-120, chap 8).

(3) Apply for retirement in lieu of elimination, if otherwise eligible for voluntary retirement as stated in paragraph 4-10*d* (1) and (2), (format for voluntary retirement (fig 4-1) will be amended to specifically state that the application is submitted in lieu of elimination).

(4) Appear before a board of inquiry to show cause for retention.

*d.* Advise the officer that he or she has 30 days to acknowledge receipt in writing, to prepare a written statement, and to elect one of the options (para *c* above). The statement—

(1) May be prepared with the assistance of an officer of the Judge Advocate General's Corps (JAGC) or civilian counsel obtained by the officer at no expense to the Government.

(2) Should contain any pertinent facts or submission of any rebuttal bearing on the question of the officer's elimination. Documents submitted in rebuttal must be legible and reproducible.

(3) May be sworn or unsworn.

*e.* Advise the officer of the least favorable discharge that the officer may receive. (Officers separated solely for substandard performance (para 5-11) will receive an honorable discharge. All other officers may receive an under other than honorable discharge.)

*f.* Advise the officer that he or she may consult with the local finance and accounting officer concerning possible entitlement to separation pay.

*g.* Personally sign the memorandum (applicable only to separations initiated by a GOSCA).

*h.* Furnish a copy of the notification memorandum directly to Cdr, PERSCOM (TAPC-OPP-M).

*i.* Initiate a Suspension of Favorable Personnel Action (DA Form 268) according to AR 600-8-2.

*j.* If the officer elects one of the options in *c* (1) through (3) above, the officer will:

(1) Submit the appropriate application for separation in lieu of elimination under paragraph 4-10*d* or AR 635-120, Chapter 4 or 8.

(2) Attach his or her acknowledgement (fig 5-2).

(3) Undergo a separation physical examination within five days from the date the option is chosen.

*k.* Advise the officer that if the officer requests resignation or discharge in lieu of elimination action, he or she will be separated no later than:

(1) Fourteen days after receipt of notification that the request for resignation/discharge was approved, if stationed CONUS.

(2) Twenty-one days after receipt of notification that the request for resignation/discharge was approved, if stationed OCONUS.

### 5-15. Action by CG, PERSCOM and GOSCA

*a.* On receipt of the officer's statement and/or option selection, the CG, PERSCOM or GOSCA will—

(1) Close the case (see para 5-55 for homosexuality cases); (Prior to closing cases initiated under para 5-13*a*(3) or (4), CG, PERSCOM will coordinate with the initiating official.)

(2) If the officer elects one of the options in paragraph 5-14c (1) through (3) above, expeditiously forward the appropriate application and all elimination papers directly to Cdr, PERSCOM (TAPC-OPP-M). (When the GOSCA is not the GCM convening authority, furnish a copy to the GCM convening authority.) The forwarding endorsement will include the direct point of contact for the elimination action to include name and telephone number. Inform the major commander of this action.

(3) If the officer declines to elect the option of resignation, discharge, or retirement in lieu of elimination, refer the case to a board of inquiry. (In those cases initiated under para 5-13*a* (1), (3) or (4), CG, PERSCOM will direct the appropriate GOSCA to appoint the board of inquiry.)

*b.* Prior to forwarding the case to the board of inquiry, the CG, PERSCOM or GOSCA (as appropriate) will ensure that:

(1) With the exception of business entries and official records and reports (e.g., evaluation reports, health records, and CID investigation reports), all statements submitted, including reports of

**Headquarters**
**Department of the Army**
**Washington, DC**
**28 February 1987**

**Army Regulation 135–175**

**Effective 28 February 1987**

**Army National Guard and Army Reserve**

# Separation of Officers

By Order of the Secretary of the Army:

JOHN A. WICKHAM, JR.
*General, United States Army*
*Chief of Staff*

Official:

R. L. DILWORTH
*Brigadier General, United States Army*
*The Adjutant General*

**History.** The original form of this regulation was first published on 22 February 1971. Since that time, changes have been issued to amend the original. As of 15 May 1987, permanent Changes 1 through 19 remain in effect. This UPDATE printing incorporates all of those changes directly into the body of text. This publication has been reorganized to make it compatible with the Army electronic publishing database. No content has been changed.

**Summary.** This regulation provides policy, criteria, and procedures for the separation of officers of the Army National Guard of the United States (ARNGUS) and the United States Army Reserve (USAR), except for officers serving on active duty or active duty training exceeding 90 days.

**Applicability.** *(See para 1–2)*

**Proponent and exception authority.** The proponent agency of this regulation is the Office of the Deputy Chief of Staff for Personnel.

**Army management control process.** Not applicable.

**Supplementation.** Supplementation of this regulation and establishment of forms other than DA Forms are prohibited without prior approval from the Commander, U.S. Army ZAP–P, 9700 Page Boulevard, St. Louis, MO 63132–5200.

**Interim changes.** Interim changes to this regulation are not official unless they are authenticated by The Adjutant General. Users will destroy interim changes on their expiration dates unless sooner superseded or rescinded.

**Suggested improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to Commander, U. S. Army ZAP–P, 9700 Page Boulevard, St. Louis, MO 63132–5200.

**Distribution.** Active Army, C; USAR, A; ARNG, A.

**Contents** (Listed by paragraph and page number)

**Chapter 1**
**General Provisions,** *page 1*
Purpose • 1–1, *page 1*
Scope • 1–2, *page 1*
Policy • 1–3, *page 1*
References • 1–3.1, *page 1*
Explanation of abbreviations and terms • 1–4, *page 1*
Administrative separation proceedings • 1–5, *page 1*
Type of discharge certificate to be furnished • 1–6, *page 1*
Effective date of separation • 1–7, *page 2*
Notification of separation • 1–8, *page 2*
Mentally incompetent • 1–9, *page 2*
Orders • 1–10, *page 2*
Notification of discharge to Selective Service System • 1–11, *page 2*
Records disposition • 1–12, *page 2*
Appeals • 1–12.1, *page 3*
Statutory authority • 1–13, *page 3*



UNCLASSIFIED

meet the medical fitness standards at the time of appointment and who fail to resign (chap 6, sec V) may be recommended for involuntary separation. This action will be taken when the commander or PMS determines that the best interest of the Government and the individual can be served by his or her discharge. If the disqualification was for HTLV-III positivity 502, paragraph 2–39*m* (a disqualification that became effective on 1 November 1985), the officer will be involuntarily separated.

*b.* An officer of a Reserve Component, regardless of length of service, who reports to AD or ADT for initial entry training on or after 1 October 1985, is confirmed positive for the HTLV-III virus or antibody 501, paragraph 2–39*m*, and who fails to resign (chap 6, sec III) will be involuntarily separated.

*c.* If the basis for an involuntary separation under this paragraph is confirmed positive for the HTVL-III virus or antibody, an honorable characterization of service will be given.

### 2–14. In the interest of National security

Existence of acts or behavior not clearly consistent with the interests of National security requires the involuntary separation of an officer (AR 604–10).

## Section III
## Initiation and Processing of Involuntary Separation Actions

### 2–15. When involuntary separation action is appropriate

No person has an inherent right to continue service as an officer. The privilege of service is his only as long as he performs satisfactorily. Responsibility for leadership and example require effective performance of assigned duties and exemplary conduct at all times. The Army has no place for officers who cannot meet these requirements, and their involuntary separation is essential. In view of the rapidity with which hostilities can now occur and the attendant likelihood that many officers may be called to active duty on short notice, the same standards of efficiency and conduct apply to officers of all Reserve components.

*a.* Every officer deserves a fair chance to demonstrate his or her capabilities. When an officer shows ineffective tendencies, especially if they are due to inexperience, that officer will, when practicable, be given another chance under another commander. At the same time, however, the officer's ineffectiveness should be systematically recorded in documents that are specific as to the period each covers, the duties observed, and the defects noted. Any officer who has been given a fair chance and has failed to become an effective officer will be considered for involuntary separation to ensure that his ineffectiveness is not permitted to continue to affect the Army adversely.

*b.* Recommendation for involuntary separation under this regulation cannot be based on empty generalities and vague impressions. It is necessary to establish with some precision the reasons why an officer is considered ineffective. Basically, this officer is one who does not get acceptable results. Inefficiency is a relative matter, hence a finite definition of the ineffective officer can never be reached. Many ineffective officers are attractive, handsome, decent, educated, honorable, intelligent and generous, and yet ineffective. It is perfectly proper to give an officer credit for his good qualities in the same letter or efficiency report which reveals his ineffectiveness as an officer. Specific reasons for failure should be documented with concrete examples in their support.

### 2–16. Recommendation for involuntary separation

*a.* Recommendation for involuntary separation may be originated by one of the following:

(1) A proper agency at HQDA regardless of an officer's assignment.

(2) A commander with respect to a member of that command.

(3) A duly constituted selection board, operating under official letter of instruction (LOI), in which the board may recommend individuals who should be involuntarily separated.

(4) The Professor of Military Science (PMS) responsible for the institution where an officer is pursuing a degree may start involuntary separation action. The PMS action applies to officers commissioned through the Early Commissioning Program (ECP) and the Commissioning of Completion Students Program (CCSP). The PMS will send the action for CCSP personnel to OPR–DE, 9700 Page Boulevard, St. Louis, MO 63132–5200. For ECP personnel, the PMS will send the action to the proper Reserve Forces commander.

*b.* HQDA agencies and selection board approving authorities will send their recommendations for involuntary separation directly to the proper area commander. Commanders of officers assigned to units will send their recommendations through channels to the proper area commander.

*c.* When the Cdr, ARPERCEN determines that sufficient basis exists to initiate involuntary separation action for officers under the jurisdictional control of that center, the procedures in paragraph 2–17*e* and *f*(1) and (2) will be followed. If the where abouts of the officer are unknown or unascertained, or if the officer refuses to accept or respond to the notification, the Cdr, ARPERCEN is authorized to appoint a board of officers and follow provisions of paragraphs 2–17*g* and 2–20. If the officer elects a hearing before a board of officers, the following actions will apply:

(1) When the circumstances do not require Army investigative processes (AR 195–2), the recommendation for

involuntary separation, together with correspondence, statements, records, and similar related documents will be forwarded to the area commander in whose area the officer involved is currently residing.

(2) When circumstances indicate the need for Army investigative processes (AR 195–2), the recommendation for involuntary separation, together with correspondence, statements, records, and similar related documents will be forwarded to the area commander in whose area the incident occurred or to the responsible oversea commander requesting appropriate investigation. The area commander in whose area the incident occurred will review the report of other documents furnished by the Cdr, ARPERCEN and, except as otherwise provided in paragraph 2–8*b* and *c*, determine appropriate action (para 2–17).

*d.* Recommendations will clearly state the reasons for involuntary separation and will be supported by all documentary and physical evidence which can be reasonably included. With the exception of business entries and official records and reports, such as efficiency reports and health records, which are not made with a view to prosecution (see Manual for Courts-Martial, 1984, M.R.E. 803 (8)), all statements submitted, including reports of the investigation, will be under oath or affirmation unless the witness is dead, insane, or missing; or the exigencies of the service preclude obtaining a statement in affidavit form. Evidence to support a recommendation for involuntary separation must be able to stand on its own merits, adhering to one standard (substandard performance or moral or professional dereliction). Documents must be legible and lend themselves to reproduction. Copies reproduced by the thermofax process or other means which are barely legible, and nonpermanent-type reproduction will not be used.

**2–17. Initial actions by area commander**

The following actions may be taken by the area commander on recommendation for involuntary separation received from commanders or appropriate agencies at HQDA:

*a.* The case may be returned for further evidence or a recommendation as to further action.

*b.* If sufficient basis exists, the area commander may disapprove the recommendation, close the case, and return it to the initiating commander or appropriate agency at HQDA. (See para 2–43 on homosexuality cases.)

*c.* If considered necessary and desirable, the area commander may appoint or direct the appointment of an investigating officer (AR 15–6).

*d.* On receipt of the investigating officer's report, the area commander may disapprove the recommendation, close the case, and return it to the initiating commander or appropriate agency at HQDA.

*e.* If it is determined that sufficient basis exists to initiate involuntary separation action, the area commander will (if the whereabouts of the officer concerned is known or may be ascertained by 133)—

(1) Notify the officer concerned of the requirement to show cause for retention and will give the individual the reason for this requirement.

(2) Advise the officer in the above notification, if appropriate, that he may elect to submit a resignation in lieu of involuntary separation (sec IV and V, chap 6); or, if eligible, elect transfer to the Retired Reserve (para 2–3*d*); or to have the case acted on by a board of officers.

(3) Advise the officer of the requirement to acknowledge receipt of the above notification within 15 days of receipt, indicating his election on one of the above options.

(4) When determined necessary by notifying command, notification will be sent to member by certified mail, return receipt requested.

*f.* On securing the acknowledgement of receipt from the officer, notified in accordance with *e*above, the area commander will, if the officer—

(1) Elects transfer to the Retired Reserve and is otherwise eligible—process the officer's request.

(2) Submits a resignation in lieu of involuntary separation—forward the resignation and related correspondence to HQDA (para 2–8*a*).

(3) Elects appearance before a board or elects board proceedings but waives appearance—take necessary steps to appoint the board as prescribed in this regulation and in AR 15–6.

*g.* If the whereabouts of the officer are unknown and unascertained after complying with the procedures prescribed in AR 135–133; or if the officer refuses to accept or respond to the notification required by *e* above, the area commander will take necessary steps to appoint a board of officers, as prescribed in this regulation and in AR 15–6. A copy of the notification and either a post office receipt confirming delivery or the returned unopened envelope showing mail was refused, unclaimed, or not delivered will become part of the board exhibits. This board may proceed in the officer's absence without according the privileges listed in paragraph 2–19, except that counsel will be appointed to represent him in his absence.

*h.* New allegations received by the area commander, supporting a recommendation for involuntary separation which has already been referred to a board of officers will, if the case has not been heard, be referred to the board of officers for consideration. If the case has already been heard and is finally closed favorably to the officer, appropriate action to initiate new proceedings may be taken, subject to paragraph 1–5.

**2–18. Investigation of homosexuality**

*a.* A commanding officer who receives information that an assigned officer may require separation under the criteria

**Headquarters**
**Department of the Army**
**Washington, DC**
**15 August 1990**

***Army Regulation 635–40**

**Effective 15 September 1990**

**Personnel Separations**

# Physical Evaluation for Retention, Retirement, or Separation

By Order of the Secretary of the Army:

CARL E. VUONO
*General, United States Army*
*Chief of Staff*

Official:

MILTON H. HAMILTON
*Administrative Assistant to the Secretary of the Army*

**History.** This UPDATE printing publishes a revision of this publication. This publication has been reorganized to make it compatible with the Army electronic publishing database. No content has been changed.

**Summary.** This regulation governs the evaluation for physical fitness of soldiers who may be unfit to perform their military duties because of physical disability. It updates policy and procedures resulting from the Department of Defense Directive 1332.18 dated February 25, 1986; the reorganization of the Physical Disability Agency; the implementation of streamlined procedures for case processing; and the passage of Public Law 99–661 as it relates to disability processing of soldiers in the Reserve Components.

**Applicability.** This regulation applies to the Active Army, the Army National Guard, and the U.S. Army Reserve.

**Proponent and exception authority.** Not Applicable.

**Army management control process.** This regulation is subject to the requirements of AR 11–2. It contains internal control provisions but does not contain checklists for conducting internal control reviews. These checklists are being developed and will be published at a later date.

**Supplementation.** Supplementation of this regulation and establishment of command and local forms are prohibited without approval from HQDA (DAPE–MP).

**Suggested Improvements.** The proponent agency of this regulation is the Office of the Deputy Chief of Staff for Personnel. Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to Commander, U.S. Army Physical Disability Agency, ATTN: TAPD–OEA, Forest Glen Section—WRAMC, Washington, DC 20307–5001.

**Distribution.** Distribution of this publication is made in accordance with the requirements on DA Form 12–09–E, block number 2266, intended for command level A for the Active Army, the Army National Guard, and the U.S. Army Reserve.

**Contents** (Listed by paragraph and page number)

**Chapter 1**
**Introduction,** *page 1*
Purpose • 1–1, *page 1*
References • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*
Ineligibility for processing • 1–4, *page 1*

**Chapter 2**
**Responsibilities and Functions,** *page 1*

*Section I*
*Responsible Individuals, page 1*
Secretary of the Army (SA) • 2–1, *page 1*
Deputy Chief of Staff for Personnel (DCSPER) • 2–2, *page 1*
Commander, U.S. Total Army Personnel Command (Commander PERSCOM) • 2–3, *page 1*
CG, USAPDA • 2–4, *page 1*
The Surgeon General (TSG) • 2–5, *page 1*
The Judge Advocate General (TJAG) • 2–6, *page 1*
Commanding Generals of Health Services Command (HSC); 7th Medical Command/Europe (7 MEDCOM/EUR); and 18th Medical Command (18 MEDCOM) • 2–7, *page 1*
Commander, MTF • 2–8, *page 1*
Unit commander • 2–9, *page 1*

*Section II*
*Related Boards, page 2*
Board Elements • 2–10, *page 2*
Army Physical Disability Appeal Board (APDAB) • 2–11, *page 2*
The Army Board for Correction of Military Records (ABCMR) • 2–12, *page 2*
Army Disability Rating Review Board (ADRRB) • 2–13, *page 2*

**Chapter 3**
**Policies,** *page 2*
Standards of unfitness because of physical disability • 3–1, *page 2*
Presumptions • 3–2, *page 3*
Conditions existing before active military service • 3–3, *page 3*
LD decisions • 3–4, *page 3*
Use of the Department of Veterans Affairs Schedule for Rating Disabilities (VASRD) • 3–5, *page 4*
Length of hospitalization • 3–6, *page 4*
Retaining soldiers on active duty after scheduled nondisability retirement or discharge date • 3–7, *page 4*
Counseling provided to soldier • 3–8, *page 4*
The TDRL • 3–9, *page 4*
COAD by soldiers unfit because of physical disability • 3–10, *page 4*
Limitation on appearance by soldiers • 3–11, *page 5*
Findings and recommendations of agencies reviewing disability cases • 3–12, *page 5*
Special rules applicable to general and medical corps officers • 3–13, *page 5*

*This regulation supersedes AR 635–40, 13 December 1985.



UNCLASSIFIED

# Chapter 1
# Introduction

### 1–1. Purpose
This regulation establishes the Army Physical Disability Evaluation System according to the provisions of chapter 61, title 10, United States Code (10 USC 61) and Department of Defense Directive (DODD) 1332.18. It sets forth policies, responsibilities, and procedures that apply in determining whether a soldier is unfit because of physical disability to reasonably perform the duties of his or her office, grade, rank, or rating. If a soldier is found unfit because of physical disability, this regulation provides for disposition of the soldier according to applicable laws and regulations. The objectives of this regulation are to—

*a.* Maintain an effective and fit military organization with maximum use of available manpower.

*b.* Provide benefits for eligible soldiers whose military service is terminated because of a service-connected disability.

*c.* Provide prompt disability processing while ensuring that the rights and interests of the Government and the soldier are protected.

### 1–2. References
Required and related publications are listed in appendix A. Prescribed and referenced forms are also listed in appendix A.

### 1–3. Explanation of abbreviations and terms
Abbreviations and special terms used in this regulation are explained in the glossary.

### 1–4. Ineligibility for processing
*a.* Section 1217, title 10, United States Code (10 USC 1217) excludes cadets of service academies from eligibility for disability benefits under 10 USC 61. However, USMA cadets may be entitled to compensation administered by the Department of Veterans Affairs (VA). Section 101(21)(D), title 38, United States Code (38 USC 101(21)(D)) includes service as a cadet at the United States Military Academy (USMA) within the definition of active duty for purposes of entitlement to VA compensation.

*b.* Reserve Officers' Training Corps (ROTC) cadets are not eligible for processing under this regulation. Senior ROTC cadets may be eligible for VA disability benefits under section 101(22)(D), title 38, United States Code (38 USC 101(22)(D)) as explained above for USMA cadets.

# Chapter 2
# Responsibilities and Functions

## Section I
## Responsible Individuals

### 2–1. Secretary of the Army (SA)
The SA will prescribe regulations to carry out the provisions of 10 USC 61.Unless otherwise specified in this regulation, the SA reserves all powers, functions, and duties of the Army Physical Disability Evaluation System.

### 2–2. Deputy Chief of Staff for Personnel (DCSPER)
The DCSPER has overall Army Staff responsibility for the Army Physical Disability Evaluation System. Policy guidance will be provided by the Director of Military Personnel Management (DMPM), Office of the Deputy Chief of Staff for Personnel (ODCSPER).

### 2–3. Commander, U.S. Total Army Personnel Command (Commander PERSCOM)
The commander, PERSCOM will—

*a.* Operate the Army Physical Disability Evaluation System under the general staff supervision of the DCSPER.

*b.* Accomplish final administrative actions in processing physical disability cases; issue needed orders or other instructions for the SA, based on decisions of the Commanding General, U.S. Army Physical Disability Agency(CG, USAPDA) or higher authority (chap 4 and app E).

*c.* Notify the VA of all individuals being separated or retired from the Army for physical disability.

*d.* Coordinate, control, and manage all soldiers on the Temporary Disability Retired List (TDRL)

### 2–4. CG, USAPDA
The CG, USAPDA, under the operational control of the Commander, PERSCOM, will operate the Army Physical Disability Evaluation System, to include—

*a.* Interpreting and implementing policies coming from higher authority.

*b.* Developing the policies, procedures, and programs of the system.

*c.* Coordinating with other military departments to ensure applicable laws, policies, and directives are interpreted uniformly. (A uniform interpretation is required to ensure that a soldier of the Army will be granted substantially the same benefits as a member of another Service under similar conditions.)

*d.* Commanding and managing the subordinate elements of the USAPDA.

*e.* Reviewing Physical Evaluation Board (PEB) proceedings to ensure that soldiers are given uniform and fair consideration under applicable laws, policies, and directives.

*f.* Making the final decision whether a soldier is unfit because of physical disability except when such decisions are reserved to higher authority. Included as higher authority are the Office of the Secretary of the Army (OSA) and the Office of the Secretary of Defense (OSD).

*g.* Determining percentage rating and disposition.

### 2–5. The Surgeon General (TSG)
TSG will establish and interpret medical standards for retaining soldiers on active duty (see AR 40–3 and AR 40–501).

### 2–6. The Judge Advocate General (TJAG)
The TJAG will—

*a.* Interpret laws and regulations governing the Army Physical Disability Evaluation System.

*b.* Train and provide sufficient legal counsel to represent soldiers appearing before a PEB.

*c.* Train Army attorneys in disability law.

### 2–7. Commanding Generals of Health Services Command (HSC); 7th Medical Command/Europe (7 MEDCOM/EUR); and 18th Medical Command (18 MEDCOM)
The commanding generals of the Health Services Command (HSC); the 7th Medical Command/Europe (7 MEDCOM/EUR); and the 19 Medical Command (19 MEDCOM) will—

*a.* Ensure that Army medical treatment facilities (MTFs) under their control fulfill their responsibilities in connection with the Army Physical Disability Evaluation System as outlined in AR 40–3 and this regulation.

*b.* Appoint MTFs responsible for accomplishing periodic medical evaluation for TDRL members (chap 7).

### 2–8. Commander, MTF
The commander, MTF will—

*a.* Provide a thorough and prompt evaluation when a soldier's medical condition becomes questionable in respect to physical ability to perform duty.

*b.* Appoint a Physical Evaluation Board Liaison officer (PEBLO) to counsel soldiers undergoing physical disability processing.

*c.* Ensure medical evaluation board (MEBD) proceedings referred to the PEB are complete, accurate, and fully documented as outlined in AR 40–3, chapter 7, and chapter 4 of this regulation.

### 2–9. Unit commander
The unit commander will—

(2) Nowithstanding the above, when a soldier enters the military with a waiver for a medical condition or physical defect, and the condition represents a decided medical risk which would probably prejudice the best interests of the Government were the soldier to remain in military service, separation without benefits may be appropriate, if initiated within 6 months of initial entry on active duty. Entry physical standards will be used in separating individuals with pre-existing medical conditions. Such cases will be referred to a PEB to determine if the pre-existing condition has been service-aggravated.

### 3–2. Presumptions

The following presumptions will apply to physical disability evaluation

*a. Before and during active service.*

(1) A soldier was in sound physical and mental condition upon entering active service except for physical disabilities noted and recorded at the time of entry.

(2) Any disease or injury discovered after a soldier entered active service, with the exception of congenital and hereditary conditions, was not due to the soldier's intentional misconduct or willful neglect and was incurred in line of duty (LD).

(3) If the foregoing presumptions are overcome by a preponderance of the evidence, any additional disability or death resulting from the preexisting injury or disease was caused by military service aggravation. (Only specific findings of "natural progression" of the preexisting disease or injury, based upon well-established medical principles are enough to overcome the presumption of military service aggravation.)

(4) Acute infections and sudden developments occurring while the soldier is in military service will be regarded as service-incurred or service-aggravated. Acute infections are those such as pneumonia, active rheumatic fever (even though recurrent), acute pleurisy, or acute ear disease.Sudden developments are those such as hemoptysis, lung collapse, perforating ulcer, decompensating heart disease, coronary occlusion, thrombosis, or cerebral hemorrhage. This presumption may be overcome when a preponderance of the evidence shows that no permanent new or increased disability resulting from these causes occurred during active military service or that such conditions were the result of "natural progression" of preexisting injuries or diseases as in (3) above.

(5) The foregoing presumptions may be overcome only by a preponderance of the evidence, which differs from personal opinion, speculation, or conjecture. When reasonable doubt exists about a soldier's condition, an attempt should be made to resolve the doubt by further clinical investigation and observation and by consideration of any other evidence that may apply. In the absence of such proof by the preponderance of the evidence, reasonable doubt should be resolved in favor of the soldier.

*b. Processing for separation or retirement from active service.*

(1) Disability compensation is not an entitlement acquired by reason of service-incurred illness or injury; rather, it is provided to soldiers whose service is interrupted and they can no longer continue to reasonably perform because of a physical disability incurred or aggravated in service.

(2) When a soldier is being processed for separation or retirement for reasons other than physical disability, continued performance of assigned duty commensurate with his or her rank or grade until the soldier is scheduled for separation or retirement, creates a presumption that the soldier is fit. An enlisted solider whose reenlistment has been approved before the end of his or her current enlistment, is not processing for separation; therefore, this rule does not apply. The presumption of fitness may be overcome if the evidence establishes that—

*(a)* The soldier was, in fact, physically unable to perform adequately the duties of his or her office, grade, rank or rating for a period of time because of disability. There must be a causative relationship between the less than adequate duty performance and the unfitting medical condition or conditions.

*(b)* An acute, grave illness or injury or other significant deterioration of the soldier's physical condition occurred immediately prior to, or coincident with processing for separation or retirement for reasons other than physical disability and which rendered the soldier unfit for further duty.

(3) A soldier previously found unfit but approved for continuation on active duty (COAD) is evaluated according to chapter 6.

### 3–3. Conditions existing before active military service

*a.* According to accepted medical principles, certain abnormalities and residual conditions exist that, when discovered, lead to the conclusion that they must have existed or have started before the individual entered the military service.

(1) Examples of these conditions are as follows:

*(a)* Scars.

*(b)* Fibrosis of the lungs.

*(c)* Atrophy following disease of the central or peripheral nervous system.

*(d)* Healed fractures.

*(e)* Absent, displaced, or resected organs.

*(f)* Supernumerary parts.

*(g)* Congenital malformations and hereditary conditions

*(h)* Similar conditions in which medical authorities are in such consistent and universal agreement as to their cause and time of origin that no additional confirmation is needed to support the conclusion that they existed prior to military service.

(2) Likewise, manifestation of lesions or symptoms of chronic disease from date of entry on active military service (or so close to that date of entry that the disease could not have started in so short a period) will be accepted as proof that the disease existed prior to entrance into active military service.

(3) Manifestations of communicable disease within less than the minimum incubation period after entry on active service will be accepted as proof of inception prior to military service.

*b.* Standard in-service medical and surgical treatment reducing the effect of the disease or other conditions incurred prior to entry into military service does not constitute service aggravation unless the treatment was required to relieve disability that had been aggravated by military service.

*c.* Unexpected adverse effects, over and above known hazards, directly attributable to treatment, anesthetic, or operation performed or administered for a disease or medical condition existing before entry on active duty, may be considered service aggravation.

*d.* For separation guidance on non-service aggravated EPTS conditions when a soldier requests waiver of referral to a PEB, see chapter 5.

### 3–4. LD decisions

*a.* Under the laws governing the Army Physical Disability Evaluation System, soldiers who sustain or aggravate physically unfitting disabilities must meet the following LD criteria to be eligible to receive retirement and severance pay benefits.

(1) The disability must have been incurred or aggravated while the soldier was entitled to basic pay or as the proximate cause of performing active duty or inactive duty training.

(2) The disability must not have resulted from the soldier's intentional misconduct or willful neglect and must not have been incurred during a period of unauthorized absence.

*b.* LD decisions are reached according to policies and procedures prescribed in AR 600–8–1, chapters 39, 40, and 41. Copies of LD decision, DA Form 2173 (Statement of Medical Examination and Duty Status), or DD Form 261(Report of Investigation—Line of Duty and Misconduct Status) must be included in the official records of the case. When a board or council has substantial evidence, however, showing that a prior decision may be incorrect for any reason, they must include such evidence in the case record and request PERSCOM(TAPC–PED–S) to review the LD determination before final disposition of disability processing at HQDA level (para 4–19*g*).

*c.* In certain categories of activities, the Deputy Commander, PEB president, or alternate president have the authority to make

findings of "in line of duty, not due to own misconduct" when no LD investigation has been completed and specific criteria have been met (para 4–19*g*).

**3–5. Use of the Department of Veterans Affairs Schedule for Rating Disabilities (VASRD)**

*a.* The percentage assigned to a medical defect or condition is the disability rating. A rating is not assigned until the PEB determines the soldier is physically unfit for duty. Under the provisions of 10 USC 61 these ratings are assigned from the VASRD.

*b.* Special guidance concerning Army use of the VASRD, as well as modifications and exceptions to it as prescribed by DODD 1332.18, are set forth in appendix B of this regulation.

*c.* The fact that a soldier has a condition listed in the VASRD does not equate to a finding of physical unfitness. An unfitting, or ratable condition, is one which renders the soldier unable to perform the duties of his or her office, grade, rank, or rating in such a way as to reasonably fulfill the purpose of his or her employment on active duty.

*d.* There is no legal requirement in arriving at the rated degree of incapacity to rate a physical condition which is not in itself considered disqualifying for military service when a soldier is found unfit because of another condition that is disqualifying. Only the unfitting conditions or defects and those which contribute to unfitness will be considered in arriving at the rated degree of incapacity warranting retirement or separation for disability. Any non-ratable defects or conditions will be listed in item 8 of DA Form 199, but will be annotated as non-ratable.

**3–6. Length of hospitalization**

Providing definitive medical care to active duty soldiers requiring prolonged hospitalization who are unlikely to return to active duty is not within the DA mission. The time at which a soldier should be processed for disability retirement or separation must be decided on an individual basis. The interest of both the Army and the soldier must be considered. A soldier may not be retained or separated solely to increase retirement or separation benefits.Soldiers who are medically unfit and not likely to return to duty should be processed for disability retirement or separation when it is decided that they have attained optimum hospital improvement.

**3–7. Retaining soldiers on active duty after scheduled nondisability retirement or discharge date**

A soldier whose normal scheduled date of nondisability retirement or separation occurs during the course of hospitalization or disability evaluation may, with his or her consent, be retained in the service until he or she has attained maximum hospital benefits and completion of disability evaluation if otherwise eligible for referral into the disability system.

*a.* Officers and warrant officers on extended active duty may be retained on active duty according to the provision of AR 635–100, chapter 3.

*b.* Enlisted soldiers on extended active duty may be retained on active duty according to the provisions of AR 635–200, chapter 1.

*c.* Soldiers in the Reserve Components (other than Active Guard/Reserve)(AGR)) may be retained according to the provisions of AR 135–381.

*d.* Reserve Component soldiers serving on AGR status will be retained on active duty as prescribed in AR 635–200.

**3–8. Counseling provided to soldier**

*a. PEBLO counseling.* The appointed PEBLO at the MTF is responsible for counseling soldiers (or the next of kin or legal guardian in appropriate cases) concerning their rights and privileges at each step in disability evaluation, beginning with the decision of the treating physician to refer the soldier to a MEBD and until final disposition is accomplished. For this purpose, the MTF commander will name an experienced, qualified officer, noncommissioned officer (NCO), or civilian employee as the PEBLO. At least one additional qualified officer, NCO, or civilian employee will be designated as alternate PEBLO. Only personnel whose duties will not conflict with their counseling responsibilities will be selected. The MTF commander will notify the recorder of the applicable PEB, of the name and telephone number of the PEBLO and alternate PEBLO. PEBLOs will use the Disability Counseling Guide (app C) to assist them in providing thorough counseling. Counseling will be documented(para 4–20*d*). Counseling will cover as a minimum, the following areas:

(1) Legal rights (including the sequence of and the nature of disability processing).

(2) Effects and recommendations of MEBD and PEB findings.

(3) Estimated disability retired or severance pay (after receipt of PEB findings and recommendations).

(4) Probable grade upon retirement.

(5) Potential veteran's benefits.

(6) Recourse to and preparation of rebuttals to PEB findings and recommendations.

(7) Disabled Veterans Outreach Program (DVOP).

(8) Post-retirement insurance programs and the Survivor Benefit Plan(SBP).

*b. Legal counseling.* Counseling by the appointed legal counsel is provided when the soldier requests a formal hearing.

**3–9. The TDRL**

*a.* The TDRL is used in the nature of a "pending list". It provides a safeguard for the Government against permanently retiring a soldier who can later fully recover, or nearly recover, from the disability causing him or her to be unfit. Conversely, the TDRL safeguards the soldier from being permanently retired with a condition that may reasonably be expected to develop into a more serious permanent disability.

*b.* Requirements for placement on the TDRL are the same as for permanent retirement. The soldier must be unfit to perform the duties of his or her office, grade, rank, or rating at the time of evaluation. The disability must be rated at a minimum of 30 percent or the soldier must have 20 years of service computed under section 1208, title 10, United States Code (10 USC 1208). In addition, the condition must be determined to be temporary or unstable.

*c.* A soldier who is determined to be physically fit will not be placed on the TDRL regardless of the severity of the physical defects or the fact that they might become unfitting were the soldier to remain on active duty for a period of time.

**3–10. COAD by soldiers unfit because of physical disability**

*a.* Headquarters, Department of the Army (HQDA) may defer the disposition of a soldier who, although unfit because of physical disability, can still serve effectively with proper assignment limitations. The soldier must consent to being deferred.

*b.* A soldier COAD according to the provisions in chapter 6 must be unfit because of physical disability. The physical disability must be a basically stable condition or one for which accepted medical principles show slow progression. The soldier must be able to maintain himself or herself in a military environment without jeopardizing individual health or the health of others. The soldier must not require an excessive amount of medical care.

*c.* A soldier who is unfit because of physical disability will not be COAD solely to increase benefits. He or she will not be COAD unless his or her retention is justified as being of value to the Army.

*d.* HQDA will reevaluate soldiers approved for COAD when—

(1) An enlisted soldier's term of service expires during the period for which continuance was approved and the soldier requests reenlistment (para 6–17*d*).

(2) Soldier requests extension of continuance on active duty (para 6–13*e*).

*e.* When COAD is approved, the soldier remains liable to complete any service obligation he or she has incurred unless the disqualifying condition progresses to a point wherein the soldier becomes unable to perform within established limitations.

*f.* At the time of final retirement or separation, the soldier will be referred to a MEBD and PEB (para 6–14).

### 3–11. Limitation on appearance by soldiers

A soldier or his or her representative will not be permitted to appear before the informal PEB, USAPDA (during case review), the APDAB, or the ADRRB.

### 3–12. Findings and recommendations of agencies reviewing disability cases

Review and appeal activities are bound by the regulations under which adjudicative activities function. A rare and unusual case may occur to which current regulations do not apply. If so, refer the case through channels to the OSA with a recommendation for disposition.

### 3–13. Special rules applicable to general and medical corps officers

*a.* General officers and medical corps officers will not be found to be unfit by reason of physical disability if they can be expected to perform satisfactorily in an assignment appropriate to their grade, qualifications, and experience.

*b.* General officers and medical corps officers who are processing for retirement by reason of age or length of service may not be retired for physical disability unless the initial unfitness determination of the SA is approved by the Secretary of Defense on the recommendation of the Assistant Secretary of Defense (Health Affairs) (ASD(HA)).

*c.* General officers and medical corps officers not processing for retirement by reason of length of service at the time of their referral into the disability system, may not be retired or separated for physical disability until a recommendation therefore by the SA is approved by the ASD(HA).

*d.* One copy of all retirement orders issued in the case of general officers retired because of physical disability will be submitted to ASD(HA).

### 3–14. Factors governing time of processing

The point in time for referral of a soldier for disability separation or retirement is determined on an individual basis. Normally, soldiers who are not likely to return to duty will be processed as soon as this probability is ascertained.

*a.* Separation or retirement should normally occur within 20 days of the date of the final determination of unfitness by the SA. However, soldiers are entitled to use accrued leave in excess of that which cannot be sold back to the Government.

*b.* Soldiers having a prognosis of imminent death shall be evaluated and processed in a comparable manner and procedural sequence to that of all other soldiers. No procedures will be circumvented or omitted, to include LD determination in the interest of timely processing.

## Chapter 4
## Procedures

### Section I
### Eligibility for Disability Evaluation

### 4–1. Soldiers charged with an offense

*a. Uniform Code of Military Justice (UCMJ) action.* The case of a soldier charged with an offense under the UCMJ or who is under investigation for an offense chargeable under the UCMJ which could result in dismissal or punitive discharge, may not be referred for, or continue, disability processing unless—

(1) The investigation ends without charges.

(2) The officer exercising proper court-martial jurisdiction dismisses the charges.

(3) The officer exercising proper court-martial jurisdiction refers the charge for trial to a court-martial that cannot adjudge such a sentence.

*b. Civil court action.* If civil criminal court action is pending and the soldier is present for duty, disability processing continues provided any movement of the soldier is cleared with responsible military and civilian authorities.

### 4–2. Soldiers with suspended sentences

A soldier may not be referred for, or continue, disability processing if under sentence of dismissal or punitive discharge. If the sentence is suspended, the soldier's case may then be referred for disability processing. A copy of the order suspending the sentence must be included in the soldier's records. If action to vacate the suspension is started after the case is forwarded for disability processing, the PEB serving the area must be promptly notified to stop disability processing. Disability processing may resume if the commander decides not to vacate the suspension.

### 4–3. Enlisted soldiers subject to administrative separation

*a.* Except as provided below, an enlisted soldier may not be referred for, or continue, physical disability processing when action has been started under any regulatory provision which authorizes a characterization of service of under other than honorable conditions.

*b.* If the case comes within the limitations above, the commander exercising general court-martial jurisdiction over the soldier may abate the administrative separation. This authority may not be delegated. A copy of the decision, signed by the general court-martial convening authority (GCMCA), must be forwarded with the disability case file to the PEB. A case file may be referred in this way if the GCMCA finds the following:

(1) The disability is the cause, or a substantial contributing cause, of the misconduct that might result in a discharge under other than honorable conditions.

(2) Other circumstances warrant disability processing instead of alternate administrative separation.

*c.* A soldier being considered for separation because of unsatisfactory performance (AR 635–200, chap 13), must be referred for disability processing upon approved recommendation of a MEBD (AR 635–200, para 1–35*a*).

### 4–4. Commissioned or warrant officers who may be separated under other than honorable conditions

*a.* A commissioned or warrant officer will not be referred for disability processing instead of elimination action (administrative separation)that could result in separation under other than honorable conditions. Officers in this category who are believed to be unfit because of physical disability will be processed simultaneously for administrative separation and physical disability evaluation.

*b.* Commanders exercising general court-martial authority will ensure that the foregoing actions processed together are properly identified and cross-referenced. The administrative separation will be forwarded to the Commander, PERSCOM, ATTN: TAPC–OP-P–M, Alexandria, VA 22332–0418.

*c.* The Commander, PERSCOM, will refer the entire file, including both courses of action, to the Office of the Secretary of the Army, ATTN: SAMR–RB, Washington DC 20310–3073 for necessary review. The SA will decide the proper disposition of the case.

### 4–5. Soldiers absent without leave (AWOL)

A soldier may not be processed through the Army Physical Disability Evaluation System unless he or she is under military control. The soldier must be available to be notified of the findings of the PEB and to indicate concurrence or nonconcurrence with the PEB findings and recommendations. If AWOL, the soldier's case file may not be sent to a PEB. If determined AWOL after the soldier's case file has been referred, the PEB must be promptly notified in order to suspend processing. If the soldier returns within 10 days, the PEB must be notified so that processing may resume. Any substantial change in the soldier's condition during a period of AWOL must be

recorded by an addendum to the original MEBD or by a new MEBD and furnished to the PEB.

## Section II
## Initiation of Medical Evaluation

### 4–6. Referral by HQDA
The Commander, PERSCOM, upon recommendation of TSG, may refer a soldier to the responsible MTF for medical evaluation when a question arises as to the soldier's ability to perform the duties of his or her office, grade, rank, or rating because of physical disability.

### 4–7. Referral by commanders of MTFs
Commanders of MTFs who are treating soldiers in an assigned, attached, or outpatient status may initiate action to evaluate the soldier's physical ability to perform the duties of his or her office, grade, rank, or rating.

### 4–8. Referral by commanders
When a commander believes that a soldier of his or her command is unable to perform the duties of his or her office, grade, rank, or rating because of physical disability, the commander will refer the soldier to the responsible MTF for evaluation. The request for evaluation will be in writing and will state the commander's reasons for believing that the soldier is unable to perform his or her duties. DD Form 689 (Individual Sick Slip) may be used for such referral (AR 600–6). Commanders of Reserve units not on active duty will be guided by AR 40–501 and chapter 8 of this regulation.

## Section III
## Medical Processing Related to Disability Evaluation

### 4–9. Medical examination
The MTF commander having primary medical care responsibility will conduct an examination of a soldier referred for evaluation. The commander will advise the soldier's commanding officer of the results of the evaluation and the proposed disposition. If it appears the soldier is not medically qualified to perform duty, the MTF commander will refer the soldier to a MEBD.

### 4–10. The MEBD
MEBD's are convened to document a soldier's medical status and duty limitations insofar as duty is affected by the soldier's status. A decision is made as to the soldier's medical qualification for retention based on the criteria in AR 40–501, chapter 3. If the MEBD determines the soldier does not meet retention standards, the board will recommend referral of the soldier to a PEB. For MEBD's rules for documentation, recommendations, and disposition of the evaluated soldier, see AR 40–3, chapters 7 and 8.

### 4–11. Narrative summary (NARSUM)
The NARSUM to the MEBD is the heart of the disability evaluation system.Incomplete, inaccurate, misleading, or delayed NARSUMs may result in injustice to the soldier or to the Army.

*a.* Physicians who prepare cases for the MEBD and PEB should use the VA Physician's Guide for Disability Evaluation Examinations (published by the VA)to describe physical defects. This helps to ensure consistency in reporting similar conditions and assists the boards of the disability system in their review and evaluation process. (See AR 40–3, chapter 8.)

*b.* In describing a soldier's conditions, a medical diagnosis alone is not sufficient to establish that the individual is unfit for further military service. The history of the soldier's illness, objective findings on examination, results of X-ray and laboratory tests, reports of consultations, response to therapy, and subjective conclusions with rationale must be addressed.

*c.* A correlation must be established between the soldier's medical defects and physical capabilities. (This is important when a chronic condition is the basis for referral to a PEB and no change in severity of the condition has occurred or when referral of the case to a PEB appears controversial.)

*d.* The date of onset of a medical impairment may be questionable because of relatively short military service and the nature of the impairment, for example, a mental disease. If so, the NARSUM should address the results of inquiry into the pre-service background (family, relatives, medical, and community) of the soldier in sufficient detail to overcome substantive question concerning the date of onset.

*e.* When a soldier is diagnosed with a mental disorder, the NARSUM must include a statement indicating whether the soldier is mentally competent for pay purposes and capable of understanding the nature of, and cooperating in, PEB proceedings.

*f.* NARSUMs will not reflect a conclusion of unfitness. Therefore, diagnoses must not be qualified by such terms as "unfitting", "disqualifying", "ratable", "not ratable".

*g.* When disclosure of medical information would adversely affect the soldier's physical or mental health, the NARSUM should include a statement to that fact.

*h.* The NARSUM should include the date of the physical examination conducted for purposes of physical disability evaluation.

*i.* MEBD proceedings from other than Army MTF's must be forwarded through the designated Army facility (AR 40–3, chap 7).

### 4–12. Counseling soldiers who have been evaluated by a MEBD
*a.* The PEBLO will advise the soldier of the results of the MEBD. The soldier will be given the opportunity to read and sign the MEBD proceedings. If the soldier does not agree with any item in the medical board report or NARSUM, he or she will be advised of appeal procedures.

*b.* The decisions below are exclusively within the province of adjudicative bodies. Neither the PEBLO nor the attending medical personnel will tell the soldier that—

(1) The soldier is medically or physically unfit for further military service.

(2) The soldier will be discharged or retired from the Army because of physical disability.

(3) A given percentage rating appears proper.

(4) A LD decision is final (unless final approval has been obtained according to AR 600–8–1).

### 4–13. Referral to a PEB
*a.* The MEBD will recommend referral to a PEB those soldiers who do not meet medical retention standards. Those who apply for COAD under the provisions of chapter 6 will be included. Do not refer soldiers to a PEB who request discharge under the provisions of chapter 5. A soldier being processed for nondisability separation will not be referred to a PEB unless the soldier has medical impairments that raise substantial doubt as to his or her ability to continue to perform the duties of his or her office, grade, rank, or rating.Soldiers previously found unfit and retained in limited assignment duty status under chapter 6, or a previous authority, will be referred to a PEB.

*b.* A soldier may provide additional information to the MTF commander to forward to the PEB. The information may be from the unit commander, supervisor, or other persons who have knowledge regarding the effect the condition has on the soldier's ability to perform the duties of the office, grade, rank, or rating.

*c.* Personnel processing actions for soldiers referred to a PEB will be according to appendix E.

### 4–14. Psychiatric and spinal cord injury patients requiring continuing hospitalization
*a.* AR 40–3 provides for transfer of psychiatric and spinal cord injury patients to a VA medical facility.

(1) Psychiatric patients requiring continuing hospitalization may be transferred after completion of MEBD action. To ensure timely processing, the MEBD proceedings must be referred to the PEB immediately after transfer of the patient.

(2) Spinal cord injury patients requiring continuing hospitalization will be expeditiously transferred to the VA Spinal Cord Injury Center, regardless of whether the MEBD is completed. The MTF that has responsibility for patients in the particular VA Spinal Cord Injury Center will coordinate the completion and processing of the MEBD.

*b.* The PEBLO of the MTF that has responsibility for the completion of the MEBD will provide disability counseling to the soldier or the soldier's next-of-kin when the soldier is mentally incompetent. The PEBLO will also notify the Installation Retirement Services Officer of the soldier's transfer to the VA hospital; and in cases of mental incompetence, provide the RSO the name and address of the next of kin in order to coordinate counseling on SBP as required under section 1455, title 10, United States Code (10 USC 1455).

**4–15. Action following approval of MEBD report**

The MTF commander will notify the unit commander of the planned referral of a soldier to a PEB and obtain from the commander the written statement described in paragraph *e* below. If further action is not barred, the original and two copies of the MEBD proceedings and allied documents described below, as applicable, will be forwarded to the PEB.

*a.* DA Form 5889–R (PEB Referral Transmittal Document). This document serves as the forwarding memorandum. It identifies the documents forwarded and provides unit and home addresses and telephone numbers for the PEB to contact the soldier as required. DA Form 5889–R will be locally reproduced on 8½ by 11 inch paper. A copy of the form for reproduction purposes is located at the back of this regulation.

*b.* Documents submitted by soldier to accompany MEBD as evidence of physical ability to adequately perform military duties (letters, efficiency reports, or personal statements).

*c.* DA Form 3947 (Medical Evaluation Board Proceedings) with SF 502(Medical Record—Narrative Summary Clinical Survey) as enclosure 1 and DA Form 3349 (Physical Profile) as enclosure 2.

*d.* In cases where the soldier has been determined mentally incompetent, a statement confirming the name, address, telephone number, and relationship of individual authorized to act in behalf of the soldier; whether this person is available for counseling following PEB action; and whether the person has been advised of the referral to a PEB. If the next-of-kin is not known or cannot be located and no court-appointed guardian exists, include a summary of the attempts to identify or locate the next-of-kin. To establish the individual having authority to act for an incompetent soldier, in the absence of a valid and pertinent power of attorney or a court order authorizing an individual to act for an incompetent soldier, follow the guidelines below. The person authorized to act is the person highest in the line of authority listed below.

(1) Spouse, even if a minor.

(2) Adult sons or daughters in order of seniority. An individual is an adult upon reaching the age of majority under the state law of the individual's legal residence.

(3) Parent in order of seniority, unless legal custody was granted to another person by reason of court decree or statutory provision. The person to whom custody was granted remains as next of kin although the individual has reached the age of majority.

(4) Blood or adoptive relative who was granted legal custody of the person by reason of a court decree or statutory provision. The person to whom custody has been granted remains the nearest next of kin although the individual has reached age of majority.

(5) Adult brother and sisters in order of seniority.

(6) Grandparents in order of seniority.

(7) Other relatives in order of relationship to the individual and according to the laws of the soldier's domicile. A soldier's domicile is the soldier's legal residence. It is not necessarily where the soldier is actually living, the soldier's home of record, or where the soldier is stationed.

(8) Persons who stand in place of a parent. Seniority in age will control when the persons are of equal relationship.

*e.* Statement from soldier's commander confirming whether any adverse personnel action is being considered against the soldier and describing the soldier's current duty performance. The description of duty performance should address the following:

(1) The soldier's most recent performance of duty.

(2) Any special limitation of duty due to the soldier's physical condition.

(3) The soldier's ability to adequately perform the duties normally expected of an individual of the soldier's office, grade, rank, or rating.

(4) The soldier's current duty assignment, anticipated future assignments, branch, age, and career specialities.

*f.* A copy of the document reflecting the approved LD decision (AR 600–8–1) if the disability is the result of injury; the result of disease secondary to injury or due to misconduct; or the result of disease when the case is that of a soldier performing duty for 30 days or less. Provide either a DD Form 261, DA Form 2173, or similar LD reports from the Navy or Air Force.If the documents are not available, the MTF commander will send a request for LD decision, well in advance of a preparation of the MEBD report, to the soldier's unit of assignment at the time of injury or disease. Include a copy of the request in the case file sent to the PEB and send a copy to PERSCOM(TAPC–PED–S). The request will provide the following information:

(1) Name, grade, and SSN.

(2) Date and place of injury.

(3) Short summary of circumstances of injury, including the identity of MTF where the soldier was treated.

(4) Unit of assignment when the soldier was injured.

(5) Statement that the LD determination is required for disability processing.

*g.* Orders or training schedule under which the soldier was performing active duty, active duty for training, or inactive duty training when the soldier is subject to disability processing under chapter 8. If the soldier is retained for medical care beyond termination date of active duty for training, include a copy of the affidavit required by AR 135–381. If referral to a PEB occurs during rehospitalization for treatment of residuals of an injury, provide a copy of the authorization for rehospitalization required by AR 40–3, para 4–2*d*(2).

*h.* Copy of memorandum approving COAD when case is that of a soldier previously continued on duty under the COAD program. If available, include a copy of the DA Form 199 related to the previous COAD action.

*i.* Soldier's request for COAD under chapter 6 of this regulation.

*j.* Statement of COAD counseling when soldier has 18 but less than 20 years of service and declines to request COAD. (para 6–5).

*k.* Copy of decision by the GCMCA to waive administrative separation under AR 635–200, chapter 14 for referral of soldier to a PEB. Requirement applies even if a general discharge is directed under AR 635–200, chapter 14.Requirement is not applicable to soldiers pending separation under AR 635–200, chapter 13.

*l.* Statement from the custodian of the soldier's personnel records confirming whether one of the circumstances below is applicable at the time the soldier is referred to a PEB.

(1) Voluntary or mandatory retirement processing.

(2) Expiration of term of service without reenlistment.

(3) Expiration of term of service with bar to reenlistment.

(4) Involuntary release from active duty due to DA board action.

(5) Qualitative management denial for reenlistment.

(6) Adverse personnel action.

*m.* Document authorizing soldier's retention beyond scheduled separation or retirement date. (See AR 635–100, AR 635–120, or AR 635–200.)

*n.* If available, DA Form 2 (Personnel Qualification Record—Part I) and DA Form 2–1 (Personnel Qualification Record—Part 2). If the documents are not available, use alternative sources to obtain the required personnel data if the information is reliable. Examples include requesting the Military Personnel Office (MILPO) to extract a DA Form 2A (Personnel Qualification Record, Parts I and II) from SIDPERS and asking the soldier to furnish the information directly. The use of alternative sources does not relieve the PEBLO of the

requirement to initially request a copy of the DA Form 2 and DA Form 2–1.

*o.* If available, a statement explaining the reason for reduction to the lower grade when the soldier is serving in a grade below the highest grade held. When the information is available, include a statement explaining the circumstance precluding advancement to private or private first class under the provisions of AR 600–200 (NGR 600–200 or AR 140–158 for soldiers in the Reserve Components) if—

(1) The current grade is private (pay grade E–1), and the soldier has completed more than 6 month's service.

(2) The current grade is private (pay grade E–2), and the soldier has completed more than 12 months service.

*p.* Copy of request for VA hospital bed designation, if applicable.

*q.* Copy of orders moving patient to a VA hospital for continued hospitalization, if applicable.

*r.* Copy of letter(s) to proper state authorities, as applicable.

*s.* Copy of the request for Statement of Service when soldier is a member of the Reserve Components (fig 4–1).

*t.* Copy of latest DA Form 3686–1 (Army Leave and Earnings Statement).

### 4–16. Rehospitalization of disabled soldier

A soldier who is rehospitalized while undergoing disability evaluation or awaiting final disposition must be evaluated to decide if his or her condition may change the findings or recommendations of the PEB. If the soldier's condition may change the findings and recommendations, the MTF commander will notify the PEB president. Further adjudicative and review action may be suspended pending resolution. When the soldier has received optimum hospital improvement for disposition purposes, the hospital commander will prepare an addendum to the original medical board. The addendum will be forwarded to the PEB with any other pertinent records unless some other disposition is indicated. The PEB must be notified if other disposition terminates disability processing.

## Section IV
## Physical Disability Evaluation

### 4–17. PEBs

*a. Purpose.* PEBs are established to evaluate all cases of physical disability equitably for the soldier and the Army. The PEB is not a statutory board. Its findings and recommendations may be revised. It is a fact-finding board for the following:

(1) Investigating the nature, cause, degree of severity, and probable permanency of the disability of soldiers whose cases are referred to the board.

(2) Evaluating the physical condition of the soldier against the physical requirements of the soldier's particular office, grade, rank, or rating.

(3) Providing a full and fair hearing for the soldier as required by section 1214, title 10 United States Code (10 USC 1214).

(4) Making findings and recommendations required by law to establish the eligibility of a soldier to be separated or retired because of physical disability (10 USC 61).

*b. Composition.* PEBs will consist of at least three members(president, personnel management officer, and a medical member). PEB members will be experienced officers who are thoroughly familiar with board procedures.The CG, USAPDA will appoint PEB members from assigned personnel for full-time duty. Part-time members may be appointed by the CG, USAPDA with the consent of the commander having jurisdiction over the individual to be appointed-.Part-time members supplement or temporarily replace full-time members, as needed, for the prompt processing of disability cases. The president and personnel management officer will be field grade officers (other than Medical Corps) on active duty in the U.S. Army (other than active duty for training).The medical member will be either an officer of the U.S. Army Medical Corps or a Department of the Army civilian (DAC) physician with previous U.S. Army Medical Corps experience. The medical member must not have served in any capacity with the MEBD that referred the soldier to the PEB. If possible, the voting members should be senior to the person being evaluated. To ensure fair and independent decision making, the PEB president will not rate the other members of the board for purposes of evaluating job proficiency.

*c. President of PEB.* The appointing authority will name a senior commissioned officer as president of each PEB. The senior nonmedical member will act as president when the president is absent. The president has full responsibility for the board. He will ensure that law, regulations, and DA adjudicative principles are followed.

*d. Reserve Component member.* When a soldier of the Reserve Components (RC) is being evaluated, one of the PEB members must be a Reserve officer who is otherwise qualified for duty as a member of the PEB.

*e. Disqualification.* PEB voting members must disqualify themselves if they have had a personal or professional relationship with the soldier being evaluated.

*f. Disability evaluation of PEB members.* When members of the PEB are referred into the physical disability system, they will be evaluated by other than the PEB to which assigned. After PEB evaluation such cases will be forwarded to USAPDA for review.

*g. Female or minority representation.*

(1) When requested, the PEB will substitute a female or minority soldier of the same minority group for one of the regular members of the board, if the requested representation is reasonably available. Request for female or minority representation should be made in writing at the time of request for a formal hearing. The substitute must meet the qualifications for regular voting members. The PEB president will determine if the requested representation is reasonably available. The proceedings will include a statement of the request and whether the representation was or was not provided, that is, "Minority (or female) representation was requested and provided" or "Minority representation (or female) was requested and not reasonably available and, therefore, was not provided."

(2) When an enlisted soldier is being evaluated, the PEB will upon written request of the soldier, include enlisted representation if reasonably available. Request for enlisted representation should be in writing at the time of request for a formal hearing. The enlisted representation must be in the ranks of sergeants first class to sergeants major and senior to the soldier being evaluated. The PEB president will determine if enlisted representation is reasonably available. The proceedings will include a statement of the request and whether the representation was or was not provided as described in paragraph*g*(1) above. When enlisted representation is provided, the PEB will increase to five members, all of whom will have a vote. The fifth member may be enlisted or officer.

*h. Counsel.* An Army attorney will be appointed as counsel to represent soldiers at formal PEB hearings. The attorney will not be a voting member of the PEB or an advisor to the PEB, but will represent the soldier as required when the soldier requests a formal hearing. The attorney will counsel the soldier until formal disability proceedings are completed. The appointed counsel may also advise PEBLOs of MTFs that refer cases to the PEB.

*i. Recorder.* The appointing authority will assign a permanent recorder for the PEB. The recorder will be a commissioned officer, warrant officer, or civilian employee of equivalent grade of any branch or career field except those listed below.

(1) Medical Corps.

(2) Dental Corps.

(3) Army Nurse Corps.

(4) Army Medical Specialist Corps.

(5) The Judge Advocate General's Corps.

*j. Reporter.* The appointing authority will assign permanent qualified reporters to the PEB.

*k. Support.* A PEB is a tenant of the installation where located. The CG, USAPDA enters into agreements providing for administrative and logistical support with installation and MTF commanders.

### 4–18. Initial processing

*a.* Upon receipt of a case by the PEB, the case file will be reviewed to ensure it is complete. If documents are missing, action

will be taken to complete the file. When the case file is complete, it may be referred to the board for evaluation.

*b.* The PEB may return a case to the MTF commander for additional information. However, efforts should be made to resolve all issues without returning the case. When circumstances permit resolution of the problem by discussion, a memorandum of the discussion must be included in the case file as an exhibit. When return of the case to the MTF is necessary, the reason for its return will be clearly stated in the letter of transmittal. Examples of reasons for which a case may be returned are as follows:

(1) Further physical examination, clarification, or preparation of additional records is required.

(2) Additional description and information by the medical board of the soldier's defects and their effect on the soldier's functional ability to perform duty are necessary for proper PEB evaluation of the case.

(3) Further observation, evaluation, and reconsideration by a medical board is required.

(4) Additional information from the command concerning the soldier's ability to perform the duties of his or her office, grade, rank, or rating must be provided for proper PEB evaluation of the case.

(5) The soldier has been AWOL for 10 days or more.

(6) Any case previously forwarded to USAPDA for review and approval, which was returned to the PEB for reconsideration or rehearing.

*c. Additional documents.* Any member of the PEB, the soldier, or counsel acting in the soldier's behalf may request additional documents. The PEB president will determine if the requested information is required for proper adjudication of the case. If it is determined that the additional information is required, the PEB president will suspend consideration of the case until an effort has been made to obtain the requested information. If requested documents cannot be obtained, a memorandum for record will be included in the case file reflecting all efforts made to obtain the information.The case will then be adjudicated on the basis of the available evidence.

*d. Decision on fitness.*

(1) The first and most important determination made by the PEB is whether the soldier is physically fit or unfit to perform the duties of the soldier's office, grade, rank, or rating. All other actions are directly or indirectly tied to this one finding.

(2) The determination of physical fitness will be made by relating the nature and degree of physical disability of the soldier to the requirements and duties that the soldier may reasonably be expected to perform in his or her primary MOS.

(3) Changes in medications or other therapy for chronic conditions do not alone establish deterioration of a chronic condition. Unless recent, significant deterioration has occurred or unexpected adverse results are evident from the new treatment, such changes are not a basis for finding a soldier unfit.

*e. Conditions which existed prior to entry in service.*

(1) *Unchanged physical defects.* A soldier will not be found unfit because of physical defects that—

*(a)* Were known to exist at the time of acceptance for military service,

*(b)* Have remained essentially unchanged since acceptance,

*(c)* Have not interfered with performance of effective military service.

(2) *Application of accepted medical principles.* After a soldier is accepted for active duty, discovery of an impairment causing physical disability is not conclusive evidence that the condition was incurred after acceptance. Consideration must also be given to accepted medical principles in deciding whether a medical impairment was the result of, or aggravated by, military service while the soldier was entitled to basic pay; or in the case of a Reservist on active duty for 30 days or less, whether the disability was the proximate result of performing active duty or inactive duty training. Accepted medical principles may not be excluded in making these decisions even when there is no other evidence indicating the impairment was present before the soldier's entry on active duty. The soldier's length of service must be considered when determining service aggravation. When a decision or recommendation of a PEB is based primarily on accepted medical principles, the principle must be cited as part of the rationale.

(3) *Service aggravation.*

*(a)* The PEB may decide that a soldier's physical defect existed prior to service, or inactive duty for training, or resulted from a nonservice connected condition (not in LD). If so, the board must further consider whether military service aggravated the unfitting defect.

*(b)* If the soldier's military service makes the condition worse or hastens the natural progression of the condition beyond the normal or anticipated rate had he or she not been exposed to such service, a finding of aggravation must be considered. AR 600–8–1, chapter 41, contains guidance on service aggravation. When the PEB decides that a condition has been aggravated by service, the PEB will consider the degree of disability that is in excess of the degree existing at the time of entrance into service. (app B).

(4) *Conditions not aggravated by service.* Soldiers who are unfit by reason of physical disability neither incurred nor aggravated during any period of service while entitled to basic pay, or as the proximate result of performing active duty or inactive duty training,

### 4–19. PEB decisions—common criteria

*a. Determinations.* The voting members of a PEB make findings and recommendations in each case on the basis of the instructions set forth in paragraphs *b* thru *q* below. The board decides all questions by majority vote. All findings must be based on a preponderance of the evidence. Recommendations must be supported by the findings. In summary, the board determines the following:

(1) Whether the soldier is physically fit or unfit to perform the duties of the soldier's office, grade, rank, or rating.

(2) Whether the disability is of a permanent nature.

(3) Whether the disability meets the criteria established by law for compensation. This determination considers the following questions:

*(a)* Was the disability incurred or aggravated while the soldier was entitled to basic pay (when the soldier is on active duty for more than 30 days)?

*(b)* Was the disability the result of misconduct or willful neglect or incurred during a period of unauthorized absence?

*(c)* Was the disability incurred in LD during a time of war or national emergency or incurred in LD after 14 September 1978?

*(d)* In the case of a soldier ordered to active duty for 30 days or less or ordered to duty under section 270(b), title 10, United States Code (10 USC 270(b)), was the disability the proximate result of performing active duty or inactive duty training? If the disability results from a disease, was it incurred prior to or after 15 November 1986 (chap 8).

(3) Whether the disability meets the criteria for exemption of disability retired or severance pay from gross federal income.

(4) Whether the disability meets the criteria for Civil Service preference eligible status and exemption from the Dual Compensation Act.

*b. Limitations of PEB approval authority.* The PEB may approve for the SA all but the following cases:

(1) General and medical corps officers found unfit.

(2) Informal proceedings when the soldier nonconcurs, waives a formal hearing, and submits within the required time frame a statement explaining his or her reasons for disagreement. The PEB will forward the proceedings to USAPDA for review when its consideration of the rebuttal does not result in a change of the PEB findings and recommendations.

(3) Formal proceedings when the soldier nonconcurs with any finding or recommendation, submits within the required time frame a statement explaining his reasons for disagreement, and the PEB does not modify its decision as requested by the soldier.

(4) All cases in which a minority report is submitted.

(5) Cases of members assigned to a PEB.

but which effects duty performance, will be separated for physical disability without entitlement to benefits.

*(a)* Enlisted soldiers who are eligible for discharge under chapter 5, may be processed under the provisions of that chapter upon their application.

*(b)* Soldiers who meet the criteria and apply for COAD as set forth in chapter 6 will be processed under the provisions of that chapter.

*(c)* RC soldiers may request transfer to the Retired Reserve if eligible.

*f. Entitlements to benefits.* The following rules apply when deciding whether a soldier is entitled to Army disability retired or severance pay.

(1) Sections 1201 through 1203, title 10, United States Code (10 USC 1201 thru 1203) establish the criteria for compensation for soldiers of the Regular Army or soldiers of the RC ordered to active duty for more than 30 days(other than for training under 10 USC 270(b)). These criteria include the following:

*(a)* Disability was incurred while the soldier was entitled to basic pay.

*(b)* The disability is not the result of the soldier's intentional misconduct or willful neglect, and was not incurred during a period of unauthorized absence; and either the soldier has at least eight years of active federal service for retirement; the disability is the proximate result of performing active duty; the disability was incurred in the line of duty in time of war or national emergency; or the disability was incurred in line of duty after September 14, 1978.

(2) Sections 1204 through 1206, title 10, United States Code (10 USC 1204 thru 1206) establish the criteria for entitlements for soldiers of the RC ordered to active duty for 30 days or less or under 10 USC 270(b) (chap 8).

(3) Decision of the Comptroller General of the United States, B–205953, dated 18 June 1982, has ruled that a member in excess leave status is not entitled to basic pay and, therefore, is not entitled to any disability benefits under the provisions of 10 USC 61.

(4) When a finding of unfitness depends on the combined effect of two or more disabilities, each disability must meet the above eligibility requirements to qualify the soldier for disability retirement or severance pay.If one of the combined disabilities that, in combination, renders the soldier unfit does not meet the requirements for entitlement to benefits, the soldier is not eligible for disability benefits from the Army. For example, a soldier may be found unfit because of a disability determined to be EPTS. That soldier may also have a disability that alone is not unfitting but when considered with the EPTS disability would be unfitting. Such a soldier may not be found unfit because of the first disability (EPTS) and thereafter rated for the second disability (which is only unfitting in combination with the first disability).

(5) If the soldier is entitled to disability benefits, the PEB decides the rating for each compensable disability from the VASRD, as modified by appendix B.

(6) When a soldier is eligible for disability benefits, any other disability is compensable if—

*(a)* The criteria in (1) and (2) above are met.

*(b)* The disability, in itself, is unfitting or contributes to the unfitting condition.

*g. Application of LD policy.*

(1) Normally PEBs accept the validity of informal and formal LD investigations and reports. However, the PEB may question the validity of a favorable LD determination. If so, the PEB will conditionally adjudicate the case as if a favorable line of duty decision is correct. Unless the case is subject to review by USAPDA, the PEB will forward the case to PERSCOM(TAPC–PED–S), requesting a review of the LD determination. The following comment will be made in the remarks section of the DA Form 199. "This PEB questions the validity of the line of duty decision rendered in your case. Your case has been processed assuming the decision is valid. Should an unfavorable line of duty determination result, you will not be eligible for entitlement to benefits under the Army disability system." The soldier will be informed of the conditional processing and advised that final disposition by HQDA will be held in abeyance until the LD decision is resolved.

(2) It is not intended that PEBs act as hearing authorities for soldiers' appeal of LD determinations. AR 600–8–1 sets out LD appeal procedures. However, if during a formal hearing, the soldier or his or her counsel presents evidence of error in the LD finding, the PEB shall consider such evidence. If the PEB believes the evidence warrants reconsideration of the LD finding, a referral of the case to PERSCOM (TAPC–PED–S) for review of the LD determination by TAG is authorized. When forwarding a case for such review, the PEB will explain in the forwarding memorandum its rationale for determining that the new evidence raises a question as to the correctness of the LD determination. The soldier and his or her counsel will be advised of the referral and that the case has been conditionally adjudicated as if a favorable LD decision has been made. If the PEB determines that the evidence does not provide reason to question the LD determination, the PEB will inform the soldier and the counsel of this fact and that the case was adjudicated based upon the approved LD determination.

(3) The deputy commander, PEB president, or alternate PEB president have the authority to make a finding of "in line of duty—not due to own misconduct" in the following categories below when an LD determination has not been made at the time a case is referred to a PEB. This authority may only be used when the PEB is convinced no further investigation is required and the weight of the evidence in the case indicates that the injury was not due to misconduct or willful negligence, was not incurred during a period of unauthorized absence, and that the use of alcohol or drugs was not involved.

*(a)* Training accidents to include maneuvers and physical training.

*(b)* Unit organized sports and recreational activities.

*(c)* Individual jogging and sports activities.

*(d)* Household accidents.

*(e)* Slip-and-fall injuries.

*(f)* Injuries incurred in Vietnam, Cambodia, and in other geographical areas where U.S. Army soldiers are not longer present.

(4) If the case is lacking an LD determination and it does not fall into one of the above categories, the PEB will conditionally adjudicate the case as if a favorable decision has been made. The applicable advisory statement described in para 4–19*l*(2) will be included on the Form 199. The soldier will be informed of the conditional processing and advised that final disposition by HQDA will be held in abeyance until the LD decision is resolved.

*h. Deciding permanency of disability.*

(1) Based on accepted medical principles, a disability is"permanent", and a soldier who is otherwise qualified will be permanently retired, if—

*(a)* The defect has become stable so that, with reasonable expectation, the compensable percentage rating will remain unchanged during the following 5-year period.

*(b)* The compensable percentage rating is 80 percent or more and the disability will probably not improve so as to be ratable at less than 80 percent during the following 5 years.

(2) A soldier is placed on the TDRL if fully qualified for permanent retirement except that the disability "may be permanent." The soldier may not be placed on the TDRL for any other reason. Based on accepted medical principles, a disability will be considered as "may be permanent" if it has not stabilized, and one of the following occurs:

*(a)* The soldier may recover so as to be fit for duty.

*(b)* The defect is expected to change in severity within the next 5 years so as to change the compensable percentage rating.

*i. Percent of disability.* After establishing the fact that a soldier is unfit because of physical disability, and that the soldier is entitled to benefits, the PEB must decide the percentage rating for each unfitting compensable disability. Percentage ratings reflect the severity of the soldier's medical condition at time of rating. The VASRD, as modified by appendix B of this regulation, is used in deriving percentage ratings. The first 31 paragraphs of the VASRD, which provide general policies, do not apply and have been replaced by

section I and II of appendix B of this regulation.PEBLOs, raters, and reviewers must be familiar with the VASRD, including introductory paragraphs to sections and italicized footnotes. Appendix B sets forth Army policies (including modifications) on use of the VASRD when rules or ratings provided by the VA schedule are improper for Army use or do not provide a rating basis.

*j. Armed conflict—instrumentality of war.* Certain advantages accrue to soldiers who are retired for physical disability and later return to work for the Federal Government when it is determined that the disability for which retired was incurred under specific circumstances. These advantages concern preference eligible status within the Civil Service system (section 3501, title 5, United States Code (USC 3501)) and exemption of retired veterans to the provisions of the Dual Compensation Act (section 5532, title 5, United States Code (5 USC 5532)). As part of its findings, the PEB will make an entry in block 10A of DA Form 199 to reflect its determination as to whether the disability was incurred within the specified parameters discussed below.

(1) The disability resulted from injury or disease received in LD as a direct result of armed conflict and which itself renders the soldier unfit. A disability may be considered a direct result of armed conflict if—

*(a)* The disability was incurred while the soldier was engaged in armed conflict, or in an operation or incident involving armed conflict or the likelihood of armed conflict; while the soldier was interned as a prisoner of war or detained against his will in the custody of a hostile or belligerent force; or while the soldier was escaping or attempting to escape from such prisoner of war or detained status.

*(b)* A direct causal relationship exists between the armed conflict or the incident or operation, and the disability.

(2) The disability is unfitting, was caused by an instrumentality of war, and was incurred in LD during a period of war as defined by law. The periods of war as defined in 38 USC 101 and 301 are shown below: (The statute does not include the action in Grenada).

*(a) World War II.* The period beginning 7 December 1941 and ending 31 December 1946 and any period of continuous service performed after 31 December 1946 and before 26 July 1947 if such period began before 1 January 1947.

*(b) Korea.* The period beginning 27 June 1950 and ending 31 January 1955.

*(c) Vietnam.* The period beginning 5 August 1964 and ending 7 May 1975. (The “Dominican Intervention” occurred during this period.)

*k. Disability compensation excluded from gross income.*

(1) *The Tax Reform Act of 1976 (TRA 76).* Prior to the enactment of TRA 76 (section 104, title 26, United States Code (26 USC 104)), military disability retired pay or disability severance pay was excluded from gross income for Federal tax purposes. (Disability retired pay is that portion of retired pay based on a person’s disability percentage rating. Disability severance pay is a lump sum payment based on years of service.) With the passage of TRA 76, one of two conditions listed below must be satisfied for military disability retired or severance pay to be exempt from Federal taxation.

*(a)* On 24 September 1975, the individual was a member (including RC membership) of the armed forces of any country, the National Oceanic and Atmospheric Administration (NOAA and formerly the Coast and Geodetic Survey), the U.S. Public Health Service (USPHS), or was under binding written agreement to become such a member. (Soldiers retired or separated by reason of disability on or before the cited date are not affected by TRA 76.)

*(b)* The disability pay is awarded by reason of a combat-related injury. Within the meaning of 26 USC 104, combat-related injuries cover those disabilities attributable to the special dangers associated with armed conflict or the preparation or training for armed conflict.

*1.* A soldier may be performing extrahazardous service even if not directly engaged in combat. Extrahazardous service includes but is not limited to the following activities: Aerial flight duty, parachute duty, demolition duty, experimental stress duty, and diving duty.

*2.* Conditions simulating war include, but are not limited to, the following activities: performance of tactical exercises such as the squad or platoon in the assault; airborne operations; leadership reaction courses;grenade and live fire weapons practice; bayonet training; hand-to-hand combat training; repelling; and negotiation of combat confidence and obstacle courses.

*3.* Unlike the provisions for exemption from the Dual Compensation Act(5 USC 5532) and the provisions for Civil Service retention preference (5 USC 3501), the injury resulting from an instrumentality of war need not have occurred during a period of war as defined by law.

(2) *Entries on DA Form 199.* The entries made on DA Form 199, blocks 10B and 10C, concern disability compensation excludable from gross income.

*(a)* If the PEB can establish the fact (from available records) that the soldier was or was not a member or obligated to become a member of one of the designated organizations on 24 September 1975, the board will make the proper entry in block 10B. If such a decision cannot be made, the PEB will enter a statement after the last entry in block 8 to reflect that fact and leave block 10B blank.

*(b)* In block 10C, the board will record its determination of whether the injury was combat-related as defined by 26 USC 104.

(3) *VA compensation.* VA compensation is exempt from income tax. An individual may waive disability retired pay to receive VA compensation, or receive a combination of the two, or receive military retired pay and exclude from his or her gross income an amount equal to the VA entitlement. The Army does not make the determination as to the probable VA disability compensation. The individual must apply to the VA and receive a disability rating.

*l. Recording of rationale and advisory statements.*

(1) *Rationale.* The PEB will include the rationale for the findings and recommendations on the DA Form 199 along with a statement of the reasons for finding a soldier fit or unfit, and if unfit, the basis for the rating. The rationale will support specifically, the finding that the soldier was, or was not, capable of performing the duties of his or her office, grade, rank or rating. A significant variance may occur between the disability described in block 8 of DA Form 199 and diagnoses or degree of impairment reflected in the MEBD proceedings. If so, explain the variance completely in block 16.

(2) *Advisory statements.* The DA Form 199 will inform the soldier of legal or administrative requirements that impact on the soldier’s disability benefits in the situations described below.

*(a)* When the recommendation of the PEB is placement or retention on the TDRL: “Failure to report for a scheduled periodic examination or to inform PERSCOM of a change in address will result in the suspension of retired pay.Address changes must be reported to: Commander, PERSCOM, ATTN: TAPC–PDB, 2461 Eisenhower Avenue, Alexandria, VA 22331–0477.”

*(b)* When a case has been adjudicated pending completion of a LD:“Your case has been conditionally adjudicated pending the receipt of a favorable LD determination. Should an unfavorable LD determination result, you will not be eligible for benefits under the Army disability system.”

*(c)* When a soldier has a rating of less than 30 percent and has at least 20 qualifying years for retirement for non-regular service: “You have the option of accepting discharge with disability severance pay and forfeiting retirement for non-regular service; or you may request transfer to the Retired Reserve and receive retired pay at age 60. According to sections 1209 and 1213, title 10 United States Codes (10 USC 1209 and 1213), you will forfeit all rights to retired pay if you accept severance pay instead of transfer to the Retired Reserve.”

*m. Minority reports.* If a voting member of the PEB disagrees with the findings and recommendation of the other members, that member may prepare a minority report explaining wherein and why he or she differs with the other members. The minority report will be included in the record of the proceedings and referenced in the remarks section of DA Form 199. A copy will be provided to the soldier and his or her counsel.

*n. Continuances.* A PEB may continue a hearing upon its own motion, at the request of the recorder, or at the request of the soldier

or the soldier's counsel, if the board determines a continuance is needed for a full and fair hearing. Examples of proper reasons for continuance are the need for further medical evaluation and the need to obtain additional records, reports, or statements as evidenced in the case. When a continuance is granted, only one DA Form 199 will be used. Data such as the date, fact, and time of recess and reconvening, and changes in membership will be recorded. If a change of membership is involved, the record will show the reason for the change and that the new member became familiar with the case before proceeding with the hearing.

*o. Recording, assembly, and transmittal of reports of proceedings.*

(1) The findings and recommendations of the PEB are recorded on DA Form 199. This form is distributed on a limited issue basis from the US Army Publications Distribution Center to the PEB's. Instructions for completion of the form are at appendix D. The recorder will initial erasures and corrections involving any substantive matters in the proceedings.

(2) Records of PEB proceedings will be assembled as indicated in table 4–1.

*p. Reconvened and improperly constituted boards.*

(1) *Reconvened board.* Before final action on a case, the proceedings of a properly constituted PEB may be returned to the same board for further consideration of findings, correction of errors, or other reasons. When proceedings are returned, the reconvened board will include as many members of the original PEB as possible. However, proceedings may be conducted properly even though no members of the original board are available. The board must be otherwise properly constituted. The new members must have acquainted themselves with the records of the case before reconvening the board. When reconvening the board with the same members would be prejudicial to the soldier, a new board with all new members will be convened. The case may be transferred to another PEB for this purpose. Proceedings will be the same (formal or informal) as were used at the original hearing and any transcript of the prior hearing will be included with the original and USAPDA copy of the case. If a formal hearing is held, the soldier (his or her next-of-kin or legal guardian if he or she represents the soldier's interests) will be notified of the new hearing date.Should the PEB reconsider the case and change its findings or recommendations, a new DA Form 199 will be prepared and referred to the soldier for his or her election. Despite the procedures employed, the soldier (next-of-kin or legal guardian) will be notified of the results if a change is made in the disposition or benefits from those originally recommended. The soldier will be afforded the opportunity to consult with counsel and to rebut any change. When new findings are made by the PEB, they become the only findings on which later action will be taken. If the reconsideration results in no change, a new DA Form 199 will not be prepared but the fact that the case was reconsidered will be reflected in block 16.

(2) *Improperly constituted boards.* Proceedings of an improperly constituted PEB are null and void. Whenever a hearing is discovered to have been conducted by an improperly constituted PEB, the record of proceedings less the DA Form 199 will be forwarded for the new hearing by a properly constituted board.

*q. Action when soldier is AWOL or dies during disability processing.*

(1) If a PEB receives information that a soldier whose case is in the disability system is AWOL, case processing will be suspended. If the soldier returns to military control within 10 days, processing may be resumed.Processing will include consideration of any new or increased disability incurred during the period of AWOL. Should the soldier not return to military control within 10 days, the case file will be returned to the MTF. If information that a soldier is AWOL is received after the case file has been forwarded for disposition, the PEB will promptly notify the USAPDA.

(2) If information is received that a soldier being processed for physical disability has died, disability processing will be discontinued and the case file will be returned to the MTF.

*r. Disposition.* PEB's will recommend disposition of the case according to the rules stated in table 4–2.

**4–20. Informal board**

*a. Procedure.* Each case is first considered by an informal PEB. Informal procedures reduce the overall time required to process a case through the disability evaluation system. An informal board must ensure that each case considered is complete and correct. The rapid processing intended by the use of informal boards must not override the fundamental requirement for detailed and uniform evaluation of each case. All evidence in the case file must be closely examined and additional evidence obtained if required. The PEB will consider each case using the policies of chapter 3 and the criteria provided in paragraph 4–19.

*b. DA Form 199.* The findings and recommendations of the informal PEB are recorded on DA Form 199 according to the procedures described in appendix D. If the soldier is on active duty, the original form, signed by the president of the PEB, the soldier's copy, and the MTF's copy will be promptly forwarded to the MTF commander concerned using the fastest means of transmission available. If the DA Form 199 is not received by the PEBLO, the PEB will prepare new copies and forward them promptly.

*c. Soldier's election.*

(1) DA Form 199, block 13, lists the election options available to the soldier for informal determinations. These include the following:

*(a)* Concurrence with the findings and recommendations and waiver of a formal hearing.

*(b)* Nonconcurrence with the findings and recommendations; submission of a rebuttal explaining the soldier's reasons for nonconcurrence; and waiver of a formal hearing.

*(c)* Demand for a formal hearing with or without personal appearance.

*(d)* Choice of counsel if a hearing is demanded.

(2) Soldiers indicate their elections by checkmark in block 13 and sign and date the original and MTF copies of DA Form 199.

(3) The election must be received at the PEB within 10 days from the soldier's receipt of the informal findings. See paragraph 4–20*f* below for procedures when elections and rebuttals are received after the required time.

*d. PEBLO.* In all informal cases, the PEBLO of the MTF having control of the soldier will be the counselor for the soldier. As such, the PEBLO is primarily concerned with the soldier's interests. The PEBLO should consult with, and obtain advice as needed from the local legal office, the legal counsel at the nearest PEB, or the Agency Judge Advocate. Upon receipt of the informal proceedings, the PEBLO will accomplish the following actions:

(1) Counsel the soldier according to appendix C. The soldier will be made fully aware of the election options available to him or her, the processing procedures, and the benefits to which he will be entitled if separated or retired for physical disability. As needed, the PEBLO should consult with the local finance officer and the installation Retirement Services Officer (RSO) when counselling on benefits. DA Form 5892–R (PEBLO Estimated Disability Compensation Worksheet) will be provided to the soldier as an estimate only of disability compensation. DA Form 5892–R will be locally reproduced on 8½ and 11 inch paper. A copy of the form for reproduction purposes is located at the back of this regulation.

(2) After the soldier completes block 13, the PEBLO will complete block 14 of the original and MTF copies of DA Form 199. If the soldier fails or declines to make an election, the PEBLO will prepare a brief statement describing the circumstances, indicating the date the soldier was first informed of, and counselled on, the informal board's action. The PEBLO will then forward the DA Form 199 and the statement to the PEB.

(3) In deleterious-type cases or others involving mental incompetence, the PEBLO will contact the next-of-kin or legal guardian (if one has been appointed) and request that person to act in behalf of the soldier. If one cannot be located, the PEBLO will prepare a statement reflecting all actions taken to identify and contact a responsible person to act on behalf of the soldier and forward the

statement for inclusion with the case. (See para 4–15*a* for guidance on establishing the next of kin.)

(4) If soldier elects formal hearing, forward soldier's medical records to the PEB if they were not submitted with MEBD proceedings for the informal PEB.

(5) Complete DA Form 5893–R (PEBLO Counseling Checklist/ Statement).This form will be used to document counseling. At the time of the soldier's final election to PEB determinations, the PEBLO and soldier will sign the form.A copy will be forwarded to the PEB for inclusion in the record of proceedings.DA Form 5893–R will be locally reproduced on 8½ and 11 inch paper. A copy of the form for reproduction purpose is located at the back of this regulation.

*e. Disposition by PEB.* Upon receipt of the soldier's completed DA Form 199 from the PEBLO, the PEB will take the following actions as applicable.

(1) If the soldier accepts the findings and recommendations of the informal PEB, the recorder will assemble the records as required by table 4–1.The proceedings will be approved for the SA and forwarded to PERSCOM for final disposition.

(2) If the soldier nonconcurs with the findings without submitting a rebuttal, the PEB will approve the proceedings for the SA and forward the case to PERSCOM for final disposition.

(3) If the soldier fails or declines to make an election within the prescribed time and the PEB has not received from the PEBLO the statement described in 4–20*d*(2) above, the PEB will contact the PEBLO to confirm the status of the soldier's election. When the PEBLO confirms the soldier has been informed of the findings and recommendations but has not made an election, the PEB will proceed as if the soldier has accepted the findings and recommendations. The proceedings will be forwarded to PERSCOM for final disposition. The forwarding memorandum will document the circumstances resulting in the waiver of election (fig 4–2). The PEB will forward a copy of the memorandum to the soldier through the PEBLO.

(4) In deleterious-type cases or those involving mental incompetence in which the next-of-kin or guardian fails to make an election on behalf of the soldier, the PEB will appoint legal counsel to act on behalf of the soldier.The counsel will prepare a memorandum documenting the results of his or her action (fig 4–3).

(5) If the soldier nonconcurs and submits a statement or rebuttal to the recommended findings without asking for a formal hearing, the PEB president will respond in writing to the soldier, normally within 3 days. When the soldier's rebuttal does not result in a change to the PEB's findings, the response will acknowledge receipt of the rebuttal and explain the PEB's decision to adhere to the earlier findings. The soldier will be advised that the rebuttal will be included in the case file and considered in the review action by USAPDA. A copy of the PEB president's letter will be included in the case file.

(6) If the soldier nonconcurs with the findings and recommendations with a statement of rebuttal and demands a formal hearing, the PEB may reconsider their findings and recommendations in the light of the soldier's statement of rebuttal. Should the PEB agree with the soldier and modify their findings and recommendations, the PEB will initiate a new DA Form 199 informing the soldier through the MTF commander of the results. If the soldier accepts them, the case will be processed as in paragraph 4–20*e*(1), above.Otherwise, the case will be scheduled for a formal hearing. The PEB will inform the appointed legal counsel of the pending action. If the soldier (in demanding a formal hearing) has elected to be represented by individual counsel, the appointed PEB counsel in coordination with the PEB president will make arrangements for the hearing with the individual counsel. If the soldier is at some location other than that of the PEB, the commanding officer will promptly issue necessary TDY orders for travel of the soldier using locally available funds.

(7) Whenever more than one hearing (including a reconsideration) is held on a case, a copy of the DA Form 199 for each hearing will be attached to the final DA Form 199 to reflect and explain the multiple considerations. For example, a copy of an informal board's DA Form 199 attached to the copy of the formal board's DA Form 199 will record the soldier's demand for a formal hearing without further comment or explanation.

*f. Rebuttals.* Rebuttals received after the allotted time or after initial election of concurrence.

(1) In those instances when a rebuttal from a soldier is received after the allotted time for submission of a rebuttal, or after a soldier has initially agreed with the findings and recommendations of the PEB and the case has been approved for the SA and forwarded to PERSCOM for final disposition, the PEB will respond to the soldier as set forth below.

*(a)* If the rebuttal does not result in a change to the findings and recommendations, the PEB will advise the soldier in writing that no change is warranted and the rebuttal, together with the reply, has been forwarded to PERSCOM for inclusion in the case proceedings. The soldier retains the right to one formal hearing prior to final disposition by PERSCOM if the soldier is otherwise entitled and requests the hearing.

*(b)* When the rebuttal results in a change to the PEB's findings or recommendations, the PEB will recall the case and effect the necessary changes by preparing a new DA Form 199. The new findings will be furnished to the soldier. Normal processing procedures apply.

(2) Notwithstanding the above, when additional medical evidence or an addendum to the MEBD is received after the PEB has forwarded the case and the PEB determines that such evidence would change any finding or recommendation, the case will be recalled by the PEB and a new DA Form 199 issued. Normal procedures apply following the preparation of a new DA Form 199.

**4–21. Formal board**

*a. Formal hearing.* A soldier is entitled to a formal hearing if requested after informal consideration by a PEB. The soldier may waive this right by concurring in the findings and recommendations of the informal board.If the soldier is incompetent, the right to waive a formal hearing may be exercised by next-of-kin or legal counsel. After demanding a formal hearing, a soldier may later withdraw the demand and accept the informal board's decision, in which case, the counsel will inform the PEB. The case will be forwarded to PERSCOM. The soldier must be counseled on the right to demand a formal board.If the soldier demands a formal hearing, he or she is entitled to counsel as provided in paragraph 3–10*d* and *h* below. A formal board will be convened when—

(1) A soldier (next-of-kin or legal guardian) demands it after electing not to accept the findings and recommendations of an informal board.

(2) The case file has been forwarded to PERSCOM for issuance of retirement or separation instructions and the soldier demands a formal hearing before PERSCOM action is final.

(3) After an informal board, the president of the PEB decides that a formal hearing is in the best interest of the soldier or the Army.

*b. Formal board membership.* A formal hearing will normally be conducted before a board composed of the same members who considered the soldier's case informally. The purpose of a formal hearing is to afford the soldier the opportunity to present views, testimony, and new evidence. The board members must consider these matters with open minds despite their earlier decisions. For this reason the challenge of a voting member, solely because the member took part in the informal board, ordinarily should be denied. If the soldier is able to establish that a member of the formal board is not impartial, that board member will be replaced. If a replacement for the successfully challenged member is not available, the CG, USAPDA will appoint another member to the PEB panel for the formal hearing. If an original voting member of the informal board is not available for the formal hearing, that member may be replaced with another who is qualified to sit. The new member must become thoroughly acquainted with all pertinent records before the formal hearing is convened.

*c. Hearing room.* Locally available space will dictate the arrangement of the hearing room. The minimum requirement gives room for three board members, the recorder, the soldier whose case is to

be heard, counsel for the soldier, and the reporter. Proper decorum consistent with the purpose of the hearing is important; however, every effort should be made to maintain a relaxed and courteous environment. Avoid any implication of adversary proceedings in the case.

*d. Scheduling hearing.* The president of the PEB will establish the date, time, and place of the hearing subject to the following:

(1) The soldier (next-of-kin or legal guardian) will be allowed a minimum of 3 working days to prepare for the hearing.

(2) The soldier may waive the 3-day period or any portion of it.

(3) If more time is required to prepare the case, the soldier will forward a written request for an extension to the president of the PEB. The president, in turn, will endorse the request to the soldier indicating approval or disapproval and forward a copy of the response to the soldier's counsel. In deciding whether to approve the request, the president must consider whether the soldier would be unable to receive a full and fair consideration of his case if a delay were not granted. The date and time of any rescheduled hearing will be specified in the endorsement. If, in the judgment of the PEB president, the soldier or counsel are attempting to delay the hearing without valid reasons, the formal hearing will be held with or without the presence of the soldier and selected counsel.

(4) Ample travel time will be allowed if the soldier will be represented by his or her next-of-kin or legal guardian in those cases where the member is mentally incompetent or the physician determines that divulging information to the soldier would be harmful to his or her well being. Funded travel is authorized under the provisions of C6000 of the Joint Federal Travel Regulation. The MTF will issue invitational travel orders authorizing travel for one person.

(5) The PEB will—

*(a)* Notify the soldier (next-of-kin or legal guardian) of the scheduled hearing. Figures 4–4 and 4–5 show notification to the soldier based on soldier's selection of counsel. Figure 4–6 shows notification to the next-of-kin. DA Form 5890–R (Acknowledgment of Notification of Formal Physical Evaluation Board Hearing) will be enclosed with the letter of notification to the soldier or next-of-kin. DA Form 5890–R will be locally reproduced on 8½- and 11-inch paper. A copy of the form for reproduction purposes is located at the back of this regulation.

*(b)* Notify the board members, witnesses, counsel, reporter, and interpreter (if needed) of the date, time, and place of the hearing.

*(c)* Arrange for the attendance of all available military witnesses or, under appropriate circumstances, obtain depositions and other evidence.

*(d)* Ensure that the soldier's records are furnished to medical witnesses for review before hearing.

*(e)* Present all available evidence and witnesses to the board.

*e. Soldier's rights.*

(1) Certain rights accrue to a soldier whose case is under evaluation by a PEB. A counsel must be aware of these rights. When communicating with the soldier (next-of-kin or legal guardian), counsel must ensure the soldier knows and understands the rights that apply to the circumstances of the soldier's case. Although certain rights apply in all cases, some are particularly applicable during formal hearings, especially when the soldier is present at the hearing. These rights are described below:

*(a)* The Privacy Act of 1974 applies to information of a personal nature requested of the soldier during a formal hearing.

*(b)* The soldier may testify as a witness under oath in his or her own behalf, in which case the soldier may be cross-examined as any other witness.

*(c)* The soldier or the soldier's counsel may introduce witnesses, depositions, documents, or other evidence in his or her own behalf, and cross-examine witnesses who have been examined by the PEB including witnesses who have specific knowledge of the soldier's case and whose conversations have been summarized for the record.

*(d)* The soldier or soldier's counsel may make unsworn statements, orally, or in writing, or both, without being subject to cross-examination.

*(e)* The soldier may remain silent. The choice not to make a statement or answer questions is not to be considered adverse to the soldier's interests.

(2) Appointed counsel will use DA Form 5891–R (Acknowledgment of Counseling on Legal/Procedural Rights) to counsel the soldier on his or her procedural rights and to provide a record of such counseling. DA Form 5891–R informs the soldier of the rights described above, and requests acknowledgment by soldier's signature. A copy will be included in the record of formal proceedings and provided to the soldier. DA Form 5891–R will be locally reproduced on 8½- and 11-inch paper. A copy of the form for reproduction purposes is located at the back of this regulation.

*f. Failure to appear.* If a soldier who has elected to appear at a formal hearing fails to do so, the president of the PEB will take the following actions:

(1) Suspend the hearing and determine the reason for the soldier's absence. Subject to the provisions of (2) below, if no reasonable excuse is apparent for the soldier's absence, the hearing may proceed. The president will include in the record a statement of circumstances. Should the soldier later appear before the hearing has been concluded, the president may recess the hearing. He may permit the counsel to brief the soldier on proceedings up to that point. The hearing will then proceed.

(2) A formal hearing may not proceed if the soldier's individually selected counsel (if the soldier has one and who has been determined to be available to represent the soldier) is absent, unless the appointed counsel is present in open session.

*g. Waiver of appearance.* A soldier may waive, in writing, his or her appearance at a formal hearing. In such a case, the appointed counsel(or individually selected counsel if the soldier has one) must be present. The counsel will represent the soldier during all open sessions of the hearing, and perform the duties required of counsel during post-hearing actions.

*h. Counsel.* For formal hearings at which the soldier will be present, each soldier will be represented by counsel unless representation is specifically declined in writing.

(1) *Representation.* The appointed PEB counsel, other military counsel if reasonably available and released by the counsel's command for this purpose, or civilian counsel of the soldier's choice will represent the soldier. A soldier may arrange for civilian counsel of the soldier's own choice at no expense to the Government. The soldier may present his or her case without counsel, in which case the soldier must conform to all procedural rules. The soldier must sign a statement specifically excusing appointed PEB counsel. The statement will be made a part of the record. The PEB president will require appointed counsel to remain in the hearing room even if counsel is released by the soldier in writing, except when counsel of choice is present.Appointed counsel will act as co-counsel when the soldier chooses another counsel unless excused by the soldier.

(2) *Duties.* The counsel safeguards the legal rights of the soldier. He or she remains in attendance at all open sessions of the board unless excused, in writing, by the soldier. Counsel's duties are to—

*(a)* Confer with the soldier and advise the soldier of his or her rights.

*(b)* Prepare the soldier's case for presentation to the board.

*(c)* Request the PEB arrange for the attendance of available witnesses or obtain their depositions or other specifically desired evidence in support of the soldier's position.

*(d)* Examine and cross-examine witnesses and otherwise assist the soldier in presenting his or her case.

*(e)* Submit oral or written arguments.

*(f)* Counsel the soldier on the board's findings.

*(g)* Upon request, assist in the preparation of the rebuttal.

(3) Mentally incompetent and deleterious-type cases. The appointed legal counsel will serve as counsel when the next-of-kin (or legal guardian)acts for the soldier in a case of this type unless replaced by special counsel.Funded travel is authorized as described in paragraph *d*(4) above. In the absence of the next-of-kin, the PEB counsel must be present, even though special counsel is representing the soldier, unless excused by the next-of-kin or special counsel in writing.

*i. Records review by soldier.* All records assembled for use during the hearing, including those furnished by HQDA and by other official sources, will be made available to the soldier and his or her counsel for review. The assembled records will include memoranda of conversations with individuals who have specific knowledge of the soldier's case, including, but not limited to, the soldier's chain of command or treating physician. In cases involving mental incompetence or deleterious-type cases, only the counsel and, if present, the next-of-kin or legal guardian may examine the records. The soldier (next-of-kin or legal guardian) and counsel may make notes from the records to prepare the soldier's case properly. However, the PEB president may withhold from civilian counsel, next-of-kin, or legal guardian, any security information.

*j. Challenges.*

(1) The recorder will announce the names and grades of the members of the board present. Any member of the board or counsel who is aware of any facts that the member believes to be grounds for challenge against himself or any other member, including the president of the board, will state such facts. If it appears a member is subject to challenge for cause, and the fact is not disputed, the member will be excused and replaced. The recorder is not subject to challenge.

(2) The statutory right to a full and fair hearing includes the right to challenge for cause. Grounds for challenge may be made by a statement of any fact indicating any member should not sit as a member of the board in the interest of having the hearing and later proceedings free from substantial doubt as to legality, fairness, and impartiality. Not more than one member will be challenged at one time. Later challenges may be made against other members of the board after a ruling is made on a previous challenge.

(3) A challenge may be withdrawn at any time. If a challenge is not withdrawn, the board will give the soldier the opportunity to introduce evidence, examine the challenged member under oath, and make an argument as to why the challenge should be granted. The PEB will decide if the challenge should be granted by majority vote of the remaining members following discussion in closed deliberation. If the challenged member is the president of the board, the next senior nonmedical board member will preside in the case. A tie vote will sustain the challenge. Upon reopening the board, the president of the board will announce whether the challenge has been sustained. This announcement will be reflected in the record. If the challenge is sustained, the proceedings will be suspended until a replacement for the challenged member is provided.

*k. Verifying soldier's rights.* When the hearing begins, the PEB president will assure himself or herself that the soldier has been informed of his or her rights. If it appears the soldier has not been so informed, the PEB president will recess the hearing and allow the counsel time to advise the soldier.

*l. Proof of facts.*

(1) *General.* Facts and circumstances relevant to the matter under investigation are most often proved or disproved, either directly or through inferences, by real (tangible) evidence, documentary evidence, testimony or statements of witnesses, and matters of which official notice may be taken without proof.

(2) *Real evidence.* A tangible object (for example, brace, crutch) which is material and relevant to the subject of the inquiry is real evidence. Whenever an item of real evidence would aid in establishing the existence or nonexistence of a fact, that item, or a photograph, description, or other suitable reproduction of it, should be included in the report of proceedings, together with any statement of witnesses necessary to identify the item and verify the accuracy of the reproduction. Board members should not overlook their own observations respecting real evidence. If a board member observes an item and gains impressions not adequately portrayed by a photograph, chart, or other representation, he or she should ensure that an appropriate description of the item is made and included in the report.

(3) *Documentary evidence.* Documentary evidence consists of records, reports, letters, and other written, printed, or graphic materials which indicate the existence or nonexistence of a fact. Boards should be alert to discover all such evidence relevant to the matter under inquiry and to include the originals or copies in the record.

(4) *Testimony or statements of witnesses.* Oral or written accounts of matters within the personal knowledge of individuals usually constitute an indispensable part of the evidence considered by a board.Because, unlike real or documentary evidence, such evidence is not fixed as to form or substance, obtaining a witness' testimony or statement requires careful advance analysis of relevant matters of which the witness is expected to have knowledge and preparation of questions to elicit that knowledge without distorting its substance. A preliminary interview of the witness to clarify what information can be elicited is often appropriate, especially by the soldier's counsel and the recorder. Voting members, however, may not conduct separate interviews of witnesses.

(5) *Official notice.* Some facts are of such common knowledge that there is no need to obtain specific evidence to prove them (for example, general facts and laws of nature; general facts of history; location of major elements of the Army; organization of the Department of Defense and its components).

*m. Rules of evidence.*

(1) *General.* Proceedings of the PEB are administrative and not judicial in nature; therefore, a board is not bound by the rules of evidence prescribed for trials by court-martial or for court proceedings generally. Accordingly, except as limited in (3) below, anything which in the opinions of reasonable persons is relevant and material to an issue, may be accepted as evidence. All evidence will be given such weight as is warranted under the circumstances.

(2) *Best evidence.* A board is not precluded from considering any evidence merely because there may be better evidence available to prove the same fact. Generally, however, an effort should be made to obtain the best evidence reasonably available, considering factors such as time, importance, and expense as well as the availability and reliability of substitute evidence.Although hearsay evidence may always be accepted, the personal statement or recent deposition of a witness is usually better evidence than an earlier written statement by that witness or having someone else state what the witness said.

(3) *Limitations.* Administrative proceedings governed by this regulation generally are not subject to exclusionary rules precluding the use of relevant evidence. However, the following does apply with regard to evidence which may be accepted and considered in a board.

*(a) Privileged communications.* The rules concerning privileged communications between client-attorney, and penitent-clergyman, apply to PEBs.

*(b) "Off the record" statements.* Findings and recommendations of the board must be supported by evidence contained in the record. Accordingly, witnesses should not be allowed to make statements "off the record" to board members in formal proceedings.

*(c) Statements regarding disease or injury.* Section 1219, title 10, United States Code (10 USC 1219) provides that a soldier may not be required to sign a statement relating to the origin, incurrence, or aggravation of a disease or injury that the soldier has suffered. Before any signed, written statement against the soldiers interest may be considered, it must be determined that such a statement was made voluntarily. Any statement signed after the soldier has been advised of the right not to make a statement is presumed to be voluntary and is valid for consideration. (This restriction does not include oral testimony.)

*(d) Self-incrimination.* Military witnesses will not be compelled to incriminate themselves, or to answer any question to which the answer might tend to incriminate them, or to make a statement or produce evidence if the statement or evidence is not material to the issue and might tend to degrade them (article 31, Uniform Code of Military Justice (UCMJ, Art 31)). Any witness not subject to the UCMJ, will not be required to make a statement or produce evidence which would deprive them of their rights under the Fifth Amendment of the United States Constitution.

*n. Administering oaths.* Voting members of a PEB, the recorder, counsel, and others who regularly take part in PEB evaluations and have no vested interest in the outcome of cases considered need not

be sworn before performing their duties. Officers are required in their oath of office to "carefully and diligently discharge the duties of the office to which appointed." Civilian employees are sworn to perform their duties faithfully. A high standard of performance is to be expected, therefore, of individuals assigned to these duties.

(1) A soldier appearing in his or her own behalf is not sworn unless the soldier elects to testify under oath. If the soldier chooses to be sworn, the oath or affirmation prescribed in (2) below will be used.

(2) Witnesses will sometimes have a vested interest in a case, often adverse to the soldier's or the Army's interest. Because this partiality is not evident initially, any person who is to testify will first be sworn. In deleterious-type cases or those involving mental incompetence, the next-of-kin or guardian will be sworn. If the witness desires to affirm rather than swear, the words "so help you God" will be omitted. The recorder will administer the following oath:

> "Do you swear (or affirm) that the evidence you shall give in the case now in hearing shall be truth, the whole truth, and nothing but the truth? (So help you God)?"

*o. Attendance of witnesses.* The board will summon available witnesses needed for the hearing. Either the soldier or the PEB may request attendance of a witness. Whether a witness is available depends on the conditions described below.

(1) Members and employees of the armed services located at the same installation as the PEB are usually available. If available, the commander or supervisor will ensure that they appear.

(2) Members and employees of the armed services located at other installations may be available. The PEB president will decide whether the presence of such witnesses is required for a full and fair hearing. If the PEB president decides the testimony of such a witness is needed and that alternative forms of evidence cannot be substituted for the personal presence of the witness, the commander or supervisor must ensure the witness is present.

(3) The soldier is responsible for arranging for the attendance of witneses who are not members or employees of the armed forces. Such witnesses attend hearings at no expense to the Government. Additionally, the soldier is entitled to present the testimony of any other soldier or employee of the Army, or other armed services, whom the soldier obtains at no expense to the Government, and whom is given leave to attend.

(4) Witnesses summoned by the PEB who are members or employees of the armed services are entitled to travel expenses and per diem allowances authorized by Joint Federal Travel Regulations. The commander of the command to which the witness belongs is responsible for these costs. If command funds are not available, and the PEB president still considers personal testimony by the witness essential, funds available to the PEB may be used to pay the costs.

(5) The PEB president may decide that the witness need not appear in person to testify. If so, he or she may authorize the soldier's military counsel to take the deposition at the witness' location. The counsel may take the deposition either personally or by arranging with the soldier's representative to do so. If the counsel is to take the deposition in person and TDY is involved, the counsel will provide the PEB president a summary of the information he or she expects to discover and how it relates to the case. if the PEB president approves the TDY, the PEB will pay costs from travel funds available to the PEB. The deponent may be at a distance so that the military counsel is unable to take the deposition in person. If so, the soldier's counsel may request assistance from the staff Judge Advocate nearest the deponent's location. Should expenditure of per diem or travel funds be involved, the counsel will make his or her request through the PEB president who is considering the case. A summary of the information to be discovered will be included. If no expenditure of public funds is involved, the receiving PEB president will approve the request and refer it for action to the appropriate Staff Judge Advocate. If the requested action involves payment of TDY costs, expenses will be paid from funds available to the PEB president requesting the deposition. A counsel may believe that a deposition is required and it cannot be obtained as described above. If so, the counsel may make a request to the officer exercising GCMCA over the installation at which the PEB is located. If the GCMCA approves taking the deposition, he or she will refer the request to the GCMCA in the area in which the deponent is located for action. The deponent will return the deposition through the referring GCMCA. Depositions may be taken on oral or written questions. Depositions will be prepared as provided in rule 703, Military Rules of Evidence, Manual for Courts-Martial, United States,1984.

*p. Procedural objections.* The soldier (the soldier's next-of-kin, legal guardian, or counsel) may object to any actions taken or proposed to be taken by the board or to the admission of evidence. When an objection is made, it will be recorded as part of the record. The president of the board will rule on objections. If any board member dissents from the president's ruling, however, the board will be closed for deliberation and the objection will be ruled upon by majority vote. Upon reopening of the board, the ruling of the board will be announced in open session and recorded as part of the record.

*q. Closed deliberations.* Upon completing an open hearing, the board is closed for deliberation. The voting members decide the findings and recommendations according to policies stated in chapter 3 and criteria in this chapter.

*r. Findings and recommendations.*

(1) The board, upon completion of deliberations, will reopen and inform the soldier of the findings and recommendations. (In cases of mental incompetence or in deleterious-type cases, the board will inform the soldier's counsel, next-of-kin, or legal guardian.) If the soldier (soldier's next-of-kin or legal guardian) is not present at the hearing, notice of the findings and recommendations will be provided to them in writing. (Figs 4–7 and 4–8 respectively show a sample notification to the soldier and the next-of-kin.)

(2) The PEB may change, modify, or correct its findings and recommendations at any time before the record of proceedings is delivered to the CG, USAPDA or Commander, PERSCOM. When such changes are made in previously announced findings or recommendations, the PEB will inform the soldier(soldier's next-of-kin, counsel, or legal guardian) in writing, of the proposed change. The PEB will afford the soldier the opportunity to accept or rebut the proposed change.

(3) When the soldier personally appears before the board, the DA Form 199 will be prepared immediately following the conclusion of the hearing and a copy provided to the soldier. The soldier will be afforded the opportunity to make an election at this time but may choose to take the full time-period permitted for reaching a decision. When the soldier does not appear at the hearing, the DA Form 199 and election form will be transmitted to the commander of the applicable MTF within 24 hours of the adjournment of the hearing. The actual date of delivery to the soldier will be documented in the case file.

*s. Soldier's response.* DA Form 199–1 (Election to Formal Physical Evaluation Board Proceedings) will be provided to the soldier as the election statement to formal proceedings. This form is distributed from the Army Publication Center solely to PEBs.

(1) The DA Form 199–1 and the letter of rebuttal must be received at the PEB within 10 days from the soldier's receipt of the formal findings unless the President of the PEB approves a request for an extension of time. A request for an extension must be received within 10 days of the soldier's receipt of the DA Form 199. If the request for extension is denied, the original time frame remains applicable. A copy of the PEB's decision on the request for extension will be sent to the soldier's counsel.

(2) If the soldier's statement of election or a request for an extension of time is not received within the required time, the PEB will deem that the soldier has waived the right to an election. The proceedings will be forwarded to PERSCOM for final disposition. The forwarding memorandum will document the circumstances resulting in the waiver of election (fig 4–2). The PEB will forward a copy of the memorandum to the soldier through the PEBLO.

(3) A soldier who fails to make an election or to submit a statement of rebuttal to formal proceedings within the allotted time if he or she is in disagreement with the findings and recommendations, will forfeit the opportunity for USAPDA review of his or her case (para 4–21*t* below).

*t. Rebuttals.* Letters of rebuttal to the findings and recommendation of formal proceedings (to include the recommended disability percentage) must be prepared and processed according to the following guidance.

(1) A rebuttal may only be based upon one or more of the issues listed below and must provide rationale in support of the issue.

*(a)* The decision of the PEB was based upon fraud, collusion, or mistake of law.

*(b)* The soldier did not receive a full and fair hearing.

*(c)* Substantial new evidence exists and is submitted which, by due diligence, could not have been presented before disposition of the case by the PEB.

(2) If a letter of rebuttal is received within the required time frame, the PEB will respond to the soldier, or his representative, normally within 3 days confirming that the rebuttal has been received and considered. If consideration of the rebuttal does not affect the outcome of any portion of the PEB decision, the response will include the reasons why the rebuttal does not support a change to the findings and recommendations. The soldier will be informed that the rebuttal will be forwarded with the case file to USAPDA for review (based on the soldier's election of nonconcurrence with submission of a rebuttal). The response by the PEB president will be included in the case file and a copy will be furnished to the soldier's legal counsel or other representative.

(3) If a soldier submits a letter of rebuttal after having initially made an election of concurrence and the rebuttal is submitted within the required time frame, the procedures of paragraph 4–21*t*(2) above apply. If the case has been forwarded to PERSCOM for final disposition based upon the soldier's initial concurrence, the PEB will recall the case. If the letter of rebuttal is received after the required time frame, the procedures of paragraph 4–2*t*(4) below apply.

(4) If a letter of rebuttal is received by the PEB after the soldier's case has been forwarded to PERSCOM for final disposition (based upon the soldier's failure to make an election within the required time frame or nonconcurrence without submission of a rebuttal) the PEB will consider the rebuttal as set forth below.

*(a)* If consideration of the rebuttal does not result in a change to the findings and recommendations, the PEB will advise the soldier, in writing, that no change is warranted and the rebuttal, together with the reply, has been forwarded to PERSCOM for inclusion in the case proceedings. A copy of the reply will be forwarded to the soldier's legal counsel or other representative.Review of proceedings by USAPDA is not required.

*(b)* When the consideration of the rebuttal results in a change to the PEB's findings and recommendations, the PEB will recall the case and effect the necessary changes by preparing a new DA Form 199. The new DA Form 199 will be furnished to the soldier according to normal processing procedures.

(5) Notwithstanding the above, when additional medical evidence or an addendum to the MEBD is received after the PEB has forwarded the case to USAPDA or PERSCOM and the PEB determines that such evidence would change any finding or recommendation, the case will be recalled by the PEB and a new DA Form 199 issued. Normal procedures apply following the preparation of a new DA Form 199.

*u. Mental incompetency.* Formal proceedings of cases involving mental incompetency or nonappearance because of the MTF commander's decision that it would be detrimental for the soldier's well being to appear, will be processed as follows:

(1) The DA Form 199 and DA Form 199–1 with all exhibits will be forwarded by certified mail, return receipt requested, to the soldier's guardian or next-of-kin (fig 4–8). A copy of the forwarding letter will be provided to the soldier's legal counsel or representative.

(2) The transmittal letter will advise the individual of the following:

*(a)* The individual has the right to make an election (DA Form 199–1)and to submit a letter of rebuttal to any finding or recommendation.

*(b)* The election (DA Form 199–1) and rebuttal must be received at the PEB within 10 days of receipt of the DA Form 199 unless, within the 10-day period, the president of the PEB has approved a request for extension.

*(c)* A rebuttal submitted within the allotted time must be considered and the individual notified of the PEB's determination.

*(d)* Upon failure of the individual to submit an election within 10 days, the appointed military counsel will take proper action in behalf of the soldier.

(3) The PEB will not forward the case for disposition until the DA Form 199–1 has been received or counsel has acted in behalf of the soldier.Counsel's action will be documented by memorandum, a copy of which will be included in the case proceedings (fig 4–3).

## Section V
## Review and Confirmation of PEB Action

### 4–22. Review by USAPDA

*a. Required review.* USAPDA will review the following cases.

(1) General and Medical Corps officers found unfit.

(2) Informal proceedings when the soldier nonconcurs with the PEB findings and recommendations, waives a formal hearing, submits a statement of rebuttal within the required time frame, and consideration of the rebuttal by the PEB does not result in a change to its findings and recommendations.

(3) Formal proceedings when the soldier nonconcurs with the PEB findings and recommendations, submits a statement of rebuttal within the required time frame, and consideration of the rebuttal by the PEB does not result in a change to its findings and recommendation.

(4) Cases in which a voting member of the PEB submits a minority report.

(5) Any case previously forwarded to USAPDA for review and approval and which has been returned to the PEB for reconsideration or rehearing.

(6) Cases designated by the CG, USAPDA for review.

(7) Cases of soldiers assigned to USAPDA.

*b. Purpose of review.* The review will be confined to the case records and proceedings and related evidence. The review will ensure that the following criteria have been satisfied.

(1) The soldier received a full and fair hearing.

(2) The proceedings of the medical evaluation board and the PEB were conducted according to governing regulations.

(3) The findings and recommendations of the MEBD and PEB were just, equitable, consistent with the facts, and in keeping with the provisions of law and regulations.

(4) Due consideration was given the facts and requests contained in any rebuttal to the PEB findings and recommendations submitted by, or for, the soldier being evaluated.

(5) Records of the case are accurate and complete.

*c. Determinations.* Based upon review of the PEB proceedings, USAPDA may take the following actions:

(1) Concur with the findings and recommendations of the PEB or make minor changes or corrections that do not affect the recommended disposition of the soldier or lower the combined percentage rating.

(2) Return the case to the PEB for reconsideration, clarification, further investigation, a formal hearing, or other action when the case records show such action is in the best interests of the soldier or the Army. A detailed explanation for the reasons for return of the case will be provided to the PEB.

(3) Issue revised findings providing for a change in disposition of the soldier or change in the soldier's disability rating.

(4) Refer the case to the APDAB.

*d. Revised findings.* USAPDA, will take the following actions when modifying PEB findings and recommendations.

(1) Furnish the soldier (next-of-kin or legal guardian) a copy of the revision by certified mail, return receipt requested. The letter of transmittal will state the reason for the change. Information copies will be provided to the PEBLO and to the soldier's counsel.

(2) Advise the soldier (next-of-kin or legal guardian) that his or her election or rebuttal to the revision must be received by USAPDA within 10 days from the soldier's receipt of the revised findings unless a request for extension is received and approved within the same time frame.

(3) Return the case records to the PEB if the soldier is eligible for and requests a formal hearing or if one is directed under the provisions of 4–22*c*(2), above. Processing will be according to paragraph 4–21.

*e. Consideration of rebuttal.*

(1) After considering the soldier's rebuttal to the revised findings, USAPDA will make one of the following determinations:

*(a)* Accept the rebuttal; issue new findings and recommendations according to the rebuttal; and forward the case to PERSCOM for final action.

*(b)* Concur with the original recommendations of the PEB; forward the case to PERSCOM for final action.

*(c)* Adhere to the revised findings and recommendations and forward the case to APDAB.

(2) USAPDA, will inform the soldier in writing of the results of its consideration of the rebuttal.

*f. Soldier's response.*

(1) If the soldier concurs with the revised findings and recommendations, USAPDA will approve the case for the Secretary of the Army and forward the case to PERSCOM for final disposition.

(2) If the soldier nonconcurs and submits a statement of rebuttal explaining his or her reasons for disagreement, and the consideration of the rebuttal does not result in a change to the revised findings, USAPDA will forward the case to APDAB for review unless (3) below is appliable.

(3) If the soldier fails to submit an election within the allotted time, USAPDA will deem that the soldier has waived his or her right to file a rebuttal. The proceedings will be forwarded to PERSCOM for final action.

*g. USAPDA disposition.*

(1) The proceedings of general and medical corps officers found physically unfit will be forwarded to ASD(HA) for review prior to disposition by PERSCOM. This is not required if the finding is fit.

(2) If the case file is to be forwarded to APDAB for appeal action, USAPDA will prepare a cover letter explaining the reasons for referral and note that final decision is deferred to the APDAB. If the APDAB's decision is unfit, and if the soldier has requested Continuance on Active Duty (COAD) under chapter 6, APDAB will forward the file to the appropriate office for COAD review. When the case is that of a General or Medical Corps officer, APDAB will return the case to USAPDA for forwarding to ASD(HA). If the General or Medical Corps officer has requested COAD, USAPDA will forward the case for COAD review upon confirmation of unfit determination by ASD(HA).

(3) When proper authority (AR 600–8–1) has made an unfavorable LD determination on the soldier's unfitting condition, USAPDA will modify the PEB findings and recommendations. USAPDA will notify the soldier that the modification resulted from a final LD decision by HQDA and that neither USAPDA nor APDAB are the approving authority for an appeal of the LD decision. LD appeal are governed by AR 600–8–1. This does not preclude an appeal of the determination of physical unfitness. Nor does it preclude the right to a formal PEB hearing if the soldier has not had a formal hearing (para 4–19*g*(2)). If the case file is forwarded to PERSCOM (TAPC–PED–S) to await a final LD decision, USAPDA will reflect in the cover letter the result of review subject to the final LD decision.

(4) If notice is received that a soldier whose case is in the disability system is AWOL, USAPDA will suspend further action on the case. If the soldier has been AWOL for 10 days or more, USAPDA will verify the fact of AWOL and return the case file, less PEB proceedings, to the MTF to which the soldier belongs. USAPDA will cancel PEB proceedings and notify the PEB and applicable MTF. If the case file has been forwarded to PERSCOM, USAPDA will recall the case for return to the MTF.

(5) With the exception of those cases noted above, USAPDA will approve revised findings for the Secretary of the Army and forward the case to PERSCOM for disposition.

### 4–23. Disposition of medical records

If the medical records were included in the case proceedings, they will be disposed of as follows:

*a.* If further review or appeal of the case is not involved, USAPDA will withdraw the medical records from the case file and will return them to the MTF that referred the case file to a PEB.

*b.* If the case is to be reviewed by APDAB or ASD(HA) and if the medical records are not included in the case, they will be requested and forwarded with the case file for the required review or appeal action. The review or appeal action may result in return of the case file to the CG, USAPDA, for final action. If so, the medical records will be disposed as indicated in paragraph"*a*" above.

## Section VI
## Disposition Subsequent to Adjudication

### 4–24. Disposition by PERSCOM

PERSCOM will dispose of the case by publishing orders or issuing proper instructions to subordinate headquarters, or return any disability evaluation case to USAPDA for clarification or reconsideration when newly discovered evidence becomes available and is not reflected in the findings and recommendations.

*a. Actions based upon modification by APDAB.* When APDAB changes the disposition of the soldier or lowers the disability rating, PERSCOM will—

(1) Notify the soldier (or next-of-kin, counsel, or guardian) of the changes by certified mail, return receipt.

(2) Furnish a copy of the notification to USAPDA, the PEB, and the PEBLO of the MTF concerned.

(3) Advise the soldier that his or her concurrence or rebuttal to the findings by the APDAB must be received by PERSCOM within 10 days of the receipt of the notification letter (based upon date of the certified return receipt)unless PERSCOM has approved an extension of time. Failure to respond within the allotted time will result in waiver of right to file a rebuttal to the new findings.

(4) If timely rebuttal is received, forward it and the proceedings to APDAB for reconsideration.

*b. Final disposition.* Based upon the final decision of USAPDA or APDAB, PERSCOM will issue retirement orders or other disposition instructions as follows:

(1) Permanent retirement for physical disability (see 10 USC 1201 or 1204).

(2) Placement on the TDRL (see 10 USC 1202 or 1205).

(3) Separation for physical disability with severance pay (10 USC 1203 or 1206).

(4) Separation for physical disability without severance pay (sections 630, 1162(a), 1165, or 1169, title 10, United States Code (10 USC 630, 1162(a),1165, or 1169)).

(5) Transfer of a soldier who has completed at least 20 qualifying years of Reserve service, and otherwise qualifies for transfer as described in paragraph 8–9, to the Inactive Reserve on the soldier's request (section 1209, title 10, United States Code (10 USC 1209)).

(6) Separation for physical disability without severance pay when the disability was incurred as a result of intentional misconduct, willful neglect, or during a period of unauthorized absence (10 USC 1207).

(7) Release from active duty and return to retired status of retired soldiers serving on active duty who are found physically unfit.

(8) Return of the soldier to duty when he or she is determined physically fit.

(9) Provide to ASD(HA) one copy of all retirement orders issued in the case of each general officer (O–7 or higher).

*c. AWOL.* PERSCOM will take the following actions when notified that a soldier in the disability system is AWOL.

(1) Suspend disposition action.

(2) If the soldier has been AWOL for 10 days or more, or upon expiration of 10 days in AWOL status, verify with the unit commander the fact of AWOL.

(3) If AWOL status is confirmed, void the proposed disposition.

(4) Notify the soldier's commander, the PEBLO, and USAPDA of the revoked disposition.

(5) Return the case file to USAPDA.

*d. Medical records.* Upon completion of disposition processing, PERSCOM will remove medical records from the proceedings and return them to the MTF that referred the soldier to a PEB.

### 4–25. The APDAB

The Army Physical Disability Appeal Board is a component of the Army Council of Review Boards. It reviews cases forwarded by the CG,USAPDA as provided in paragraph 4–22*f*(2) above.

*a. Determinations.* The APDAB will determine if—

(1) The soldier received a full and fair hearing.

(2) The evaluation proceedings conformed to current laws and governing regulations.

(3) Findings and recommendations of the PEB, as changed or modified by the CG, USAPDA are supported by the evidence.

*b. Actions.* The APDAB will take one of the following actions and forward the case to PERSCOM (or to USAPDA if the case is that of a general officer or medical doctor).

(1) Concur with the decision of the CG, USAPDA.

(2) Concur with the recommendations of the PEB.

(3) Adopt the recommendations of the minority member of the PEB when PEB recommendations were not unanimous.

(4) Concur with the requests contained in the rebuttal submitted by the soldier being evaluated.

(5) Specify new findings and recommendations or other proper actions.

*c. Limitations.* APDAB does not have appellate review authority over modifications resulting from ASD(HA) decisions or adverse line of duty determinations by HQDA.

### 4–26. ADRRB

The Army Disability Rating Review Board (ADRRB) is a component of the Army Council of Review Boards (ACRB). The ADRRB reviews disability percentage ratings on request of a soldier who was retired because of physical disability.

*a. Determinations.* The ADRRB may notify or amend a fully executed retirement order of a soldier based upon the following criteria:

(1) The original order was based on fraud or mistake of law.

(2) The soldier was not granted a full and fair hearing when the soldier had made timely demand for such a hearing.

(3) Substantial new evidence exists which, by due diligence, could not have been presented before disposition was accomplished, and the evidence would have warranted a higher percentage of disability if presented before disposition.

*b. Petition procedures.*

(1) The person concerned, legal representative, or any informed DA authority may request relief on the grounds set forth above.

(2) The request for relief must be filed within 5 years from the effective date of the disposition complaint.

(3) Request for relief is addressed to the ADRRB. No special form is required. However, the petition must state the reason for requesting relief and the relief desired.

(4) If the petition is based on evidence that is not on DA records, forward the evidence as an enclosure to the petition.

(5) The filing of a petition for relief will not affect the directed disposition unless the SA or authority acting for the SA so directs. If operation of the directed disposition is suspended by proper authority, the suspension does not extend the time limit within which an application for review must be submitted to a statutory board.

*c. Review procedures.*

(1) The ADRRB will consider all petitions submitted according to the criteria of paragraph 4–26*b* above.

(2) If the person concerned (or his or her legal representative) did not submit the petition, the ADRRB will give the retiree (or his or her legal representative) reasonable notice of the matter presented by the petition and the opportunity to submit a statement or other evidence in rebuttal.

(3) The Director, ACRB may act for the SA on petitions submitted if the recommendation of the ADRRB is unanimous. Other cases are referred to the SA for action. (The authority herein conferred is permissive only. It will not prevent referral of a case to the SA for action.) In acting on a petition, the Director, ACRB, may—

*(a)* Deny relief, set aside the final disposition or placement on the TDRL directed in a case and direct further retirement proceedings.

*(b)* Direct such action as is needed to effect the relief requested or any other action thought proper.

***(Letterhead)***

***(Office symbol)*** ***(Date)***

MEMORANDUM FOR Commander, Walter Reed Army Medical Center, ATTN: HSHL–PAD–PA, Washington, D.C. 20307–5001

SUBJECT: Request for Separation and Waiver of PEB Evaluation

1. I request discharge for physical disability based upon the findings and recommendations of a medical evaluation board (MEBD). The MEBD considers me unqualified for retention in the military service because of physical disability that was found to have existed prior to my entry into active service (EPTS). The MEBD found the disability neither incident to nor aggravated by, my military service.

2. I have been fully informed and understand that I am entitled to the same consideration and processing as any other soldier of the Army separated for physical disability. I understand this includes the consideration of my case by a Physical Evaluation Board. However, I elect not to exercise this right. I also understand the Veterans Administration (VA) will determine entitlement to VA benefits.

3. If this application is approved, I understand that I will be separated by reason of EPTS physical disability. I also understand that I will receive a discharge in keeping with the character of my service, as decided by the officer designated to effect my separation.

John E. Doe
987–65–4321
SSG, Medical Holding Co.

**Figure 5-1. Sample format for request for separation with waiver of PEB evaluation**

## Chapter 6
## Continuance of Disabled Personnel on Active Duty

### 6–1. General

*a.* This chapter prescribes procedures under which certain soldiers of the Active Army (on the active duty list) who are eligible for retirement or separation because of physical disability may be COAD. COAD will be upon approval of their application for waiver. The policies of paragraph 3–10 apply to all cases processed under this chapter.

*b.* Soldiers in the RC (not part of Active Army end strength), to include AGR program, who request continuance in the RC will be processed according to paragraph 8–7. The criteria delineated in paragraph 6–3 are not applicable to soldiers requesting continuance in the RC.

### 6–2. Objective

The primary objective of this program is to conserve manpower by effective use of needed skills or experience. A soldier who is physically unqualified for further active duty has no inherent or vested right to be COAD. Disapproval of such a request has no bearing on the disposition of a case processed under other chapters of this regulation.

### 6–3. Qualification for continuance

To be considered for COAD under the provisions of this chapter, a soldier must be—

*a.* Found unfit by a PEB because of a disability that was not the result of intentional misconduct nor willful neglect, nor incurred during a period of unauthorized absence.

*b.* Capable of maintaining one's self in a normal military environment without adversely effecting one's health and the health of others and without undue loss of time from duty for medical treatment.

*c.* Physically capable of performing useful duty in an MOS for which he or she is currently qualified or potentially trainable.

*d.* Eligible through one of the criteria below as determined by the appropriate approving authority listed in paragraph 6–10.

(1) Has 15 years but less than 20 years of total service, or

(2) Is qualified in a critical skill or shortage MOS confirmed by PERSCOM; or

(3) Disability is the result of combat.

### 6–4. Processing of application

A soldier on active duty being evaluated for possible unfitness because of physical disability may submit an application through the MTF for COAD. The application must be submitted when the soldier is being evaluated by the MEBD or during counseling by the PEBLO after the informal PEB. The soldier may not submit the application directly to the PEB. (fig 6–1.)

### 6–5. Special counseling

*a. Application.* Before the soldier completes an application for COAD, the PEBLO will counsel the soldier according to appendix C. The PEBLO will specifically inform the soldier of the procedures listed below.

(1) That the PEB will process the case to completion to include the following:

*(a)* Convening a formal hearing, if requested.

*(b)* Determining a percentage rating.

*(c)* Recommending a disposition that will apply if application for continuance is disapproved.

(2) Of the criteria for qualification for continuance.

(3) That the appropriate approving authority in paragraph 6–10 will determine whether the criteria for qualification are met.

(4) That if continuance is approved, the soldier will again be referred into the disability system for reevaluation upon final separation or retirement.

(5) That subsequent adjudication upon final separation or retirement may determine the soldier to be physically fit or unfit according to paragraph 6–14.

(6) That if the application is disapproved, the disapproving authority will forward the case file directly to PERSCOM for separation or retirement action.

*b. Soldiers with 18 years.* When a soldier with 18 years but less than 20 years of active service is referred to a PEB for further processing and elects not to submit a request for COAD, such election will be in writing and attached to the MEBD proceeding. If

the soldier does not indicate in writing his or her desire not to request COAD, the PEBLO will include a signed certificate stating that the soldier has been counseled and elects not to submit an election in writing.

### 6–6. Reclassification procedures (enlisted soldiers only)
Policies and procedures of AR 600–200 apply when reclassification into another MOS is necessary. Reclassification action is not within the authority of USAPDA.

### 6–7. Processing by MTF
The policies and procedures described in chapter 4 of this regulation apply.The MTF commander will ensure that—

*a.* Item 16 of DA Form 3947, Medical Board Proceedings, is completed indicating whether COAD is medically inadvisable.

*b.* Item 3 of DA Form 3349 lists assignment limitations.

*c.* Documents specified in paragraph 4–15 are included in the case file forwarded to the PEB. The commander's statement should include a recommendation for or against approval of continuance.

### 6–8. PEB processing
*a. Policy.* The PEB will consider the case according to chapter 4. The fact that a soldier has applied for COAD must not influence the listing of disabilities or percentage ratings. Policy requires that findings and recommendations of the PEB be as carefully decided as if the soldier had not applied for continuance. The PEB's function is to establish whether the soldier is physically unfit. Its action is one of a series of actions to confirm the soldier's unfitness and to determine whether he or she is acceptable for COAD.

*b. DA Form 199.*

(1) If the soldier is found physically unfit, the following statement will be added in block 8. "Soldier has applied for COAD. The recommended disposition in block 9 applies if soldier's application for continuance is denied."

(2) If the soldier submits an application for COAD after the informal PEB, all copies of DA Form 199 will be amended to reflect the above statement and copies provided to the soldier and MTF.

*c. PEB recommendation.* While not required, the PEB is encouraged to include in the forwarding letter to the approving authority a recommendation for or against approval of the soldier's application.

*d. Suspense File.* For those cases which the PEB approves for the SA, PEB will forward the case file for COAD consideration to the applicable approving authority listed in paragraph 6–10. A suspense file will be maintained.

### 6–9. Review at USAPDA or APDAB
*a.* When the review confirms the findings and recommendations of the PEB, USAPDA will forward the case file to the applicable addressee listed in paragraph 6–10 for action on COAD application. A suspense file will be maintained.

*b.* When review by APDAB is required, USAPDA will request APDAB to forward case to the applicable addressee if finding of unfit is confirmed.

*c.* When the case concerns a finding of unfit for a General or Medical Corps officer, USAPDA will obtain review by OASD(HA) prior to forwarding the case file for consideration of COAD application.

### 6–10. Action by Approving Authority
*a.* The approving authority listed in (1) through (6) below will act on the soldier's request for COAD.

(1) *Regular Army enlisted.* Commander, PERSCOM, ATTN:TAPC–PDB, Hoffman II, 2461 Eisenhower Avenue, Alexandria, VA 22331–0477.

(2) *Regular Army officers.* Commander, PERSCOM, ATTN:TAPC–OPP–M, 200 Stovall Street, Alexandria, VA 22332–0418.

(3) *USAR Officers (OBV tour, VI status, or otherwise counted in the Active Duty End Strength).* Commander, PERSCOM, ATTN: TAPC–OPP–M, 200 Stovall Street, Alexandria, VA 22332–0418.

(4) *MSC Officers (Active Component).* HQDA, ATTN:DAPC–OPH–PS, 1900 Half Street, S.W. Washington, DC 20324.

(5) *Chaplains (Active Component).* HQDA, ATTN: DACH–PZB, Pentagon, Room 1E417, Washington, DC 20310–2206.

(6) *JAGC Officers (Active Component).* HQDA, ATTN: DAJA–PT, Pentagon, Room 2E443, Washington, DC 20310–2206.

*b.* If the soldier's application is approved, the approving authority will—

(1) Notify the MTF commander of the action and furnish assignment orders or instructions, if appropriate.

(2) Notify soldier's Military Personnel Service Center (PSC)—

*(a)* Of the serial code (AR 40–501, table 7–2) to be entered on DA Forms 2 and 2–1.

*(b)* That the assignment limitations detailed on DA Form 3349 must be followed.

(3) Furnish an information copy of the action to the PEB from which the case originated; the CG, USAPDA; and Cdr, USAEREC, ATTN: PCRE–FS, Fort Benjamin Harrison, IN 46249–5301.

*c.* If the soldier's application is disapproved, the disapproving office will notify the MTF commander promptly so that the soldier may be informed. The disapproving office will furnish CG, USAPDA, and the PEB originating the case with information copies of the letter of disapproval. The disapproving office will forward the original DA Form 199 and enclosures referred by USAPDA, less medical records, without delay to Commander, PERSCOM, ATTN: TAPC–PDB, 2461 Eisenhower Avenue, Alexandria, VA 22331–0477. PERSCOM will take action required by chapter 4.

### 6–11. Disposition of records
*a.* If the soldier's application for COAD is approved—

(1) File the original of the DA Form 199, the medical board proceedings, and other enclosures to the DA Form 199 in the soldier's official military personnel file (OMPF).

(2) Include a copy of the letter of approval.

(3) Exclude medical records, Health Record, and similar supporting documents if they are included with the application.

(4) Return the records mentioned in (3) above, with the approval letter, to the MTF commander who sent the case to the PEB for disposition prescribed by other regulations.

(5) The MTF commander will provide the soldier a copy of the letter of approval.

(6) HQDA will retain the remaining copy of the DA Form 199 and attachments as working file copy, destroying them when they are no longer needed.

(7) The MTF commander will annotate copies of the PEB and medical board proceedings retained at the MTF to reflect the approval action and file them.

(8) The MTF commander will forward the letter of approval to the soldier's military personnel office (MILPO) for filing in the soldier's unit DA Form 201 (Military Personnel Records Jacket, U.S. Army).

*b.* Not used.

### 6–12. Disposition of soldiers unable to perform their duty
Any soldier COAD under the provisions of this regulation who is later found to be unable to perform effectively the duties to which assigned because of physical disability must be referred to an MTF for re-evaluation. The MTF will process his or her case through the Physical Disability Evaluation System with a new MEBD.

### 6–13. Reevaluation
*a. Periodic medical examination.* A soldier COAD under this program must be reevaluated periodically to determine whether further continuance or, conversely, retirement or separation is in the best interest of the Army and service member. AR 40–501 establishes acceptable schedules.Exceptions to established schedule are as follows:

(1) The condition causing the soldier's physical unfitness is such that more frequent examination is indicated.

(2) The soldier has been rehospitalized because of worsening of the unfitting condition.

(3) The soldier has been rehospitalized because of some other condition impacting on the soldier's ability to perform duty.

*b. Responsibilities of the managing physician.* The managing physician must give special attention to the stability of the soldier's unfitting condition. The physician will—

(1) If severity increases, estimate the impact on the soldier's ability to perform duty.

(2) If degradation of the soldier's condition occurs so as to further impair performance of duty, note such findings and conclusions on the SF 88.

(3) Notify the soldier's commander.

*c. Referral to PEB.* If the managing physician believes it is needed, or the soldier's commander requests it, a MEBD will be prepared. The MEBD will refer the case to a PEB for processing.

*d. Request for reenlistment.* An enlisted soldier whose term of service expires during the period for which COAD has been approved may request reenlistment with a waiver of the physical disqualification. Requests from personnel serving on extended active duty will be submitted to the Commander, United States Army Enlistment Eligibility Activity (USAEEA), 9700 Page Boulevard, St. Louis, Missouri 63132–5260. The soldier will complete DA Form 3072 (Waiver of Disqualification for Reenlistment/Promotion in the Regular Army) in support of the DA Form 3340 (Request for Regular Army Reenlistment or Extension). The soldier must support the request for waiver by a current DA Form 3947, SF 502, and SF 88. The DA Form 3947 contains a recommendation for, or against, reenlistment. (PEB consideration is not required unless reenlistment is denied. If reenlistment is denied, the MTF Commander will forward the case to the supporting PEB as provided in chapter 4.) Request for reenlistment will be submitted between 4 and 6 months in advance of expiration of term of service (ETS). The Commander, USAEEA will approve or disapprove reenlistment.

*e. Request for extension of continuance.* A soldier may request extension of COAD. The soldier will forward an application to the approving authority in paragraph 6–10, 4 to 6 months before expiration of the period for which continuance was approved.

(1) An officer may apply by letter. He or she will attach DA Form 3947, SF 502, and SF 88. The DA Form 3947 contains a recommendation for, or against, extension of the officer's COAD. The officer will forward the letter of application through his or her rater. The rater will comment on the officer's physical capacity to perform assigned duties. The rater will recommend for or against extension of the officer's COAD.

(2) Enlisted soldiers will use the procedures of reenlistment described in paragraph "d" above.

*f. Extension request denial.* An enlisted soldier whose request for continuance is denied by the Commander, USAEEA will not be offered the opportunity to apply for continuance during further processing of his or her medical proceedings (para 6–14).

### 6–14. Final retirement or separation

*a.* A soldier COAD under the provisions of this chapter will be reevaluated by a MEBD and PEB when processing for final retirement or when the soldier's continuance is ended and reenlistment or extension of continuance is denied. The disqualifying defect will be evaluated under the physical standards in effect at the time of current evaluation. If the disability has improved so as to no longer be unfitting or has been cured, the soldier may be found fit.If the disability has remained unchanged or increased in severity, the PEB will find the soldier unfit because of physical disability. Presumption of fitness(para 3–2*b*(2)) does not apply to the subsequent disability processing of soldiers who were approved for COAD. The disability will be rated under the current VASRD.

*b.* The PEB may not judge a COAD soldier physically unfit or determine disability rating on the basis of how the disability may impact on the soldier's future ability to perform his or her duties.

*c.* Cases of medical officers and general officers and the cases of any other designated soldier will be reviewed by the ASD(HA). The review may affect the final decision on the soldier's unfitness.

*(Letterhead)*

*(Office symbol)* *(Date)*

MEMORANDUM FOR Commander, PERSCOM, ATTN: TAPC–PDB, Hoffman II, 2461 Eisenhower Avenue, Alexandria, VA 22331–00477

SUBJECT: Request for Continuance on Active Duty

1. If I am determined unfit because of physical disability, I hereby apply for continuance on active duty. I apply for assignment to duties that I am able to perform within the limitations imposed by my physical disabilities. I request continuance instead of retirement or separation disposition.

2. I meet the following criteria for application for COAD:
________I have 15 years of total service but less than 20.
________I am qualified in shortage MOS.
________My disability is the result of combat.

3. I also understand that—

a. I must be able to maintain myself in a normal military environment without the environment adversely affecting my health or requiring extensive medical care.

b. My disabilities will be periodically reevaluated to decide whether further continuance on active duty or retirement or separation is in the best interests of myself and the Army.

c. Should I later incur a service obligation, I remain liable to complete such obligation in spite of my condition. Only when my disabilities progress to a point that I am no longer able to perform duty with proper limitations am I no longer liable to complete such obligation.

d. At the time of my final retirement or separation from active duty, I will be evaluated under the regulations in effect at that time, and I may be found physically fit.

e. I will not be separated without proper examination and physical disability evaluation.

f. If my term of service expires during the period for which continuance on active duty has been approved, I may request reenlistment with a waiver, and such request may be disapproved.

4. I request consideration for assignment to one of the following installations. (I have listed three in order of my preference.)

a. Fort Detrick
b. Fort Lee
c. Fort Wainwright

John E. Doe
987–65–4321
SSG, 76P30
HQ, USA Quartermaster Center
244th Quartermaster Battalion
Fort Lee, VA 23801–5260

**Figure 6-1. Sample format to request COAD**

# Chapter 7
# Temporary Disability Retired List

## Section I
## Introduction

### 7–1. Overview
This chapter outlines procedures for administration and processing of soldiers whose names are on the TDRL.

### 7–2. Reasons for placement on the TDRL
*a.* A soldier's name may be placed on the TDRL when it is determined that the soldier is qualified for disability retirement under 10 USC 1201 but for the fact that his or her disability is determined not to be of a permanent nature and stable.

*b.* A soldier with a hereditary or congenital condition that is unfitting and known to be progressive will not be placed on the TDRL unless there is unstabilized service aggravation and the soldier is qualified as described above. If upon removal from the TDRL, there is no evidence of residual aggravation, the soldier may be found to be ineligible for disability benefits.

*c.* TDRL will not be used for convalescence. When a soldier's correct rating is less than 30 percent, a rating will not be increased to 30 percent solely for the purpose of making a soldier eligible for TDRL.

### 7–3. Information reflected on the TDRL
The TDRL will list names of all soldiers temporarily retired. The list, as a minimum, will reflect—

*a.* The identity of the soldier.

*b.* The date the soldier was placed on the TDRL.

*c.* The month and year in which the next medical examination is required.

*d.* Current address and phone number.

### 7–4. Requirement for periodic medical examination and PEB evaluation

A soldier on the TDRL must undergo a periodic medical examination and PEB evaluation at least once every 18 months to decide whether a change has occurred in the disability for which the soldier was temporarily retired.

*a.* Soldiers who have waived retired pay to receive compensation from the VA, continue to be retired Army soldiers. These soldiers must undergo examinations when ordered by Commander, PERSCOM, acting on behalf of the SA.

*b.* Soldiers recalled to active duty while still on the TDRL must also undergo a periodic examination when ordered by the Commander, PERSCOM.

*c.* Soldiers who fail to complete a physical examination when ordered will have their disability retired pay suspended.

*d.* Soldiers on the TDRL will notify Commander, PERSCOM, ATTN: TAPC–PDB,2461 Eisenhower Drive, Alexandria, VA 22331–0477, of any change in their current mailing address.

### 7–5. Counseling

The PEBLO is responsible for counseling the soldier until the informal PEB is completed. The soldier may demand a formal hearing. If so, the regularly appointed PEB counsel is responsible for the counseling unless the soldier elects a different counsel. Counseling will be according to appendix C.Soldiers on the TDRL are more difficult to counsel because they are not as readily available to the counselor as are soldiers on active duty.Nevertheless, they must be counseled to the same extent required for active duty soldiers.

### 7–6. Prompt processing

To prevent the soldier suffering severe financial and other hardships, processing delays will be avoided. All portions of the medical examination will be conducted on a priority basis. All involved agencies and personnel will ensure that cases of soldiers nearing expiration of 5-year TDRL tenure are identified and given priority processing.

### 7–7. Prompt removal from TDRL

Medical examiners and adjudicative bodies will carefully evaluate each case.They will recommend removal of the soldier's name from the TDRL as soon as the soldier's condition permits. Placement on the TDRL confers no inherent right to remain for the entire 5-year period allowed by 10 USC 1210.

## Section II
## Administration

### 7–8. Individual TDRL file

CG, PERSCOM will maintain an active file for each soldier on the TDRL. The file will contain the following:

*a.* Complete identification, grade, and a statement of total active service when placed on the TDRL; orders placing the soldier on the TDRL; the soldier's current mailing address.

*b.* Original copy of PEB proceedings with exhibits, less medical and health records; original reports of periodic medical examinations and evaluations.

*c.* Record of current location of clinical, medical, and health records to make the next periodic medical examination easier.

*d.* Significant correspondence with the former soldier and medical treatment facility in order to support suspension of pay for failure to report for scheduled reexaminations or to show that reasonable efforts were made to notify the soldier.

### 7–9. PERSCOM's letter of instruction to the MTF commander on periodic medical examination

*a. Procedural instructions.* PERSCOM will issue a letter of instructions to the MTF commander responsible for the medical examination 4 months before the month during which the examination is to be carried out.PERSCOM will coordinate with the U.S. Army Health Services Command (HSC) in issuing the letter. The letter will include—

(1) Name and address of the soldier requiring examination.

(2) A statement that the periodic medical examination is required during the month prescribed.

(3) Location of medical records, if known (the MTF commander will obtain all medical records).

(4) Instructions on completing the enclosed travel order as to the exact place and date of the examination.

(5) Authority for the MTF commander to arrange for the examination to be conducted. Another U.S. Government MTF, a civilian medical facility, or civilian physician(s), including medical consultants, may conduct the examination. The examination will be conducted as close to the soldier's home as circumstances and requirements of the case permit.

(6) Specific guidance governing conduct of the examination needed.

*b. Preparation of orders.* PERSCOM will prepare travel orders to accompany the letter of instructions. The travel orders permit payment for TDY only for the period needed to complete the TDRL examination. These orders do not provide for periods of medical treatment after the examination.

*c. Supporting documents.* The following documents will accompany the letter of instructions:

(1) Proceedings of the PEB and supporting documents that placed the soldier on the TDRL.

(2) A copy of the letter notifying the soldier of the examination.

*d. Final TDRL examination.* PERSCOM will initiate processing action no later than 6 months before the fifth anniversary date of the soldier being placed on the TDRL. The MTF commander and the soldier will be advised that the final examination must be expedited to ensure removal from the TDRL before the soldier's completion of 5 years on the list.

### 7–10. PERSCOM's letter of instruction to the soldier

PERSCOM will notify the soldier of the forthcoming medical examination. The letter will include the information below:

*a.* Name, address, and telephone number of the appointed MTF closest to the soldier's home.

*b.* Name and telephone number of the PEBLO who will assist the soldier during and after the medical examination.

*c.* The soldier may telephone the MTF collect to resolve any problems.

*d.* The MTF will arrange for and schedule the medical examination. Every effort will be made to schedule the examination for the soldier's convenience;however, the medical examination must be carried out within the month prescribed.

*e.* At the discretion of PERSCOM an escort may accompany a soldier who is unable to travel alone to the place of examination. One person may travel with the soldier upon request when the record clearly shows that the soldier is not physically or mentally able to travel without help. The attendant is entitled to file a claim for expenses according to JFTR, volume I, chapter 7, part I. If a private conveyance is used for travel, only the retired soldier may be reimbursed for transportation cost. Request for attendant must be approved by PERSCOM, (TAPC–PDB) in advance of travel.

*f.* The MTF will forward the following:

(1) Travel orders issued by PERSCOM if needed.

(2) Facts for obtaining transportation request and collection of approved travel expense.

(3) Per diem allowance if applicable.

*g.* Failure to make or follow through with arrangements with the hospital for carrying out the medical examination during the required month may result in the suspension of disability retirement pay.

*h.* The soldier must inform the MTF of visits to civilian or military physicians or other Federal medical facilities for treatment while on the TDRL and give permission to obtain records of such visits if available.

# Appendix B
# Army Application of the Department of Veterans Affairs Schedule for Rating Disabilities

## Section I
## General Rating Policies

### B–1. Purpose of the Department of Veterans Affairs Schedule for Rating Disabilities (VASRD)

*a.* Congress established the VASRD as the standard under which percentage rating decisions are to be made for disabled military personnel.Such decisions are to be made according to Title IV of the Career Compensation Act of 1949 (Title IV is now mainly codified in 10 USC 61.)

*b.* Percentage ratings in the VASRD represent the average loss in earning capacity resulting from these diseases and injuries. The ratings also represent the residual effects of these health impairments on civil occupations.

### B–2. Policy application

Not all of the general policy provisions of the VASRD apply to the Army.Section I replaces or modifies paragraph 1–31 of the VASRD, which pertain to VA determination of service-connected disabilities, internal VA procedures or practices, and other paragraphs that do not apply to the Army. Rating policies that apply to the Army but are not made clear by the VASRD are addressed.

### B–3. Essentials of rating disabilities

*a. Application of the VASRD.* The VASRD is primarily used as a guide for evaluating disabilities resulting from all types of diseases and injuries encountered as a result of, or incident to, military service. Because of differences between Army and VA applications of rating policies, differences in ratings may result. Unlike the VA, the Army must first determine whether or not a soldier is fit to reasonably perform the duties of his office, grade, rank, or rating. Once a soldier is determined to be physically unfit for further military service, percentage ratings are applied to the unfitting conditions from the VASRD. These percentages are applied based on the severity of the condition.

*b. Medical treatment at the time of voluntary or mandatory separation or retirement.* Many medical and surgical procedures are performed when a soldier is nearing the end of his military career. These are intended to improve a soldier's health, not to render him unfit. The principles of paragraph 3–3*b* and *c* must be considered at the termination of service as well as for EPTS conditions. Corrective treatment and convalescence will not be considered as a valid contribution to disability unless unexpected adverse effects occur that are disabling or contribute to disability and are ratable.

*c. Failure to comply with prescribed treatment.*

(1) There are many conditions, such as neuropsychiatric disorders, asthma, hypertension, epilepsy, diabetes, certain injuries, which may be improved sufficiently by treatment to prevent disability, or to significantly decrease it. If a soldier unreasonably fails or refuses to submit to medical or surgical treatment or therapy, or take prescribed medications, or to observe prescribed restrictions on diet, activities, or the use of alcohol, drugs or tobacco, that portion of the disability that results from such failure or refusal will not be rated where it is clearly demonstrated that—

*(a)* The soldier was advised clearly and understandably of the medically proper course of treatment, therapy, medication or restriction.

*(b)* The soldier's failure or refusal was willful or negligent and not the result of mental disease or a physical inability to comply.

(2) Notwithstanding the above guidance, MTF's should not forward MEBD's involving refusal to submit to medical care unless a determination has been made by OTSG that the soldier's refusal was reasonable according to the procedures set forth in AR 600–20, paragraph 5–4*c*. PEB's may return cases to MTF's for compliance with AR 600–20.

*d. Objective medical findings and disability ratings.* Physical examination, laboratory tests, x-rays, and other findings are not, in themselves, ratable. A rating for a disability must be based on demonstrable impairment of function unless otherwise provided for in this regulation.

*e. Elective surgery or treatment.* Soldiers who, after being told by competent military medical authority that a treatment option is unwarranted for a given medical condition, elect to have such treatment done at their own expense, will not be eligible for compensation under the provisions of this regulation for any adverse residuals resulting from the elected treatment, unless it can be shown that such election resulted from impaired judgment or lack of insight that is part of their condition.

*f. Disabilities not unfitting for military service.* Conditions which do not render a soldier unfit for military service will not be considered in determining the compensable disability rating unless they contribute to the finding of unfitness.

### B–4. Higher of two evaluations

In a number of atypical instances, it is not expected that all cases will show all the findings specified in the VASRD. Where there is question as to which of two percentage evaluations shall be applied, the higher evaluation will be assigned if the soldier's disability more nearly approximates the criteria for that rating. Otherwise, the lower rating will be assigned. When, after careful consideration of all reasonably procurable and assembled data, there remains a reasonable doubt as to which rating shall be applied, such doubt will be resolved in favor of the soldier.

### B–5. Pyramiding

Pyramiding is the term used to describe the application of more than one rating to any area or system of the body when the total functional impairment of that area or system can be reflected under a single code. All diagnoses that contribute to total functional impairment of any area or system of the body will be merged with the principal diagnosis, for rating purposes, unless specifically exempted in section II of this appendix.

### B–6. Total disability ratings

Total disability will be considered to exist when the soldier's impairment is sufficient to render it impossible for the average person to follow a substantially gainful occupation. Accordingly, in cases in which the VASRD does not provide a 100 percent rating under the appropriate (or analogous) code, a soldier may be assigned a disability rating of 100 percent if his impairment is sufficient to render it impossible for him or her to follow a substantially gainful occupation. When such an extra-schedule rating is proposed, review and approval must be obtained from USAPDA.

### B–7. Convalescent ratings

Under certain diagnostic codes, the VASRD provides for convalescent ratings to be awarded for specified periods of time without regard to the actual degree of impairment of function. Such ratings do not apply to the Military Departments since the purpose of convalescent ratings is accomplished by other means under disability laws. Convalescence will ordinarily have been completed by the time optimum hospital improvement (for disposition purposes) has been attained. The ratings for observation periods, as distinguished from convalescence, such as those "for one year" following treatment for a malignant neoplasm, are not affected by this policy.

### B–8. Analogous ratings

When an unlisted condition is encountered, it is rated under a closely related disease or injury in which not only the functional, but the anatomical localization and symptomatology are closely analogous. Conjectural analogies, as well as the use of analogous ratings for conditions of doubtful diagnosis, or those not fully supported by clinical and laboratory findings, are to be avoided. The ratings for organic diseases and injuries are not to be assigned by

(4) *WR–4.* Positive antibody test, T helper cell deficiency as defined above and positive response to only one antigen on repetitive (x2)delayed hypersensitivity (DHS) skin testing (partial anergy).

(5) *WR–5.* Positive antibody test, T helper cell deficiency and either complete anergy (no positive response on repetitive DHS skin testing) or one episode of oral candidiasis (thrush).

(6) *WB–6.* Positive antibody test, T helper cell deficiency and the occurrence of a recognized opportunistic infection, for example pneumocystis carinii, disseminated cytomegalovirus infection, CNS toxoplasmosis, etc. (Kaposi's sarcoma alone does not fulfill staging criteria for WR–6.)

*b.* Clinical staging will not serve as the criterion for determining medical fitness or a disability rating, however, the clinical manifestations that determine the several stages of the disease are those that determine a soldier's fitness for duty. Soldiers infected with HIV who show signs of immunological deficiency must be referred to a MEB regardless of the clinical staging of the disease. This policy permits initiation of board proceedings at any Walter Reed stage determined appropriate.

*c.* Central Nervous System (CNS) infections may be one of the first noted clinical manifestations of HIV. Diffuse, profound and devastating damage can occur before MRI, CT scans, or psychological tests can pick it up and before T–4 cells are significantly depressed. The prognosis is grim and the soldier never becomes functional even though criteria for Stage WR–2 may not be exceeded. Consider high disability ratings.

*d.* Further guidance is provided under codes 6351–6353.

## Section III
## Special Instructions and Explanatory Notes, VASRD

### B–22. 5000—Osteomyelitis

*a.* Minimum rating of 20 percent for active osteomyelitis does not apply when amputation of the part would be ratable at only 10 percent. In this case, the amputation rule does not apply. The following are examples:

(1) Active osteomyelitis, middle finger, rate 10 percent (amputation rule applies),

(2) Active osteomyelitis, little finger, distal to P.I.P., rate 10 percent (amputation rule does not apply).

*b.* Saucerization or sequestrectomy does not necessarily equate with stabilization or a cure.

*c.* Rate osteomyelitis extending into a major joint according to the amputation rule.

### B–23. 5002—Rheumatoid arthritis

*a.* Active process, rate under 5002, 5004, 5009, and 5017 based on clinical and laboratory features.

*b.* Chronic residuals, rate under appropriate limitation of motion codes(5200 series) based on X-ray evidence plus clinical features.

*c.* Apply bilateral factor, if proper, for residuals when systemic illness is not the major disability.

*d.* Do not combine ratings for active process (5002) with ratings for residuals (5200 series).

*e*. Rate lung involvement separately under 6802 and enteropathies separately under 7300 series if unfitting by themselves.

### B–24. 5003—Arthritis, degenerative, hypertrophic and pain conditions rated by analogy to degenerative arthritis

These are rated as follows:

*a.* Each major joint (or grouping of minor joints) with objective limitation of motion plus X-ray evidence—10 percent. The bilateral factor applies.

*b.* X-ray evidence of two or more major joints or groups of minor joints, plus occasional exacerbations of incapacitating symptoms—total 20 percent. With X-ray evidence alone—10 percent. No bilateral factor applies.

*c.* When the limitation of motion of the involved specific joint or joints is of sufficient degree, the rating assigned will be under one of the appropriate limitation of motion codes (5200 series or 9905). Bilateral factor applies only to 5200 series.

*d.* If more than two major joints or groups of minor joints are involved, rate separately and combine the ratings for those joints which would merit a rating under the 5200 series or 9905. When a rating is assigned under a limitation of motion code (5200 series), it will not be combined with a rating under code 5003 for other joint involvement on the basis of X-ray findings.

*e.* For rating purposes, combinations of interphalangeal, metacarpal phalangeal and metatarsal phalangeal joints are groups of minor joints equivalent to a major joint. Likewise, each segment of the spine (cervical, thoracic lumbar) and both sacroiliac joints together constitute groups of minor joints. The lumbosacral joint is a major joint.

*f.* Often a soldier will be found unfit for any variety of diagnosed conditions which are rated essentially for pain. Inasmuch as there are no objective medical laboratory testing procedures used to detect the existence of or measure the intensity of subjective complaints of pain, a disability retirement cannot be awarded solely on the basis of pain. However, lack of objective findings does not constitute a valid reason for finding a soldier unfit by analogy to a neuropsychiatric disability or assuming that the soldier is malingering. Rating by analogy to degenerative arthritis as an exception to analogous rating policies (para B–8) may be assigned in unusual cases with a 20 percent ceiling, either for a single diagnosed condition or for a combination of diagnosed conditions each rated essentially for a pain value. To do otherwise would be to combine pain ratings so as to achieve a percentage of disability that would result in erroneous disability retirement. (Severe eye pain is an exception, see code 6009.)

### B–25. 5004–5009–5024—Arthritis, miscellaneous

Rate all of the septic infectious, or other arthritides on the basis of associated system symptoms according to VASRD code 5002. Reiters syndrome, spondylitis, transplantation antigen-related arthritis, or arthritis secondary to bowel disease are examples.

### B–26. 5051–5056—Prosthetic implants

These do not necessarily render soldiers unfit. If a soldier is unfit at the time of the medical board, it may be appropriate to place the soldier on the TDRL. If unfit on reevaluation, consider permanent rating based on residual impairment. Amputation rule applies. Convalescent ratings do not apply.

### B–27. 5126–5151—Multiple finger disabilities

A convenient method of computation has simplified rating multiple finger disabilities. One may calculate an "average amputation level" for fingers involved by assigning graded values for each finger according to the level at which it was amputated. Graded values may also be assigned for the severity of the finger's ankylosis. The disability may then be rated according to the notes of instruction in the VASRD. The method is as follows:

*a. Step one.* Determine the grade value of each of the affected fingers from figure B–1, columns A and C.

*b. Step two.* Find the average grade value by dividing the total values for the individual fingers by the number of fingers involved.Round off fractions to the nearest whole number.

*c. Step three.* From figure B–1, columns B and C, determine the correct category of the defects (favorable ankylosis, unfavorable ankylosis, amputation) for the average grade of the disabled hand. The proper code number and rating can then be determined within that category according to the number of fingers involved. (For example: A soldier has had a thumb amputated through the distal phalanx; the index and little fingers through the middle phalanges; and the entire ring finger, including more than one-half of the metacarpal. The total value of each of the effected fingers is 10 based on grade values of 2 for the thumb, 2 for the index finger, 2 for the little finger, 4 for the ring and metacarpal. The average grade value is 3 based on dividing the total value of 10 by the total number of fingers, 4, and rounding the answer to the nearest whole number. Based on figure B–1, grade 3 is rateable as amputation.

rather than on anatomical diagnosis. For example, a complete paralysis of the circumflex nerve of the major extremity carries a 50 percent rating under 8518. In many cases, however, abduction of the arm when the circumflex nerve is paralyzed occurs by the virtue of the other muscles taking over the function of the paralyzed muscles-.To warrant the 50 percent rating, the soldier's residual loss of function must actually include all the defects listed under 8518. When other muscles have taken over the function of the circumflex-innervated deltoid, the residual loss of function is properly ratable under 5201, limitation of arm motion, or 5303, muscle injury, Group III, whichever best reflects the predominant impairment.Rate cases of paralysis of the common peroneal nerve with foot drop, 8521, in terms of loss of function, rather than topographically. Amputation below the knee, 5165, is ratable at 40 percent. In order to warrant a similar rating for peroneal palsies, there must be sufficiently severe symptoms, such as trophic and circulatory changes and other concomitants to make the functional impairment reasonably equivalent to actual loss of the foot.

### B–105. 8599—Scalenus anticus syndrome

Rate this syndrome by analogy with the lower radicular group (8512), or less commonly, with either erythromelalgia (7119) or Raynauds Disease (7117), depending upon predominant symptoms and overall functional impairment.

### B–106. 8910–8914—Epilepsies

Attacks following omission of prescribed medication or the ingestion of alcoholic beverages are not indicative of the controllability of the disease.Do not consider these in the determination of the rating.

### B–107. 9200–9511—Mental disorders

*a. Functional impairment.* Loss of function is the principal criterion for establishing the level of impairment resulting from mental illness. Loss of function is reflected in impaired social and industrial adaptability. Psychoses specifically include those disorders manifesting disturbances of perception, thinking, emotional control, and behavior, severe enough to hinder economic adjustment, that is, hinder the soldier's capacity to perform military duties or to earn a living.

(1) When assessing loss of function, refer to the soldier's social and industrial adjustment before his or her diagnosed psychiatric illness.Carefully review all pertinent information provided by the MEBD and TDRL examining physicians and other competent medical authorities before arriving at a final determination. When there are differences in the information, resolve the differences before making a rating decision. Show clearly in the record of proceedings the action taken to resolve these differences.

(2) To properly assess the degree of permanent impairment resulting from a psychotic process is often difficult during the weeks immediately following an acute episode. Sometimes a soldier's period of intensive in-hospital treatment has not been completed at the time of the initial MEBD.With the passage of time, the clinical picture tends to become stable. The degree of permanent impairment may then be estimated more accurately.

*b. Social impairment.* Information which directly relates to social impairment includes but is not limited to—

(1) Living arrangements (by oneself, with parents and siblings, with wife and children).

(2) Marital status (single, married, separated, divorced, and the type of relationship (harmony or strife)).

(3) Leisure activity (sports, hobbies, TV, reading, sleeping).

(4) Acquaintances (male, female, both sexes, many, few).

(5) Substance use or abuse (alcohol, illicit drugs).

(6) Police record.

*c. Industrial impairment.* Information which directly relates to industrial impairment includes, but is not limited to—

(1) Job stability (unemployed, part-time work, full-time job, quit, fired, promoted).

(2) Type of job (menial, responsible, OJT, technical, for a relative, for a private employer).

(3) Schooling (grade, technical, academic, high school, college, post-graduate).

*d. Additional factors.* Other factors that bear on social and industrial adaptability include, but are not limited to—

(1) *Mental competency.* The MEBD should include a statement as to whether soldier is competent to handle his or her financial affairs, and to participate in board proceedings.

(2) *Level of supervision.* There are several levels of supervision. The most disabling is constant hospitalization. Constant supervision at home or intermittent and repeated hospitalizations are disabling factors to be considered. Being placed in one's own custody suggests a lower level of supervision.

(3) *Contact with reality.* Certain soldiers have lost all contact with reality and cannot tell fact from fantasy. Dreams, imaginations, delusions, and hallucinations are just as real to certain soldiers as actual events. The quality of loss of contact with reality as well as quantity of time that soldier is preoccupied with loss of contact with reality are factors to be considered.

(4) *Potential for harm.* At times, individuals suffering from mental disorders may be dangerous to themselves or to others. They may be homicidal, suicidal, or violently destructive of property. Their judgment may be so impaired that they could jeopardize or destroy a family, business, or themselves, financially, socially, and or legally.

(5) *Signs or symptoms.* The degree of social and industrial impairment is influenced by the number and intensity of signs or symptoms of mental disorders. These signs or symptoms may be overtly apparent or they may be subtle and apparent only to skilled examiners. Their significance must be carefully evaluated. A partial list of the more common signs or symptoms includes, but is not limited to: autism, ambivalence, inappropriate affect, dissociative thinking, bizarre behavior, delusions, hallucinations, hyperactivity, depression, disorientation, emotional lability, memory defects, unfounded somatic complaints, phobias, compulsions, lack of insight, poor judgment, and so forth.

(6) *Medication or psychotherapy.* The type of medication(potent or mild) and the amount (large or small doses) of medication as well as the frequency (daily, weekly, or as needed) should be considered. The frequency of psychotherapy and by whom (psychiatrist, psychologist, social worker, nurse)administered also should be considered. The fact that a soldier is receiving medication does not automatically place him or her at a certain level of disability.

*e. VASRD classification.* The VASRD uses specific terms to classify the level of social and industrial impairment. These are characterized below for ratings under 9201 through 9511.

(1) *Total at 100 percent.*

*(a)* Usually mentally incompetent to handly financial affairs and to participate in PEB proceedings.

*(b)* Usually hospitalized, rarely in care of next-of-kin or guardian.

*(c)* Actively psychotic, totally out of contact with reality.

*(d)* Requires constant supervision and care.

*(e)* Significant potential to be harmful to self or others.

*(f)* Unemployable.

*(g)* Incapable of any social adjustment.

(2) *Severe at 70 percent.*

*(a)* Usually financially mentally competent and capable of cooperating in PEB proceedings but occasionally may be incompetent.

*(b)* Usually hospitalized, but often in care of next-of-kin or guardian.

*(c)* Actively psychotic, but may have intermittent contact with reality.

*(d)* Requires supervision approximately 50 percent or more of the time.

*(e)* Some potential to be harmful to self or others.

*(f)* Unemployable.

*(g)* Minimal social adjustment.

(3) *Considerable at 50 percent.*

*(a)* Mentally competent to handle financial affairs and to participate in PEB proceedings.

*(b)* Intermittent hospitalization.

*(c)* Overtly displays some signs or symptoms of mental illness,

such as:autism, ambivalence, inappropriate affect, dissociative thinking, delusions, hallucinations, hyperactivity, depression, lack of insight, poor judgment, bizarre behavior, disorientation, emotional lability, memory defects, unfounded somatic complaints, phobias, compulsion, decreasing IQ, personality changes, and so forth.

*(d)* Requires constant medications or psychotherapy.

*(e)* Extreme job instability.

*(f)* Significant social maladjustment.

(4) *Definite at 30 percent.*

*(a)* Does not require hospitalization.

*(b)* Displays some signs or symptoms of mental illness on examination.

*(c)* Usually requires medication and or psychotherapy.

*(d)* Usually there is job instability.

*(e)* Borderline social adjustment.

(5) *Mild at 10 percent.*

*(a)* Displays minimal signs or symptoms with probing.

*(b)* May require medication or psychotherapy, especially during times of stress.

*(c)* Adequate job adjustment.

*(d)* Adequate social adjustment.

(6) *Full remission at 0 percent.*

*(a)* Symptom free.

*(b)* No medication.

*(c)* No medical supervision.

*(d)* Work record acceptable or better.

*(e)* Satisfactory social adjustment.

*f. Use of TDRL for Schizophrenia.* When assessing impairment resulting from most schizophrenias and the major affective psychoses, an initial period of placement on TDRL (18 months) usually is warranted. A definitive determination of level of impairment usually is made at the close of that period. In a few instances, an additional period of TDRL tenure may be required (usually 12 months) because of continuing instability of the soldier's status. Every effort should be made, however, to complete adjudication of cases within a 3-year period of observation. The date of initial diagnosis reasonably may be considered as the starting time of the assessment period.

*g. Schizophreniform.* A schizophreniform disorder is considered to be an acute disease, whereas a schizophrenic disorder is considered to be a chronic disease. A soldier who is diagnosed as having a schizophreniform disorder and who has less than 90 days of active duty at the time his or her disorder comes to the attention of medical personnel, should be placed on TDRL for a short period of time, usually eight months. At the time of TDRL reexamination, the soldier should be either in complete remission of his schizophreniform disorder or the original diagnosis may be changed to a schizophrenic disorder, EPTS, not service aggravated.

*h. Correlation of ICD–9–CM, DSM IIIR, AR 40–501, VASRD.* The Army is using a nomenclature from Diagnostic and Statistical Manual of Mental Disorders (Third Edition) Revised (DSM IIIR) published by the American Psychiatric Association. DSM IIIR became effective May 1987. The Army uses the numerical coding system of International Classification of Diseases, 9th Revision, Clinical Modification (ICD–9–CM). ICD–9–CM became effective 1 January 1979. Older Army records have used various other editions of DSM, ICD, and Army regulations. The VASRD uses a combination of DSM II and DSM III. The PEB will use the same nomenclature as the MEBD, whenever possible. If modification of the MEBD nomenclature is necessary for clarification or for other reasons, the modification will be minimal, preserving the MEBD nomenclature as much as possible. Although the PEB will use the MEBD nomenclature, it must use the VASRD numerical code. If difficulties are encountered in matching the MEBD nomenclature to the VASRD numerical code, assistance should be sought from the psychiatric service of the MTF. To further assist in the correlation of the diagnostic code number ICD–9–CM, and the nomenclature under DSM IIIR, with the VASRD, Tables B–6 through B–8 provide an interpolation of the three references.Certain mental disorders render a soldier administratively unfit rather than unfit because of physical disability. Table B–9 correlates these disorders to the applicable retention standards cited in AR 40–501.

### B–108. 9300–9326—Organic brain disorders

In determining the severity of organic brain damage for rating purposes, the impairment index score from the Halstead-Reitan battery of neuropsychological tests provides a rough but useful measurement to supplement clinical findings.As depicted in Table B–10, an index score range corresponds to a disability percentage range in the VASRD when consistent with clinical findings. In the event there is a discrepancy between the impairment index score and the clinical findings, the latter will prevail for determining a disability rating.

**Table B–1**
**Conversion table**

| Diameter of circle | Area of circle: Square centimeters | Area of circle: Square inches |
|---|---|---|
| 1 centimeter | 0.7854 | 0.1216 |
| 2 centimeters | 3.1416 | 0.4869 |
| 3 centimeters | 7.0685 | 1.0956 |
| 4 centimeters | 12.5664 | 1.94780 |
| ½ inch (See note 1) | | 0.19635 |
| 1 inch | | 0.7854 |
| 1½ inches | | 1.76715 |
| 2 inches | | 3.1416 |

Legend for Table B-1:
1 centimeter = 0.3937 inches
1 inch = 2.54 centimeters
1 square centimeter = 0.1550 square inches
2 square centimeters = 0.3100 square inches
3 square centimeters = 0.4560 square inches
1.Size of the average diagnostic burr hole

**Table B–2**
**Pulmonary function test values (See note 1)**

| Forced Expiratory Volume (FEV) 1% | Rating |
|---|---|
| **Chronic Obstructive Pulmonary Disease (Before Bronchodilators)** | |
| 50 or less | Severe |
| 55–65 | Moderate, moderately severe |
| 65–75 | Mild |
| 70 or better | Normal |
| **Vital Capacity (VC)** | **Rating** |
| **Chronic Restrictive Pulmonary Disease** | |
| 50 or less | Severe |
| 50–65 | Moderate, moderately severe |
| 65–80 | Mild |
| 80 or better | Normal |

Notes:
1.The AMA “Guides to the Evaluation of Permanent Impairment,” while differing slightly from the above values, is otherwise helpful in interpreting clinical and functional values.

# Appendix C
# Counseling

## Section I
## Introduction

### C–1. Purpose
This appendix outlines the responsibilities and duties of the PEBLO and the appointed Legal Counsel who represents soldiers before the formal PEB. It provides a guide for counseling soldiers who are being processed within the Physical Disability Evaluation System.

### C–2. Scope
*a.* The PEBLO will counsel each soldier (or the next-of-kin or legal guardian, when appropriate) throughout physical disability processing.Counseling will be based upon the individual circumstances of each case and will be designed to serve the soldier's best interest. Answers to questions about MEBD and PEB procedures will be provided in detail. The PEBLO must reassure the soldier that counseling will continue, as needed, as the case progresses within the disability system. Soldiers should be encouraged to ask questions during case processing. All soldiers should be advised of benefits and training provided by the Department of Veterans Affairs, Department of Labor, and Social Security Administration.

*b.* Federal law (10 USC 1214) provides that no soldier of the Armed Forces may be retired or separated without a full and fair hearing if demanded.If the soldier requests a formal hearing, an Army attorney will be appointed as counsel to represent the soldier at the formal hearing. The attorney is responsible for counseling the soldier on all matters relating to the formal hearing.

### C–3. Stages of counselling
*a.* The PEBLO will provide counseling at the following stages of case processing.

(1) Upon referral of the soldier's case to a MEBD.

(2) When approved findings and recommendations of the MEBD are received by the soldier or next-of-kin.

(3) When the findings and recommendations of the PEB informal hearing are received by the soldier or next-of-kin.

(4) When the soldier demands a formal PEB hearing.

(5) After the PEB president announces the findings and recommendation of the formal hearing.

(6) When the USAPDA informs the soldier or next-of-kin of a proposed modification to the findings and recommendations of the PEB.

(7) When the results of an appeal to the APDAB are received by the soldier or next-of-kin.

*b.* Major duties of the appointed legal counsel are outlined in paragraph 4–21*h*. Counsel will ensure that each soldier who elects a formal hearing has been properly counseled. Counsel will contact the soldier within 3 days of being detailed by the PEB. The soldier will be advised of the following rights:

(1) Rights under the Privacy Act of 1974 and its application to the formal hearing.

(2) To testify or to remain silent. Remaining silent is not considered adversely by the board.

(3) To introduce witnesses, depositions, documents, or other relevant evidence in the soldier's behalf.

(4) To question all witnesses including those called by the PEB.

(5) To make unsworn statements, orally, in writing, or both, without being subject to questioning by the board.

(6) To decline to make any statement touching on the origin or aggravation of any disease or injury.

(7) That no soldier may be separated or retired for physical disability without a full and fair hearing, and that counsel is present to safeguard the legal rights of the soldier.

### C–4. Overview of PEBLO counseling
*a.* In order to fully execute required responsibilities, PEBLOs must have a thorough knowledge of the policies, regulations, and directives applicable to the Physical Disability Evaluation System. Section II contains further guidance for counseling purposes.

*b.* Although specific details will vary with each case, PEBLOS will include the following topic areas when explaining PEB findings and recommendations and applicable benefits.

(1) Rights of the soldier—MEBD and PEB (paras C–6 and C–7)

(2) Findings and recommendations—MEBD and PEB (paras C–6 and C–7)

(3) Case review (paras C–8 and C–9)

(4) Pay and related benefits (para C–12)

(5) Grade determination (para C–12)

(6) VA benefits (para C–13)

(7) Social Security benefits (para C–14)

(8) TDRL regulatory requirements (para C–10)

(9) Rights of retired soldiers (para C–11)

(10) Benefits under the Department of Labor DVOP (para C–15)

*c.* At all stages of counseling, PEBLOs will advise soldiers of the necessity of obtaining sufficient documentation (medical and non-medical)concerning the soldier's ability to perform military duties and the severity of the soldier's disease or injury. If additional documentation to support the soldier's case is required, the PEBLO will assist in identifying the type of information needed and will assist in obtaining the required information. In unique or complex cases the PEBLO is authorized direct contact with the PEB appointed legal counsel to determine what type of additional information will be most useful to the soldier. The PEBLO will ensure that all additional information received is promptly included in the soldier's case file as supporting evidence.

*d.* PEBLOs will maintain close coordination with the PEB during the processing of all cases and will advise the PEB of all matters which have an impact upon the prompt and efficient processing of disability cases.

*e.* Counseling and assistance will be provided by the PEBLO to soldiers on the TDRL who are undergoing periodic examination or related evaluations.

*f.* If found unfit, each soldier will be counseled by the PEBLO about the approximate date of release from active duty. (app E.) This will be accomplished at the initial counseling session following the MEBD or PEB processing in order to facilitate an orderly transition from the service.

*g.* The PEBLO will coordinate with the installation RSO and the Transition Point in arranging for briefings on benefits and programs for which the soldier may be eligible. If possible, the PEBLO should arrange for interviews with VA, Social Security, and DVOP representatives. Appointments should be scheduled as far ahead of estimated separation date as is possible to allow the soldier adequate time to assimilate the information.

*h.* PEBLO's must ensure that the case file of a soldier being placed on TDRL contains a current mailing address for soldier's location upon departure from unit.

## Section II
## Counseling Guides

### C–5. Publications for physical disability processing
Listed below are publications that relate to the processing and entitlements of soldiers undergoing physical disability processing. PEBLO'S should obtain these publications in order to counsel soldiers thoroughly.

*a.* AR 37–104 (Finance series)

*b.* AR 40–3, Medical, Dental, and Veterinary Care

*c.* AR 40–501, Standards of Medical Fitness

*d.* AR 600–8–1, Army Casualty and Memorial Affairs and Line of Duty Investigations

*e.* AR 600–20, Army Command Policies and Procedures

*f.* AR 600–50, Standards of Conduct for Department of the Army Personnel

*g.* AR 608–9, The Survivor Benefit Plan (SBP)

*h.* AR 608–25, Retirement Services Program

*i.* AR 635–40, Physical Evaluation for Retention, Retirement, or Separation

*j.* DA Pam 360–506, Disability Separation

*k.* DA Pam 360–539, SBP Made Easy (Revised 1987)

*l.* DA Pam 600–5, Handbook on Retirement Services for Army Personnel and Their Families

*m.* Veterans Administration Schedule for Rating Disabilities (VASRD).

*n.* Physicians Guide: Disability Evaluation Examination; Department of Medicine and Surgery, Veterans Administration.

## C–6. Medical Evaluation Board (MEBD)

*a.* The MEBD may find that a soldier does not meet Army medical retention standards and refer the soldier to a PEB for disability processing.MEBD findings and recommendations are not binding on the PEB. At this stage soldiers often have questions requiring PEBLO assistance. PEBLOS should inform the soldier that additional documentation regarding the soldier's ability to perform military duties may be necessary. Assistance should be provided by the PEBLO to obtain this information. Such documentation may include letters, performance evaluations, efficiency reports, or additional medical information.Copies of efficiency reports may be obtained upon request from the following locations:

(1) *Officers.* Records Branch, HQDA (DAPC–POS), 200 Stoval Street, Alexandria, VA 22331–0476.

(2) *Enlisted.* U.S. Army Enlisted Records Center, Fort Benjamin Harrison, IN 46249–5301.

(3) *USAR personnel.* Commander, ARPERCEN, ATTN: DARP–PRP–P,9700 Page Boulevard, St. Louis, Missouri 63132–5200.

*b.* If not already part of the MEBD proceedings, PEBLO's should request a statement from soldier's commander describing current duty performance. This statement should address the following:

(1) The soldier's most recent performance of duty.

(2) Any special limitation of duty due to the soldier's physical condition.

(3) The soldier''s ability to adequately perform the duties normally expected of an individual of the soldier's office, grade, rank, or rating.

(4) The soldier's current duty assignment, anticipated future assignments, branch, age, and career specialties.

*c.* Upon receipt of the MEBD findings and recommendations, PEBLOs will—

(1) Review and become thoroughly familiar with the DA Form 3947. Check all entries for completeness and accuracy.

(2) Ensure that the medical terminology is explained to the soldier in terms that the soldier can understand.

(3) Confirm that the Narrative Summary accurately represents the soldier's condition.

(4) Promptly contact and arrange to counsel the soldier on the MEBD findings and recommendations.

*d.* During the counseling session with the soldier, PEBLOs will—

(1) Give the soldier ample time to read the MEBD report and the narrative summary and ensure that both are understood by the soldier.

(2) Ask the soldier whether all medical conditions and physical defects appear in the report, and whether they have been adequately described.If not, discuss with the soldier the possibility of submitting an appeal or contacting the physician to obtain an addendum.

(3) Inform the soldier of the requirements and procedures for requesting discharge under the provisions of chapter 5 (when applicable), and COAD (chap 6), and the probable effect of each.

(4) Explain to the soldier the following:

*(a)* How more evidence may be presented for consideration by the MEBD.

*(b)* The options of the appointing authority who will either approve the findings and recommendations or return the proceedings to the MEBD for reconsideration.

*(c)* How the soldier completes the medical board proceedings in order to indicate a desire to appeal.

*(d)* How the soldier can obtain assistance in writing an appeal, if desired, and how clerical support is provided.

*(e)* The meaning and effect of an adverse line of duty decision at any stage of the proceedings.

*(f)* The effect of being under investigation for an offense which could result in discharge under other than honorable conditions.

(5) Describe for the soldier the course of physical disability processing through the PEB and USAPDA. Inform the soldier that once the PEB makes findings and recommendations at the formal hearing the soldier should again see the PEBLO for additional counseling. Furnish the soldier with publications which answer often asked questions and encourage the soldier to call if any questions arise which have not been answered.

*e.* PEBLOs or physicians may not inform any soldier of the following before PEB action:

(1) That the soldier has been found physically fit or unfit for duty.

(2) That the soldier will be discharged or retired from the service.

(3) What disability percentage rating the soldier will receive for his condition.

## C–7. Physical Evaluation Board

*a.* The PEB must make findings and recommendations based upon the MEBD proceedings, evaluations of duty performance, and any other available relevant evidence. The PEB must first decide whether the soldier is physically fit or unfit for duty. A soldier ultimately found fit is returned to duty. If the soldier is found unfit, the PEB will—

(1) Decide whether the disability was incurred while the soldier was entitled to basic pay and in line of duty when the case is that of a soldier on orders for more than 30 days of active duty. Decide whether the disability was the proximate result of performing duty and incurred in line of duty when the case is that of a Reservist performing duty for 30 days or less. (See para 3–1 and 4–19*g* concerning line of duty and 8–2 concerning eligibility of Reservists performing duty for 30 days or less.)

(2) Assign a percentage rating to the disability if the soldier otherwise qualifies. (See appendix B for the method of computing combined ratings for multiple disabilities, and for an explanation of both the amputation rule and the rule prohibiting pyramiding.)

(3) In reference to the Dual Compensation Act and Civil Service employment, determine whether the disability resulted from an injury or disease received in the line of duty as a direct result of armed conflict, or was caused by an instrumentality of war and incurred in the line of duty during a period of war. (See paras 4–19*j* and C–12.)

(4) In reference to tax exemption, determine:

*(a)* Whether the soldier was a member or obligated to become a member of an armed force or Reserve thereof, or the National Oceanic and Atmospheric Administration (NOAA) or the U.S. Public Health Service on 24 September 1975.(See paras 4–19*k* and C–12.)

*(b)* Whether the disability resulted from a combat related injury. (See paras 4–19*k* and C–12.)

*b.* The soldier does not personally appear at or take part in, the PEB informal hearing. The board bases its findings and recommendations solely on the available evidence of record. Upon receipt of the PEB informal findings and recommendations, PEBLOs will—

(1) Review and become thoroughly familiar with the PEB findings and recommendations.

*(a)* Compare the PEB findings with the soldier's MEBD, the VASRD, and appendix B. (If the soldier has been found fit, consult AR 40–501, chap 3 and chaps 2 and 4 of this regulation.) Verify that PEB has not overlooked any condition that may substantially alter the soldier's benefits.

*(b)* Various means of rating a disability exist. For example, a joint injury may involve nerve or muscle damage and limitation of motion. Check each to assure the member has been rated the most

advantageous way. However, give attention to the amputation rule (para B–18) and the prohibition of pyramiding(para B–5).

(2) Compute and prepare an estimate of retirement or severance pay, tax benefits, and VA compensation.

(3) Contact the soldier and make an appointment to counsel the soldier about the findings and recommendations of the PEB.

*c.* During the scheduled counseling session with the soldier PEBLOs will—

(1) Inform the soldier of the PEB informal findings and recommendations, the benefits which apply, (using the prepared estimates), and the possible courses of action available to the soldier.

(2) Advise the soldier that an election to either concur or nonconcur with the results of the PEB informal hearing must be received at the PEB within 10 days from receipt of the DA Form 199, and that if no election is made within the authorized time the soldier will be considered to have agreed with the informal PEB decision.

(3) Fully explain the soldier's possible elections. Election choices include—

*(a)* Concurrence and waiver of the formal hearing.

*(b)* Nonconcurrence and waiver of the formal hearing with a statement of rebuttal.

*(c)* Nonconcurrence and a demand for the formal hearing. The soldier may personally appear or choose not to appear.

(4) Fully explain the guidelines for submission of a statement of rebuttal and the process of review of USAPDA.

(5) Fully explain the soldiers representational options for the hearing. Possible representatives include the following:

*(a)* Regularly appointed PEB Legal Counsel(Judge Advocate General's Corps attorney).

*(b)* Other military counsel if reasonably available.

*(c)* Civilian counsel of the soldier''s choice at no expense to the Government.

*(d)* A counselor of an accredited veteran's service organization.

*(e)* A DA attorney specifically assigned PEB legal counsel duties and made available to represent soldiers.

(6) If the soldier chooses to nonconcur, determine whether the nonconcurrence is due to a misunderstanding of benefits. Recheck the MEBD (or contact the physician) to insure that all diagnosed conditions are recorded and properly described. Seek an addendum if necessary. Compare the symptomology related by the soldier and contained in the MEBD with the requirements of the VASRD, and appendix B. Advise the soldier of the merits of the nonconcurrence.

(7) If the soldier still nonconcurs, notify the PEB so a formal hearing can be scheduled and arrangements can be made for the soldier to consult with the PEB Legal Counsel.

(8) Prepare a summary of the soldier's reasons for nonconcurring and forward the summary with the soldier's election.

*d.* When a soldier demands a formal hearing, PEBLO's will advise the soldier—

(1) That the soldier may personally appear at the hearing.

(2) Of all the representational options.

(3) That the soldier or counsel may question any witnesses called to testify at the hearing.

(4) That the soldier may request the PEB to summon witnesses who are members or employees of the Army or another Armed Service who are reasonably available, and who are essential to the presentation of the soldier's case. The PEB president (according to AR 635–40, para 4–21) decides whether the presence of such witnesses is essential. The soldier is responsible for the attendance of witnesses who are not members or employees of the Armed Forces at no expense to the Government. Additionally, the soldier is entitled to present the testimony of any soldier or employee of the Army or other armed service obtained at own expense, and who is given leave to attend.

(5) That any statement required to be signed by the soldier against the soldier's interest concerning the origin, incurrence, or aggravation of a disease or injury will be excluded from consideration. Any such statement against the soldier's interest, signed by the soldier, before he or she is advised that he or she need not make a statement, or any written statement obtained under circumstances indicating that it was involuntary, is invalid.

(6) That the soldier may submit a written rebuttal or appeal of the PEB formal findings and recommendations according to guidelines in paragraph 4–21*t*.

(7) That if the soldier elects not to concur with the PEB formal findings and recommendations, the case will be reviewed by the agency providing the election and a statement of rebuttal is received within the prescribed time.

*e.* PEBLO's will also advise soldiers that—

(1) Pay computations are merely estimates.

(2) PEB findings and recommendations are not final until approved for the SA. If a modification is made by USAPDA, the soldier should again contact the PEBLO. (Proceedings of general officers and medical corps officers found physically unfit must be approved by ASD(HA)).

(3) Soldiers to be retired should read DA Pam 600–5, DA Pam 360–506, and DA Pam 360–539.

(4) Contact should be made with appropriate representatives from the VA, Social Security Administration, DVOP, and RSO. Claims should be filed at the time of separation where applicable.

(5) VA compensation is payable as an alternative to Army payments while social security is payable in addition to Army or VA compensation for qualified veterans.

(6) The soldier should determine if other disability insurance exists on any outstanding indebtedness which might relieve the soldier of further payments.

(7) Disabled veterans receive a 10-point job performance in Federal Employment (under some circumstances the preference may be claimed by a spouse). Veterans preference provides a waiver of age and physical requirements and it gives retention preference except to those soldiers retired with 20 or more years of service.

(8) If a soldier of the RC, at least one voting member of the PEB will be a Reserve Officer.

*f.* PEBLOs will explain that the soldier has a duty to keep his home and work telephone numbers current so that the PEBLO can contact him promptly regarding his case.

*g.* If a soldier is recommended for the TDRL, explain the TDRL rights listed in paragraph C–10.

**C–8. U.S. Army Physical Disability Agency**

*a.* USAPDA reviews those cases designated in paragraph 4–22. When as a result of review, USAPDA modifies the findings and recommendations of the PEB, certain rights accrue to the soldier. In order to properly counsel soldiers, the PEBLO must—

(1) Review and become thoroughly familiar with the USAPDA modification and the rationale for the action.

(2) Compare the modification with the findings and recommendations of the PEB, the soldier's medical board proceedings, the VASRD, and appendix B.

*b.* The PEBLO will notify the soldier of the USAPDA modification by telephone or certified mail. Counseling will cover the following:

(1) The effect of the modification on disposition, compensation, and the benefits applicable to DA Form 199, Block 10.

(2) The election options pertaining to USAPDA modification. These include—

*(a)* Concurrence.

*(b)* Demand for a formal hearing (if not already held).

*(c)* Submission of a rebuttal

(3) The rationale for the modification.

(4) The fact that the PEBLO is available to assist in making an election and pursuing the course of action the soldier elects.

(5) The fact that the election and rebuttal must be received by USAPDA within 10 days of the soldier's notification of the modification unless an extension has been granted by USAPDA.

*c.* If the soldier elects to demand a formal hearing, the PEBLO will—

(1) Notify the PEB who will detail counsel. PEB counsel will contact soldier within 3 days of being detailed.

(2) Advise the soldier that the PEB Recorder will provide notification of the date and time of the hearing.

*d.* If the soldier nonconcurs and plans to submit a rebuttal, the PEBLO will advise the soldier that—

(1) The PEBLO is available to assist the soldier in the preparation of the rebuttal. If the soldier has been ordered home on a permanent change of station (PCSH), it may be more convenient for the soldier to work with a PEBLO or PEB Legal Counsel near the PCS location.

(2) The rebuttal must meet the same guidelines as a rebuttal to formal proceedings.

(3) Rebuttals are directed to the Commander, USAPDA, Forest Glen Section—WRAMC, Washington DC, 20307–5001.

*e.* After counseling the soldier on the modification, complete the counseling statement on the DA Form 199.

## C–9. Army Physical Disability Appeal Board (APDAB)

The APDAB reviews cases when the soldier has elected to rebut a proposed modification and the CG, USAPDA did not agree with the rebuttal. If the APDAB arrives at findings and recommendations different from those of the PEB or USAPDA, the soldier has the right to be informed of the revision by the APDAB and to submit a rebuttal. In those cases, the PEBLO will—

*a.* Advise the soldier of the meaning and effect of the new findings and recommendations.

*b.* Assist the soldier in preparing a rebuttal statement if the soldier so elects. (Send rebuttals to the APDAB for reconsideration.)

## C–10. Temporary Disability Retired List

Soldiers recommended for placement on the TDRL will be advised by PEBLOs that—

*a.* TDRL status is authorized for a maximum of 5 years, but permanent disposition may be made at an earlier date.

*b.* Payment while on the TDRL is computed according to section 1401 and 1407, title 10, United States Code (10 USC 1401 and 1407).

(1) For those soldiers who entered active duty prior to 8 September 1980, the minimum payment is 50 percent of base pay.

(2) For those soldiers who first entered active duty after 7 September 1980, the minimum payment is 50 percent of the monthly retired pay base (para C–12).

*c.* No changes will be made in the disability percentage rating while the soldier is retained on the TDRL even if the disability becomes materially better or worse (para 7–20*b*).

*d.* TDRL retired pay will be suspended when the soldier fails to report for a periodic examination even though the fifth anniversary of placement on the TDRL has not been reached.

*e.* A soldier will not be removed from the TDRL without processing through the PEB unless the fifth anniversary of placement on the TDRL has occurred and the soldier has failed to obtain the required periodic evaluation.

*f.* Periodic medical examinations are required at least every 18 months.The soldier will receive instructions detailing where and when to report. If the soldier fails to respond, Army retired pay will be stopped. If the soldier is unable to make the appointment for cogent reasons, the PEBLO must be notified so that a new appointment may be made. Prior to examination PEBLOs will ascertain whether the soldier has been treated by a VA hospital, other military hospital, civilian hospital or a private physician since the last medical evaluation. If the soldier was recently seen for a service connected disability, the PEBLO will make every effort to obtain copies of any records of the treatment and evaluation.

*g.* Each periodic examination report is referred to a PEB for a determination as to whether the soldier is to be retained on, or removed from, the TDRL.

*h.* Final disposition may result in permanent retirement with the same, greater, or lessor disability percentage rating; separation with severance pay (if less than 20 years service); or a finding of physical fitness.

*i.* A finding of fit for duty by the PEB results in one or more of the following actions:

(1) A soldier of the Regular Army upon the soldier's consent, will be reappointed, reenlisted, or discharged. A soldier in the RC may, upon the soldier's consent, reenter the RC without active duty or be discharged.

(2) If the soldier elects to return to active duty, time spent on the TDRL counts for pay purposes.

(3) If the soldier elects to be discharged, the finding of fit does not necessarily effect the soldier's standing with the VA or the entitlement to VA compensation.

*j.* The soldier must notify Commander, PERSCOM, ATTN: TAPC–PDB, 2461 Eisenhower Avenue, Alexandria VA 22331–04772 of every change of address.Failure to do so or to report for a scheduled examination will result in the suspension of retired pay beginning with the month following the missed examination.

## C–11. Rights of retired soldiers

Soldiers retired for physical disability have the same rights as those retired for years of service. Possession of DD Form 2 (United States Uniformed Services Identification Card (Retired)) is all that is required for most.Dependents require DD Form 1173 (Uniformed Services Identification and Privilege Card). In summary benefits include—

*a.* Commissary, Post Exchange, and other installation privileges for retiree, spouse and dependent children. (Dependency is determined under applicable regulations.)

*b.* Medical care for the retiree, spouse and dependent children, if reasonably available, at any service installation.

*c.* Civilian Health and Medical Program of the Uniformed Services(CHAMPUS). Refer the soldier to the MTF CHAMPUS advisor (or the installation Retirement Services Officer). Briefing should include the issue of CHAMPUS supplemental insurance.

*d.* VA hospital treatment and other VA benefits.

## C–12. Compensation and Related Benefits

Computation of disability compensation pay can be complicated by the numerous laws governing it, the various types of creditable service, and other factors.Care should be taken to advise soldiers that computations provided by the PEBLO are estimates only, and that the U.S. Army Finance and Accounting Center(USAFAC) will make the official computation of compensation. Normally a soldier's retired pay will be computed using the method of computation most favorable to the soldier. One method is based on multiplying percentage of disability by the retired pay base and the other is based on multiplying the years of creditable service by the retired pay base. (See para *c*below.) Estimates of compensation will be provided to the soldier using DA Form 5892–R (PEBLO Estimated Disability Compensation Worksheet.)

*a. Severance pay.* In computing pay for those with less than 20 years' active service and a disability percentage of less than 30 percent, figure 2 months' basic pay for every year of active duty with a maximum of 12 years service. Consider 6 months or more as a whole year for computing years of service as a multiplier. A soldier with less than 6 months' service cannot receive severance pay. The soldier may apply to the VA for disability compensation. (Years of service for members of the RC is computed in accordance with 10 USC 1332)

*b. Retired pay base.* The DOD Authorization Act of 1981, now codified in section 1407, title 10, United States Code (10 USC 1407) changed the method of computing the retired pay base.

(1) Retired pay for soldiers who entered active duty on or prior to 7 September 1980 is computed on the highest grade "satisfactorily" held or current grade. DA makes the final grade decision.

(2) For soldiers who first became members of the Armed Forces after 7 September 1980, retired pay is computed on 1/36 of the total amount of monthly basic pay received for the high-36 months of active duty. When the period of active duty is less than 36 months, the amount equal to the total amount of basic pay received divided

**Active duty**
Full-time duty in the active military service of the United States. This general term applies to all active duty service with the active forces without regard to duration or purpose.

**Active service**
Service on active duty.

**Acute, grave illness**
A pathological condition having a sudden onset or sharp rise that is very serious or dangerous to life. It is usually short and relatively severe as opposed to a prolonged chronic condition.

**Armed conflict**
Any activity in which American military personnel are engaged with a hostile or belligerent nation, faction, or force. The activity may include a war, expedition, occupation, battle, skirmish, raid, invasion, rebellion, insurrection, guerrilla action, or similar situation.

**Combat-related injury**
A personal injury or sickness that a soldier incurs under one of the following conditions: as a direct result of armed conflict; while engaged in extrahazardous service; under conditions simulating war; or which is caused by an instrumentality of war.

**Conditions simulating war**
Those circumstances of training so simulating conditions of war that a special personal risk attends the situation. The mere fact that training(calisthenics) was required, or that training (football) is sponsored by the military, does not equate with "conditions simulating war."

**Counsel**
As used is this regulation, the term "counsel" will be construed to include members in good standing of the Federal bar or the bar of any State, accredited representatives of veterans' organizations recognized by the Administrator of Veterans Affairs under section 3402, title 38, United States Code (10 USC 3402), and other persons who, in the opinion of the board, are considered to be competent to present equitably and comprehensively the soldier's case.

**Disease**
An abnormal condition affecting a person that is not defined or classified as an injury. (A detailed listing of diseases may be found in Volume I, International Classification of Diseases, Adapted for Use in the United States (ICD–9–CM) Eighth Revision, diagnostic codes 000 to 796.9.)

**Deleterious-type cases**
A case in which disclosure of information on a soldier's physical condition would be harmful to his physical or mental health.

**Deterioration of existing condition**
When recurring coincident with non-disability separation, it must be equivalent to acute, grave illness to overcome the presumption of fitness.

**Extended active duty**
The duty status of a member of the Regular Army. It is also the duty status of a non-Regular member who is called or ordered to active duty for a period of more than 30 days other than for training under section 270(b), title 10, United States Code (10 USC 270(b)).

**Impairment of function**
The lessening of the capacity of the body or its parts to perform normally because of disease or residual of an injury.

**Impairment, manifest**
An impairment evidenced by signs or symptoms.

**Impairment, physical**
Any anatomic, functional, or physiologic abnormality of the body. The term is synonymous with "physical defect."

**In loco parentis**
In the place of a parent instead of a parent; charged, factitiously, with a parent's rights, duties, and responsibilities.

**Injury**
A condition caused by trauma, such as a fracture, wound, sprain, dislocation, concussion, or compression. Also, an injury includes conditions resulting from extremes of temperature or prolonged exposure. Acute poisonings resulting from exposure to a toxic or poisonous substance are also classed as injuries. Poisoning due to contaminated food is not considered an injury. (A detailed listing of injuries may be found in Volume I, International Classification of Diseases, Adapted for Use in the United States (ICD–9–CM), Eighth Revision, diagnostic codes 800 to 999.9.)

**Instrumentality of war**
A device designed primarily for military service and intended for use in such service at the time of the occurrence of the injury. It may also be a device not designed primarily for military service if use of or occurrence involving such a device subjects the individual to a hazard peculiar to military service. This use or occurrence differs from the use or occurrence under similar circumstances in civilian pursuits. There must be a direct causal relationship between the use of the instrumentality of war and the disability and the disability must be incurred incident to a hazard or risk of the service.

**Maximum hospital benefits**
The point during hospitalization when a patient's progress appears to be stabilized. At this point, it can be anticipated if additional hospitalization will contribute to any further substantial recovery. A patient who can be expected to continue to improve over a long period of time without specific therapy or medical supervision, or with only a moderate amount of treatment on an outpatient basis, may be considered as having attained maximum hospital benefits.

**Next-of-kin**
An individual's nearest relative. (See AR 600–8–1 for identification as well as the definition of "parent" in this glossary.)

**Not on extended active duty**
The duty status of a non-Regular member who is ordered to active duty for training under section 270(b), title 10, United States Code (10 USC 270(b)); ordered to active duty or active duty for training for 30 days or less; or performing inactive duty for training.

**Office, grade, rank, or rating**
For the purpose of this regulation—

*a.* Office is a position of duty, trust, or authority to which an individual is appointed.

*b.* Grade is a step or degree in a graduated scale of office or military rank that is established and designated as a grade by law or regulation.

*c.* Rank is the order of precedence among members of the Armed Forces.

*d.* Rating is the name prescribed for members of an Armed Force in an occupational field. The term equates with military occupational specialty.

**Optimum hospital improvement**
The point during hospitalization when a patient's fitness for further military service can be decided. Also further treatment for a reasonable period in a military medical treatment facility will probably not result in material change in his condition so as to alter his type of disposition or amount of separation benefits.

**Parent**
Father of a legitimate child, mother of a legitimate child, father through adoption, mother through adoption, mother of an illegitimate child, and father of an illegitimate child but only if—

*a.* He acknowledged paternity in writing signed by him; or

*b.* He had been judicially ordered to contribute to the child's support; or

*c.* He had been judicially decreed to be father of such child; or

*d.* Proof of paternity is established by a certified copy of the public record of birth or church record of baptism showing that he was the informant and was named as father of the child; or

*e.* Proof of paternity is established from service department of other public records, such as school or welfare agencies, which show that with his knowledge he was named as father of the child.

**Physical disability**
Any manifest impairment due to disease or injury, regardless of degree, that reduces or prevents an individual's actual or presumed

ability to engage in gainful or normal activity. The term includes disability due to mental disease.

**Physical evaluation board liaison officer (PEBLO)**
An experienced, mature officer, NCO, or civilian employee designated by the MTF commander to perform the primary duties of counseling soldiers who are undergoing physical disability evaluation. The PEBLO provides soldiers with authoritative and timely answers to their questions about the physical disability system and aids them in understanding their rights and entitlements. The PEBLO is not, and need not be, an attorney.

**Physically unfit**
Unfitness due to physical disability. The unfitness is of such a degree that a soldier is unable to perform the duties of his office, grade, rank, or rating in such a way as to reasonably fulfill the purpose of his employment on active duty. "Physically unfit" is synonymous with "unfit because of physical disability."

**Preponderance of evidence**
Factual information that tends to prove one side of a disputed fact by outweighing the evidence on the other side. Preponderance does not necessarily mean a greater number of witnesses or a greater mass of evidence; rather, the term means a superiority of evidence on one side or the other of a disputed fact. The term requires consideration of the quality rather than the quantity of the evidence.

**Presumption**
An interference of the truth of a proposition or fact. It is reached through a process of reasoning and based on the existence of other facts.Presumed matters need no proof to support them. They may be rebutted by evidence to the contrary, however.

**Processing for separation from active service**
A soldier is "processing for separation from active service" when he has requested retirement by reason of age or length of service or is being processed for administrative separation to include separation at ETS or ESA date (for officers only).

**Proximate result of performing duty**
A disability may reasonably be assumed to have been the result of, arising from, or connected with active duty, full-time training duty, other full-time duty, or inactive duty training. All facts, circumstances, and laws on a particular case must be considered.

**Reasonable doubt**
Reasonable doubt exists when evidence does not satisfactorily prove or disprove a claim. Reasonable doubt is substantial, not specious. It is within the range of probabilities as distinguished from pure speculation or remote possibility. It is not means of reconciling conflicts or contradictions in evidence.

**Reserve Components of the Army**
The Army National Guard of the United States and the US Army Reserve.

**Separation**
An all-inclusive term that is applied to personnel actions resulting from release from active duty, discharge, retirement, dismissal, resignation, dropped from the rolls, or death. In this regulation, separation means discharge because of physical disability with or without severance pay.

**Service aggravation**
*a.* Medical treatment facilities frequently list a medical condition as "service aggravated" based on the fact that the condition becomes symptomatic under certain conditions found in the military. Symptoms arising when limits imposed by a condition have been exceeded are poor criteria of service aggravation of the condition, itself.
*b.* When an EPTS condition becomes symptomatic under the stress of active duty it may be unfitting but it has not been aggravated by AD unless it has been permanently worsened over and above natural progression.

**Unfit because of physical disability**
Synonymous with physically unfit.

## Section III
## Special Abbreviations and Terms
There are no special terms.

**Headquarters**
**Department of the Army**
**Washington, DC**
**19 February 2004**

***Army Regulation 40–501**

**Effective 19 March 2004**

**Medical Services**

# Standards of Medical Fitness

By order of the Secretary of the Army:

PETER J. SCHOOMAKER
*General, United States Army*
*Chief of Staff*

Official:

JOEL B. HUDSON
*Administrative Assistant to the Secretary of the Army*

**History.** This publication is a rapid action revision. The portions affected by this rapid action revision are listed in the summary of change.

**Summary.** This regulation provides information on medical fitness standards for induction, enlistment, appointment, retention, and related policies and procedures. This publication implements DOD Directive 6130.3, Physical Standards for Appointment, Enlistment, and Induction, December 15, 2000, and DOD Instruction 6130.4, Criteria and Procedure Requirements for Physical Standards for Appointment, Enlistment, or Induction in the Armed Forces, December 14, 2000.

**Applicability.** This regulation applies to candidates for military service and to Active Army personnel. It also applies to the Army National Guard of the United States (ARNGUS), including periods when operating in their Army National Guard (ARNG) capacity, and the U.S. Army Reserve. This publication is applicable during mobilization.

**Proponent and exception authority.** The proponent of this regulation is the Office of the Surgeon General. The proponent has the authority to approve exceptions or waivers to this regulation that are consistent with controlling law and regulation. The proponent may delegate this approval authority, in writing, to a division chief within the proponent agency or a direct reporting unit or field operating agency of the proponent agency in the grade of colonel or the civilian equivalent. Activities may request a waiver to this regulation by providing justification that includes a full analysis of the expected benefits and must include formal review by the agency's senior legal officer. All waiver requests will be endorsed by the commander or senior leader of the requesting activity and forwarded through their higher headquarters to the policy proponent. Refer to AR 25–30 for specific guidance.

**Army management control process.** This regulation contains management control provisions in accordance with AR 11–2, but it does not identify key management controls that must be evaluated.

**Supplementation.** Supplementation of this regulation and establishment of command or local forms are prohibited without prior approval from HQDA (DASG–HS–AS), 5109 Leesburg Pike, Falls Church, VA 22041–3258.

**Suggested improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to HQDA (DASG–HS–AS), 5109 Leesburg Pike, Falls Church, VA 22041–3258.

**Distribution.** This publication is available in electronic media only, and is intended for command levels A, B, C, D, and E for medical activities only of the Active Army, the Army National Guard of the United States, and the U.S. Army Reserve.

**Contents** (Listed by paragraph and page number)

**Chapter 1**
**General Provisions,** *page 1*
Purpose • 1–1, *page 1*
References • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*
Responsibilities • 1–4, *page 1*
Medical classification • 1–5, *page 1*
Review authorities and waivers • 1–6, *page 1*

*This regulation supersedes Army Regulation 40–501, dated 29 August 2003.



**UNCLASSIFIED**

**Table 2–2**
**Military acceptable weight (in pounds) as related to age and height for females—Initial Army procurement[1, 2]—Continued**

| Height (inches) | Minimum weight any age | Maximum weight by years of age 17–20 | 21–27 | 28–39 | 40 and over |
|---|---|---|---|---|---|
| 73 | 128 | 177 | 182 | 188 | 193 |
| 74 | 130 | 183 | 189 | 194 | 198 |
| 75 | 133 | 188 | 194 | 200 | 204 |
| 76 | 136 | 194 | 200 | 206 | 209 |
| 77 | 139 | 199 | 205 | 211 | 215 |
| 78 | 141 | 204 | 210 | 216 | 220 |
| 79 | 144 | 209 | 215 | 222 | 226 |
| 80 | 147 | 214 | 220 | 227 | 232 |

| | | Maximum body fat by years of age 17–20 | 21–27 | 28–39 | 40 and over |
|---|---|---|---|---|---|
| | | 30% | 32% | 34% | 36% |

Notes:
[1] If a female exceeds these weights, percent body fat will be measured by the method described in AR 600–9.
[2] If a female also exceeds this body fat, she will be rejected for service.

# Chapter 3
# Medical Fitness Standards for Retention and Separation, Including Retirement

## 3–1. General
This chapter gives the various medical conditions and physical defects which may render a soldier unfit for further military service and which fall below the standards required for the individuals in paragraph 3–2 below.

## 3–2. Application
These standards apply to the following individuals (see chaps 4 and 5 for other standards that apply to specific specialties):

*a.* All commissioned and warrant officers of the Active Army, ARNG/ARNGUS, and USAR.

*b.* All enlisted soldiers of the Active Army, ARNG/ARNGUS, and USAR.

*c.* Students already enrolled in the HPSP and USUHS programs.

*d.* Enlisted soldiers of the ARNG/ARNGUS or USAR who apply for enlistment in the regular Army.

*e.* Commissioned and warrant officers of the ARNG/ARNGUS or USAR who apply for appointment in the Active Army.

*f.* Soldiers of the ARNG/ARNGUS or USAR who re-enter active duty under the "split-training option." (However, the weight standards of tables 2–1 and 2–2 apply to split option trainees.)

*g.* Retired soldiers recalled to active duty.

## 3–3. Disposition
Soldiers with conditions listed in this chapter who do not meet the required medical standards will be evaluated by an MEB as defined in AR 40–400 and will be referred to a PEB as defined in AR 635–40 with the following caveats:

*a.* USAR or ARNG/ARNGUS soldiers not on active duty, whose medical condition was not incurred or aggravated during an active duty period, will be processed in accordance with chapter 9 and chapter 10 of this regulation.

*b.* Soldiers pending separation in accordance with provisions of AR 635–200 or AR 600–8–24 authorizing separation under other than honorable conditions who do not meet medical retention standards will be referred to an MEB. In the case of enlisted soldiers, the physical disability processing and the administrative separation processing will be conducted in accordance with the provisions of AR 635–200 and AR 635–40. In the case of commissioned or warrant officers, the physical disability processing and the administrative separation processing will be conducted in accordance with the provisions of AR 600–8–24 and AR 635–40.

*c.* A soldier will not be referred to an MEB or a PEB because of impairments that were known to exist at the time of acceptance in the Army and that have remained essentially the same in degree of severity and have not interfered with successful performance of duty.

*d.* Physicians who identify soldiers with medical conditions listed in this chapter should initiate an MEB at the time

of identification. Physicians should not defer initiating the MEB until the soldier is being processed for nondisability retirement. Many of the conditions listed in this chapter (for example, arthritis in para 3–14*b*) fall below retention standards only if the condition has precluded or prevented successful performance of duty. In those cases when it is clear the condition is long standing and has not prevented the soldier from reaching retirement, then the soldier meets the standard and an MEB is not required.

*e.* Soldiers who have previously been found unfit for duty by a PEB, but were continued on active duty (COAD) under the provisions of AR 635–40, chapter 6, will be referred to a PEB prior to retirement or separation processing.

*f.* If the Secretary of Defense prescribes less stringent standards during partial or full mobilization, individuals who meet the less stringent standards but do not meet the standards of this chapter will not be referred for an MEB or a PEB, until the termination of the mobilization or as directed by the Secretary of the Army.

**3–4. General policy**

Possession of one or more of the conditions listed in this chapter does not mean automatic retirement or separation from the Service. Physicians are responsible for referring soldiers with conditions listed below to an MEB. It is critical that MEBs are complete and reflect all of the soldier's medical problems and physical limitations. The PEB will make the determination of fitness or unfitness. The PEB, under the authority of the U.S. Army Physical Disability Agency, will consider the results of the MEB, as well as the requirements of the soldier's MOS, in determining fitness. (See chapter 9 and chapter 10 of this regulation for processing of RC soldiers.)

**3–5. Abdominal and gastrointestinal defects and diseases**

The causes for referral to an MEB are as follows:

*a.* Achalasia (cardiospasm) with dysphagia not controlled by dilatation or surgery, continuous discomfort, or inability to maintain weight.

*b.* Amoebic abscess with persistent abnormal liver function tests and failure to maintain weight and vigor after appropriate treatment.

*c.* Biliary dyskinesia with frequent abdominal pain not relieved by simple medication, or with periodic jaundice.

*d.* Cirrhosis of the liver with recurrent jaundice, ascites, or demonstrable esophageal varices or history of bleeding therefrom.

*e.* Gastritis, if severe, chronic hypertrophic gastritis with repeated symptomatology and hospitalization, confirmed by gastroscopic examination.

*f.* Hepatitis, chronic, when, after a reasonable time (1 or 2 years) following the acute stage, symptoms persist, and there is objective evidence of impairment of liver function.

*g.* Hernia, including inguinal, and other abdominal, except for small asymptomatic umbilical, with severe symptoms not relieved by dietary or medical therapy, or recurrent bleeding in spite of prescribed treatment or other hernias if symptomatic and if operative repair is contraindicated for medical reasons or when not amenable to surgical repair.

*h.* Crohn's Disease/Ileitis, regional, except when responding well to treatment.

*i.* Pancreatitis, chronic, with frequent abdominal pain of a severe nature; steatorrhea or disturbance of glucose metabolism requiring hypoglycemic agents.

*j.* Peritoneal adhesions with recurring episodes of intestinal obstruction characterized by abdominal colicky pain, vomiting, and intractable constipation requiring frequent admissions to the hospital.

*k.* Proctitis, chronic, with moderate to severe symptoms of bleeding, painful defecation, tenesmus, and diarrhea, and repeated admissions to the hospital.

*l.* Ulcer, duodenal, or gastric with repeated hospitalization, or "sick in quarters" because of frequent recurrence of symptoms (pain, vomiting, or bleeding) in spite of good medical management and supported by endoscopic evidence of activity.

*m.* Ulcerative colitis, except when responding well to treatment.

*n.* Rectum, stricture of with severe symptoms of obstruction characterized by intractable constipation, pain on defecation, or difficult bowel movements, requiring the regular use of laxatives or enemas, or requiring repeated hospitalization.

**3–6. Gastrointestinal and abdominal surgery**

The causes for referral to an MEB are as follows:

*a.* Colectomy, partial, when more than mild symptoms of diarrhea remain or if complicated by colostomy.

*b.* Colostomy, when permanent.

*c.* Enterostomy, when permanent.

*d.* Gastrectomy, total.

*e.* Gastrectomy, subtotal, with or without vagotomy, or gastrojejunostomy, with or without vagotomy, when, in spite

limitations. Soldiers incapable of performing duty with a hearing aid will be referred for MEB/PEB processing. (See paragraph 8–26.)

**3–11. Endocrine and metabolic disorders**

The causes for referral to an MEB are as follows:

*a.* Acromegaly with severe function impairment.

*b.* Adrenal dysfunction that does not respond to therapy satisfactorily or where replacement therapy presents serious problems in management.

*c.* Diabetes insipidus unless mild and the patient shows good response to treatment.

*d.* Diabetes mellitus when proven to require insulin or oral medications for control.

*e.* Goiter causing breathing obstruction.

*f.* Gout in advanced cases with frequent acute exacerbations and severe bone, joint, or kidney damage.

*g.* Hyperinsulinism when caused by a tumor or when the condition is not readily controlled.

*h.* Hyperparathyroidism when residuals or complications of surgical correction such as renal disease or bony deformities preclude the reasonable performance of military duty.

*i.* Hypofunction, adrenal cortex requiring medication for control.

*j.* Osteomalacia with residuals after therapy of such nature or degree as to preclude the satisfactory performance of duty.

**3–12. Upper extremities**

The causes for referral to an MEB are as follows (see also para 3–14):

*a.* Amputation of part or parts of an upper extremity equal to or greater than—

(1) A thumb proximal to the interphalangeal joint.

(2) Two fingers of one hand, other than the little finger, at the proximal interphalangeal joints.

(3) One finger, other than the little finger, at the metacarpophalangeal joint and the thumb of the same hand at the interphalangeal joint.

*b.* Joint ranges of motion which do not equal or exceed the measurements listed below. Measurements must be made with a goniometer and conform to the methods illustrated and described in TC 8–640.

(1) Shoulder—forward elevation to 90 degrees, or abduction to 90 degrees.

(2) Elbow—flexion to 100 degrees, or extension to 60 degrees.

(3) Wrist—a total range extension plus flexion of 15 degrees.

(4) Hand (for this purpose, combined joint motion is the arithmetic sum of the motion at each of the three finger joints (TC 8–640))—an active flexor value of combined joint motions of 135 degrees in each of two or more fingers of the same hand, or an active extensor value of combined joint motions of 75 degrees in each of the same two or more fingers, or limitation of motion of the thumb that precludes opposition to at least two finger tips.

*c.* Recurrent dislocations of the shoulder, when not repairable or surgery is contraindicated.

**3–13. Lower extremities**

The causes for referral to an MEB are as follows (see also para 3–14):

*a.* Amputations.

(1) Loss of toes that precludes the abilities to run or walk without a perceptible limp and to engage in fairly strenuous jobs.

(2) Any loss greater than that specified above to include foot, ankle, below the knee, above the knee, femur, hip.

*b.* Feet.

(1) Hallux valgus when moderately severe, with exostosis or rigidity and pronounced symptoms; or severe with arthritic changes.

(2) Pes planus, when symptomatic, more than moderate, with pronation on weight bearing which prevents the wearing of military footwear, or when associated with vascular changes.

(3) Pes cavus when moderately severe, with moderate discomfort on prolonged standing and walking, metatarsalgia, and which prevents the wearing of military footwear.

(4) Neuroma that is refractory to medical treatment, refractory to surgical treatment, and interferes with the satisfactory performance of military duties.

(5) Plantar fascitis or heel spur syndrome that is refractory to medical or surgical treatment, interferes with the satisfactory performance of military duties, or prevents the wearing of military footwear.

(6) Hammertoes, severe, that precludes the wearing of appropriate military footwear, refractory to surgery, or interferes with satisfactory performance of duty.

(7) Hallux limitus, hallux rigidus.

*c.* Internal derangement of the knee.

(1) Residual instability following remedial measures, if more than moderate in degree.

(2) If complicated by arthritis, see paragraph 3–14*a*.

*d.* Joint ranges of motion. Motion that does not equal or exceed the measurements listed below. Measurements must be made with a goniometer and conform to the methods illustrated and described in TC 8–640.

(1) Hip—flexion to 90 degrees or extension to 0 degree.

(2) Knee—flexion to 90 degrees or extension to 15 degrees.

(3) Ankle—dorsiflexion to 10 degrees or planter flexion to 10 degrees.

*e.* Shortening of an extremity that exceeds 2 inches.

*f.* Recurrent dislocations of the patella.

### 3–14. Miscellaneous conditions of the extremities

The causes for referral to an MEB are as follows (see also paras 3–12 and 3–13):

*a.* Arthritis due to infection, associated with persistent pain and marked loss of function with objective x-ray evidence and documented history of recurrent incapacity for prolonged periods. For arthritis due to gonococcic or tuberculous infection, see paragraphs 3–40 *j*and 3–45*b*.

*b.* Arthritis due to trauma, when surgical treatment fails or is contraindicated and there is functional impairment of the involved joints so as to preclude the satisfactory performance of duty.

*c.* Osteoarthritis, with severe symptoms associated with impairment of function, supported by x-ray evidence and documented history of recurrent incapacity for prolonged periods.

*d.* Avascular necrosis of bone when severe enough to prevent successful performance of duty.

*e.* Chondromalacia or osteochondritis dissecans, severe, manifested by frequent joint effusion, more than moderate interference with function, or with severe residuals from surgery.

*f.* Fractures.

(1) Malunion of fractures, when, after appropriate treatment, there is more than moderate malunion with marked deformity and more than moderate loss of function.

(2) Nonunion of fractures, when, after an appropriate healing period, the nonunion precludes satisfactory performance of duty.

(3) Bone fusion defect, when manifested by more than moderate pain and loss of function.

(4) Callus, excessive, following fracture, when functional impairment precludes satisfactory performance of duty and the callus does not respond to adequate treatment.

*g.* Joints.

(1) Arthroplasty with severe pain, limitation of motion, and of function.

(2) Bony or fibrous ankylosis, with severe pain involving major joints or spinal segments in an unfavorable position, and with marked loss of function.

(3) Contracture of joint, with marked loss of function and the condition is not remediable by surgery.

(4) Loose bodies within a joint, with marked functional impairment and complicated by arthritis to such a degree as to preclude favorable results of treatment or not remediable by surgery.

(5) Prosthetic replacement of major joints if there is resultant loss of function or pain that precludes satisfactory performance of duty.

*h.* Muscles.

(1) Flaccid paralysis of one or more muscles with loss of function that precludes satisfactory performance of duty following surgical correction or if not remediable by surgery.

(2) Spastic paralysis of one or more muscles with loss of function that precludes the satisfactory performance of military duty.

*i.* Myotonia congenita.

*j.* Osteitis deformans (Paget's disease) with involvement of single or multiple bones with resultant deformities or symptoms severely interfering with function.

*k.* Osteoarthropathy, hypertrophic, secondary with moderately severe to severe pain present, with joint effusion occurring intermittently in one or multiple joints, and with at least moderate loss of function.

*l.* Osteomyelitis, chronic, with recurrent episodes not responsive to treatment and involving the bone to a degree that interferes with stability and function.

*m.* Tendon transplant with fair or poor restoration of function with weakness that seriously interferes with the function of the affected part.

### 3–15. Eyes

The causes for referral to an MEB are as follows:

*a.* Active eye disease or any progressive organic disease or degeneration, regardless of the stage of activity, that is

*d.* Progressive degenerative disorders of the basal ganglia and cerebellum including Parkinson's disease, Huntington's chorea, hepatolenticular degeneration, and variants of Friedreich's ataxia.

*e.* Multiple sclerosis, optic neuritis, transverse myelitis, and similar demyelinating disorders.

*f.* Stroke, including both the effects of ischemia and hemorrhage, when residuals affect performance.

*g.* Migraine, tension, or cluster headaches, when manifested by frequent incapacitating attacks.

*h.* Narcolepsy, sleep apnea syndrome, or similar disorders. (See para 3–41.)

*i.* Seizure disorders and epilepsy. Seizures by themselves are not disqualifying unless they are manifestations of epilepsy. However, they may be considered along with other disabilities in judging fitness. In general, epilepsy is disqualifying unless the soldier can be maintained free of clinical seizures of all types by nontoxic doses of medications. The following guidance applies when determining whether a soldier will be referred to an MEB/PEB.

(1) All active duty soldiers with suspected epilepsy must be evaluated by a neurologist who will determine whether epilepsy exists and whether the soldier should be given a trial of therapy on active duty or referred directly to an MEB for referral to a PEB. In making the determination, the neurologist may consider the underlying cause, EEG findings, type of seizure, duration of epilepsy, family history, soldier's likelihood of compliance with therapeutic program, absence of substance abuse, or any other clinical factor influencing the probability of control or the soldier's ability to perform duty during the trial of treatment.

(2) If a trial of duty on treatment is elected by the neurologist, the soldier will be given a temporary P–3 profile with as few restrictions as possible.

(3) Once the soldier has been seizure free for 1 year, the profile may be reduced to a P–2 profile with restrictions specifying no assignment to an area where medical treatment is not available.

(4) If seizures recur beyond 6 months after the initiation of treatment, the soldier will be referred to an MEB.

(5) Should seizures recur during a later attempt to withdraw medications or during transient illness, referral to a PEB is at the discretion of the physician or MEB.

(6) If the soldier has remained seizure free for 36 months, he or she may be removed from profile restrictions.

(7) Recurrent pseudoseizures are disqualifying under the same rules as epilepsy.

*j.* Any other neurologic conditions, regardless of etiology, when after adequate treatment there remains residual symptoms and impairments such as persistent severe headaches, uncontrolled seizures, weakness, paralysis, or atrophy of important muscle groups, deformity, uncoordination, tremor, pain, or sensory disturbance, alteration of consciousness, speech, personality, or mental function of such a degree as to significantly interfere with performance of duty.

*Note.* Diagnostic concepts and terms used in paragraphs 3–31 through 3–37 are in consonance with the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM–IV). The minimum psychiatric evaluation will include Axis I, II, and III.

### 3–31. Disorders with psychotic features

The causes for referral to an MEB are mental disorders not secondary to intoxication, infectious, toxic, or other organic causes, with gross impairment in reality testing, resulting in interference with duty or social adjustment.

### 3–32. Mood disorders

The causes for referral to an MEB are as follows:

*a.* Persistence or recurrence of symptoms sufficient to require extended or recurrent hospitalization; or

*b.* Persistence or recurrence of symptoms necessitating limitations of duty or duty in protected environment; or

*c.* Persistence or recurrence of symptoms resulting in interference with effective military performance.

### 3–33. Anxiety, somatoform, or dissociative disorders

The causes for referral to an MEB are as follows:

*a.* Persistence or recurrence of symptoms sufficient to require extended or recurrent hospitalization; or

*b.* Persistence or recurrence of symptoms necessitating limitations of duty or duty in protected environment; or

*c.* Persistence or recurrence of symptoms resulting in interference with effective military performance.

### 3–34. Dementia and other cognitive disorders due to general medical condition

The causes for referral to an MEB include persistence of symptoms or associated personality change sufficient to interfere with the performance of duty or social adjustment.

### 3–35. Personality, sexual and gender identity, or factitious disorders; disorders of impulse control not elsewhere classified; substance-related disorders

The conditions may render an individual administratively unfit rather than unfit because of physical disability. Interference with performance of effective duty in association with these conditions will be dealt with through administrative channels.

### 3–36. Adjustment disorders

Situational maladjustments due to acute or chronic situational stress do not render an individual unfit because of physical disability, but may be the basis for administrative separation if recurrent and causing interference with military duty.

### 3–37. Eating disorders

The causes for referral to an MEB are eating disorders that are unresponsive to treatment or that interfere with the satisfactory performance of duty.

### 3–38. Skin and cellular tissues

The causes for referral to an MEB are as follows:

*a.* Acne. Severe, unresponsive to treatment, and interfering with the satisfactory performance of duty or wearing of the uniform or other military equipment.

*b.* Atopic dermatitis. More than moderate and after hospitalization interfering with performance of duty.

*c.* Amyloidosis. Generalized.

*d.* Cysts and tumors. (See paras 3–42 and 3–43.)

*e.* Dermatitis herpetiformis. Not responsive to therapy.

*f.* Dermatomyositis.

*g.* Dermographism. Interfering with the performance of duty.

*h.* Eczema, chronic. Regardless of type, when there is more than minimal involvement and the condition is unresponsive to treatment and interferes with the satisfactory performance of duty.

*i.* Elephantiasis or chronic lymphedema. Not responsive to treatment.

*j.* Epidermolysis bullosa.

*k.* Erythema multiforme. More than moderate and recurrent or chronic.

*l.* Exfoliative dermatitis. Chronic.

*m.* Fungus infections, superficial or systemic types. If not responsive to therapy and interfering with the satisfactory performance of duty.

*n.* Hidradenitis suppurative and/or folliculitis decalvans (dissecting cellulitis of the scalp).

*o.* Hyperhidrosis. On the hands or feet, when severe or complicated by a dermatitis or infection, either fungal or bacterial and not amenable to treatment.

*p.* Leukemia cutis or mycosis fungoides or cutaneous T–Cell lymphoma. (See also para 3–42.)

*q.* Lichen planus. Generalized and not responsive to treatment.

*r.* Lupus erythematosus. Cutaneous or mucous membranes involvement that is unresponsive to therapy and interferes with the satisfactory performance of duty.

*s.* Neurofibromatosis. When interfering with the satisfactory performance of duty.

*t.* Panniculitis. Relapsing, febrile, nodular.

*u.* Parapsoriasis. Extensive and not controlled by treatment.

*v.* Pemphigus. Not responsive to treatment and with moderate constitutional or systemic symptoms, or interfering with the satisfactory performance of duty.

*w.* Psoriasis. Extensive and not controllable by treatment.

*x.* Radiodermatitis. If resulting in malignant degeneration at a site not amenable to treatment.

*y.* Scars and keloids. So extensive or adherent that they seriously interfere with the function of an extremity or interfere with the performance of duty.

*z.* Scleroderma. Generalized or of the linear type that seriously interferes with the function of an extremity.

*aa.* Tuberculosis of the skin. (See paragraph 3–40.)

*ab.* Ulcers of the skin. Not responsive to treatment after an appropriate period of time if interfering with the satisfactory performance of duty.

*ac.* Urticaria/Angioedema. Chronic, severe, and not responsive to treatment.

*ad.* Xanthoma. Regardless of type, but only when interfering with the satisfactory performance of duty.

*ae.* Intractable plantar keratosis, chronic. Requires frequent medical/surgical care or that interferes with the satisfactory performance of duty.

*af.* Other skin disorders. If chronic or of a nature that requires frequent medical care, or interferes with the satisfactory performance of military duty.

### 3–39. Spine, scapulae, ribs, and sacroiliac joints

The causes for referral to an MEB are as follows (see also para 3–14):

*a.* Dislocation. Congenital, of hip.

*b.* Spina bifida. Demonstrable signs and moderate symptoms of root or cord involvement.

*c.* Spondylolysis or spondylolisthesis. More than mild symptoms resulting in repeated outpatient visits, or repeated hospitalization or limitations effecting performance of duty.

*d.* Coxa vara. More than moderate with pain, deformity, and arthritic changes.

*e.* Herniation of nucleus pulposus. More than mild symptoms following appropriate treatment or remedial measures, with sufficient objective findings to demonstrate interference with the satisfactory performance of duty.

*f.* Kyphosis. More than moderate, interfering with military duties.

*g.* Scoliosis. Severe deformity with over 2 inches deviation of tips of spinous process from the midline, or of lesser degree if recurrently symptomatic and interfering with military duties.

*h.* Nonradicular pain involving the cervical, thoracic, lumbosacral, or coccygeal spine, whether idiopathic or secondary to degenerative disc or joint disease, that fails to respond to adequate conservative treatment and necessitates significant limitation of physical activity.

### 3–40. Systemic diseases

The causes for referral to an MEB are as follows:

*a.* Amyloidosis.

*b.* Blastomycosis.

*c.* Brucellosis. Chronic with substantiated, recurring febrile episodes, severe fatigue, lassitude, depression, or general malaise.

*d.* Leprosy. Any type that seriously interferes with performance of duty or is not completely responsive to appropriate treatment.

*e.* Myasthenia gravis.

*f.* Mycosis. Active, not responsive to therapy or requiring prolonged treatment, or when complicated by residuals that themselves are unfitting.

*g.* Panniculitis. Relapsing, febrile, nodular.

*h.* Porphyria, cutanea tarda.

*i.* Sarcoidosis. Progressive with severe or multiple organ involvement and not responsive to therapy.

*j.* Tuberculosis.

(1) Meningitis, tuberculous.

(2) Pulmonary tuberculosis (see para 3–26), tuberculous empyema, and tuberculous pleurisy.

(3) Tuberculosis of the male genitalia. Involvement of the prostate or seminal vesicles and other instances not corrected by surgical excision, or when residuals are more than minimal, or are symptomatic.

(4) Tuberculosis of the female genitalia.

(5) Tuberculosis of the kidney.

(6) Tuberculosis of the larynx.

(7) Tuberculosis of the lymph nodes, skin, bone, joints, eyes, intestines, and peritoneum or mesentery. These will be evaluated on an individual basis, considering the associated involvement, residuals, and complications.

*k.* Rheumatoid arthritis that interferes with successful performance of duty or requires geographic assignment limitations or requires medication for control that requires frequent monitoring by a physician due to debilitating or serious side effects.

*l.* Spondyloarthropathies. Chronic or recurring episodes of arthritis causing functional impairment interfering with successful performance of duty supported by objective, subjective, and radiographic findings, or requires medication for control that requires frequent monitoring by a physician due to debilitating or serious side effects.

(1) Ankylosingpondylitis.

(2) Reiter's syndrome.

(3) Psoriatic arthritis.

(4) Arthritis associated with inflammatory bowel disease.

(5) Whipple's disease.

*m.* Systemic lupus erythematosus that interferes with successful performance of duty or requires geographic assignment limitations or requires medication for control that requires frequent monitoring by a physician due to debilitating or serious side effects.

*n.* Sjogren's syndrome. When chronic, more than mildly symptomatic and resistant to treatment after a reasonable period of time.

*o.* Progressive systemic sclerosis, diffuse and limited disease that interferes with successful performance of duty or requires geographic assignment limitations or requires medication for control that requires frequent monitoring by a physician due to debilitating or serious side effects.

*p.* Myopathy, to include inflammatory, metabolic or inherited, that interferes with successful performance of duty or requires geographic assignment limitations or requires medication for control that requires frequent monitoring by a physician due to debilitating or serious side effects.

# Chapter 7
# Physical Profiling

## 7–1. General

This chapter prescribes a system for classifying individuals according to functional abilities. See also paragraphs 3–25, 3–27, 3–30, 3–45, and 3–46 for additional guidance on coronary artery disease, asthma, seizure disorders, and heat and cold injuries.

## 7–2. Application

The physical profile system is applicable to the following categories of personnel:

*a.* Registrants who undergo an induction or pre-induction medical examination related to Selective Service processing.

*b.* All applicants examined for enlistment, appointment, or induction.

*c.* Members of any component of the U.S. Army throughout their military service, whether or not on active duty.

## 7–3. Physical profile serial system

*a.* The physical profile serial system is based primarily upon the function of body systems and their relation to military duties. The functions of the various organs, systems, and integral parts of the body are considered. Since the analysis of the individual's medical, physical, and mental status plays an important role in assignment and welfare, not only must the functional grading be executed with great care, but clear and accurate descriptions of medical, physical, and mental deviations from normal are essential.

*b.* In developing the system, the functions have been considered under six factors designated "P–U–L–H–E–S." Four numerical designations are used to reflect different levels of functional capacity. The basic purpose of the physical profile serial is to provide an index to overall functional capacity. Therefore, the functional capacity of a particular organ or system of the body, RATHER THAN THE DEFECT PER SE, will be evaluated in determining the numerical designation 1, 2, 3, or 4.

*c.* The factors to be considered are as follows:

(1) P—Physical capacity or stamina. This factor, general physical capacity, normally includes conditions of the heart; respiratory system; gastrointestinal system, genitourinary system; nervous system; allergic, endocrine, metabolic and nutritional diseases; diseases of the blood and blood forming tissues; dental conditions; diseases of the breast, and other organic defects and diseases that do not fall under other specific factors of the system.

(2) U—Upper extremities. This factor concerns the hands, arms, shoulder girdle, and upper spine (cervical, thoracic, and upper lumbar) in regard to strength, range of motion, and general efficiency.

(3) L—Lower extremities. This factor concerns the feet, legs, pelvic girdle, lower back musculature and lower spine (lower lumbar and sacral) in regard to strength, range of motion, and general efficiency.

(4) H—Hearing and ears. This factor concerns auditory acuity and disease and defects of the ear.

(5) E—Eyes. This factor concerns visual acuity and diseases and defects of the eye.

(6) S—Psychiatric. This factor concerns personality, emotional stability, and psychiatric diseases.

*d.* Four numerical designations are assigned for evaluating the individual's functional capacity in each of the six factors. Guidance for assigning numerical designators is contained in table 7–1. The numerical designator is not an automatic indicator of "deployability" or assignment restrictions, or referral to an MEB/PEB. Likewise, the conditions listed in chapter 3, rather than the numerical designator of the profile, will be the determinant for MEB processing.

(1) An individual having a numerical designation of "1" under all factors is considered to possess a high level of medical fitness.

(2) A physical profile designator of "2" under any or all factors indicates that an individual possesses some medical condition or physical defect that may require some activity limitations.

(3) A profile containing one or more numerical designators of "3" signifies that the individual has one or more medical conditions or physical defects that may require significant limitations. The individual should receive assignments commensurate with his or her physical capability for military duty.

(4) A profile serial containing one or more numerical designators of "4" indicates that the individual has one or more medical conditions or physical defects of such severity that performance of military duty must be drastically limited.

*e.* Anatomical defects or pathological conditions will not of themselves form the sole basis for recommending assignment or duty limitations. While these conditions must be given consideration when accomplishing the profile, the prognosis and the possibility of further aggravation must also be considered. In this respect, profiling officers must consider the effect of their recommendations upon the soldier's ability to perform duty. Profiles must be realistic. All profiles and assignment limitations must be legible, specific, and written in lay terms. If the commander has questions about a profile or is unable to use the soldier within the profile, the procedures in paragraph 7–12 will apply.

(1) Determination of individual assignment or duties to be performed are command/administrative matters. Limitations such as "no field duty," or "no overseas duty," are not proper medical recommendations. (However, they are

included as administrative guidelines in pregnancy profiles.) Profiling officers should provide enough information regarding the soldier's physical limitations to enable the nonmedical commander and AHRC to make a determination on individual assignments or duties.

(2) It is the responsibility of the commander or personnel management officer to determine proper assignment and duty, based upon knowledge of the soldier's profile, assignment limitations, and the duties of his or her grade and MOS.

(3) Table 7–1 contains the physical profile functional capacity guide.

(4) See TB MED 287 for profiling soldiers with pseudofolliculitis.

### 7–4. Temporary vs. permanent profiles

*a. Permanent profiles.* A profile is considered permanent unless a modifier of "T" (temporary) is added as described in *b* below. A permanent profile may only be awarded or changed by the authority designated in paragraph 7–6.

(1) If the profile is permanent the profiling officer must assess if the soldier meets retention standards by chapter 3. Those soldiers on active duty who do not meet retention standards must be referred to an MEB as per chapter 3. (See paras 9–10 and 10–26 for disposition of USAR and ARNG soldiers not on active duty who do not meet medical retention standards.)

(2) Those soldiers (active duty and USAR/ARNG) who meet retention standards but have at least a 3 or 4 PULHES serial will be referred to a Medical MOS Retention Board (MMRB) in accordance with AR 600–60, unless waived by the MMRB convening authority.

(3) Permanent profiles may be amended at any time if clinically indicated and will automatically be reviewed at the time of a soldier's periodic examination.

(4) The soldier's commander may also request a review of a permanent profile in accordance with paragraph 7–12.

*b. Temporary profiles.* A temporary profile is given if the condition is considered temporary, the correction or treatment of the condition is medically advisable, and correction usually will result in a higher physical capacity. Soldiers on active duty and RC soldiers not on active duty with a temporary profile will be medically evaluated at least once every 3 months at which time the profile may be extended by the profiling officer.

(1) The profiling officer must review previous profiles before making a decision to extend a temporary profile. Any extension of a temporary profile must be recorded on DA Form 3349, and if renewed, item 9 on the DA Form 3349 must contain the following statement: "This temporary profile is an extension of a temporary profile first issued on (date)."

(2) Temporary profiles should specify an expiration date. If no date is specified, the profile will automatically expire at the end of 30 days from issuance of the profile. In no case will soldiers carry a temporary profile that has been extended for more than 12 months. If a profile is needed beyond the 12 months the temporary profile should be changed to a permanent profile.

### 7–5. Representative profile serial and codes

To facilitate the assignment of individuals after they have been given a physical profile serial and for statistical purposes, code designations have been adopted to represent certain combinations of physical limitations or assignment guidance. (See table 7–2.) The alphabetical coding system will be recorded on personnel qualifications records. This coding system will not be used on medical records to identify limitations. The numerical designations under each profile factor, PULHES, are given in table 7–1.

### 7–6. Profiling officer

*a.* Commanders of Army MTFs are authorized to designate one or more physicians, dentists, optometrists, podiatrists, audiologists, nurse practitioners, nurse midwives, licensed clinical psychologists, and physician assistants as profiling officers. The commander will assure that those designated are thoroughly familiar with the contents of this regulation. Profiling officer limitations are as follows:

(1) *Physicians.* No limitations.

(2) *Dentists, optometrists, physical therapists, and occupational therapists.* No limitation within their specialty for awarding numerical designators "1" and "2." A temporary numerical designator "3" may be awarded for a period not to exceed 30 days. Any extension beyond 30 days must be signed by a physician. (See para 7–8.)

(3) *Audiologists.* No limitation within their specialty for awarding permanent numerical designators "1," "2," "3," or "4" in cases of sensorineural hearing loss if retrocochlear lesion has been ruled out. Changing from or to a permanent numerical designator "3" or "4" requires the co–signature of a physician approving authority (para 7–8).

(4) *Physician assistants, nurse midwives, nurse practitioners, and licensed clinical psychologists.* Limited to awarding temporary numerical designators "1," "2," and "3" for a period not to exceed 30 days. Any extension of a temporary profile beyond 30 days must be confirmed by a physician, except when the provisions of paragraph 7–9 apply. However, physician assistants with AOC 65DM1 certified in orthopedics have no limitations in awarding temporary orthopedic profiles or permanent profiles with a numerical designator of "1" or "2." Physician assistants

with AOC 65DM1 may award permanent orthopedic profiles of "3" or "4" provided the profile is signed by the physician approving authority.

(5) *Podiatrists.* No limitations within their specialty for awarding temporary or permanent profiles with a numerical designator of "1" or "2." Podiatrists may award permanent profiles of "3" or "4" providing the profile is co-signed by a physician approving authority.

*b.* MEPS physicians will also be designated as profiling officers. (See para 7–7*b*.)

### 7–7. Recording and reporting of initial physical profile

*a.* Individuals accepted for initial appointment, enlistment, or induction in peacetime normally will be given a numerical designator "1" or "2" physical profile in accordance with the instructions contained in this regulation. Initial physical profiles will be recorded on DD Form 2808 by the medical profiling officer at the time of the initial appointment, enlistment, or induction medical examination.

*b.* The initial physical profile serial will be entered on DD Form 2808 and also recorded on DD Forms 1966/1 through 5 (Record of Military Processing—Armed Forces of the United States), in the appropriate spaces. When the modifier "T" is entered on the profile serial, or in those exceptional cases where the numerical designator "3" is used on initial entry, a brief, nontechnical description of the defect will be recorded in the "Summary of Defects" section on the DD Form 2808, in addition to the exact diagnosis. All physical, geographic, or climatic area limitations applicable to the defect will also be entered in that section. If sufficient room for a full explanation is not available in that section, proper reference will be made in that section number and an additional sheet of paper attached. It is not uncommon for the MEPS to assign a profile with the numerical designator of "3" or "0" pending a medical waiver review of a disqualifying condition. This is for their administrative purposes only. If the individual receives a medical waiver, the waiver documentation completed by the waiver authority should indicate the appropriate profile in accordance with table 7–1.

### 7–8. Profiling reviews and approvals

*a.* Permanent "3" or "4" profiles require the signatures of 2 profiling officers, one of which is a physician approving authority (unless the provisions of 7–8*f* apply). (Permanent profiles of "3" or "4" for the IRR are valid with only one signature if signed by the AHRC Surgeon or his/her designee.) Temporary or permanent profiles of "1" or "2" require the signature of one profiling officer. See paragraph 7–6 to determine who is authorized to sign profiles.

*b.* Situations that require a mandatory review of an existing physical profile include—

(1) Return to duty of a soldier hospitalized. The attending physician will ensure that the patient has the correct physical profile, assignment limitations(s), and medical followup instructions, as appropriate.

(2) When directed by the appointing authority in cases of a problematical or controversial nature requiring temporary revision of profile.

(3) At the time of the periodic medical examination.

(4) Upon request of the unit commander.

(5) On request of a PEB.

*c.* A temporary revision of profile will be completed when, in the opinion of the profiling officer, the functional capacity of the individual has changed to such an extent that it temporarily alters the individual's ability to perform duty. Temporary profiles written on DA Form 3349 will not exceed 3 months except as provided for in paragraphs 7–8*d* and 7–9. Temporary profiles written on DD Form 689 (Individual Sick Slip) will not exceed 30 days.

*d.* Tuberculous patients returned to a duty status who require anti-tuberculous chemotherapy following hospitalization will be given a temporary "2" profile under the P factor of the physical profile for a period of 1 year with recommendation that the soldier be placed on duty at a fixed installation and will be provided the required medical supervision for a period of 1 year.

*e.* The physical profile in controversial or equivocal cases may be verified or revised by the hospital commander or command surgeon.

*f.* Physical profiles for Reservists not on active duty may be accomplished by the U.S. Army Regional Readiness Command (RRC) surgeons, division staff surgeons, Active Army or USAR medical facility profiling officers, the Army Reserve (ARC) Command Surgeon, the AHRC Command Surgeon or their designees. For ARNG/ARNGUS soldiers not on active duty, profiles will be accomplished by State ARNG/ARNGUS providers. The respective State Surgeons will be the approving authority for permanent "3" or "4" profiles. Approval authorities for the Army Reserve are the ARC Command Surgeon, the AHRC Command Surgeon, the U.S. Army Special Operations Command Surgeon, and the Regional Readiness Command Surgeons. Division surgeons that function as Command surgeons may be delegated profile approving authority by the supporting RRC Surgeon or the ARC Command Surgeon.

*g.* Individuals who were found unfit by a PEB but COAD used to be assigned a code "V" on their physical profile code. The code "V" is no longer used for this purpose but rather to identify soldiers with restrictions on deployment.

*h.* MEB members must ensure that the physical profile and assignment limitations are fully recorded on DA Form 3349. In cases where the soldier is referred to a PEB, a copy of the most current DA Form 3349 will be forwarded to the PEB with the MEB proceeding, with distribution of the form as indicated in the "Distribution" block of DA Form

**Table 7–1**
**Physical profile functional capacity guide**

| Profile | P | U | L | H | E | S |
|---|---|---|---|---|---|---|
| Serial | Physical capacity | Upper extremities | Lower extremities | Hearing–ears | Vision–eyes | Psychiatric |
| Factors to be considered. | Organic defects, strength, stamina, agility, energy, muscular coordination, function, and similar factors. | Strength, range of motion, and general efficiency of upper arm, shoulder girdle, and upper back, including cervical and thoracic vertebrae. | Strength, range of movement, and efficiency of feet, legs, lower back and pelvic girdle. | Auditory sensitivity and organic disease of the ears | Visual acuity, and organic disease of the eyes and lids. | Type severity, and duration of the psychiatric symptoms or disorder existing at the time the profile is determined. Amount of external precipitating stress. Predisposition as determined by the basic personality makeup, intelligence, performance, and history of past psychiatric disorder impairment of functional capacity |
| 1 | Good muscular development with ability to perform maximum effort for indefinite periods. | No loss of digits or limitation of motion; no demonstrable abnormality; able to do hand to hand fighting. | No loss of digits or limitation of motion; no demonstrable abnormality; able to perform long marches, stand over long periods, run. | Audiometer average level for each ear not more than 25 dB at 500, 1000, 2000 Hz with no individual level greater then 30 dB. Not over 45 dB at 4000 Hz | Uncorrected visual acuity 20/200 correctable to 20/20, in each eye. | No psychiatric pathology. May have history of a transient personality disorder. |
| 2 | Able to perform maximum effort over long periods. | Slightly limited mobility of joints, muscular weakness, or other musculo-skeletal defects that do not prevent hand–to–hand fighting and do not disqualify for prolonged effort. | Slightly limited mobility of joints, muscular weakness, or other musculo-skeletal defects that do not prevent moderate marching, climbing, timed walking, or prolonged effort. | Audiometer average level for each ear at 500, 1000, 2000 Hz, or not more than 30 dB, with no individual level greater than 35 dB at these frequencies, and level not more than 55 dB at 4000 Hz; or audiometer level 30 dB at 500 Hz, 25 dB at 1000 and 2000 Hz, and 35 dB at 4000 Hz in better ear. (Poorer ear may be deaf.) | Distant visual acuity correctable to not worse than 20/40 and 20/70, or 20/30 and 20/100, or 20/20 and 20/400. | May have history of recovery from an acute psychotic reaction due to external or toxic causes unrelated to alcohol or drug addiction. |
| 3 | Unable to perform full effort except for brief or moderate periods. | Defects or impairments that require *significant* restriction of use. | Defects or impairments that require *significant* restriction of use. | Speech reception threshold in best ear not greater than 30 dB HL, measured with or without hearing aid; or acute or chronic ear disease. | Uncorrected distant visual acuity of any degree that is correctable not less than 20/40 in the better eye. | Satisfactory remission from an acute psychotic or neurotic episode that permits utilization under specific conditions (assignment when outpatient psychiatric treatment is available or certain duties can be avoided). |
| 4 | *Functional level below P3.* | *Functional level below U3.* | *Functional level below L3.* | *Functional level below H3.* | *Visual acuity below E3.* | Does not meet S3 above. |

**Table 7–2**
**Profile codes***

| Code | Description/assignment limitation | Medical criteria (examples) |
|---|---|---|
| CODE A | No assignment limitation. | No demonstrable anatomical or physiological impairment within standards established in table 7–1. |
| CODE B | May have assignment limitations that are intended to protect against further physical damage/injury. May have minor impairments under one or more PULHES factors that disqualify for certain MOS training or assignment. | Minimal loss of joint motion, visual and hearing loss |
| CODES C through P | Possesses impairments that limit functions or assignments. *The codes listed below are for military personnel administrative purposes. Corresponding limitations are general guidelines and are not to be taken as verbatim limitations. (For example, a soldier with a code C may not be able to run but may have no restrictions on marching or standing.) Item 3 of DA Form 3349 will contain the specific limitations.* | |
| CODE C | Limitations in running, marching, standing for long periods etc. | Orthopedic or neurological conditions |
| CODE D | Limitations in any type of strenuous physical activity. | Organic cardiac disease; pulmonary insufficiency |
| CODE E | Limitations requiring dietary restrictions preventing consumption of combat rations. | Endocrine disorders–recent or repeated peptic ulcer activity–chronic gastrointestinal disease requiring dietary management. |
| CODE F | Limitations prohibiting assignment or deployment to OCONUS areas where definitive medical care is not available. | Individuals who require continued medical supervision with hospitalization or frequent outpatient visits for serious illness or injury. |
| CODE G | Limitations prohibiting wearing Kevlar, LBE, lifting heavy materials required of the MOS, overhead work. | Arthritis of the neck or joints of the extremities with restricted motion; disk disease; recurrent shoulder dislocation. |
| CODE H | Limitations on duty where sudden loss of consciousness would be dangerous to self or to others such as work on scaffolding, vehicle driving, or near moving machinery. | Seizure disorders; other disorders producing syncopal attacks of severe vertigo, such as Meniere's syndrome. |
| CODE J | Hearing Protection Measures required to prevent further hearing loss.<br>1. No exposure to noise in excess of 85 dBA (decibels measured on the A scale) or weapon firing without use of properly fitted hearing protection. Annual hearing test required.<br>2. Further exposure to noise is hazardous to health. No duty or assignment to noise levels in excess of 85 dBA or weapon firing (not to include firing for preparation of replacements for overseas movement (POR) qualification or annual weapons qualification with proper ear protection). Annual hearing test required.<br>3. No exposure to noise in excess of 85 dBA or weapon firing without use of properly fitted hearing protection. This individual is 'deaf' in one ear. Any permanent hearing loss in the good ear will cause a serious handicap. Annual Hearing test required.<br>4. Further duty requiring exposure to high intensity noise is hazardous to health. No duty or assignment to noise levels in excess of 85 dBA or weapon firing (not to include firing for overseas movement (POR) or weapon firing without use of properly ear protection). No duty requiring acute hearing. A hearing aid must be worn to meet medical fitness standards. | Susceptibility to acoustic trauma. |

**Table 7–2**
**Profile codes*—Continued**

| Code | Description/assignment limitation | Medical criteria (examples) |
| --- | --- | --- |
| CODE L | Limitations restricting assignment to cold climates. | Documented history of cold injury; vascular insufficiency; collagen disease, with vascular or skin manifestations. |
| CODE M | Limitations restricting exposure to high environmental temperature. | History of heat stroke; history of skin malignancy or other chronic skin diseases that are aggravated by sunlight or high environmental temperature. |
| CODE N | Limitations restricting wearing of combat boots. | Any vascular or skin condition of the feet or legs that, when aggravated by continuous wear of combat boots, tends to develop unfitting ulcers. |
| CODE P | Limitations restricting wearing or being exposed to required items necessary to perform duty (for example, Latex, wool). | Established allergy to wool, latex. |
| CODE U | Limitation not otherwise described, to be considered individually. (Briefly define limitation in item 8.) | Any significant functional assignment limitation not specifically identified elsewhere. |
| CODE V | Deployment. This code identifies a soldier with restrictions on deployment. Specific restrictions are noted in the medical record. | |
| CODE W | MMRB. This code identifies a soldier with a permanent profile who has been returned to duty by an MMRB (MOS Medical Review Board.) | |
| CODE Y | Fit for duty. This code identifies the case of a soldier who has been determined to be fit for duty (not entitled to separation or retirement because of physical disability) after complete processing under AR 635–40. | |

Notes:
* Codes do not automatically correspond to a specific numerical designator of the profile but are based on the general physical/assignment limitations.

# Chapter 8
# Medical Examinations—Administrative Procedures

## 8–1. General
(See chap 6 for aviation administration procedures.) This chapter provides—

*a.* General administrative policies relative to military medical examinations.

*b.* Requirements for periodic, separation, mobilization, and other medical examinations.

*c.* Policies relative to hospitalization of examinees for diagnostic purposes and use of documentary medical evidence, consultations, and the individual health record.

*d.* Policies relative to the scope and recording of medical examinations accomplished for stated purposes.

## 8–2. Applications
The provisions contained in this chapter apply to all medical examinations accomplished at U.S. Army medical facilities or accomplished for the U.S. Army.

## 8–3. Physical fitness
Maintenance of physical and medical fitness is an individual military responsibility, particularly with reference to preventable conditions and remediable defects. Soldiers have an obligation to maintain themselves in a state of good physical condition so that they may perform their duties efficiently. Soldiers should seek timely medical advice whenever they have reason to believe that a medical condition or physical defect affects, or is likely to affect, their physical or mental well–being. They should not wait until the time of their periodic medical examination to make such a condition or defect known. Commanders will bring this matter to the attention of all soldiers during initial orientation and periodically throughout their period of service.

## 8–4. Consultations
*a.* The use of specialty consultants, either military or civilian, is authorized in AR 40–400 and AR 601–270/AFR 33–7/MCO P–1100.75A.

*b.* A consultation will be completed in the case of an individual being considered for military service, including USMA and ROTC, whenever—

(1) Verification, or establishment, of the exact nature or degree of a given medical condition or physical defect is necessary for the determination of the examinee's medical acceptability or unacceptability based on prescribed medical fitness standards; or

(2) It will assist higher headquarters in the review and resolution of a questionable or borderline case; or

(3) The examining physician deems it necessary.

*c.* A consultation will be accomplished in the case of a soldier on active duty whenever it is indicated to ensure the proper medical care and disposition of the soldier.

*d.* A medical examiner requesting a consultation will routinely furnish the consultant with—

(1) The purpose or reason for which the individual is being examined; for example, enlistment.

(2) The reason for the consultation; for example, persistent tachycardia.

(3) A brief statement on what is desired of the consultant.

(4) Pertinent extracts from available medical records.

*e.* Reports of consultation will be appended to DD Form 2808 as outlined in paragraph 8–5.

**8–5. Distribution of medical reports**

*a.* DD Form 2808 and DD Form 2807–1 are to be used for all military examinations. Previous medical examinations/histories accomplished on soldiers in accordance with this chapter should be considered valid. However, once the DD Forms are available for use, the DD Forms should be used. DD Form 2807–2 (Medical Prescreen of Medical History Report) is not required for military medical examinations.

*b.* A minimum of two copies (both signed) of DD Form 2807–1 and DD Form 2808 will be prepared. One copy of each will be retained by the examining facility. The other copy will be filed as a permanent record in the health record (AR 40–66) or outpatient treatment record. Special instructions for preparation and distribution of additional copies are contained elsewhere in this chapter or in other regulations dealing with programs involving or requiring medical examinations. Copies may be reproduced from signed copies by any duplicating process that produces legible and permanent copies. Such copies are acceptable for any purpose unless specifically prohibited by the applicable regulation. Distribution of copies will not be made to unauthorized personnel or agencies.

*c.* In the case of general officers (grade O7 and above), the duplicate DD Form 2808 will be forwarded by the examining facility directly to Department of the Army, General Officer Management Office, ATTN: DACS–GO, 200 Army Pentagon, Washington, DC 20310–0200.

**8–6. Documentary medical evidence**

*a.* Documentary medical records and other documents prepared by physicians or other individuals may be submitted by, or on behalf of, an examinee as evidence of the presence, absence, or treatment of a defect or disease, and will be given due consideration by the examiner(s). Submission and use of such documentary medical evidence is encouraged. If insufficient copies are received, copies will be reproduced to meet the needs of *b* and *c* below.

*b.* A copy of each piece of documentary medical evidence received will be appended to each copy of the DD Form 2808, and a statement to this effect will be made in the Summary of Defects section and cross-referenced by the pertinent item number.

*c.* When a report of consultation or special test is obtained for an examinee, a copy will be attached to each DD Form 2808 as an integral part of the medical report, and a statement to this effect will be made on the DD Form 2808 and cross-referenced by the pertinent item number.

**8–7. Facilities and examiners**

*a.* Physicians may perform medical examinations of any type except where a specific requirement exists for the examination to be conducted by a physician qualified in a specialty. Physician assistants, nurse practitioners, optometrists, audiologists, and podiatrists, properly qualified by appropriate training and experience, may accomplish such phases of the medical examination as are deemed appropriate by the examining physician. They may sign the report of medical examination for the portions of the examination they actually accomplish, but the supervising physician will sign the report of medical examination in all cases.

*b.* In general, medical examinations conducted for the Army will be completed at facilities of the Armed Forces, using military medical officers on Active or Reserve duty, or full-time or part-time civilian employee physicians, with the assistance of dentists, physician assistants, nurse practitioners, optometrists, audiologists, and podiatrists. There may be contract agreements with civilian or VA facilities to perform military medical or separation examinations for Active or Reserve Component Forces. In such cases, agreements must be worked out with the overseeing Army MTF or Reserve Command to ensure that the medical examinations are reviewed by individuals who are familiar with the medical retention standards of chapter 3 (for example, military physicians) and can make a competent determination on whether the soldier meets the medical retention standards of chapter 3 and is therefore medically fit for retention, retirement, or separation.

*c.* Medical examinations for qualification and admission to the USMA, the U.S. Naval Academy, the U.S. Air Force Academy, and the respective preparatory schools will be conducted in coordination with DODMERB. (See AR 40–29/AFR 160–13/NAVMEDCOMINST 6120.2/CG COMDTINST M6120.8.)

### 8–8. Hospitalization

Whenever hospitalization is necessary for evaluation in connection with a medical examination, it may be furnished as authorized in AR 40–400.

### 8–9. Objectives of medical examinations

The objectives of military medical examinations are to provide information—

*a.* To inform the individual of modifiable health risks and to identify potential lifestyle modifications.

*b.* Needed to initiate treatment of illness.

*c.* To meet administrative and legal requirements.

### 8–10. Recording of medical examinations

The results of a medical examination will be recorded on DD Form 2808 and such other forms as may be required. (See AR 40–29/AFR 160–13/NAVMEDCOMINST 6120.2/CG COMDTINST M6120.8 for DODMERB forms.) Results will be transferred to DD Form 2766 (Adult Preventive and Chronic Care Flowsheet) as needed.

### 8–11. Scope of medical examinations

*a.* The scope of a medical examination is prescribed in paragraph 8–12 and will conform to the intended use of the examination.

*b.* Limited or screening examinations, special tests, or inspections required for specific purposes (for example, drivers, personnel exposed to industrial hazards, blood donors, food handlers) may be prescribed by other regulations.

*c.* Each abnormality, whether or not it affects the examinee's medical fitness to perform military duty, will be routinely described. All diagnoses and symptoms will be noted.

### 8–12. Medical examination requirements and required forms

*a. Required forms.* The required form for all Army military medical examinations is DD Form 2808. The "Laboratory Findings" section of this form may not contain enough space to include all required tests. If additional space is needed, the "Notes" section in box 73 may be used for that purpose. (MTFs are encouraged to use standard overprints, stamps, etc., in box 73 for that purpose.) Table 8–1 contains model entries and explanatory notes for every box on the DD Form 2808. All items are NOT required on all examinations.

*b. All examinations.* The following items ARE REQUIRED on ALL Army military medical examinations. (Additional items may be accomplished if clinically indicated.) See paragraphs (3) through (8) below for additional items required for special examinations. The box number from the DD Form 2808 that corresponds to the appropriate item to be completed is listed following each item.

(1) *Administrative data.* Date of examination (box 1), SSN (box 2), Name of examinee (box 3), Home address (current address, not "home of record" if different) (box 4), Home or contact telephone number (box 5), Grade/rank (box 6), Date of birth (box 7), Age (box 8), Sex (box 9), Race (box 10), Service (box 15a), Component (box 15b), Purpose of exam (box 15c), and Name of examining facility (box 16). (Name and SSN will also be completed on the top of pages 2 and 3 of the DD Form 2808.)

(2) *Clinical evaluation section (boxes 17 through 39).* This includes examination of head, face, neck, scalp, nose, sinuses, mouth, throat, ears (drums), eyes (includes ophthalmoscopic), heart, lungs, vascular system, anus, abdomen, upper and lower extremities, feet, spine, skin, breast exam, neurologic exam, and testicular exam on males. (Rectal exams are not required on all examinations. Pelvic exams and Pap tests are not required on all female examinations. See paras (3) through (8) below for specific requirements.)

(3) *Dental section (box 43), usually completed by a physician or physician's assistant who will be noting any obvious gross abnormalities.* This does not replace the dental examination by a dentist required in AR 40–3. The physician or physician assistant will check the box acceptable or unacceptable. The section in this item for dental "class" will not be completed unless it is completed by a dentist.

(4) *Notes section (box 44) (to explain any abnormalities).*

(5) *Urinalysis for albumin and sugar (boxes 45a and 45b).*

(6) *Miscellaneous measurements.* Height (box 53), weight (box 54), temperature (box 56), pulse (box 57), blood pressure (box 58a), distant vision (box 61), near vision (box 63), and audiometer results (box 71a).

(7) *Qualification for service (box 74a).* For periodic, separation, and retirement exams, qualification is based on whether the examinee meets the medical retention standards of chapter 3.

(8) *Physical profile (box 74b).* This section does not replace the requirements for a DA Form 3349 as described in chapter 7.

(9) *Summary of defects (box 77).*

commanders, the Commander, AHRC, and the Chief, NGB may, at their discretion, direct more frequent medical examinations in individual cases.

(5) All members of the Ready Reserves not on active duty will be screened for medical fitness annually. DA Form 7349 (Initial Medical Review—Annual Medical Certificate) will be used for all Selected Reserve soldiers to record the results of this clinical screen. A medical exam will be accomplished, if, upon review of the form, it is clinically indicated. This form will be filed in the individual's health record. DA Form 3725 (Army Reserve Status and Address Verification) (AR 135–133) is used to meet the yearly screen for all other Individual Ready Reserve soldiers.

### 8–20. Frequency of additional/alternate examinations

*a. Female examinations.*

(1) In addition to the periodic medical examination, all women in the Army, regardless of age, on active duty or ADT/ADSW tours in excess of 1 year or Active Guard—Reserve (AGR) tours will undergo annual breast and pelvic examinations to include a cervical cytologic screening test for cancer. All women in the Army, under age 25, on active duty or ADT/ADSW tours in excess of 1 year or AGR tours will undergo a screening test for Chlamydia. These special examinations are mandatory and will be accomplished during the month of the soldier's birthday. Periodic medical examinations for ARNG/ARNGUS and USAR soldiers not on active duty will include current (within 1 year) pelvic examinations and a cervical cytologic screening test for cancer. Civilian test results attached to the periodic physical for ARNG/ARNGUS and USAR soldiers not on active duty will be acceptable.

(2) All women in the Army on active duty (including AGR) or ADT tours in excess of 1 year will have a mammographic study accomplished at ages 40, 42, 44, 46, 48, and 50. After age 50, the study will be repeated annually. A record of the examination and test results will be maintained in the health record. More frequent mammographic studies may be performed if clinically indicated.

(3) Army applicants are not required to undergo a pelvic examination or a cytologic screening test. However, once enlisted or appointed, the provisions of paragraph 8–20(1) apply.

*b. Medical surveillance examinations.* The frequency of medical surveillance examinations varies according to job exposure. Annual or less frequent examinations will be performed during the birthday month. More frequent examinations will be scheduled during the birthday month and at appropriate intervals thereafter.

### 8–21. Deferment of examinations

*a. Army-wide or at specific installations.* In circumstances requiring Army-wide or installation deferment of periodic examinations (where conditions of the Service preclude the accomplishment of periodic examinations) because resources are being directed to other missions (for example, screening for mobilization/contingency operations, heavy casualties, etc.), requests for exceptions to policies deferring examinations will be forwarded to TSG (ATTN: DASG–HS–AS).

*b. Soldiers in isolated areas.* Periodic medical examinations may be delayed by the commander concerned for those soldiers stationed in isolated areas; that is, Army attaches, military missions, and MAAGs, where medical facilities of the U.S. Armed Forces are not available. Medical examinations so delayed will be accomplished at the earliest opportunity in conjunction with leave, temporary duty, or when the individuals concerned are assigned or attached to a military installation having a medical facility. Medical examination of such individuals for retirement purposes may not be delayed.

*c. Other deferments.* In exceptional circumstances, in the case of an individual soldier, where conditions of the service preclude the accomplishment of the periodic examination, it may be deferred by direction of the commander having custody of personnel files until such time as its accomplishment becomes feasible. An appropriate entry explaining the deferment will be made in the health record and on an SF 600 when such a situation exists.

### 8–22. Promotion

Officers, warrant officers, and enlisted personnel, regardless of component, are considered medically qualified for promotion on the basis of the periodic medical examination outlined in paragraph 8–19.

### 8–23. Separation and retirement examinations

*a.* Soldiers separating from the Army will be given a medical interview using DD Form 2697. The interview will be conducted by a physician, physician assistant, or nurse practitioner to document any complaints or potential service–related (incurred or aggravated) illness or injury. The soldier must acknowledge with his or her signature in block 19 of the form that the information provided is true and complete. This form will be filed in the health record; a copy will be furnished to the Department of Veterans Affairs (VA). See paragraph 8–23*i* for hepatitis screening requirements.

*b.* Soldiers separating from the Army will receive a separation medical examination if the soldier requests it, or if, on review of the medical records or the DD Form 2697, a physician, a physician assistant, or a nurse practitioner feels an examination is appropriate (with exception noted in *c* below). See table 8–2 for additional requirements based on the type of discharge. See *d* below for soldiers retiring from active service.

*c.* ARNG/ARNGUS or USAR soldiers ordered to active duty for war, national emergency, or Presidential Select Reserve Call-Up (10 USC 12301(a), 12302, or 12304) will undergo medical screening prior to mustering out of Federal

service (ARNG/ARNGUS) or release from active duty (USAR). The scope of this screening (for example, medical interview with an examination if clinically indicated vs. a complete medical examination) will be determined by TSG prior to separation based on length of the mobilization/contingency operation and occupational exposures of the soldiers. However, all soldiers, as a minimum, will complete DD Form 2697 prior to mustering out of Federal service or release from active duty in accordance with *a* above.

*d.* Soldiers retiring from active service are required to undergo a medical examination prior to retirement, and will complete DD Form 2697.

*e.* Soldiers in paragraphs *a, b, c,* and *d* above who have indicated on DD Form 2697 that they intend to seek VA disability compensation or who have been referred to the Army Disability Evaluation System for determination of fitness will be given a standard VA compensation and pension physical in addition to any other examinations required by this regulation, AR 40–400, or AR 635–40. For those soldiers, the service medical record, proof of line of duty (LOD) determination, if necessary, and recent laboratory, radiological, and all other associated test results should accompany the claimant for VA benefits to the place of examination so that testing is not duplicated. A complete Review of Systems that documents the individual's physical condition at the time of separation from the military service shall also be conducted as part of the physical examination to minimize duplication. The location for the performance of such VA compensation examination, as well as which facilities shall be used for the laboratory, radiological, and other specialized testing, will be determined by the MTF commander and the VA medical center director and will be clearly delineated in a cost-neutral memorandum of understanding between the respective facilities. If the physical examination is conducted by the VA, a separate medical examination on DD Form 2808 need not be accomplished with the following caveats. A copy of the VA examination must be included in the soldier's military health record. If the VA does not accomplish the required tests contained in paragraph 8–12*e*, the military MTF will complete the additional tests and results will be included in the military health record. Both the VA exam and any additional test will be reviewed by the MTF Commander or the Commander's designee to ensure the soldier meets medical retention standards and is therefore medically cleared for separation or retirement.

*f.* Voluntary requests for medical examinations should be submitted to the commander of the servicing MTF not earlier than 4 months nor later than 1 month prior to the anticipated date of separation or retirement (or if applicable and requested by the soldier, 4 months prior to transition leave). If the examination is accomplished earlier than 4 months, *g*, below, applies.

*g.* When accomplished incident to retirement, discharge, or release from active duty, medical examinations are valid for a period of 12 months from the date of examination. If the examination is accomplished more than 4 months prior to release from active duty, discharge, or retirement (or 4 months prior to transition leave date if the soldier requests it), DA Form 3081 will be attached to the original DD Form 2808.

*h.* Soldiers who have been in medical surveillance programs because of hazardous job exposure will have a clinical evaluation and specific laboratory tests accomplished prior to separation even though a complete medical examination may not be required.

*i.* Soldiers requesting HCV screening will be tested. If the test is positive, medical evaluation to confirm HCV infection, to determine the need for specific treatments, and to provide counseling on lifestyle modifications and steps to protect others from infection will be accomplished. The following statements will overprinted on a DA Form 4700 (Medical Record—Supplemental Medical Data), administered and placed in the medical record for all soldiers separating or retiring from active duty:

(1) *Hepatitis C virus (HCV) is transmitted primarily by injections (for example, blood transfusions, contaminated needles, or sticks with contaminated sharp objects) of contaminated blood. The following are possible sources of HCV infection. If you can answer "yes" to any of these risk factors, you should receive a sample blood test to determine if you could have HCV. If you consider yourself at risk, based on an exposure to a possible source of HCV, you should have a simple blood test for HCV. You will not be asked to identify any specific risk factors to justify HCV testing. If the test is positive, you will receive a medical evaluation to confirm HCV infection, determine your need for specific treatments, and be provided counseling on lifestyle modifications and steps to protect others from infection.*

(2) *Risk factors are—*

*(a) Receiving a transfusion of blood or blood products before 1992.*

*(b) Ever injecting illegal drugs, including use once many years ago.*

*(c) Receiving clotting factor concentrates produced before 1987.*

*(d) Having chronic (long term) hemodialysis.*

*(e) Being told that you have persistent abnormal liver enzyme tests (alanine aminotransferase) or an unexplained liver disease.*

*(f) Receiving an organ transplant before July 1992.*

*(g) Having a needle stick, sharps, or mucosal exposure to potentially HCV-infected blood as part of your occupational duties and not having been previously evaluated for HCV infection.*

(3) *If the test is positive, you will receive a medical evaluation to confirm HCV infection, determine your need for specific treatments, and be provided counseling on lifestyle modifications and steps to protect others from infection.*

(4) *Circle yes or no to the following responses and sign and date.*

Department of Defense

# DIRECTIVE

NUMBER 1332.18

November 4, 1996

Certified Current as of December 1, 2003

ASD(FMP)

SUBJECT: Separation or Retirement for Physical Disability

References: (a) DoD Directive 1332.18, "Separation from the Military Service by Reason of Physical Disability," February 25, 1986 (hereby canceled)
(b) Title 10, United States Code
(c) Sections 3502, 5532, 6308, and 8332 of title 5, United States Code
(d) Section 104 of title 26, United States Code
(e) through (h), see enclosure 1

## 1. REISSUANCE AND PURPOSE

This Directive:

1.1. Reissues reference (a) to update policy and responsibilities for separation or retirement for physical disability under reference (b) and related determinations under references (c) and (d).

1.2. Incorporates policy and responsibility for conduct of Ready Reserve physical examinations and certification of physical condition under Section 10206 of reference (b).

1.3. Authorizes procedures under DoD Instruction 1332.38 reference (e)) and DoD Instruction 1332.39 (reference (f)) for the DoD Disability Evaluation System (DES).

1.4. Establishes policy for processing Active and Reserve component members who have conditions that are cause for referral for physical disability evaluation.

2. APPLICABILITY

This Directive applies to the Office of the Secretary of Defense, the Military Departments (including the Coast Guard when it is operating as a Military Service in the Navy), the Chairman of the Joint Chiefs of Staff, and the Combatant Commands (hereafter referred to collectively as "the DoD Components"). The term "Military Services," as used herein, refers to the Army, the Navy, the Air Force and the Marine Corps.

3. POLICY

It is DoD policy that:

3.1. The DES shall be the mechanism for implementing retirement or separation because of physical disability in accordance with Chapter 61 of 10 U.S.C. (reference (b)).

3.2. The DES shall consist of four elements: medical evaluation; physical disability evaluation, to include appellate review; counseling; and final disposition.

3.3. The sole standard to be used in making determinations of unfitness due to physical disability shall be unfitness to perform the duties of the member's office, grade, rank or rating because of disease or injury. In addition, retirement or separation because of physical disability requires determinations that the disability:

3.3.1. Further:

3.3.1.1. In the case of a member on active duty for more than 30 days, was incurred while the member was entitled to basic pay, or any other member of the Armed Forces, after September 23, 1996, who is on active duty but is not entitled to basic pay under 37 U.S.C. 502(b) (reference (g)) due to authorized absence to participate in an educational program, or for an emergency purpose, as determined by the Secretary concerned; or

3.3.1.2. In the case of a member on active duty for 30 days or less, is the proximate result of, or was incurred in line of duty after September 23, 1996, as a result of:

3.3.1.2.1. Performing active duty or inactive duty training;

3.3.1.2.2. Traveling directly to or from the place at which such duty is performed; or

3.3.1.2.3. After September 23, 1996, an injury illness, or disease incurred or aggravated while remaining overnight, between successive periods of inactive duty training, at or in the vicinity of the site of the inactive duty training, if the site is outside reasonable commuting distance of the member's residence.

3.3.2. Is of a permanent nature.

3.3.3. Was not the result of intentional misconduct or willful neglect and was not incurred during a period of unauthorized absence.

3.4. Each member of the Ready Reserve shall be examined as to his or her physical fitness every five years, or more often if the Secretary concerned considers it necessary, and, if not on extended active duty or full-time National Guard duty, shall execute and submit annually to the Secretary concerned a certificate of physical condition. Each member of the Standby Reserve shall, in accordance with procedures established by the Secretary, execute and submit annually a certificate of physical condition.

3.5. Any member of the Ready Reserve who is pending separation for a non-duty related impairment or condition shall be afforded the opportunity to enter the DES for a determination of fitness. If determined fit, the Secretary concerned may deem the member medically qualified for retention in the Ready Reserve in the specialty for which he or she was found fit.

3.6. Service members who have conditions that are cause for referral into the DES shall be processed in a timely manner. In no case shall timely disposition from the Service result in denial of transition and leave entitlements provided by statute.

3.7. The standards for determining unfitness because of physical disability or medical disqualification and the compensability of unfitting disabilities shall be uniform among the Services and between components within an individual Service. (See DoD Instruction 1332.38 (reference (e)).)

3.8. The assignment of disability ratings shall be based on the Veterans Administration Schedule for Rating Disabilities (VASRD) (reference (h)) as implemented by reference (e) and DoD Instruction 1332.39 (reference (f)).

3.9. Service members who are otherwise eligible for, and who have the minimum number of years of service to qualify for, military retirement under any law in effect at the time of their physical disability evaluation, and who are pending separation for unfitness because of physical disability or medical disqualification, shall be afforded the opportunity to elect disability separation or to apply for, and, if approved, be retired for length of service. Further, the same opportunity shall be afforded members recommended for placement on or separation from the Temporary Disability Retired List (TDRL).

3.10. A Service member shall be placed on the TDRL when the member meets the requirements for permanent disability retirement, except that the member's disability is not determined to be stable. A disability shall be determined to be stable when the preponderance of medical evidence indicates the severity of the condition will probably not change within the next five years so as to warrant an increase or decrease in the disability rating percentage.

3.11. The TDRL shall be managed to meet the requirements under Chapter 61 of 10 U.S.C. (reference (b)) for periodic physical examination, suspension of retired pay, and prompt removal from the TDRL.

3.12. As an exception to general policy, the Secretary concerned, upon the request of the member or upon the exercise of discretion based on the needs of the Service, may continue in a permanent limited duty status either on active duty or in the Ready Reserve a member determined unfit because of physical disability when the member's service obligation or special skill and experience justifies such continuation.

3.13. Service members referred for physical disability evaluation shall be afforded, at appropriate stages of processing, comprehensive counseling on the significance of the actions proposed and the related rights, entitlements, and benefits.

3.14. The record of proceedings for members determined unfit shall include a recommendation or determination and supporting documentation on whether the member's disability meets the requirements under:

3.14.1. 5 U.S.C. 3502, 5532, 6308, and 8332 (reference (c)) for entitlement to certain considerations or exemptions if subsequently employed under Federal Civil Service; and

3.14.2. 26 U.S.C. 104 (reference (d)) for exclusion of disability compensation from Federal gross income for purposes of taxation.

4. RESPONSIBILITIES

4.1. The Assistant Secretary of Defense for Force Management Policy, under the Under Secretary of Defense for Personnel and Readiness, shall:

4.1.1. In coordination with the Assistant Secretary of Defense for Health Affairs (ASD(HA)) and the Assistant Secretary of Defense for Reserve Affairs (ASD(RA)), develop and maintain a program of instruction for the DES.

4.1.2. Monitor changes and proposed changes to military personnel and compensation statutes and DoD policy, and other pertinent authorities, to assess their impact on physical disability evaluation, Reserve component medical disqualification, and related benefits; and issue timely guidance to the Military Services, as appropriate.

4.1.3. Coordinate with the ASD(HA) and the ASD(RA) in developing policy for referral of members into the DES.

4.1.4. Issue and maintain DoD Instruction 1332.38 (reference (e)).

4.2. The Assistant Secretary of Defense for Health Affairs, under the Under Secretary of Defense for Personnel and Readiness, shall:

4.2.1. Monitor changes to the statutes, laws, and regulations of the Department of Veterans Affairs to assess their impact on the Department of Defense's application of the VASRD (reference (h)) to Service members determined unfit because of physical disability, and issue timely guidance to the Military Services, as appropriate, upon coordination with the Assistant Secretary of Defense for Force Management Policy.

4.2.2. Develop and periodically review medical standards for referral of Service members into the DES.

4.2.3. Recommend changes to and maintain DoD Instruction 1332.39 (reference (f)).

4.2.4. Monitor the medical element of the DES and propose corrective actions as required.

4.2.5. Develop policies for the medical component of the DES, to include the establishment of minimum standards for Medical Evaluation Boards (MEBs), Reserve

component medical examinations forwarded to Physical Evaluation Boards (PEBs), and TDRL periodic reexaminations.

4.2.6. Develop and maintain a program of instruction for use by military treatment facilities on the preparation of MEBs for physical disability cases.

4.2.7. Develop a program of instruction for use by PEB adjudicators and appellate review authorities on the medical aspects of physical disability adjudication, to include the application of the VASRD (reference (h)).

4.2.8. Monitor the timeliness of the medical component of the DES.

4.2.9. Develop policy for conduct of maximum interval physical examinations and certification of physical condition for members of the Reserve components.

4.3. The Assistant Secretary of Defense for Reserve Affairs, under the Under Secretary of Defense for Personnel and Readiness, shall ensure that policies for the DES are applicable to members of the Ready Reserve and those policies for the Ready Reserve are consistent with the policies established for active component personnel.

4.4. The Secretaries of the Military Departments shall:

4.4.1. Ensure compliance with Chapter 61 of 10 U.S.C. (reference (b)), this Directive, and Instructions and guidance issued under the authority of this Directive.

4.4.2. Establish the Service-specific DES to consist of the four components designated in paragraph 3.2., above.

4.4.3. Manage the Service-specific DES to ensure physical disability evaluation is accomplished in a timely manner with uniform application of the governing laws and DoD policy.

4.4.4. Ensure that physicians who serve on MEBs are trained in the preparation of MEBs for physical disability evaluation.

4.4.5. Ensure that PEB members and applicable review authorities are trained and certified in physical disability evaluation.

4.4.6. Ensure all matters raising issues of fraud within the DES are investigated and resolved as appropriate.

4.4.7. Defer a determination of disability retirement of any officer who is being processed for, is scheduled for, or has received non-disability retirement for age or length of service until such determination is approved by the Under Secretary of Defense (Personnel and Readiness) on the recommendation of the ASD(HA) under Section 1216(b) of reference (b).

5. EFFECTIVE DATE

This Directive is effective immediately.

John P. White
Deputy Secretary of Defense

Enclosures - 1
E1. References, continued

# Department of Defense

# INSTRUCTION

**NUMBER** 1332.38
November 14, 1996
*Incorporating Change 1, July 10, 2006*

ASD(FMP)

SUBJECT: Physical Disability Evaluation

References: (a) DoD Directive 1332.18, "Separation or Retirement for Physical Disability," November 4, 1996
(b) Title 10, United States Code
(c) Sections 3502, 5532, 6303, and l8332 of title 5, United States Code
(d) Sections 206 and 502 of title 37, United States Code
(e) through (k), see enclosure 1

1. PURPOSE

This Instruction implements policy, assigns responsibilities, and prescribes procedures under References (a) and (b) for:

1.1. Retiring or separating Service members because of physical disability.

1.2. Making administrative determinations under references (c) and (d) for Service members with Service-incurred or Service aggravated conditions.

1.3. Authorizing a fitness determination for members of the Ready Reserve who are ineligible for benefits under reference (b) because the condition is unrelated to military status and duty.

2. APPLICABILITY

This Instruction applies to the Office of the Secretary of Defense (OSD), the Military Departments (including the Coast Guard when it is operating as a Military Service in the Navy), the Chairman of the Joint Chiefs of Staff, and the Combatant Commands (hereafter referred to collectively as "the DoD Components"). The term "Military Services," as used herein, refers to the Army, the Navy, the Air Force and the Marine Corps.

3. DEFINITIONS

E1. ENCLOSURE 1

REFERENCES, continued

(e) DoD Directive 6130.3, "Physical Standards for Appointment, Enlistment, Induction", May 2, 1994
(f) Section 104 of title 26, United States Code
(g) DoD Directive 1332.27, "Survivor Benefit Plan", January 4, 1974
(h) DoD Directive 1332.35, "Transition Assistance for Military Personnel," December 9, 1993
(i) DoD Instruction 1332.39, "Application of the Veterans Administration Schedule for Rating Disabilities," November 14, 1996
(j) Sections 801-940 of title 10, United States Code, "Uniform Code of Military Justice"
(k) Sections 101 and 302 of title 38, United States Code

E3. ENCLOSURE 3

PROCEDURES

TABLE OF CONTENTS


| PART 1. OPERATIONAL STANDARDS FOR THE DES | Page |
|---|---|
| E3.P1.1. Overview of the DES | 14 |
| E3.P1.2. Medical Evaluation | 14 |
| E3.P1.2.1. Purpose | 14 |
| E3.P1.2.2. Type of Evaluation | 14 |
| E3.P1.2.3. Content | 14 |
| E3.P1.2.4. Competency | 15 |
| E3.P1.2.5. TDRL Periodic Examinations1 | 15 |
| E3.P1.2.6. Physician's Guide | 15 |
| E3.P1.2.7. Nonmedical Documentation | 15 |
| E3.P1.2.8. Ready Reserve Nonduty-Related Impairments | 16 |
| E3.P1.3. Physical Disability Evaluation | 16 |
| E3.P1.3.1. Purpose | 16 |
| E3.P1.3.2. Informal PEB | 16 |
| E3.P1.3.3. Formal PEB | 16 |
| E3.P1.3.3.1. Eligibility | 16 |
| E3.P1.3.3.2. Directed Formal | 17 |
| E3.P1.3.3.3. Issues | 17 |
| E3.P1.3.3.4. Submission of Informal PEB Rebuttal | 17 |
| E3.P1.3.3.5. Hearing Rights | 17 |
| E3.P1.3.4. Record of Proceedings | 18 |
| E3.P1.3.4.1. Duty-Related Impairments | 18 |
| E3.P1.3.4.2. Nonduty-Related Conditions | 19 |
| E3.P1.3.4.3. Rationales | 19 |
| E3.P1.3.5. Quality Assurance | 19 |
| E3.P1.4. Counseling | 19 |
| E3.P1.4.1. Purpose | 19 |
| E3.P1.4.2. Topics | 19 |
| E3.P1.4.3. Ready Reserve Members | 20 |
| E3.P1.4.4. Incompetent Members | 20 |
| E3.P1.4.5. Pre-separation Counseling | 20 |
| E3.P1.5. Personnel | 20 |
| E3.P1.5.1. Purpose | 20 |
| E3.P1.5.2. Functions | 20 |
| E3.P1.6. Time Standards for Case Processing | 20 |
| E3.P1.6.1. Referral Time Frame | 20 |
| E3.P1.6.2. Medical | 21 |
| E3.P1.6.2.1. Duty Related | 21 |

(reference (i)), which would have to be recognized in order to increase the percentage of disability.

E3.P1.4.3. Ready Reserve Members. Ready Reserve members pending separation for physical disability should be counseled by the MTF Physical Evaluation Board Liaison Officer concerning their rights under the DES as established by section E3.P1.3. of Part 1 and section E3.P2.1. of Part 2.

E3.P1.4.4. Incompetent Members. When a Service member has been determined incompetent, his or her primary next of kin, or court appointed guardian shall be counseled and afforded the opportunity to assert the rights granted to the Service member, unless prohibited by law.

E3.P1.4.5. Pre-Separation Counseling. Service members on a call to active duty of more than 30 days shall not be separated or retired because of physical disability prior to completion of pre-separation counseling under reference (h). Though counseling is normally accomplished 90 days before separation, the date of separation or retirement of members determined unfit need not be extended to provide a minimum of 90 days between counseling and separation or retirement.

E3.P1.5. Personnel

E3.P1.5.1. Purpose. The personnel element of DES shall accomplish disposition of the Service member's case. Specifically, appropriate personnel authorities shall accomplish the functions listed in subsection E3.P1.5.2., below.

E3.P1.5.2. Functions. The personnel element shall:

E3.P1.5.2.1. Issue orders and instructions to implement the determination of the respective Service's final reviewing authority.

E3.P1.5.2.2. Serve as approving authority for requests by Service members determined unfit to continue on active duty or in the Ready Reserve in a permanent limited duty status.

E3.P1.5.2.3. Manage the TDRL under section E3.P6.2. of Part 6.

E3.P1.6. Time Standards for Case Processing

E3.P1.6.1. Referral Time Frame. It is not within the mission of the Military Departments to retain members on active duty or in the Ready Reserve to provide prolonged, definitive medical care when it is unlikely the member will return to full military duty. Service members shall be referred into the DES as soon as the probability that they will be unable to return to full duty is ascertained and optimal medical treatment benefits have been attained (see Enclosure 2, Page 9, Paragraph E2.1.20). All members shall be referred for evaluation within one year of the diagnosis of their medical condition if they are unable to return to military duty.

# Department of Defense
# INSTRUCTION

NUMBER 1332.39
November 14, 1996

ASD(FMP)

SUBJECT: Application of the Veterans Administration Schedule for Rating Disabilities

References: (a) DoD Directive 1332.18, "Separation or Retirement for Physical Disability", November 4, 1996
(b) Title 10, United States Code
(c) DoD Instruction 1332.38, "Physical Disability Evaluation", November 14, 1996
(d) Veterans Administration Schedule for Rating Disabilities (38 CFR, Part 4)
(e) DoD Directive 6130.3, "Physical Standards for Appointment, Enlistment, and Induction," May 2, 1994
(f) Title 37, United States Code

## 1. PURPOSE

This Instruction implements policy, assigns responsibilities, and prescribes procedures, under the authority of reference (a), for rating disabilities of Service members determined to be physically unfit and who are eligible for disability separation or retirement under reference (b).

## 2. APPLICABILITY

This Instruction applies to the Office the Secretary of Defense (OSD) and the Military Departments.

## 3. DEFINITIONS

E1.1.21.1. Office. A position of duty, trust, authority to which an individual is appointed.

E1.1.21.2. Grade. A step or degree in a graduated scale of office or military rank that is established and designated as a grade by law or regulation.

E1.1.21.3. Rank. The order of precedence among members of the Armed Forces.

E1.1.21.4. Rating. The name (such as "Boatswain's Mate") prescribed for members of an Armed Force in an occupational field.

E1.1.22. Optimum Hospital and Medical Treatment Benefits. The point of hospitalization or treatment when a member's progress appears to be stabilized; or when, following administration of essential initial medical treatment, the patient's medical prognosis for being capable of performing further duty can be determined.

E1.1.23. Performing Military Duty of 30 days or less. A term used to inclusively cover the categories of duty pertaining to 10 U.S.C. 1204 - 1206 (reference (b)) (active duty, IDT, and travel directly to and from active duty or IDT).

E1.1.24. Permanent Limited Duty. The continuation on active duty or in the Ready Reserve in a limited duty capacity of a Service member determined unfit as a result of physical disability evaluation or medical disqualification.

E1.1.25. Physical Disability. Any impairment due to disease or injury, regardless of degree, that reduces or prevents an individual's actual or presumed ability to engage in gainful employment or normal activity. The term "physical disability" includes mental disease, but not such inherent defects as behavioral disorders, adjustment disorders personality disorders, and primary mental deficiencies.

E1.1.26. Preponderance of Evidence. That evidence that tends to prove one side of a disputed fact by outweighing the evidence on the other side (that is, more than 50 percent). Preponderance does not necessarily mean a greater number of witnesses or a greater mass of evidence; rather, preponderance means a superiority of evidence on one side or the other of a disputed fact. It is a term that refers to the quality, rather than the quantity of the evidence.

E1.1.27. Presumption. An inference of the truth of a proposition or fact, reached through a process of reasoning and based on the existence of other facts.

Matters that are presumed need no proof to support them, but may be rebutted by evidence to the contrary.

E1.1.28. Presumption Period. The designated time frame that requires application of the Presumption of Fitness Rule to a member's physical disability evaluation.

E1.1.29. Proximate Result. A disability the result of, arising from, or connected with active duty, annual training, active duty for training, or inactive duty training (IDT), (etc.) to include travel to and from such duty or remaining overnight between successive periods of inactive duty training. Proximate result is a statutory criteria for entitlement to disability compensation under Chapter 61 of 10 U.S.C. (reference (b)) applicable to Reserve component members who incur or aggravate a disability while performing an ordered period of military duty of 30 days or less.

E1.1.30. Ready Reserve. Units and individual reservists liable for active duty as outlined in Sections 12301 (Full Mobilization) and 12302 (Partial Mobilization) of reference (b). This includes members of units, members of the Active Guard Reserve Program, Individual Mobilization Augmentees, Individual Ready Reserve, and the Inactive National Guard.

E1.1.31. Retention Standards. Physical standards or guidelines which establish those medical conditions or physical defects that may render a Service member unfit for further Military Service and are therefore cause for referral of the member into the DES.

E1.1.32. Service Aggravation. The permanent worsening of a pre-Service medical condition over and above the natural progression of the condition caused by trauma or the nature of Military Service.

**Headquarters**
**Department of the Army**
**Washington, DC**
**13 October 2006**

***Army Regulation 40–400**

**Effective 13 November 2006**

## Medical Services

# Patient Administration

By Order of the Secretary of the Army:

PETER J. SCHOOMAKER
*General, United States Army*
*Chief of Staff*

Official:

JOYCE E. MORROW
*Administrative Assistant to the Secretary of the Army*

**History.** This publication is a rapid action revision. The portions affected by this rapid action revision are listed in the summary of change.

**Summary.** This consolidated regulation prescribes policies and mandated tasks governing the management and administration of patients. It includes DOD and statutory policies regarding medical care entitlements and managed care practices. It also implements North Atlantic Treaty Organization and American, British, Canadian, and Australian approved standardization agreements.

**Applicability.** This regulation applies to the Active Army and Reserve Components. It also applies to medical department activities, medical centers, dental activities, and organizations for which the Army Medical Department is the executive agent. This publication is applicable during mobilization.

**Proponent and exception authority.** The proponent of this regulation is the Surgeon General. The proponent has the authority to approve exceptions or waivers to this regulation that are consistent with controlling law and regulations. The proponent may delegate this approval authority, in writing, to a division chief within the proponent agency or a direct reporting unit or field operating agency of the proponent agency in the grade of colonel or the civilian equivalent. Activities may request a waiver to this regulation by providing justification that includes a full analysis of the expected benefits and must include formal review by the activity's senior legal officer. All waiver requests will be endorsed by the commander or senior leader of the requesting activity and forwarded through their higher headquarters to the policy proponent. Refer to AR 25-30 for specific guidance.

**Army management control process.** This regulation contains management control provisions and identifies key management controls that must be evaluated.

**Supplementation.** Supplementation of this regulation and establishment of command and local forms are prohibited without prior approval from Headquarters, Department of the Army (OTSG) (DASG-HSZ), 5109 Leesburg Pike, Falls Church, VA 22041-3258.

**Suggested improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to OTSG (DASG-HSZ), 5109 Leesburg Pike, Falls Church, VA 22041-3258.

**Distribution.** This publication is available in electronic media only and is intended for command levels B, C, D and E for the Active Army, C, D, and E for the Army National Guard of the United States, and B, C, D, and E for the U.S. Army Reserve.

**Contents** (Listed by paragraph and page number)

**Chapter 1**
**Introduction,** *page 1*
Purpose • 1–1, *page 1*
References • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*
Responsibilities • 1–4, *page 1*

**Chapter 2**
**Patient Policies,** *page 1*
Eligibility verification • 2–1, *page 1*
Identification procedures • 2–2, *page 1*
Priorities • 2–3, *page 1*

*This regulation supersedes AR 40–400 dated 12 March 2001.



UNCLASSIFIED

# Chapter 1
# Introduction

## 1–1. Purpose
This regulation assigns responsibilities and provides guidance on patient administration in Army regional medical commands (RMCs) and military treatment facilities (MTFs).

## 1–2. References
Required and related publications and prescribed and referenced forms are listed in appendix A.

## 1–3. Explanation of abbreviations and terms
Abbreviations and special terms used in this regulation are explained in the glossary.

## 1–4. Responsibilities
*a.* The Surgeon General (TSG) develops policies governing the provision of patient administrative services for U.S. Army MTFs worldwide.

*b.* Major overseas commanders and commanders of U.S. Army Medical Commands are responsible for the administration of patients receiving care in MTFs under their jurisdiction.

*c.* RMC and MTF commanders are responsible for the administration of patients receiving care under their jurisdiction.

*d.* Patient administrators provide guidance on policies, procedures, and practices prescribed in this regulation.

# Chapter 2
# Patient Policies

## 2–1. Eligibility verification
The Military Installation Identification Card Issuance Activity establishes an individual's eligibility for medical care. The commander of an Army MTF will confirm the patient's identity and verify entitlement through the Defense Enrollment Eligibility Reporting System (DEERS) or identification (ID) card verification. Eligibility issues will be referred to the patient administrator.

## 2–2. Identification procedures
*a.* All persons, including Soldiers in uniform, must show satisfactory evidence of their beneficiary status. A valid ID card and enrollment in DEERS will establish beneficiary status. Children under age 10 must be enrolled in DEERS, but are not routinely issued an ID card. Secretary of the Army designees are issued a letter from the U.S. Army Medical Command (USAMEDCOM) or the MTF commander where designee status has been delegated, (see para 3-50) which establishes their beneficiary status. They are not enrolled in DEERS and will not have an ID card. Discharged female members who require maternity care establish beneficiary status with a copy of their DD Form 214 (Certificate of Release or Discharge from Active Duty).

*b.* AR 600–8–14 describes the types of Uniformed Services ID cards.

*c.* MTF personnel will not provide routine care to patients with questionable eligibility. When proper identification is not available and no emergency exists, a statement of eligibility should be initiated by the MTF personnel and signed by the sponsor prior to delivery of care. The statement of eligibility will be forwarded to the MTF medical services accountable officer (MSAO). If proof of eligibility is not provided within 30 days, the patient will be billed as an emergency nonbeneficiary. In an emergency, medical care will be rendered before eligibility determination. Ineligible patients will be treated only during the period of the emergency. (See para 3-55.)

## 2–3. Priorities
When an MTF commander must refer care to eligible beneficiaries because of a temporary lack of access, a priority system will be used as specified in a through c below. The MTF commander must coordinate care for all beneficiaries based upon access and capabilities. Beneficiaries enrolled in the TRICARE Prime option at an MTF are provided space-required care and not space-available care in compliance with the TRICARE access standards. Beneficiaries participating in the TRICARE Standard and Extra options are provided space-available care in MTFs. The medical or dental Army MTF commander will have final authority regarding whether or not a beneficiary will be seen in the facility. A nonavailability statement for authorized nonemergency inpatient care is required for non-enrolled Civilian Health and Medical Program of the Uniformed Services (CHAMPUS) beneficiaries. The first level of appeal for decisions surrounding nonavailability statement issuance is the MTF commander, the second level appeal is the RMC commander, and the third and final level of appeal is the USAMEDCOM (MCHO-CL-M).

nonemergent specialty care. The Prime travel benefit does not apply OCONUS; the Overseas Travel benefit (JFTR U5240-C) applies. A comprehensive listing of medical travel benefits for CONUS and OCONUS is located at https://pad.amedd.army.mil.

*c.* An AD Soldier may be reimbursed for travel and per diem expenses while serving as an NMA, when recommended by a medical provider. The Soldier's commander determines if and for how long a member may perform NMA duties. NMA duties may be performed in an ordinary leave status, funded temporary duty (TDY), or permissive TDY.

*d.* TDRL retirees who are required to travel for their periodic examinations are funded by the Army Human Resources Command (HRC) and authorized under JFTR U7251. Headquarters, U.S. Army Physical Disability Agency must authorize the travel of the TDRL retiree and any required attendant.

### 2–7. Medical examinations for insurance purposes

Subject to access and available resources, examinations may be provided for those authorized persons defined in chapter 3. The examinee is entitled to a written report of the examination. Insurance companies will be charged search and copying fees when a request for a report of examination is received.

### 2–8. Maternity care for active duty members

Army Soldiers who become pregnant while on AD and who remain on AD are authorized maternity care in Uniformed Services MTFs. They are also authorized maternity care from civilian sources as described in a and b below.

*a. Physical limitations of pregnant Soldiers.* A pregnant Soldier will continue to perform duties, limited by physical profile as outlined in AR 40-501. If the member remains at her duty station, maternity care will be provided at the MTF serving the station if obstetrics and gynecology (OB/GYN) services are available and the member resides and works within 50 miles of the MTF. Active duty members (ADMs) who reside and work more than 50 miles from an MTF are required to enroll in the TRICARE Prime Remote Program (TPRP). As a general rule, pregnancy care for Soldiers enrolled in TPRP will be provided locally by a TRICARE-authorized civilian provider. Upon discharge from the hospital following delivery and when medically indicated, the member may, upon recommendation of the attending physician, be granted convalescent leave per AR 600-8-10.

*b. Maternity care while in a leave status.* A pregnant Soldier may elect to take leave and deliver in the vicinity of her leave address. When such leave is contemplated, the member will be counseled by the leave approving authority and local MTF PCM about requirements for obtaining maternity care from civilian sources. If the member's leave address is within 50 miles of an MTF that offers OB/GYN services, maternity care will be provided at the MTF.

*c. Existed prior to service (EPTS) pregnancy-RC members.* An RC member who is pregnant at the time of entry on active duty for training (ADT) for a period of 30 days or less is authorized only emergency care for that pregnancy.

### 2–9. Remediable physical defects developed in the military service

When a medical examination shows that an Army Soldier has developed a remediable defect, the patient will be offered the opportunity of surgical repair or other medical treatment if medically indicated. If the Soldier refuses surgery, other treatment, or other diagnostic procedure, which is considered necessary to enable the person to properly perform their military duties, the provisions of AR 600-20 apply. In the case of Navy or Air Force patients, the matter will be referred to the nearest headquarters of the Service concerned. Surgical intervention will not be performed to correct a preexisting condition in the case of an RC member unless there is an LD determination that the condition was incurred or aggravated in the LD.

### 2–10. Hospitalization before the effective date of separation or retirement orders

When a military patient is hospitalized before the effective date of separation or retirement orders, notification procedures in AR 600-8-24 for officers and in AR 635-200 for enlisted personnel apply.

### 2–11. Statements of prolonged hospitalization

An MTF commander is authorized to issue a statement of prolonged hospitalization for a period exceeding 90 days (JFTR, 37 USC 554). The statement will be sent to the installation transportation officer who will instruct and assist the patient in arranging for transportation of family members and household goods. This statement is not required when the member is transferred on permanent change of station (PCS) orders from OCONUS to a CONUS MTF.

### 2–12. Consent by a nonmilitary patient to medical care

*a. Legality of consent.* Legality of consent is determined by the law of the State in which the facility is located, unless preempted by Federal law, or as modified in overseas locations by Status of Forces Agreements (SOFA).

*b. Requirement for consent.* A nonmilitary person may not be furnished care in Army MTFs without his or her consent or the consent of a person authorized under applicable local law, court order, or power of attorney to consent on the patient's behalf. Except for emergencies, when a patient for some reason other than a judicial determination of mental incompetency is unable to consent, consent must be obtained from the person whom local law determines is authorized to consent on the patient's behalf. When a judicial determination of mental incompetency has been made,

*c.* Laws governing the registration of stillbirths or fetal deaths (completion of fetal death certificates) vary among the States and overseas countries. Fetal remains will be disposed of according to local law. The disposition desired by the person authorized to direct the disposition of remains will be recorded and will become a part of FN 40-400p (AR 25-400-2). Where the gestational age of the fetus, or weight, in the absence of gestational age information, meets the statutory requirement for death registration, written authorization for disposal of the fetus will be obtained from the person authorized to direct disposition of remains.

*d.* Disposition of live born infants, regardless of duration of life or gestational age, will be through a licensed funeral director (AR 638-2).

### 6–5. Autopsy authority and consent

*a.* The Installation Commanding Officer has statutory authority pursuant to 10 USC 4711, to direct an investigation including ordering an autopsy on persons (military and civilian) found dead on an installation that has exclusive jurisdiction. DOD Instruction 5154.30, Armed Forces Institute of Pathology Operations, establishes a system for conducting forensic investigations and authorizes the Armed Forces Medical Examiner at the Armed Forces Institute of Pathology to order an autopsy on an installation that has exclusive jurisdiction (AR 40-57/BUMEDINST 5360.26/AFR 169-99 and AR 600-8-1). Commanders may authorize autopsies performed on the remains of members of the military departments who die while serving on AD or ADT as described in (1) and (2) below.

(1) When considered necessary for the protection and welfare of the military community, an autopsy will be performed to determine the true cause of death or to secure information for the completion of military records.

(2) When death occurs while the member is serving as an aircrew member in a military aircraft, an autopsy is mandatory.

*b.* In circumstances not covered in a above and except as provided in (1) and (2) below, when an individual dies in an Army MTF or on a military installation, consent from the spouse or NOK must be obtained before an autopsy is performed.

(1) If applicable State laws require the performance of an autopsy, the commander may order an autopsy performed without the consent of the spouse or NOK. The record will clearly document the authority and reason why consent from spouse or NOK was not obtained.

(2) In overseas areas where local laws and regulations require an autopsy, and the United States has not been exempted from such laws or regulations by treaty or agreement, the commander will order an autopsy performed without the consent of the spouse or NOK. The record will clearly document the authority and reason why consent from spouse or NOK was not obtained.

*c.* In circumstances not covered in a above, when an individual dies outside a military installation and is DOA at an Army MTF, the authority to perform an autopsy is governed by the applicable local laws unless the local authority specifically relinquishes such right, in which case the provisions of b above apply.

*d.* Authorization or consent for the performance of an autopsy will be recorded on SF 523 (Clinical Record-Authorization for Autopsy). When appropriate, the applicable law, regulation, treaty, or international agreement will be cited as authority and recorded on the SF 523. The servicing SJA or legal advisor should be consulted when necessary (for example, when the definition for “NOK” is needed for the jurisdiction in which the facility is located).

*e.* All autopsies will be performed promptly to preclude delayed release of remains to mortuary officials. The prosector will comply with restrictions specified on SF 523 or the approving authority. Provided the prosector concurs, embalming may be performed prior to autopsy. All autopsies will be recorded on SF 503 (Clinical Record-Autopsy Protocol).

## Chapter 7
## Military Personnel Physical Disability Processing

### 7–1. General

MEBs are convened to document a Soldier’s medical status and duty limitations insofar as duty is affected by the member’s medical status. MEBs must be completed expeditiously. MEB appointments and consultations will receive priority access over all other categories of nonemergent patients. For duty related cases, MEB processing will not normally exceed 30 days (beginning on the date of the medical officer’s narrative summary through the date forwarded to the PEB). Military occupational specialty/medical retention board (MMRB) results requiring referral to an MEB should be transmitted expeditiously to the MTF commander (AR 600-60). An MEB should be initiated within 30 days upon receipt of an approved MEB referral from an MMRB. Decisions regarding unfitness for further military duty because of physical or mental disability are prerogatives of PEBs (AR 635-40). MEBs will not express conclusions or recommendations regarding such matters. However, entrance physical standards boards (EPSBDs) will make decisions as to the member’s fitness or unfitness for enlistment or induction.

### 7–2. Appointing authority

MTF commanders; Commander, TSG/Commander, USAMEDCOM; and Commander, 18th MEDCOM; are authorized to appoint MEBs.

### 7–3. Composition

MEBs will be composed of two or more physician members. One will be a senior medical officer with detailed knowledge of directives pertaining to standards of medical fitness and disposition of patients, disability separation processing, and the Veterans Affairs Schedule for Rating Disabilities (VASRD). It is further encouraged that the physician use the VA Physicians's Guide for Disability Evaluation Examinations to describe the nature and degree of severity of the member's condition. The other member(s) will be familiar with these matters. When a board is considering conditions which normally fall within the professional jurisdiction of the Dental Corps, the membership of the board will include a dentist. Likewise, a board considering a psychiatric problem will include a psychiatrist. In consideration of mental competency, the MEB will consist of at least three members, one of whom will be a psychiatrist.

### 7–4. Medical board procedures for Medical Corps officers

MEBs will not be done by the MTF to which a Medical Corps (MC) officer is assigned. MC officers may appear before a board at another MTF within their RMC provided the review authority is not in the officer's rating chain. In unusual circumstances, requests for authority to deviate from this policy may be forwarded to USAMEDCOM, ATTN: MCHO-CL-P, 2050 Worth Road, Fort Sam Houston, TX 78234-6010. A copy of the approval, if granted, will be attached to each copy of the board proceedings. An exception to this policy has been granted to MC officers assigned to Fort Sam Houston, TX as in a and b below.

*a.* MEBs will be held at Brooke Army Medical Center (BAMC) for all MC officers with duty station at Fort Sam Houston except those assigned to BAMC and USAMEDCOM.

*b.* MEB officers for MC officers assigned to USAMEDCOM will be appointed by TSG or a designated representative.

### 7–5. Use of medical evaluation boards

*a.* Only those patients that present problematical or controversial aspects and those in which MEB action is required by regulation should be referred to the MEB before disposition. Patients who will be returned to duty without any permanent revision to their physical profile and those who require transfer to another hospital before final disposition normally should not be considered by an MEB before such disposition. When patients are transferred, the losing MTF will forward all medical and administrative MEB documents to the gaining MTF having geographical responsibility.

*b.* Situations that require MEB consideration are—

(1) Those in which PEB referral is contemplated for other than TDRL periodic examinations. (See para 7-21.) It is essential that the MEB evaluate thoroughly and report all abnormalities and their impact on fitness for duty. Correlation must be established between the abnormalities and the inability to perform duties. This is particularly important when a chronic condition is the basis for referral to a PEB and there has been no change in the severity of the condition.

(2) Those involving patients with medical conditions or physical defects that are usually progressive in nature and expectations for reasonable recovery cannot be established. The MEB must ensure that adequate documentation is made of the nature, extent, and cause of all medical conditions or physical defects in question.

(3) Those involving patients whose medical fitness for return to duty is questionable, problematical, or controversial. When a member's fitness for further military duty is questionable, it becomes essential that all abnormalities in his or her condition be thoroughly evaluated. Under these conditions, evaluation will be undertaken only in an MTF that has the necessary professional staffing and equipment. Also, the MTF must have the administrative competence and experience to document the case fully and to initiate the member's processing. Otherwise, the member will be transferred to the nearest Army MTF that has the capability.

(4) Those involving RC personnel on authorized duty—

*(a)* Whose fitness for further military service upon completion of hospitalization is questionable.

*(b)* Who require hospitalization beyond the termination of their tour of duty.

(5) Those involving an RC member not on AD who require evaluation because of a condition that may render him or her unfit for further duty. If the condition is the result of injury incurred while on authorized duty for 30 days or less, the case may be referred to a PEB as provided in paragraph 7-21. RC members with a disabling condition incurred under other circumstances will be processed under provisions of AR 40-501. RC personnel with a nonduty related condition pending separation for medical disqualification are entitled to a PEB.

(6) Those involving ROTC members on a training tour (annual training camps and training encampments at military installations)—

*(a)* Who may be eligible for benefits under the OWCP because of an injury incurred or a disease contracted during their training tour (para 5-9 and AR 145-1).

*(b)* Who require hospitalization beyond the termination of their training tour.

**7–10. Documentation for referral to a physical evaluation board**

Documentation required as attachments when MEB proceedings require referral to a PEB is as follows (refer to AR 635-40 for the list of additional documentation):

*a.* A complete current medical examination (examinations less than 6 months old if no major change has taken place in the patient's medical condition). These reports will be attached as enclosures to the MEB board proceedings and will be recorded on SF 88 and SF 93.

*b.* Copies of all previous MEBs and PEBs. Medical record copies of civilian medical records, and x ray films will be retained in the HREC by the MTF until requested by the PEB. (All medical records will accompany any disability case referred to the PEB involving a general officer or MC officer.)

*c.* The HREC with a copy of entrance history and medical examination when required by the PEB. For MEBs on psychiatric diagnoses, the HRECs will include the psychiatric treatment records.

*d.* A copy of the request for VA treatment facility bed designation or a copy of orders moving the patient to a VA treatment facility for continued hospitalization, if applicable.

*e.* A copy of correspondence to State authorities for disposition of psychiatric members who are not eligible for hospitalization in a VA treatment facility, if applicable.

**7–11. Expeditious discharge**

Soldiers who are identified within the first 6 months as not meeting the medical procurement standards under AR 40-501, chapter 2, may be separated under AR 635-200. The Soldier is not referred to the PEB. Soldiers who have a condition listed in AR 40-501, chapter 3, and the condition is deemed pre-existing and nonservice aggravated may be separated under AR 635-40 without evaluation by the PEB if the Soldier requests waiver of the PEB evaluation.

*a.* Enlisted Soldiers that do not meet AR 40-501, chapter 2 standards but do meet AR 40-501, chapter 3 standards are processed as follows: DA Form 4707 (Entrance Physical Standards Board (EPSBD) Proceedings) is used for recording EPSBD proceedings. DA Form 4707 is available on the APD Web site (www.apd.army.mil/). The Soldier must be on their initial enlistment and the EPSBD condition identified within the first 180 days of enlistment. These proceedings apply only to those enlisted personnel who within the initial 180 days of AD or ADT are found to have a medical condition/physical impairment which, had it been identified, would have precluded their current induction or enlistment (AR 40-501) however, their medical condition/impairment is within retention standards (AR 40-501, chap 3). Additionally, the condition has not been permanently aggravated during any period in which the member was entitled to base pay.

*b.* Officers are evaluated under AR 40-501, chapter 3 only and must be referred to an MEB/PEB if they fail to meet retention standards.

*c.* EPSBD chapter 2 procedures include—

(1) A member will be referred for EPSBD action when there is clinical evidence, written documentation, or patient admission in conjunction with a clinical history, that the medical condition, had it been identified, would have precluded the member's induction or enlistment. This condition must be noted within the initial 180 days and recorded in an official military record (for example, medical/unit records).

(2) Soldiers who have entered AD with a medical waiver for a disqualifying condition will not be separated for that condition unless the condition for which the waiver was granted changes.

(3) All medical records applicable to the member will be reviewed. The primary purpose of this board is to document those EPTS medical conditions which would have precluded induction or enlistment but were not noted during the entrance physical examination. Additionally, this board will note any changes in the member's physical condition since his/her entitlement to base pay. Once a Soldier has been enlisted, inducted, or commissioned, the fact that the Soldier is found to have an EPTS condition does not, in itself, mean the Soldier must be separated. In each case, it is necessary to compare the nature and degree of the medical condition and the physical disability present (if any) with the requirements of the duties the Soldier reasonably may be expected to perform because of his or her MOS. In addition, all efforts should be directed to retaining the Soldier in an alternate MOS if necessary, where the medical condition would not interfere with satisfactory duty performance. Patients undergoing EPSBD action will be processed on an outpatient basis except when active inpatient treatment is required.

(4) Proceedings will be recorded on DA Form 4707.

*d.* Instructions for the preparation of DA Form 4707 include—

(1) Items 1 through 7. Obtain from personnel or medical records.

(2) Item 8. In narrative form, the evaluating physicians will provide the following information:

*(a)* General statement of health (compare the induction medical examination with the member's current condition noting all changes and/or discrepancies). Attach a copy of entrance medical examination.

*(b)* Specific history of medical conditions/impairments noted as changes to and/or discrepancies in the information contained in the entrance medical examination.

*(c)* Current clinical and laboratory findings (positive and negative), as required.

*(d)* List of all diagnoses. Note paragraph and subparagraph of AR 40-501.

### 7–18. Transmittal of medical evaluation board proceedings by Service reviewing authority to Service physical evaluation boards

The reviewing authority will attach the completed board proceedings to a letter of transmittal. This letter will state the proposed service disposition and state that the member has been advised and agrees or disagrees with the proposed disposition.

### 7–19. Processing actions related to physical evaluation boards

*a.* The PEB results will be forwarded directly to the MTF where the patient is located. An informational copy will be provided to the appropriate Service reviewing authority.

*b.* Counseling on PEB findings will be the primary responsibility of the member's parent Service. However, PEBLO counseling arrangements may be established by mutual agreement between the appropriate Service reviewing authority and the MTF where the member is hospitalized when it is beneficial to do so.

*c.* TDY funding for appearances at formal PEB hearings will be the responsibility of the member's parent Service. For Army patients, this is the Soldier's unit of assignment.

### 7–20. VA Physician's Guide for Disability Evaluation Examination Worksheet and the VASRD

Medical officers who prepare MEBs for presentation will be familiar with the VA Physician's Guide for Disability Evaluation Examination Worksheetand the VASRD. Material contained in these documents is essential in the disability evaluation process.

### 7–21. Referrals

*a.* Soldiers in the following categories will be referred to a PEB:

(1) Regular and RC members with LD disabilities who fail to meet retention standards as outlined in AR 40-501, chapter 3. This includes those who apply for continuance on AD under AR 635-40. AR 635-40 contains instructions for commanders on the referral of persons to the PEB. RC members who do not meet medical retention standards for a condition incurred or aggravated while performing duty of 30 days or less or those pending separation for medical disqualification for nonduty related conditions that request a fitness determination by a PEB. (Also see National Guard regulation (NGR) 40-400 and AR 135-381.)

(2) All members on the TDRL following their periodic medical examination.

*b.* The Deputy Chief of Staff for Personnel (DCSPER), on advice of TSG, DA, may direct referral of a case to a PEB for adjudication.

### 7–22. Referral to the physical evaluation board liaison officer

Members will be referred to the PEBLO as soon as it has been determined that referral to a PEB may be recommended. Referral to the PEBLO is also proper when the member is undergoing a TDRL periodic examination and related evaluation according to AR 635-40. No members will be told that they will be discharged or retired from the Service or told the percentage of their disability until PEB results are finalized.

### 7–23. Records sent to a physical evaluation board

When a case is referred to a PEB, all pertinent records will be sent to the board by the fastest means available. AR 635-40 addresses records and other administrative requirements for PEB adjudication.

### 7–24. Preparing medical evaluation board narrative summaries

The recommended format for an MEB narrative summary is provided below.

*a. Baseline documentation.* At the beginning of the MEB, the following will be recorded:

(1) The signatory physician's specialty.

(2) The clinical department/service.

(3) The MTF and its location.

(4) Reason for doing the MEB (for example, physician-directed, command-directed).

(5) Soldier's eligibility for MEB.

(6) Military history.

*(a)* Date of entry into Service.

*(b)* Estimated termination of Service.

*(c)* Administrative actions ongoing, pending, or completed (for example, courts-martial, selective early retirement, bars, retirement or separation dates).

(7) Chief complaint stated in Soldier's own words.

(8) History of present illness. Exact details, including pertinent dates regarding injuries, how incurred, and a statement of the final LD determination, if available.

(9) Past medical history.

*(a)* Past injuries and illnesses.

*(b)* Prior disability ratings (for example, given by the VA).

*(c)* Past hospitalizations and relevant outpatient treatment, including documentation of diagnosis and therapy, pertinent dates, and location should be listed.

*(d)* Illnesses, conditions, and prodromal symptoms, existing prior to service conditions.

*b. Physical examination.* A complete physical examination must be recorded in the MEB. Selected specialty-related considerations and guidelines follow.

(1) *Cardiology.*

*(a)* Results of special studies to support and quantify the cardiac impairment should be noted (for example, treadmill and thallium stress tests, angiography, and other special studies).

*(b)* It is imperative that the Functional Therapeutic Classification of the cardiac condition be included. Either the New York or Canadian classification system may be used.

(2) *Gastroenterology.* Soldiers with fecal incontinence should have recorded findings of rectal examination (for example, digital exam, manometric studies as indicated and radiographic studies). The degree and frequency of the incontinence should be noted, as well as the incapacitation caused by the condition.

(3) *Neurosurgery.*

*(a)* In vertebral disc problems, radicular findings on physical examination should be supported by laboratory studies such as computerized axial tomography scan, MRI, or electromyography. In cases where surgery has been performed, both pre- and post-operative deep tendon reflexes should be documented.

*(b)* In head injuries, neuropsychiatric assessment should be accomplished. Results of any clinically indicated neuropsychological testing should be included.

(4) *Ophthalmology.* If retention standards are not met for reasons related to vision, visual fields must be included in the physical examination and verified by an ophthalmologist. Specialist examination should include uncorrected and corrected central visual acuity. Snellen's test or its equivalent will be used and, if indicated, measurements of the Goldman Perimeter chart will be included.

(5) *Orthopedics.*

*(a)* Range of motion measurements must be documented for injuries to the extremities. The results of the measurement should be validated and the method of measurement and validation should be stated.

*(b)* In cases involving back pain, the use of Waddell's signs should be included in assessing the severity and character of the pain. (See app A.)

(6) *Psychiatry.*

*(a)* Particular attention should be paid to documenting all prior psychiatric care. Supportive data should be obtained for verification of the patient's verbal history.

*(b)* Psychometric assessment should be carried out if such assessment will help quantify the severity of certain conditions and allow a reference point for future evaluation.

*(c)* The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Revised (or current edition) will be used for diagnostic terminology (app A). The Multiaxial System of Assessment will be used to include Axes I-V. The degree of social and industrial impairment must be determined and documented, and correlated to the Soldier's clinical manifestations for each Axis I and Axis II diagnosis. In addition, relationship of the impairment to military and civilian performance is required.

*(d)* Every effort must be made to distinguish symptoms and impairment resulting from personality disorder or maladaptive traits from impairments based on other psychiatric conditions.

(7) *Pulmonary.* When an MEB is held for restrictive or obstructive pulmonary disease, documentation will be provided of pulmonary function testing carried out when Soldier is on and off therapeutic medication. There must be three pulmonary function tests done off medication, two of which must be in agreement within the 5 percent level, and three done on medication, two of which must agree within the 5 percent level.

(8) *Urology.*

*(a)* Cases involving neurogenic bladder must have studies done that document the condition.

*(b)* All cases involving incontinence must have studies done that document the condition.

*(c)* Cases involving incontinence/neurogenic bladder should have documentation regarding severity as indicated by the number of times self-catheterization is required, the number and type of pads required in a day, or the soilage frequency.

*c. Laboratory studies.* Studies that support and quantify the diagnosis(es) should be included as should any studies that conflict with the diagnosis(es).

*d. Present condition and current functional status.* The current clinical condition of the Soldier should be noted including required medications and any non-medication treatment regiments (for example, physical therapy) in progress.

(1) The Soldier's functional status as to the ability to perform his/her required duty should be indicated.

(2) The Soldier's civilian equivalent performance should be indicated.

(3) A statement should be given regarding the prognosis for functional status after completion of treatment, if chronic treatment is not necessary.

(4) A statement should be given regarding the prognosis for functional status in cases requiring chronic treatment.

(5) The stability of the current clinical condition and functional status should be addressed.

*e. Conclusions.*

(1) An informed opinion should be stated as to the Soldier's ability to meet current retention standards.

(2) If a Soldier does not meet retention standards, the specific reasons why should be stated.

*f. Diagnosis(es).* The diagnostic terminology used by the MEB should correlate, if at all possible, with that of the VASRD. Because the PEBs are required to assess a Soldier's status based on the VASRD, a clearer understanding of that status is facilitated when the same terminology is used by the MEBs and the PEBs. All MEB diagnoses will be given an International Classification of Diseases-Ninth Revision-Clinical Modification (ICD-9-CM) code.

*g. Profile (if required by Service regulation).*

(1) The physical profile of the Soldier should agree with the severity of the medical impairment as expressed in the narrative summary.

(2) The physical profile of the SF 88 should agree with that of the physical profile form, as well as that noted in the MEB cover sheet.

**Table 7–1**
**Distribution of medical board proceedings (See notes 1 and 2)**

| Type of Disposition | Health Record Copy No. | Clinical Record Copy No. | Hospital Copy No. | Other Copy No. |
|---|---|---|---|---|
| 1. Returned to duty | 1 | 2 | 3 | |
| 2. Retained under medical jurisdiction for later evaluation | 1 | 2 | 3 | |
| 3. Referred to physical evaluation board | | 7 | 8 | 1 through 6 to PEB |
| 4. Separation not for disability: | | | | |
| a. Release from AD RC | 1 | 2 | 3 | |
| b. Discharge | 1 | 2 | 3 | |
| 5. EPTS separation not referred to PEB | 1 | 2 | 3 | 4 copy of SF 88 and SF 93 attached to Cdr U.S. Army Recruiting Command ATTN: RCCS-SURG, Fort Knox, KY 40121. (See AR 635-40.) |

Notes:

[1] See AR 635-40 for disposition of DA Form 3947 when a disabled individual is continued on AD.

[2] See AR 40-501 for instructions on the use of DA Form 3349 to notify unit commanders of physical profile and assignment limitations on members returned to duty.

# Chapter 8
# Medical Hold Unit

*Note.* The term "medical hold unit," as used in this chapter, includes both companies and detachments.

## 8–1. General

Each Defense-Health-Program-funded MTF having inpatient capabilities will maintain a medical hold unit (MHU) company/detachment. All Soldiers (inpatient/outpatient) arriving at an MTF from contingency operations will be required to report to the MTF MHU for in-processing, accountability, and administrative control. Soldiers who will remain at an MTF away from their parent unit installation in excess of 30 days will be assigned or attached to the MHU in accordance with this regulation. Soldiers traveling to Army MTFs for routine follow-up care in a temporary duty status (TDY) will also be required to report to the MTF MHU. MHUs will be under the command and control of the MTF commander/troop commander/personnel officer. Assignment or attachment to the MHU will not be performed

**Section 1074. Medical and dental care for members and certain former members**

(a)(1) Under joint regulations to be prescribed by the administering Secretaries, a member of a uniformed service described in paragraph (2) is entitled to medical and dental care in any facility of any uniformed service.

(2) Members of the uniformed services referred to in paragraph (1) are as follows:

(A) A member of a uniformed service on active duty.

(B) A member of a reserve component of a uniformed service who has been commissioned as an officer if -

(i) the member has requested orders to active duty for the member's initial period of active duty following the commissioning of the member as an officer;

(ii) the request for orders has been approved;

(iii) the orders are to be issued but have not been issued; and

(iv) the member does not have health care insurance and is not covered by any other health benefits plan.

(b) Under joint regulations to be prescribed by the administering Secretaries, a member or former member of a uniformed service who is entitled to retired or retainer pay, or equivalent pay may, upon

request, be given medical and dental care in any facility of any uniformed service, subject to the availability of space and facilities and the capabilities of the medical and dental staff. The administering Secretaries may, with the agreement of the Secretary of Veterans Affairs, provide care to persons covered by this subsection in facilities operated by the Secretary of Veterans Affairs and determined by him to be available for this purpose on a reimbursable basis at rates approved by the President.

(c)(1) Funds appropriated to a military department, the Department of Homeland Security (with respect to the Coast Guard when it is not operating as a service in the Navy), or the Department of Health and Human Services (with respect to the National Oceanic and Atmospheric Administration and the Public Health Service) may be used to provide medical and dental care to persons entitled to such care by law or regulations, including the provision of such care (other than elective private treatment) in private facilities for members of the uniformed services. If a private facility or health care provider providing care under this subsection is a health care provider under the Civilian Health and Medical Program of the Uniformed Services, the Secretary of Defense, after consultation with the other administering Secretaries, may by regulation require the private facility or health care provider to provide such care in accordance with the same payment rules (subject to any modifications considered appropriate by the Secretary) as apply under that program.

(2)(A) Subject to such exceptions as the Secretary of Defense considers necessary, coverage for medical care for members of the uniformed services under this subsection, and standards with respect to timely access to such care, shall be comparable to coverage for medical care and standards for timely access to such care under the managed care option of the TRICARE program known as TRICARE Prime.

(B) The Secretary of Defense shall enter into arrangements with contractors under the TRICARE program or with other appropriate contractors for the timely and efficient processing of claims under this subsection.

(C) The Secretary of Defense shall consult with the other administering Secretaries in the administration of this paragraph.

(3)(A) A member of the uniformed services described in subparagraph (B) may not be required to receive routine primary medical care at a military medical treatment facility.

(B) A member referred to in subparagraph (A) is a member of the uniformed services on active duty who is entitled to medical care under this subsection and who -

(i) receives a duty assignment described in subparagraph (C); and

(ii) pursuant to the assignment of such duty, resides at a location that is more than 50 miles, or approximately one hour of driving time, from the nearest military medical treatment facility adequate to provide the needed care.

(C) A duty assignment referred to in subparagraph (B) means any of the following:

(i) Permanent duty as a recruiter.

(ii) Permanent duty at an educational institution to instruct, administer a program of instruction, or provide administrative services in support of a program of instruction for the Reserve Officers' Training Corps.

(iii) Permanent duty as a full-time adviser to a unit of a reserve component.

(iv) Any other permanent duty designated by the Secretary concerned for purposes of this paragraph.

(d)(1) For the purposes of this chapter, a member of a reserve component of the armed forces who is issued a delayed-effective-date active-duty order, or is covered by such an order, shall be treated as being on active duty for a period of more than 30 days beginning on the later of the date that is -

(A) the date of the issuance of such order; or

(B) 90 days before the date on which the period of active duty is to commence under such order for that member.

(2) In this subsection, the term "delayed-effective-date active-duty order" means an order to active duty for a period of more than 30 days in support of a contingency operation under a provision of law referred to in section 101(a)(13)(B) of this title that provides for active-duty service to begin under such order on a date after the date of the issuance of the order.

(3) This subsection shall cease to be effective on December 31, 2004.

**Section 1201. Regulars and members on active duty for more than 30 days: retirement**

(a) Retirement. - Upon a determination by the Secretary concerned that a member described in subsection (c) is unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability incurred while entitled to basic pay or while absent as described in subsection (c)(3), the Secretary may retire the member, with retired pay computed under section 1401 of this title, if the Secretary also makes the determinations with respect to the member and that disability specified in subsection (b).

(b) Required Determinations of Disability. - Determinations referred to in subsection (a) are determinations by the Secretary that -

(1) based upon accepted medical principles, the disability is of a permanent nature and stable;

(2) the disability is not the result of the member's intentional misconduct or willful neglect, and was not incurred during a period of unauthorized absence; and

(3) either -

(A) the member has at least 20 years of service computed under section 1208 of this title; or

(B) the disability is at least 30 percent under the standard schedule of rating disabilities in use by the Department of

Veterans Affairs at the time of the determination; and either -

(i) the member has at least eight years of service computed under section 1208 of this title;

(ii) the disability is the proximate result of performing active duty;

(iii) the disability was incurred in line of duty in time of war or national emergency; or

(iv) the disability was incurred in line of duty after September 14, 1978.

(c) Eligible Members. - This section and sections 1202 and 1203 of this title apply to the following members:

(1) A member of a regular component of the armed forces entitled to basic pay.

(2) Any other member of the armed forces entitled to basic pay who has been called or ordered to active duty (other than for training under section 10148(a) of this title) for a period of more than 30 days.

(3) Any other member of the armed forces who is on active duty but is not entitled to basic pay by reason of section 502(b) of title 37 due to authorized absence (A) to participate in an educational program, or (B) for an emergency purpose, as determined by the Secretary concerned.

## Section 1202. Regulars and members on active duty for more than 30 days: temporary disability retired list

Upon a determination by the Secretary concerned that a member described in section 1201(c) of this title would be qualified for retirement under section 1201 of this title but for the fact that his disability is not determined to be of a permanent nature and stable, the Secretary shall, if he also determines that accepted medical principles indicate that the disability may be of a permanent nature, place the member's name on the temporary disability retired list, with retired pay computed under section 1401 of this title.

**Section 1203. Regulars and members on active duty for more than 30 days: separation**

(a) Separation. - Upon a determination by the Secretary concerned that a member described in section 1201(c) of this title is unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability incurred while entitled to basic pay or while absent as described in section 1201(c)(3) of this title, the member may be separated from the member's armed force, with severance pay computed under section 1212 of this title, if the Secretary also makes the determinations with respect to the member and that disability specified in subsection (b).

(b) Required Determinations of Disability. - Determinations referred to in subsection (a) are determinations by the Secretary that -

(1) the member has less than 20 years of service computed under section 1208 of this title;

(2) the disability is not the result of the member's intentional misconduct or willful neglect, and was not incurred during a period of unauthorized absence;

(3) based upon accepted medical principles, the disability is or may be of a permanent nature; and

(4) either -

(A) the disability is less than 30 percent under the standard

schedule of rating disabilities in use by the Department of Veterans Affairs at the time of the determination, and the disability was (i) the proximate result of performing active duty, (ii) incurred in line of duty in time of war or national emergency, or (iii) incurred in line of duty after September 14, 1978;

(B) the disability is less than 30 percent under the standard schedule of rating disabilities in use by the Department of Veterans Affairs at the time of the determination, and the member has at least eight years of service computed under section 1208 of this title, or

(C) the disability is at least 30 percent under the standard schedule of rating disabilities in use by the Department of Veterans Affairs at the time of the determination, the disability was neither (i) the proximate result of performing active duty, (ii) incurred in line of duty in time of war or national emergency, nor (iii) incurred in line of duty after September 14, 1978, and the member has less than eight years of service computed under section 1208 of this title on the date when he would otherwise be retired under section 1201 of this title or placed on the temporary disability retired list under section 1202 of this title.

However, if the member is eligible for transfer to the inactive status list under section 1209 of this title, and so elects, he shall be transferred to that list instead of being separated.

## Section 1214. Right to full and fair hearing

No member of the armed forces may be retired or separated for physical disability without a full and fair hearing if he demands it.

Case 1:07-cv-00166-GGM Document 11-10 Filed 08/14/2007 Page 99 of 99

**Section 10209. Regular and reserve components: discrimination prohibited**

Laws applying to both Regulars and Reserves shall be administered without discrimination -

(1) among Regulars;

(2) among Reserves; and

(3) between Regulars and Reserves.