IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PAUL E. DOLAN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action |
| v. | ) | |
| | ) | No. 07-166C |
| | ) | (C.O.C.Miller) |
| | ) | |
| THE UNITED STATES | ) | |
| | ) | |
| Defendant, | ) | |

PROPOSED FINDINGS OF UNCONTROVERTED FACT

Plaintiff under RCFC 56(h)(1), Rules for the U.S. Court of Federal Claims, in support of his motion for summary judgment, submits his proposed findings of material facts as to which he believes there is no genuine dispute. Each fact cites to documentary evidence contained in either his Exhibits A-F [Pl.Ex], Appendix, Vols.1-5 [Pl.Appx.Vol.V], or complaint. [Compl].

1. Dolan enlisted in the Army in 1975. Pl.Ex.E 38. In 1975 while in Basic Training, he injured both his knees in an accident during a training exercise. While in a "slide-for-life" exercise he fell over a hundred feet onto a riverbank, knocking him unconscious. Pl.Ex.C 25C (medical entry);[1] and see Pl.Ex.F 54 (Dolan Declaration ¶ 2).

2. Dolan served four years on active duty, then transferred into the Army Reserve. In May 1981, he was commissioned a second lieutenant. Pl.Ex. E 38 ¶ 2. In 1988 while still a reservist, he entered full-time active duty in the Army's Active Guard/Reserve program [AGR]. Id 39 ¶ 3.

3. In 1994 Major Dolan had surgery for perirectal abscess. However, his underlying condition was not treated properly and so he "had the onset of acute severe low back pain in approximately 1994." PL.Ex.C 21 (Army Medical Evaluation Board Addendum, 26 March 2001, LTC Schaefer, MD, Orthopedics). The Army determined that the 1994 perirectal abscess had been a "secondary condition symptomatic of degenerative disc disease at the lower lumbar spine region

[1] SF Form 93, Report of Medical History ("fall form slide....287 feet onto knees causing trauma injury.").

L4-5." A physical therapy training program was "without significant success." His condition was aggravated by wearing of a rucksack and lifting greater than 25 pounds. Unfortunately, it was not until about six year later in 2001, that he issued the appropriate P-3 ("permanent") "physical profile" that restricted these activities and allowed an alternative physical fitness test. Id 21-22 (DA Form 3349, approved P-3, March 13, 2001).

4. From the initial traumatic injury to Dolan's knees in 1975, their condition began to deteriorate by the mid-1990s. The injury was aggravated by sitting at repeated desk jobs for long periods causing the knees to lock-up and swell. He then started reporting the knee pain at every Army annual physical exam since, and began physical therapy. Pl.Ex.F 54 ¶ 2.

5. In August 1998, Dolan was ordered to report to a new assignment with the 9th Regional Support Command in Honolulu, Hawaii. Pl.Ex.E 39 ¶ 5.

6. Major Dolan requested 30 days leave, which is normally granted as a privilege accompanying a permanent change of duty station (PCS). He was informed the leave was granted. He then departed to care for his terminally ill father. Unknown to Major Dolan, his leave request for 30 days was later "whited out" by the unit clerk to show he had only requested 5 days. A dispute arose whether Dolan was notified that his leave was cut short and to report early to his new duty at the 9th RSC. Compl. ¶¶ 4-5.

**Non-judicial punishment and elimination proceedings; medical issues**

7. On February 4, 1999, Major's Dolan's commander at the 9th RSC, Brigadier General Gandy, made a preliminary inquiry into whether various offenses had been committed: absence without leave; and disobeying an order. Pl.Ex.A 2-3 ("offense report" of investigating officer). This investigation was a "Preliminary Inquiry Into Reported Offenses" under a R.C.M. 303, Rules for Courts-Martial. Pl.AppxVol.I 6.[2] This particular investigation was administrative in nature under Army Regulation 15-6, and not a formal Article 32 investigation after court-martial charges

[2] **"Discussion**. The preliminary inquiry is usually informal. It may be an examination of charges or an investigative report."

have been brought.[3] Nor was it a criminal investigation as felonies within the authority of the Criminal Investigation Division (CID).[4]

8. After no real improvement in Major Dolan's knees, in early 1999 an orthopedic physician, LTC Schaefer, told Dolan that he needed knee replacement surgery to resolve the chronic pain. As part of the regimen, he first referred Dolan for more intensive therapy to "strengthen my knees" as a requirement before surgery. Dolan was told to come back for status appointments with Dr. Schaefer every 60-90 days. Pl.Ex.F 54 ¶ 3. See Pl.Appx.Vol.III 103A (A.Reg. 40-400 ¶ 2-9, "Remedial physical defects developed in military service" (when a medical exam shows a soldier has a remedial defect, the patient will be offered the opportunity of surgical repair or other treatment).

9. After this informal investigation, BG Gandy recommended imposing administrative discipline under Article 15, 10 U.S.C. ¶ 815 (non-judicial punishment). Pl.Ex.A 2.

10. In March 1999, the offense report was referred to the superior officer Major General Hill. He agreed with administrative disposition of the offenses. MG Hill ended the investigation by deciding to dispose of the allegations without charges by imposing Article 15 proceedings.

A. By regulation, disposition of alleged offenses is encouraged at the lowest level through administrative measures. Pl.Appx.Vol.I 7-8 (R.C.M. 306, Initial Disposition §§ (b) (*policy*), (c)(3)(*non-judicial punishment*).

B. Proceedings under Article 15 are "disciplinary punishment for minor offenses without the intervention of court-martial." 10 U.S.C. § 815(b). The proceedings do not involve "charges" but allegations of misconduct under a "statement of each offense." Pl.Appx. Vol.I 8A-8B.[5] Punishment is limited to pay forfeitures, restriction, reduction in rank (enlisted only).

---

[3] AR 15-6, "Procedures for Investigating Officers and Boards of Officers," (1996). 10 U.S.C. § 832 (investigation after charges preferred).

[4] Pl.Appx.Vol.I 15 (¶ 1-5), 17 (¶3-3a), 19 (Appx B). Dolan's alleged offenses under UCMJ Articles 86, 90, and 107, are not within the criminal investigative responsibility of the CID.

[5] DA Form 2627 *Record of Proceedings Under Article 15, UCMJ*). See note 1.

Punishment could not include administrative or punitive discharge. 10 U.S.C. § 815.

11. On March 17, 1999, Major Dolan received non-judicial punishment for absence without leave, and disobeying an order to timely report to the 9th RSC. These offenses arose from the dispute over his 30-day PCS leave request. After pleading not guilty, the commander MG Hill after hearing the evidence, determined Major Dolan had committed the offenses. Dolan was issued a Letter of Reprimand, and pay forfeitures for two months. The pay forfeitures were suspended for six months. Dolan's appeal was denied, and proceedings were completed May 25, 1999. Pl.Ex.E 39-41 (¶¶ 8, 11, 12, 16)

12. In the Fall of 1999, Major Dolan was treated for chronic and severe gastroesophageal reflux disease. To avoid the potential for stomach cancer by stabilizing symptoms, stomach surgery was recommended to avoid developing esophageal cancer. Pl.Ex.A 5.

13. On September 20, 1999, MG Hill, initiated discharge processing by referring Major Dolan for elimination before a Board of Inquiry (BOI) in a "show-cause" proceeding. Pl.Ex.A 6 ("you are required to show cause for retention on active duty"). The action relied on the Article 15 punishment, and a third alleged offense. Id. Elimination means to involuntarily discharge an officer from the military. See generally A.Reg 600-8-24, ¶¶ 4-1, 4-6; Pl.Appx. Vol.II 27, 29.

14. The Elimination notice stated that if eliminated, the least favorable discharge characterization Dolan could receive was an administrative discharge Under Other Than Honorable Conditions [UOTHC]. Pl.Ex.A 6-7 ¶ 5.[6] The Elimination proceeding could not result in a punitive discharge of Dismissal which is limited to sentence by court-martial. Pl.Appx.Vol.II 23-24 ¶ 1-21f.

15. The Elimination notice further stated that in lieu of demanding a BOI proceeding, Dolan could immediately do the following: resign, request discharge, or retire if eligible. With respect to retirement, if a soldier has at least 19 years 6 months of accrued active duty, the soldier would be allowed to extend until no later than 60 days after reaching 20 years. Pl.Ex.A 7. These options available even after a BOI proceeding, up until final action by the Secretary.

[6] The highest service characterization upon discharge is Honorable, followed by General (Under Honorable Conditions), followed the lowest Under Other than Honorable Conditions.

Pl.Appx.Vol.III 30 (¶ 4-11i), 35 (¶ 6-17d).

16. Dolan was not informed that he was eligible for early retirement under a statutory program called “Temporary Early Retirement Authority” [TERA]. This allows soldiers with over 15 years service but less than 20 to retire early during the post-Cold War personnel draw-down, expiring in 2002. Compl. ¶ 13. The TERA also allowed soldiers found physically unfit with less than a 30% minimum rating to qualify for disability retirement, could still be medically retired. This avoided the simple severance pay of those unfit at 20% or below. Public Law 102-484 (National Defense Authorization Act for FY 1993) § 4403, extended to September 30, 2001). Army budgetary documents show that the TERA program was still available for AGR personnel until early 2002. Pl.Appx.Vol.I 1, 4.

**Categorical distinction between elimination and “officers under investigation for an offense chargeable under the UCMJ that could result in punitive discharge of dismissal.”** ¶ 1-23a, A.Reg. 600-8-24 (*Officer Transfers and Discharges*)(1995)

17. Because Major Dolan was being processed the Referral for Elimination, a “Flag” had been placed into his records to suspend all favorable personnel actions (DA Form 268). Pl.Ex.A 4, 6 (elimination notice stating flag “has been initiated”). Pl.Appx.Vol.I 9 (A.Reg.600-8-2, *Suspension of Favorable Personnel Actions (Flags)* (1987). Prohibited actions do not include disability processing. Id. 11 ¶ 1-14.

18. The DA Form 268 Flag shows it was initiated for “Elimination” and its associated reason code of “B.” Id item 10. Code B shows the Elimination was not for the reason of an “investigation” which falls within the definition of actions under Code A as “adverse actions.” Pl.Appx.Vol.I 12 (Table 3-9). The regulation further shows that investigations fall within the subset of “adverse actions” involving “charges, restraint or investigation.” Id 10 ¶1-12 (“Circumstances requiring a non-transferrable flag” (¶1-12a.(1)).[7] The current 2004 version of the Flag regulation maintains this distinction. Id 13 ¶ 1-12a(1).

[7] The paragraphs correspond to the codes in Table 3-9.

19. The Army regulation A.Reg. 600-8-24 that sets forth procedures for officer administrative separations distinguishes in several provisions between "elimination" and "investigations", the latter involving a view towards trial:

A. Under ¶ 1-12 with respect to eligibility for "voluntary separation," it must be determined that "the officer is not under investigation or charges, awaiting results of trial, *or being considered for administrative elimination* [emphasis added]"). Pl.Appx.VII 22 ¶ 1-12

B. Under ¶ 1-16, "officers pending court-martial charges or investigation with a review [sic] toward court-martial will not be separated without [Army Headquarters] approval." See Wilson v. U.S., 53 M.J. 327 (2000)(the phrase "a view toward court-martial" includes actions such as apprehension, pretrial confinement, charges initially brought by a commander or "preferred" after the Article 32 investigation). Where charges have been preferred, or the officer is under investigation "with a view toward trial by [general court-martial], a special type of resignation may be submitted— a Resignation for the Good of the Service in lieu of general court-martial (RFGOS). Pl.Appx. Vol.II 26A(¶ 3-13). There is no provision for disability evaluation except a psychiatric exam "whether the officer is (or was at the time of the misconduct) mentally incompetent." Id 26B Table 3-5, Step 4. A court-martial may proceed against the officer while the RFGOS is pending approval by the Army Secretary. Id 26B ¶ 3-13e, Table 3-5 Step 4.

C. Under ¶ 4-18, elimination actions will not be initiated for conduct that is *currently* the subject of Article 15 proceedings or court-martial charges until *after* the appeal is completed or charges dismissed, respectively. Id 31 (¶4-18d.(3)-(4))(elimination proper for conduct that "was" subject to judicial or non-judicial punishment but not conduct that "is" subject to such proceedings);[8] See also Pl.Appx Vol.V 148 (DA Pam 27-50-136, Major Wagner "Officer Eliminations," *The Army Lawyer* 9, 12 n. 35 (1984)(concluding under predecessor A.Reg. 635-100 and identical provision, "an elimination action may be initiated on the basis of conduct which was

[8] A soldier may halt pending Article 15 proceedings by demanding court-martial, but then risks a punitive discharge.

the basis of judicial or non-judicial punishment after charges are dismissed or appellate review is completed").[9]

D. Under ¶ 1-23 (*Referral for physical disability evaluation*), an elimination action is within the category administrative separations. It is set apart categorically from "investigation for an offense chargeable under the UCMJ that could result in punitive discharge of dismissal." Pl.Appx.VolI 24 (¶ 1-23a [investigation] ¶1-23b [involuntary releases from active duty, resignation, eliminations]).

E. Under ¶ 1-23a(1), an officer under such investigation becomes eligible for disability evaluation if "the investigation ends without charges." This includes an investigation ending with disposition of the offenses not by charges but Article 15 proceedings that are final.

20. The counterpart Army regulation currently in effect for discharge of non-active duty Reserve officers amplifies the distinction between elimination and investigations of chargeable offenses. Pl.Appx.Vol.III 44-45 (*Army National Guard and Army Reserve: Separation of Officers* (1987)) ¶ 2-16 ("Recommendation for involuntary separation").[10] After Reserve commanders determine sufficient basis exists they will recommend involuntary separation except "when circumstances require Army investigative processes (AR 195-2 [Army Criminal Investigation Program])." In that event, the commander will terminate or suspend the separation action and forward the supporting documents to "request appropriate investigation." Id 44-45 ¶ 2-16c(1), (2).

21. The Army's primary disability regulations also demarcate between administrative elimination actions and investigations of chargeable offenses.

A. Under A.Reg. 635-40, its ¶ 4-14a, closely mirrors the language under ¶ 1-23a, A.Reg. 600-8-24. An officer

> who is under investigation chargeable under the UCMJ that could result in dismissal...may not be referred for, continue, disability processing unless— (1) the investigation ends without charges.

---

[9] Hereinafter "Wagner, Officer Eliminations." Author cites "A.Reg.635-100 ¶ 5-14f [sic]" instead of ¶ 5-13d. This provision appears at Pl.Appx.Vol.III 42A.

[10] The term "involuntary separation" is the same as the active duty counterpart "elimination." Both are "show cause" proceedings before a board of officers. Id ¶ 2-17.

Pl.Appx Vol.III 49. Moreover, ¶ 4-4b is read with ¶ 1-23 of A.Reg. 600-8-24, because the former amplifies the categorical distinction between chargeable investigations and elimination. It requires that officers being processed for

> elimination (administrative separation) that could result in separation [UOTHC] <u>will be processed simultaneously</u> for administrative separation and physical disability evaluation * * * Commanders exercising general court-martial authority will ensure the foregoing actions processed together are properly identified and cross referenced....and forwarded to the Commander [Personnel Command, who] will refer the entire matter including both courses of action, to the Secretary of the Army. The SA will decide the proper disposition of the case.

<u>Id</u> 49 ¶ 4-4 [emphasis added].

B. The second disability regulation repeats this rule for 'simultaneous processing' to ensure completion of both elimination and disability proceedings:

> Soldiers pending separation in accordance with provisions of the [enlisted regulation] or AR 600-8-24 authorizing separation [UOTHC] who do not meet medical retention standards will be referred to an MEB [Medical Evaluation Board].

Pl.Appx.Vol.III 78 ¶ 3-3b (A.Reg. 40-501, *Standards of Medical Fitness).*

**Physical evaluation for disability along with elimination processing**

22. The simultaneous processing rule is restated in ¶ 1-23b of the Army's primary active duty discharge regulation for officers, A.Reg. 600-8-24:

> 1-23. Referral for physical disability evaluation
>
> If a commissioned or warrant officer <u>is being processed</u> for REFRAD, separation, retirement, or has been referred <u>for elimination action</u>, when it is determined that the officer has a medical impairment that does not meet medical retention standards, the officer will be processed as set forth in paragraphs (a) through (d) below.
>
> *a.* A commissioned or warrant officer under investigation for an offense chargeable under the [UCMJ] that could result in dismissal or punitive discharge may be not be referred or continue in disability processing, unless
>
> (1) The investigation ends without charges.
>
> * * *
>
> *b.* When a commissioned or warrant officer, as applicable, <u>is being processed</u> for one of the actions listed in (1) through (6) below, <u>the officer will be processed in accordance with the provisions of this [discharge] regulation and through the MEB/PEB system</u>. If the result of thc physical disability evaluation is a finding of physical fitness, the Army Physical Disability Agency will approve the findings for the Secretary of the Army and forward the proceedings to [Commander, Personnel Command] to be processed with the other action. If

a physical disability evaluation results in a finding of physical unfitness, both actions will be forwarded to [Commander Personnel Command] to the Secretary of the Army for determination of appropriate disposition.

(1) Referral to the DAADB[11] .....
(2) Involuntary REFRAD due to civil conviction or moral turpitude.
(3) Involuntary REFRAD due to the revocation of voluntary indefinite status.
(4) Resignation for the good of the service.
(5) Referral for elimination under chapter 4.
(6) Request for separation, resignation, or retirement in lieu of elimination.

Pl.Appx. Vo.II 24 [emphasis added].

23. An officer recommended for elimination is immediately required to begin a separation physical examination. Simultaneous processing of the elimination and physical exam (and possible disability evaluation) is contemplated. Appx.Vol.II 32-33 (Table 4-1, *Processing elimination* (steps 9d, 10d, 17e)(officer undergoes exam within 5 days option is chosen; if BOI option chosen, determine whether MEB or PEB proceedings are pending or appropriate citing ¶ 4-3a; after BOR appeal of BOI denied refer to Secretary for final action; establish internal suspense controls to ensure expeditious processing of the physical exam, and cites ¶ 1-22 request retention for medical reasons); Id Vol.III 90 (A.Reg. 40-501 ¶ 8-23b (separating soldiers will receive medical exam).

24. Consistent with final processing steps in table 4-1, the separation physical exam may uncover medical impairments not meeting retention standards after BOI proceedings are completed. This may require referral to an MEB:

**A.Reg. 600-8-24:**

4-3. Medical condition

a. An officer referred or recommended for elimination...who does not meet medical retention standards will be processed through both the provisions of this [discharge] regulation and through the MEB/PEB proce4ss as described in paragraph 1-23.

* * *

d. If a physical or mental condition develops after an officer has been recommended for involuntary separation or after the Board of Inquiry proceedings are completed, the officer's commander will immediately notify [Personnel Command].[12]

---

[11] Pl.Appx Vol.II 25 ¶ 2-31 (non-BOI involuntary release from active duty for substandard duty performance of misconduct by Department of Army Active Duty Board)

[12] Pl.Appx.Vol.II 28 [emphasis added].

**A.Reg. 40-501, Chapter 3,Medical Fitness Standards for Retention and Separation:**

3-3 Disposition

* * *

b. Soldiers pending separation...who do not meet medical retention standards will be referred to an MEB....In the case of commissioned officers, the physical disability processing and administrative separation processing will be conducted in accordance with the provisions of AR 600-8-24 and AR 635-40.[13]

**A.Reg. 635-40:**

3-7, Retaining soldiers on active duty after scheduled non-disability retirement/discharge date

A soldier whose normal scheduled date of non-disability...separation occurs during the course of hospitalization or disability evaluation, may be retained until...completion of disability evaluation, if otherwise eligible for referral into the disability system.[14]

**Soldier's entitlement to medical care through date of separation**

25. By statute, soldiers are "entitled to medical and dental care" with access enforceable to timeliness standards. Pl.Appx. Vol.III 107 (10 U.S.C. § 1074(a), (c)(12)). Such members found unfit by physical disability are entitled to a fair and impartial hearing (to document medical/duty impairments). Id 114 (§ 1214). There are many benefits that flow from this entitlement:

A. These entitlements to medical care and timely access are restated in regulation. Id. Vol.II 24 (AR 600-8-24 ¶ 1-22d,e (advantages of retention); Id Vol.III 47 (AR 635-40 ¶ 1-1 (disability processing ensures rights and interests of government and soldier are protected).

B. Members are entitled to disability retirement, disability severance pay, or temporary disability status. Id 110-113 (§§ 1201, 1202, 1203).[15] Moreover, those soldier found unfit but have served over 15 but less than 20 years of active duty may request retention to reach 20-years retirement under the program Continuation On Active Duty (COAD). Id Vol.III 42 (¶ 3-10), 64-32 (Chapter 6).

---

[13] Pl.Appx. Vol.III 78 [emphasis added].

[14] Pl.Appx.Vol.III 48 [emphasis added].

[15] TDRL status is when the soldier is qualified for disability retirement except the impairment is not permanent or stable. The soldier may be retained on TDRL up to 5 years, reevaluated every 18 months. Pl.Appx. Vol.III 67 (A.REg. 635-40, chapter 7)

Even officers under a "suspended" court-martial sentence of dismissal may be referred for disability processing. Id 43 (¶ 4-2).[16]

C. The opportunity to remedy injuries through treatment or surgical repair. Pl.Appx.Vol.III 103A (¶ 2-9, "Remedial physical defects developed in military service").

D. Entitlement to be retained on active duty after a scheduled date of non-disability separation. Appx.Vol.II, 24 (A.Reg. 600-8-24 ¶ 1-22, retained if required for medical reasons of continued hospitalization or disability processing); Id Vol.III 42 (A.Reg. 635-40 (¶ 3-7, retained soldier until attained maximum hospital benefits or completed disability evaluation); Id 52 (4-16, soldier re-hospitalized while undergoing disability evaluation will be re-evaluated to decide if condition may change findings).

E. Entitlement to a "Line of Duty" decision that establishes an injury or disease was incurred or aggravated during military duties (while entitled to pay), and not malingering. This qualifies the injury for physical disability processing. Pl.Appx. Vol.III 47A (¶ 3-4).

F. The military LOD decision entitles the soldier upon separation to quickly apply for VA compensation for that injury or disease as "service-connected." 10 U.S.C. § 1218 (military members may not be separated for physical disability until making a claim for VA benefits or signed statement of their right to file VA claim); 38 U.S.C. §§ 1110, 1311 (service connected VA entitlements for disability "for injury or disease contracted in line of duty").

G. Upon referral to an MEB, soldiers' entitlement to appointment of a counselor called a Physical Evaluation Board Liaison Officer (PEBLO). Pl.Appx. Vol.III 73 (A.Reg 635-40, ¶ C-3a(1)). The counselor duties are substantial throughout the entire disability process. They include confirming the MEB "narrative summary" accurately represents the soldiers' condition, and if not, then allow the soldier a right to appeal the MEB or asking the physician to obtain an

---

[16] As previously set forth above, the exception to medical care that extends to disability processing appear in ¶ 4-1 (under investigation for UCMJ chargeable offense that could result in punitive discharge or dismissal unless investigation ends without charges, or charges dismissed). This exception certainly include investigation for the UCMJ offense of malingering, 10 U.S.C. § 915 (feigning illness or physical disability, inflicting self-injury).

addendum, and how more evidcne may be presented for consideration by the MEB. Id 74 ¶ C-6c, d; see Id Vol.III 50 ¶ 4-13 (after MEB soldier may provide addition information).

**The April 20, 2000, Board of Inquiry; continuing medical issues.**

26. In October 1999, in response to the notice of elimination, Major Dolan elected to remain on active duty and invoke his right to appear before a BOI. Pl.Ex.A 8, 8A (rebuttals by defense counsel and Dolan).

27. The BOI was delayed while Major Dolan in March 2000 had stomach surgery for gastroesophageal reflux disease. Pl.Ex.A 5.

28. The BOI convened on April, 20, 2000. Pl.Ex.A 8B. The Board found that Major Dolan had committed the Article 15 offenses, although found him not guilty of the third BOI-alleged offense. The BOI recommended a General Discharge. Pl.Ex.A 10 (defense counsel appeal of BOI to BOR); Id Ex.B 12-13 (final actions on BOI findings after BOR). Compl. ¶ 12.

29. On June 23, 2000, an MRI revealed a torn cartilage in Dolan's left shoulder (labral tear). Pl.Ex.C 19 (March 2001 MEB narrative summary). That shoulder since February 2000 had increasingly caused pain with loss of use after injury in an Army Physical Fitness Test (APFT). Id 25C (Report of Medical History, "28 Nov '00 left shoulder surgery....Feb '00 APFT caused a tear to the left shoulder).

30. Major Dolan had injured the left shoulder for two reasons: (1) overuse because pre-existing painful arthritis in his right shoulder. Pl.Ex.C 17, 19 (MEB, "mild right acromio-clavicular arthritis"); and (2) long term "impingement and compaction" aggravated by degenerative disc disease in his lower spine. Pl.Ex. F 55 ¶ 4 (fitness test; overuse); Pl. Ex. C 25C (from degenerative arthritis). It was not until March 2001 that the disc disease was properly diagnosed. At that time the attending surgeon issued a "permanent physical profile" restricting duty and physical activities, and allowing an alternate fitness test. Id 21 (Addendum to MEB, diagnosed "degenerative disc disease at L4–5 disc disease narrative summary; history). Id C22. See generally Pl.Appx. Vol.III 83-87, A.Reg. 40-501, Chapter 7 (physical profiling).

31. In June 2000 Major Dolan's torn cartilage in his left shoulder was diagnosed "superior labrum anterior-posterior tear" (SLAP). Pl.Ex.A 9 (June 27, 2000, clinical entry with another physician's hand notes "shoulder SLAP, followup 2 weeks").[17] The attending orthopedic surgeon, LTC Schaefer, MD, scheduled arthroscopic surgery to repair the labral tear for November 28th. With respect the right shoulder, surgery was scheduled earlier for September 29, 2000 ("open distal clavicle resection for treatment of symptomoatic acromio-clavicular arthritis"). The Pl.Ex.C 17 (2001 MEB, date of medical defects, 1 and 3), Id 19 (MEB, explanation).

32. Also during June 2000, medical records shows additional medical complaints for his ongoing knee pain, and referral for outpatient psychiatry. Pl.Ex.A 9 (physician's several hand notes on knees an MRI, and for psychiatry). For the latter, Dolan began civilian-approved outpatient treatment and medication trials. Pl.Ex.C 22A (Dr. Denis Mee-Lee). For the knees, Major Dolan was referred to Dr. Schaefer for the follow-up on the physical therapy whether knee replacement surgery was now appropriate. Because of the impending two shoulder surgeries he was told

> knee surgery would have to wait for the shoulder surgery and healing. He explained that I would need strong shoulders since after the knee surgery I would need crutches to walk for several months. He said the shoulder surgery healing required a six month rehab program of physical therapy. Only then would he revisit the knee pain and replacement surgery.

Pl.Ex. F 55 ¶ 5.

33. In September and November 2000, Dolan had the planned surgery on his right and left shoulders, respectively. After post-surgical recovery, on late December Dolan began a six-month physical therapy and rehabilitation program projected through at least May 2001. Interim progress checks would determine surgical success by the extent of recovery of range of motion/pain. A six month therapeutic exercise regimen for SLAP tears, unless more time is required, is an acceptable minimum rehabilitation protocol. Pl.Appx. Vol.IV 116 ("superior labral tear rehabilitation

---

[17] The labrum is the rim of soft tissue inside the shoulder's ball-and-socket cup that gives stability to the arm. In addition, bicep tendons and ligaments are attached to the labrum. http://www.orthogate.org/patient-education/shoulder/labral-tears.html

protocol", Brian J. Cole, MD, MBA, Journal of Shoulder and Elbow Surgery, 12:4 (2003).[18] See Pl.Appx. Vol.IV 110 (10 U.S.C. §§ 1201, 1202, 1203, physical disabilities determined "based upon accepted medical principles").[19]

**BOI proceedings: BCMR's multiple factual and regulatory errors.**

34. With respect to what occurred after initiation of elimination, the Army BCMR later in 2004 made multiple mistakes. To avoid confusion before the Court, this requires clarification in plaintiff's findings of facts. To further explain what occurred, the BCMR relied on obsolete regulations that were not in effect at any time during the BOI proceedings. The BCMR then confused Elimination with REFRAD actions (the latter does not involve a BOI). Then confused resignations submitted "in-lieu-of elimination," with those submitted "in-lieu-of court-martial."

A. First, the BCMR incorrectly believed that Dolan's response to the elimination was a Resignation for the Good of the Service in lieu of general court-martial (RFGOS), submitted under A.Reg. 635-120. Secondly, The BCMR mistakenly believes Dolan never appeared before a BOI, but was considered by the DAADB. Thirdly, the BCMR mistakenly believes that the DAADB was the predecessor name of the Board of Review. Pl.Ex.E 41 (¶ 17) (chain of command recommended approval of Dolan's resignation); Id 43-44 (¶¶ 32-32 (citing A.Reg.635-100 ¶ 3-58a "in effect at the time " governs release of reserve officers from active duty by the DAADB "which has been renamed the...Board of Review."); Id (citing A.Reg. 635-120 Chapter 5 that provides for "resignations for the good of the service....prior to charges preferred and prior to being recommended for elimination..."); Id 46 (¶ 4, in accordance with A.Reg. 635-100, case was considered by the BOR, recommending separation with General Discharge).

---

[18] Id 117-118 (Curriculum Vitae of Dr. Cole, Professor of Orthopedics, Anatomy & Cell Biology, Cartilage Restoration Center, Rush University Medical Center, Chicago. In 2005 he was listed in *Best Doctors of America*).

[19] See Pl.Appx.Vol.III 69 (A.Reg. 635-40)*(Medical treatment at time of voluntary or mandatory separation;* stating that many medical and surgical procedures are performed near end of soldiers' careers intended to improve health; but corrective treatment and convalescence may result in unexpected adverse effects that are disabling)

B. Both A.Reg. 635-100 and A.Reg. 635-120 were not in effect at the time. Both were discontinued in 1995 when consolidated under the new A.Reg. 600-8-24. Pl.Appx.Vol.II 21 ("*History*. This publication is a consolidation of AR 635-100 and AR 635-120"). The 1995 edition of A.Reg. 600-8-24 remains in effect with current 2006 version.

C. The DAADB has for at least 50 years been a discharge procedure distinct from Eliminations. Biddle v. United States, 186 Ct.Cl. 87, 90-91 (1968)(case of officer released in 1959 by DAADB). It remains today in A.Reg. 600-8-24. Pl.Appx. Vol.II 25 (¶ 2-31). The Board of Review is an appellate procedure to consider BOIs that recommend elimination. Pl.Appx. Vol.II 31 (¶ 4-17).[20]

D. The version of A.Reg. 600-8-24 in effect since 1995 carried forward the distinction between resignations in-lieu-of elimination, and resignations for the good of the service in-lieu-of court-martial. Pl.Appx. Vol.II 26A(¶ 3-13). The latter RFGOS is submitted "in-lieu-of" trial because court-martial charges, or an investigation with a view toward trial, remain pending without "final disposition." Id ¶ 3-13c. Pl.Appx.Vol.V (Maj Wagner, *Officer Eliminations* at 12, "The officer facing criminal action might be inclined to resign for the good of the service to avoid the stigma of a federal conviction and the potential of confinement").

E. The BCMR in 2004 did state that Dolan was notified that elimination action was initiated, citing A.Reg. 600-8-24, Chapter 4 for Eliminations. But alleges Dolan thereafter submitted a "resignation in lieu of elimination" Pl.Ex. E 41 (¶ 17), 43 (¶ 31). But the BCMR later contends this was a RFGOS in lieu of trial under A.Reg. 635-120, Chapter 5. The BCMR then says because maximum punishments at trial would include punitive discharge, Dolan was ineligible for disability processing. Id 45 (¶¶ 36-38), 44 (¶ 35), 47 (¶ 12).

35. In late September 2000, Major Dolan appealed the findings and recommendation of the BOI appeal to the Board of Review. Pl.Ex.A 10.

---

[20] Moreover, the BCMR's makes an incorrect reference to DAADB processing under "¶ 3-58a" of A.Reg. 635-100. Pl.Ex.E 43 ¶ 32. That involves warrant officers non-selected for promotion, a provision rescinded in 1993. Id Vol.III 37, 41.

**Army error in calculating Dolan's accrued active duty service**

36. The BOI appeal included a request by defense counsel for the Army (BOR or Secretary) to retain Dolan until reaching 20 years to retire. The appeal could only contend Dolan had "over 17 ½ years" of active duty. This was because in September 2000 an Army Reserve manager for AGR officer's called Dolan's unit verbally stating his service was over 17 years, with a worksheet forthcoming.

37. The AGR official later completed a worksheet and forwarded this to the unit late September 2000. It projected service through October 24, 2000, reflecting 17 years 9 months, 22 days. Pl.Ex.D 29A-30 (DA Form 1506, *Statement of Service).* This was submitted directly by the AGR administrator from "Full-Time Support Management Division" (FTSMD)) to Dolan's commander. PlAppx.Bol.V 143G (A.Reg. 37-104-4, "DA Form 1506 is used when sufficient documentation is not readily available to substantiate total creditable service").

38. The worksheet by FTSMD was incomplete and did not reflect total creditable service. Dolan never saw the worksheet, nor given the opportunity to contest the computations to adjust total service. Id 29A (sections 1 and 2 give soldier opportunity to 'concur' or 'non-concur' with the service computations, and to attach copies of supporting documentation for adjustment).

39. Calculating active duty service for regular members is straightforward process, but not for reservists such as Dolan with past service from different components. A.Reg 140-185, *Training and Retirement Point Credits* (1987)[still in effect]. Reservists throughout their part-time careers will be called to active duty for one day, weeks, short tours, or extended periods. Major Dolan was prior regular enlisted, a reservist, ROTC cadet-reservists, national guardsman, reservist again (active and inactive), then full-time AGR officer.

40. The Form 1506 worksheet lacked approximately 4 months of total active duty days served prior to 1988. Pl.Appx V 142 (A.Reg 140-185, ¶ 4-2a [one point for each day on active duty]).

41. In December 2000, Major Dolan began a laborious "points" appeal process. He requested from former units and DFAS, past active duty pay vouchers, records of attendance at

schools, and full-time active duty training. In the interim, Dolan was contending with the elimination process, two surgeries, and physical therapy. This appeal was further complicated because Dolan was no longer with a part-time reserve "TPUs" where training records are available and local fixes permitted. Dolan was an AGR officer reassigned to a Regular Army unit in Hawaii, the 25th Infantry Division.

42. To update his active duty points, Dolan finally resorted to a BCMR appeal in 2003. Pl.Ex.E 34 (DA Form 1506 computation of service "erroneous"). The BCMR ignored this request, as set forth infra.

43. Regulation permits an officer at any time prior to final Secretarial approval of the elimination action to request retirement in-lieu-of elimination. In September 2000 at the time of Dolan's BOI appeal requesting retention until retirement, he was not informed that the an early retirement program was available. This was the statutory "Temporary Early Retirement Authority" allow active duty and reserve soldiers with over 15 years service but less than 20 to retire early with full benefits. The TERA also allowed soldiers found unfit with less than a 30% rating (minimum qualifying for retirement) could retire instead of forced to take simply severance pay. Public Law 102-484 (National Defense Authorization Act FY 1993)§ 4403, extended to September 30, 2001).[21] (1990) ¶ 4-13 (over 15 years less than 20 with special skills); ¶ 4-15j (over 18 less than 20).

**Elimination approval**

44. On January 18, 2001, the Board of Review acting as appellate authority on the elimination, affirmed the BOI findings, and also recommended General Discharge. According to the Army, Dolan had less than 18 years of active duty. On February 8, 2001, the BOI and BOR recommendations were approved by the Acting Army Secretary. Pl.Ex. B 12-13. Dolan still had less than 18 years of active duty. However, it was anticipated he would have exceeded 18 years by the scheduled release date of March 14, 2001. Id 14-15 (message and orders). Pl.Ex.D 27.

---

[21] Army budgetary documents show that the TERA program was curtailed for AGR personnel and others in early 2002.

**Referral to MEB**

45. On March 8, 2001, Major Dolan's left shoulder was reexamined by Dr. Schaefer. He found the joints failed to regain the anticipated range of motion under Army medical standards. He also found arthritic pain in the right shoulder. Thirdly, he recognized the chronic but unresolved bilateral knee pain. These impairments were later diagnosed, with citation to the regulation prescribing medical fitness standards for retention, A.Reg.40-501:

(1) left shoulder stiff, post op repair of labral tear
(2) bilateral patellofemoral compression syndrome [pain in knees]
(3) mild right acromio-clavicular arthritis."[pain in right shoulder, similar symptoms to left]

Pl.Ex.C 17 (MEB); see Pl.Appx Vol.III.70 (A.Reg. 635-40, ¶ B-24 "Arthritis, degenerative, hypertropic and pain conditions", ¶ B-24f, "often a soldier will be found unfit for any variety of conditions which are essentially rated for pain"). Later, the VA awarded 40% for these three conditions effective the same time as the MEB, his March 14, 2001, discharge. Pl.Ex.E 51 (left and right shoulders for degenerative joint disease 30%, left knee for patellofemoral syndrome 10%).

46. Because three medical impairments fell below retention standards, LTC Schaefer referred Major Dolan to an MEB for further evaluation. Pl.Ex.C 19 (exam March 8, 2001, "Source of Referral: Physician-directed MEB. This MEB is directed by the treating Orthopedic physician.").

47. When a medical impairment is identified that falls below retention standards an MEB must be directed, including when ongoing treatment calls for re-evaluation. The source of referral may be the soldier's commander, hospital commander, or as here by the examining physician. Pl.Appx. Vol.III 78-79 (A.Reg. 40-501 ¶ 3-3 (soldiers "will be evaluated by an MEB," including when physician-directed); Id 52 (A.Reg.635-40, ¶ 4-16 (soldiers undergoing treatment or awaiting final disposition will be reevaluated if condition has changed).[22]

48. An MEB referral was also part of LTC Schaefer's issuance of a permanent "physical profile" for Dolan's shoulder and knee conditions. Pl.Ex.C 22 (DA Form 3349, Profile, item 4 "permanent", item 9 "MEB IN PROGRESS"). By regulation, an MEB may be directed by a

---

[22] See also Pl.Appx. Vol.III 50, 52 (A.Reg. 635-40, ¶ 4-8 (when commander believes soldier unable to perform duties for physical disability, refer for exam), 4-9 (hospital commander with medical care responsibility will exam soldier, refer to MEB if not medically qualified for duty).

physician issuing a permanent physical profile. Pl.Appx. Vol.III 84 (¶ 7-4a(1)(if the profile is permanent the profiling officer must assess if the soldier meets retention standards, and if not, "must be referred to an MEB.").

49. The MEB consisted of two physicians, LTC Schaefer, and Major (P) David Kim, MD.[23] See Pl.Appx.Vol.III 105 (*Patient Administration* ¶ 7-3 (MEBs will be composed of at least two physicians). Major(P) Kim was also the required additional "profiling officer" because Dolan was issued the serious "permanent" profiles for both Upper extremities (U-3) and Lower extremities (L-2).[24] This is defined as a "defect or impairment that requires significant restriction of use." Pl.Appx.Vol.III 85 (¶ 7-8a, permanent profile 3 or 4 requires two officers), 86 (Table 7-1).

50. The MEB preliminary conclusion was that Major Dolan "fails to meet retention criteria in accordance with AR 40-501." Pl.Ex.C 20. This is the proper regulatory statement. Pl.AppxVol.III 106C (A.Reg. 40-400 ¶ 7-24e ("An informed opinion should be stated as to the soldier's ability to meet current retention standards."). The MEB "recommendation" noted the P3 profile, stating

> Major Dolan is unfit for retention at this point under AR 40-501, paragraph 3-12b1, limited range of motion of the left shoulder.

Pl.Ex. C 20 [emphasis added]. The six-month physical therapy for the left shoulder was ongoing.

51. Because the MEB as of the March 14 discharge was not complete, Major Dolan attempted to add more information, using a Health Questionnaire form. It was completed on March 16, 2001. Pl.Ex.C 25B.

A. With respect to the left shoulder, "currently undergoing physical rehabilitation therapy to increase mobility left shoulder." Pl.Ex.C 25C; Ex.F 55 ¶ 6 (therapy incomplete).

B. With respect to the lower back pain, he add comment about "degenerative arthritis at L4-5 lower discs....chronic lower back pain" and taking pain medication. Pl.Ex.C 25A ("Robaxon-recurrent back pain); Id 25C.

C. With respect the prior referral in June 2000 for depression, he added "May 2000

---

[23] "P" begin a rank means Major Kim was on the LTC promotion selection list ("promotable").

[24] Pl.Ex. C 22 (Profile at item 2).

to present chronic stress syndrome, clinical depression, Dr. Mee-Lee, Honolulu" with medication Zoloft Id 25A, 25C. Dolan attached to his questionnaire Dr. Mee-Lee's letter concluding Dolan "will need further close treatment and monitoring, and periodic reevaluation." Pl.Ex.C 22A. VA health records later indicate the mental illness was not superficial.[25]

52. After discharge on March 26, 2001, LTC Schaefer submitted a letter titled "MEB Addendum." It added the diagnosis "degenerative disc disease at L4-5" confirmed by x-rays. With respect to pain , Dolan

> had re-anesthetic performed to try to decrease the pain, but it did not seem to work; this had been chronic off and on over the past several a years. He has taken Robaxin periodically for pain. He has been through Physical Therapy training program to include strengthening exercises and modalities.....without significant success.

Pl.Ex.C 21.

53. An MEB and PEB may evaluate pain as unfitting from the additional degenerative arthritis at L4-5. Pl.Appx. Vol.III 70 ("often a soldier will be found unfit for any variety of conditions which are essentially rated for pain"). Mental disorders may be also evaluated. Id 71 (¶ B-107 (carefully review all pertinent information from "examining physicians and other competent medical authorities before arriving at a final determination"); Id 82 (A.Reg. 40-501 ¶ 3-32 (causes for referral to MEB include mood disorders when interfere with effective military performance ).

54. Army policy is, "it is critical that MEBs are complete and reflect all of the soldier's medical problems and physical limitations." Pl.Appx Vol.III.79 ¶ 3-4. The use of the MEB is to

> (1)...evaluate thoroughly and report all abnormalities and their impact on fitness for duty....This particularly important when there is a chronic condition * * *
>
> (2) [Evaluate][ expectations for reasonable recovery....The MEB must ensure there is adequate documentation is made of the nature, extent, and cause of all medical conditions or physical defects in question * * *
>
> (3)....Patients whose medical fitness is questionable, problematical or controversial.....it evaluation will be undertaken only in a [Medical Treatment Facility] with the necessary professional staffing and equipment.

Pl.Appx. Vol.III 105 ¶ 7-5b (1)-(3).

---

[25] Upon discharge in March 2001 the VA awarded him 30% disability for "chronic depression and stress," increasing to 50% rating 2003. Pl.Ex. E 49, 51, 53. This remains in effect, with Dolan in 2005 unemployable. Id, 53A (100% permanently and totally disabled).

55. This policy to throughly evaluate and document medical problems and duty limitations rests on the "presumption of fitness." Unless otherwise determined during service, a soldier upon discharge is presumed fit (regardless of pending medical issues) because of the continued performance of military duties. Pl.Appx.Vol.III 47A (A.Reg. 635-40 ¶ 3-2b.(2). The presumption relies, in part, on the statutory mandate that disability benefits may not be awarded members unless determined they were unfit to perform military duties because of a physical disability "incurred in line of duty" while in a pay status. Id 110, 112 (10 U.S.C. §§§ 1201, 1202, 1203.)

A. Once the presumption applies, it may be overcome only if military records show (1) "the soldier was, in fact, physically unable to perform duties...with a causative relationship to the medical condition, or (2) "an acute, grave illness or injury or other significant deterioration occurred" before separation. Id. See Pl.Appx.Vol.III 102B-C (DODI 1332.39 (1996)(¶¶ E1.1.27, 28, "presumption" defined as inference of truth that needs no proof to support them; "presumption period" defined as time frame requiring application of the presumption of fitness rule).

**Time limits on the separation medical exams and disability process.**

56. Medical exams for purposes of separation "are valid for a period of 12 months from the date of examination." Pl.Appx.Vol.III 91 (A.Reg. 40-501 ¶ 8-23g). "MEBs must be completed expeditiously....MEB processing will normally not exceed 30 days." Id 104 ¶ 7-1. For members on active duty, they "shall be referred for [disability] evaluation within one year of the diagnosis of their medical condition if they are unable to return to active. Pl.Appx.Vol.III 102, DODI 1332.38 *Physical Disability Evaluation* (1996), Enclosure E3.P1.6.1.

57. Time limits on medical care are mandated by statute and Department of Defense Directive. Pl.Appx.Vol.III 108 (10 U.S.C. § 1074(c)(2)(standards for timely access to care); Id 94, DODD 1332.18 (1996),*Separation or Retirement for Physical Disability* ¶ 3.6 ("service members who have conditions that are cause for referral into the [disability evaluation system] shall be processed in a timely manner."), Id 97 ¶ 4.4.2 (service secretaries "shall manage" the service-

specific disability evaluation system "to ensure evaluation is accomplished in a timely manner....").

A. Similarly, involuntary discharges such as elimination "will be processed without delay." Pl.Appx. Vol.II 22 (A.Reg. 600-8-24 ¶ 1-10b). For elimination cases, a strict timetable is set forth under Table 4-1. Id. 31-33 (steps 3, 6, 9, 10, 12-14). This includes the simultaneous processing of separation medical exams, and referral to MEB or PEB. Id step 10c, 17d, 17e.

**Request for retention for medical reasons**

58. At Dolan's separation date of March 14, 2001, his MEB was still pending, incomplete, and not approved, nor appealed, while maximum treatment benefits had not been attained:

> A soldier whose normal scheduled date of non-disability...separation occurs during the course of hospitalization or disability evaluation, may....may be retained until [he] had attained maximum hospital benefits and completion of disability evaluation, if otherwise eligible for referral into the disability system.

Pl.Appx.Vol.III 48 (A.Reg. 635-40 ¶ 3-7)[emphasis added[26]].

59. Dolans referral to a PEB was suggested because the MEB's summary stated he was unfit. However, section 14 on the MEB Form for "Board recommendations" with four options (including PEB referral) was not yet completed, left blank along with sections 20-30. Nevertheless, the MEB's unfitting suggestion arose after determining Dolan had a medical impairment failing to meet retention standards, along with at least two other diagnosed impairments at issue with unresolved but chronic pain (right shoulder, knees). The document titled "MEB Addendum" for the degenerative disc disease, was in fact done on March 26, almost two weeks after his discharge. The shoulder impairments were still undergoing rehabilitation, knee replacement was a required remedial surgery, and mental health treatment was not evaluated. Patient-Dolan had not exercised his rights to ensure "all medical conditions and physical defects appear in the report and whether they have been adequately described," nor allowed to submit an appeal concerning failure to attained maximum treatment benefits. Pl.Appx. Bol.III 74 ¶ C-6

[26] Id Glossary defines *having attained maximum hospital benefits* as a "patient who can be expected to continue to improve over a long period of time without specific therapy or medical supervision."

(patient's rights provided by PEBLO counseling). He was not advised that having over 15 years of service, he could apply for disability Continuation On Active Duty. On March 16 after discharge and no longer entitled to a PEBLO, he submitted a health questionnaire.

60. Because the MEB was pending, a request for retention for medical reasons for 90 days was submitted on March 13, 2001, by LTC Montgomery, Chief of Patient Administration, Tripler Army Medical Center. Pl.Ex.C 23. The three MEB medical impairment were listed, and that Dolan was scheduled for a elimination discharge on March 14.

61. The request added the required patient "affidavit" and contract, that was countersigned under oath by LTC Montgomery. Therein, Dolan acknowledged the "rights and advantages" of retention for medical reasons. ON march 13, 2001, in consideration Major Dolan then agreed to retention beyond his scheduled separation date without any time limit:

> * * *
>
> I, DOLAN, PAUL, MAJ have been fully advised by the undersigned officer of the rights and advantages that may accrue to me by voluntarily remaining on active duty in the Army beyond the scheduled date of my release for the purpose of completing hospital care and/or physical disability evaluation under the provisions of Chapter 61, Title 10, USC, and have been further fully advised that if I elect to be discharged or released from active duty as scheduled, I will not, after such discharge or release from active duty, be eligible for separation or retirement for physical disability.
>
> Wherefore, in consideration of the above, I DO desire retention on active duty in the Army beyond the scheduled date of expiration of my term of service.

Pl.Ex.C 24-25. Pl.Appx. Vol.II 24 (A.Reg.600-8-24 ¶ 1-22f (officer will sign retention affidavit).

62. Some of the listed advantages of remaining on active duty include medical care and/or hospitalization, pay and allowances, and additional active service creditable for longevity and retirement. Pl.Ex.C 25, <u>and</u> Pl.Appx. Vol.II 24 ¶ 1-22d (odficer will be advised on the follwoing advantages).

63. The request was submitted through the Department of Army Surgeon General's Office, to the Commanding General of the Personnel Command, (PERSCOM). The Surgeon General's Office replied with the following memorandum

> Recommend disapproval. AR 600-8-4 [sic] para 1-23a specifically excludes officers who have been processed for dismissal from physical disability processing. Major Dolan's elimination....from the Army was approved....on 12 February 2001.

Pl.Ex.C 26 (dated March 15 2001). Because the separation was not halted, nor orders otherwise revoked, the request was presumed refused by PERSCOM.

**Procedures governing requests for medical retention**

64. In 2001, requests for retention for medical reasons are governed by A.Reg.600-8-24 (1995) at ¶ 1-22b:

> An officer <u>may</u> only be retained past his or her separation date for medical reasons when continued hospitalization and/or physical disability processing <u>is required</u>.

Pl.Appx.Vol.II 24 [emphasis added]

65. Continued treatment or disability processing becomes required for an officer facing elimination "when it is determined that the officer has a medical impairment that does not meet medical retention standards...." The provision does not require conclusions by an MEB or PEB. It is sufficient for a physician's referral *to an* MEB, whether by exam or permanent profile. Pl.Appx. Vol.III 78-79 (¶ 3-3b, soldiers pending separation "who do not meet medical retention standards will be referred to an MEB") ¶ 3-3d (physicians who identify soldiers with medical conditions that fall below retention standards should initiate an MEB); <u>Id</u> 84 ¶ 7-4a(1)(permanent profiles require physician to assess if soldier meets retention standards and referral to MEB).

66. After referral to an MEB, the "officer <u>will</u> be processed...through the MEB/PEB system...." <u>Id</u>. ¶ 1-23, and subparagraph *b*. However, the officer "may" only then continue disability processing if not otherwise under investigation with a view toward trial— unless it ends without charges, or charges dismissed. <u>Id</u> ¶ 1-23a. If the soldier remains eligible for disability processing, they must be retained under the default standard — until a medical retention decision is reached. <u>Id</u> ¶ 1-22f (under circumstances when officer unable to consent to extensions, "the officer will be retained until a retention decision is reached"); ¶ 1-23b (officer will processed through MEB/PEB system until final result).

**Army Discharge and BCMR appeal**

67. Major Dolan was discharged on March 14, 2001. His DD Form 214, *Certificate of Release or Discharge,* cites the Elimination procedure under A.Reg. 600-8-24. His service characterization is "Under Honorable Conditions (General)," and narrative reasons "Unacceptable Conduct." Pl.Ex.D 27.

68. Dolan's DD 214 contains an inaccurate calculation of total active duty service of 18 years 20 days.

A. First, the DD 214 conflicts with the FTSMD worksheet, DA Form 1506, that through October 24, 2000, was 17 years 9 months, 22 days. Id 29A-30. Even by this worksheet, Dolan by March 2001 had over 18 years and 2 months.

B. The DD 214 is wrong on its face. Item 11 shows Dolan spent 13 years 1 month in his Military Police speciality. This figure derives from Dolan's entrance into full-time AGR program as an MP, in February 1988, until discharge in March 2001 (13 years 1 month). So Item 12c ("net active service this period") of 12 years 11 months, 21 days, is incorrect.

C. In Dolan's BCMR appeal in 2003 he additionally requested correction of his active duty figures. Pl.Ex.E 34 (DA Form 1506 computation of service "erroneous"). On appeal, the Board ignored the ARPC source documents and worksheet. It read from the DD 214 as correct. Pl.E 42-43 ¶ 27.

69. With the additional 4 months of pre-1988 active duty service that Dolan still claims with pay vouchers, his final active duty figure at discharge was 18 years 6 months. This does not include additional months requested in March 2001 to continue the MEB/PEB disability process.

70. Medical retention for just disability processing would, in general, take 4 to 5 months. This would bring Dolan with nearly 19 years of service. Pl.Appx.Vol.V 155 (GAO Report, *The Military Disability System: Improved Oversight Needs To Ensure Consistent and Timely Outcomes* (March 2006)(processing times for most disability cases fails to meet 70 -day time limit for MEB/PEB processing, with the majority or 44% over 90 days, and of that 24% over 120 days).

71. These GAO Report figures do not include time for two further boards, and another layer of final decision— review of PEBs by the Army Physical Disability Agency, and appeal before the Physical Disability Appeal Board. Finally The total accrued service would then exceed the minimum 19 and 6 months to permit Dolan to have been eligible for retention to complete a 20-year retirement-in-lieu of elimination. Pl.Appx.VII 35 (A.Reg. 600-8-24 ¶ 6-17d). In simultaneous elimination-disability cases the results must be "forwarded to the Secretary of the Army for determination of appropriate disposition." ¶ 1-23b ( A.Reg. 600-8-24).

72. Shortly after discharge on March 29, 2001, Dolan filed an Army Inspector General complaint:

> Request Tripler Army Med Ctr assistance to remain on active duty until a properly conducted Medical Evaluation Board can be completed to evaluate my service connected injuries.

Pl.Ex.D 28. He explained in its narrative that Army officials violated regulations by denying his continuation to completed disability processing, and by providing erroneous total active duty . Id He added that because of the incomplete MEB, the Army had never addressed his "long term medical disabilities for hearing, shoulder, knees, back, and ongoing treatment for depression and chronic stress syndrome." Id 29. Because Dolan was discharged on March 14, the IG did not forward the complaint. Upon his return to the post the IG confiscated Dolan's military ID card and escorted him off post.

73. In May 2002, Dolan appealed his discharge to the Army BCMR. In March 2004, the Board denied his request to set aside his discharge, to reinstate him, award retirement, and re-figure his total active duty. The BCMR took the same position as the prior "recommended disapproval" by the Surgeon General's office. This was fully set forth supra paragraph 34. Briefly restated, the BCMR erroneously believed Dolan never appeared before BOI but was considered by a DAADB; that he submitted a Resignation for the Good Of The Service in-lieu-of court-martial which avoided maximum punishments of punitive discharge and confinement; and thus Dolan ineligible to continue on active duty for disability processing).

**VA disability 100% rating, effective March 14, 2001.**

74. Because the Army terminated Dolan's medical treatment for chronic medical problems, he was unable to obtain adequate insurance coverage. Nor could he obtain VA treatment until eligibility was established for service-connected injuries. He filed a claim in 2001.

75. After appeal, the VA in April 2003 awarded 100% total disability rating "effective" [retroactive] for conditions existing the date of Army discharge, March 15, 2001. Pl.Ex.E 51 (30% for left/right shoulders degenerative joint disease; 10% left knee patellofemoral syndrome; 10% degenerative disc disease L4-5; 10% for residual of post-operative perirectal abscess; 30% for chronic depression and stress, 10% for tinnitus in both ears, and service connection for 4 other conditions.[27] In 2003 the depression rating increased to 50%. Id 53. Shortly thereafter Dolan was re-examined, and in 2004 found 100% totally disabled, unemployable, and permanent. Id. 53A.

Respectfully submitted,

a/s John A. Wickham, Esq.
32975 Saint Moritz Drive
Evergreen CO 80439-6720
(303) 670-3825

[27] These were all reported prior to March 2001 discharge (medial meniscus tear right knee; scars residual or surgery; hiatal hernia; left hearing loss).